UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 00-6099-CIV-GRAHAM
Magistrate Judge: Turnoff

CAREEN DIAZ,

    Plaintiff,

v.

COLUMBIA HOSPITAL CORPORATION
OF SOUTH BROWARD,

    Defendant.
_____/

**DEFENDANT WESTSIDE'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, COLUMBIA HOSPITAL CORPORATION OF SOUTH BROWARD, d/b/a WESTSIDE REGIONAL MEDICAL CENTER ("Westside" or "Hospital"), in accordance with Local Rule 7.5 hereby submits this its Statement of Undisputed Facts in support of it's Motion for Summary Judgment as to all claims.

**I.    FACTS NOT IN DISPUTE**

1. Plaintiff started working for Westside on a part time basis as a Patient Care Assistant (PCA) on or about January 1997.[1]

2. A PCA works under the direction of a nurse and assists in providing nursing care to a designated group of patients.[2]

3. A PCA is limited to mostly non-invasive procedures such as bathing patients, taking vital signs and feeding patients.[3]

---

[1]    10/27/00 Deposition of Careen Diaz ("Deposition of Diaz"), pp. 55-56.

[2]    *Id.* at p. 64, ln. 17; and Exhibit 4, thereto.

[3]    *Id.* at p. 63.

4. While working as a Patient Care Assistant at the Hospital, the Plaintiff continued with her studies in the nursing program at Broward Community College.[4] She completed her course of studies in the nursing program sometime during the summer of 1997.[5]

5. The Plaintiff obtained her Registered Nurses license sometime in August 1997.[6]

6. Shortly after completing the nursing program, the Plaintiff enrolled in a Preceptor Program at Broward Community College.[7]

7. The Preceptor Program offered by BCC allowed for a graduate of BCC's nursing program to do an internship at any participating hospital.[8]

8. Under the program, the graduate of the nursing program would precept for the Hospital under the tutelage of an existing staff nurse for a period of seven to eight weeks, so that they could acquire the requisite nursing skills and training needed.[9]

9. Westside had been approached by Kathy Jackson, the Director of Broward Community College's Nursing Preceptor Program, sometime in 1995 or 1996 and asked if the Hospital was interested in participating in the Preceptor Program since the school was then having a hard time placing new graduates.[10]

10. The Hospital agreed to participate in the program through its Director of Education.[11]

11. The program benefited the Hospital by giving it an expense free way to evaluate whether the precepting nurse met the basic performance standards of the hospital before hiring that person as a nurse and it benefited the graduate by giving them experience they otherwise lacked.[12]

12. No nursing school graduate was paid for time spent precepting at the Hospital under the BCC Preceptor Program.[13]

---

[4] *Id.* at p. 56, ln. 14.

[5] *Id.* at p. 56, ln. 22.

[6] *Id.* at p. 48, ln. 7.

[7] *Id.* at p. 65, ln. 21 and p. 67, ln. 17.  4/10/01 Deposition of Eileen Ciotti ("Deposition of Ciotti"), p. 11.

[8] Affidavit of Marybeth Thompson, ¶ 4; Deposition of Ciotti, p. 11.

[9] Deposition of Diaz, p. 66, ln. 20; Affidavit of Marybeth Thompson, ¶ 4; Deposition of Ciotti, pp. 14-15.

[10] Affidavit of Marybeth Thompson, ¶ 3.

[11] Affidavit of Marybeth Thompson at ¶ 4.

[12] *Id.* Affidavit of Kimberly Jutras ¶ 3; Deposition of Ciottti, pp. 14-15.

[13] Affidavit of Marybeth Thompson, ¶ 5; Deposition of Ciotti, pp. 11-12; Affidavit of Kimberly Jutras ¶ 4, 5; 4/10/01 Deposition of Lee Chaykin ("Deposition of Chaykin"), p.48.

13. A total of approximately 15 nursing school grads went through the BCC Preceptor Program during the three-year period ending December 1998.[14]

14. The Director of Education, Marybeth Thompson met with Careen Diaz, as she did with all nursing grads, prior to her commencement of the preceptorship. During this meeting, the Plaintiff was advised of the terms of how the program worked and specifically that it was an unpaid position.[15] Eileen Ciotti; the Plaintiff's supervisor also advised her that the Preceptor Program was an unpaid internship before she commenced the same.[16]

15. Upon completion of her preceptorship, the Plaintiff was hired as a full-time staff nurse sometime in October 1997.[17]

16. In 1998, the Hospital began experiencing the effects of a severe shortage of nurses.[18] In an attempt to attract more nurses in an ever more competitive market, Westside decided to initiate its own Preceptor Program, whereby it offered recent graduates from a nursing program a paid internship and orientation.[19]

17. The program was different then the one administered through Broward Community College, and nursing grads that participated in the same were paid for their time orienting.[20]

18. In May of 1999, the Plaintiff was assigned as the staff nurse to train a recent nursing school graduate in the then current Preceptorship Program.[21]

19. While training the recent grad assigned to her, the Plaintiff learned that the student she was training and two other recent graduates were apparently being paid for time spent precepting.[22]

20. Soon thereafter, towards the end of May 1999, the Plaintiff lodged her first complaint with the Hospital asking that it explain why she was not paid for time she spent precepting in 1997.[23]

---

[14] Affidavit of Marybeth Thompson, ¶ 6.

[15] *Id.*

[16] Deposition of Ciotti, p. 14.

[17] Deposition of Diaz, p. 80-81.

[18] Affidavit of Kimberly Jutras, ¶ 4; Deposition of Ciotti, p. 12; Deposition of Chaykin, p. 47.

[19] Affidavit of Kimberly Jutras, ¶ 4; Deposition of Chaykin, pp. 48-49; Deposition of Ciotti, p.12.

[20] Affidavit of Kimberly Jutras, ¶ 4; Deposition of Chaykin, p. 47; Deposition of Ciotti, p. 12.

[21] Deposition of Diaz, p. 107, ln. 10.

[22] *Id.* at pp. 107-108.

[23] *Id.* at p. 112, ln. 9; Exhibit 7, thereto. No allegation was made at this time that any decision made by the hospital was based upon the plaintiff's race; *See* Exhibit 7 to Deposition of Diaz.

21. The Hospital responded to the Plaintiff's concerns via a number of communications and meetings at which time the Plaintiff was advised that the program and circumstances had changed and that no one who precepted under the BCC program, when she did, was compensated for time spent precepting.[24]

22. Plaintiff only subsequently maintained, when grieving a write up issued on June 29, 1999, that the failure to pay her for precepting was based upon her race, despite the fact that she has no knowledge or information to establish that any other nurse that precepted under the BCC program was paid for time precepting and despite the fact the no racially motivated statement or remark was ever made in her presence or directed at her.[25]

23. Her claim for race discrimination is predicated solely upon her belief that she was treated differently, which belief is founded upon the fact that two Caucasians who precepted years after she did in a different program were paid for time precepting.[26]

24. On June 29, 1999 the Plaintiff was written up for insubordinate and unprofessional behavior.[27]

25. The incident centered around attempts by the Hospital to, at the request of the Plaintiff, set up a meeting with the Plaintiff, the Chief Nursing Officer ("CNO"), and the Human Resources Director, to discuss Plaintiff's continued concerns about the Preceptor Program.[28]

26. The Plaintiff had contacted the secretary to the Chief Nursing Officer and advised her that she intended to bring an unidentified person to the meeting with her.[29]

27. The CNO asked the Director of Human Resources, Lynn Mathis, to contact the Plaintiff and request that she immediately identify the individual she intended on bringing.[30]

---

[24] Affidavit of Kim Jutras, ¶ 5 & 6; Deposition of Diaz, pp. 116-117. The Hospital in the later part of 1999 learned, while conducting an audit for the 2000 Budget, that one Hispanic male individual who precepted on or about the same time that plaintiff did was reimbursed for the cost of the tuition paid to BCC. Accordingly, in order to be absolutely fair, the hospital immediately offered the same reimbursement to the plaintiff. The plaintiff, however, refused to accept the same on the advice of counsel. Deposition of Chaykin, pp. 49-50 and Defendant's Exhibits 2 and 3 thereto; Deposition of Diaz, pp. 184-85.

[25] Deposition of Diaz, p. 122, ln. 10; p. 174, ln. 16; Exhibit 17 to Deposition of Diaz.

[26] Deposition of Diaz, p. 131, ln. 13; p. 159, ln. 1.

[27] Exhibit 14 to Deposition of Diaz.

[28] Affidavit of Kimberly Jutras, ¶ 6; Affidavit of Lynn Mathis, ¶ 4; Exhibits 12 & 17 to Deposition of Diaz.

[29] Deposition of Diaz, p. 140, ln. 15; Exhibit 17 thereto; Affidavit of Lynn Mathis, ¶ 4; Affidavit of Kim Jutras, ¶ 6.

[30] Affidavit of Kimberly Jutras, ¶ 6.

28. Lynn Mathis contacted the Plaintiff and asked her who she intended on bringing, but the Plaintiff did not respond to the request.[31]

29. Later, that same day, the Human Resources Director, Lynn Mathis, called the floor where Plaintiff was working and spoke with the Plaintiff.[32]

30. Ms. Mathis asked the Plaintiff who she intended on bringing to the meeting and advised the Plaintiff that Hospital policy did not permit outsiders to attend.[33]

31. The Plaintiff refused to tell Ms. Mathis who she was intending on bringing to the meeting and then hung up the phone.[34]

32. Ms. Mathis attempted to again call the Plaintiff, but the Plaintiff refused to take her call and asked her co-workers to lie on her behalf by stating that the Plaintiff had clocked out and had gone home.[35]

33. Ms. Mathis later verified that the Plaintiff was working and still clocked in when she refused to take her calls.[36]

34. The Plaintiff acknowledges that she intentionally refused to answer her superiors questions.[37]

35. The employee who was asked to lie on behalf of the Plaintiff provided the Hospital with a written statement verifying the incident.[38]

36. Based upon this incident, the Plaintiff was given a written reprimand for unprofessional behavior.[39]

---

[31] Affidavit of Kim Jutras, ¶ 6; Affidavit of Lynn Mathis ¶4; Deposition of Diaz, p. 146, 148-49, Exhibit 17 thereto.

[32] Affidavit of Kimberly Jutras, ¶6; Deposition of Diaz, p. 146, 148-49, Exhibit 17 thereto; Affidavit of Lynn Mathis, ¶ 4.

[33] Affidavit of Lynn Mathis, ¶ 4; Affidavit of Kimberly Jutras ¶ 6; Deposition of Diaz, p. 148; Exhibit 17 thereto.

[34] Affidavit of Lynn Mathis ¶4; Affidavit of Kimberly Jutras ¶6; Deposition of Diaz, p. 146, 148-149.

[35] Affidavit of Lynn Mathis ¶ 4; Affidavit of Kimberly Jutras ¶6; Deposition of Diaz, p. 147, ln. 8; Plaintiff's Exhibit 3 to Deposition of Chaykin.

[36] Affidavit of Kimberly Jutras, ¶ 6; Affidavit of Lynn Mathis, ¶ 4; Deposition of Diaz, p. 148, ln. 3; Plaintiff's Exhibit 3 to Deposition of Chaykin.

[37] Affidavit of Kimberly Jutras, ¶ 6; Affidavit of Lynn Mathis, ¶ 4; Deposition of Diaz, p. 148-149.

[38] Plaintiff's Exhibit 3 to Deposition of Chaykin.

[39] Plaintiff's Exhibit 1 to Deposition of Chaykin; Exhibit 15 to Deposition of Diaz.

37. The written reprimand was only a warning that any further inappropriate activity would lead to disciplinary action in the future.[40]

38. Ms. Diaz, filed a written grievance concerning the write up with the Hospital administration.[41]

39. The grievance raised three issues. First, Plaintiff sought clarification on the Preceptorship Program, second, Plaintiff requested that the write up of June 29, 1999 be purged and thirdly, Plaintiff asserted that she was being retaliated against for having lodged complaints.[42]

40. The Chief Operating Officer, Lee Chaykin, investigated the grievance and based upon the investigation issued a memo of his findings.[43]

41. Mr. Chaykin met with Ms. Diaz and presented her with his findings (a) that the individuals that participated in the BCC Preceptorship Program were not paid for time spent Precepting; (b) that the write up of June 29, 1999 was appropriate and would not be purged; and, (c) that he found no evidence of perceived harassment or retaliation.[44]

42. Six months later on January 28, 2000, the Plaintiff was written up for insubordinate and unprofessional behavior for an incident that occurred on the 4th floor on January 25, 2000.[45] In accordance with the Hospital's progressive discipline plan, the Plaintiff was suspended for a period of three days.[46]

43. The write-up resulted from a complaint being lodged with the Plaintiff's supervisor by Wanda Fogarty, the Hospital's Director of Radiology and a designated Patient Representative.[47]

44. The Hospital had implemented a program to insure patient satisfaction by designating various administrators as Patient Reps and assigning each Patient Rep to patients throughout the Hospital.[48]

---

[40] *Id.*

[41] *Id.*; Exhibit 16 to Deposition of Diaz.

[42] Exhibit 16 to Deposition of Diaz.

[43] Deposition of Chaykin, p. 30; Plaintiff's Exhibit 6 thereto.

[44] Deposition of Chaykin, p 32; Plaintiff's Exhibit 6 thereto.

[45] Exhibit 28 to Deposition of Diaz; Plaintiff's Exhibit 10 to Deposition of Chaykin.

[46] *Id.*; Deposition of Chaykin, p. 35, ln. 20.

[47] Exhibit 27 to Deposition of Diaz; Affidavit of Wanda Fogarty, ¶ 5; 4/10/01 Deposition of Marlene McKay ("Deposition of McKay"), p. 32.

[48] Deposition of Chaykin pp. 36-37; Affidavit of Wanda Fogarty, ¶ 2 & 3.

45.  Each Patient Rep would check in on their assigned patients and find out if their needs were being met or if they had any complaints, etc.[49]

46.  The Patient Reps were not permitted to actually provide any care to patients, but, would instead seek out the assigned care givers (i.e., nurses and/or doctors) for the patients and communicate their needs or complaints to them.[50]

47.  On the date of the incident, Ms. Fogarty had been assigned as the Patient Rep to a patient on the fourth floor.[51]

48.  The patient was an elderly lady with physical restrictions.[52]

49.  Upon visiting the patient, the patient advised Ms. Fogarty that she needed to use the rest room.[53]

50.  Ms. Fogarty first rang the call button in the patient's room and then proceeded to the nurse's station were she identified that the nurse assigned to the patient was Ms. Diaz.[54]

51.  Ms. Fogarty located Ms. Diaz and advised her that her patient needed assistance going to the rest room.[55]

52.  Ms. Diaz requested that Ms. Fogarty locate the PCA and have her assist the patient.[56]

53.  Ms. Fogarty returned to the nurse's desk and inquired as to the availability of the PCA.[57]

54.  Ms. Fogarty was advised that the PCA was not available, at which time Ms. Diaz was again paged to assist her patient.[58]

---

[49] Deposition of Chaykin, pp. 36-37; Affidavit of Wanda Fogarty, ¶ 2

[50] Deposition of Chaykin, pp. 36-37.

[51] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz.

[52] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz.

[53] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz; Plaintiff's Exhibit 12 to Deposition of Chaykin; Deposition of McKay, pp. 14-18 and 24-26.

[54] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz.; Plaintiff's Exhibit 12 to Deposition of Chaykin; Deposition of McKay, pp. 14-18 and 24-26.

[55] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz, pp. 192-193. Plaintiff's Exhibit 12 to Deposition of Chaykin; Deposition of McKay, pp. 14-18 and 24-26.

[56] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz, pp. 192-193. Plaintiff's Exhibit 12 to Deposition of Chaykin; Deposition of McKay, pp. 14-18 and 24-26.

[57] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz; Plaintiff's Exhibit 12 to Deposition of Chaykin; Deposition of McKay, pp. 14-18 and 24-26.

[58] Affidavit of Wanda Fogarty, ¶ 4; *see also* Exhibit 27 to Deposition of Diaz; Plaintiff's Exhibit 12 to Deposition of Chaykin; Deposition of McKay, pp. 14-18 and 24-26.

55. Ms. Diaz arrived in the patient room and with the assistance of Marlene McKay, assisted the patient to the rest room.[59]

56. While doing so Ms. Diaz in a loud and derogatory manner repeatedly stated in the presence of the patient "What is the purpose of these Patient Reps, if they are not going to do anything?"[60]

57. Ms. Fogarty was standing outside the patient's room speaking with a doctor and overheard the statements, which she later reported to Ms. Diaz' supervisor.[61]

58. Ms. Fogarty and the Plaintiff had no prior contact or interaction prior to the event that led to the Plaintiff's suspension.[62]

59. Neither Ms. Fogarty or Ms. McKay, the two individuals that provided statements on the incident, had any knowledge that Ms. Diaz had lodged any complaints against the Hospital at all.[63]

60. Plaintiff does not dispute that the incident occurred or that she made the derogatory statements about Ms. Fogarty that led to her being written up.[64]

61. One of the Plaintiff's fellow employees, Marlene McKay, who is also a black employee, witnessed the entire event, provided a written statement confirming the same and agrees that the Plaintiff's behavior as exhibited warranted her suspension.[65]

---

[59] Affidavit of Wanda Fogarty, ¶ 4; *see also* Deposition of Diaz, pp. 192-193 and Exhibit 27 thereto; Plaintiff's Exhibit 12 to Deposition of Chaykin; Deposition of McKay, pp. 14-18 and 24-26.

[60] Affidavit of Wanda Fogarty, ¶ 3; Deposition of Marlene McKay, pp.14-18 and 24-26; Exhibit 27 to Deposition of Diaz; Plaintiff's Exhibit 12 to Deposition of Chaykin.

[61] Affidavit of Wanda Fogarty, ¶ 3; Deposition of Marlene McKay, pp.14-18 and 24-26; Exhibit 27 to Deposition of Diaz; Plaintiff's Exhibit 12 to Deposition of Chaykin.

[62] Affidavit of Wanda Fogarty, ¶ 6; Deposition of Diaz, p. 196; Deposition of McKay, p. 26.

[63] Affidavit of Wanda Fogarty, ¶ 6; Deposition of Diaz, p. 196.

[64] Deposition of Diaz, pp. 192-94.

[65] Deposition of McKay, pp. 26-27; Plaintiff's Exhibit 12 to Deposition of Chaykin.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 23rd day of April, 2001, to Stewart Lee Karlin, Esq., 400 S.E. 8th Street, Fort Lauderdale, Florida 33316.

        CARLTON FIELDS, P.A.
        P.O. Box 150
        West Palm Beach, FL 33402-0150
        Telephone:(561) 659-7070
        Facsimile: (561) 659-7368
        Attorneys for Defendant

By: _____
        Christopher C. Copeland
        Florida Bar Number 938076

WPB#536971.02