1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA

2          CASE NO.   00-6099-CIV-GRAHAM/TURNOFF

3

4
   COREEN DIAZ,

5               Plaintiff,

6   vs.

7   COLUMBIA HOSPITAL CORPORATION

8   OF SOUTH BROWARD, AND COLUMBIA
    HOSPITAL CORPORATION OF SOUTH

9   FLORIDA,

10              Defendant.

11  ------------------------------/

12
                      Westside Regional Center
13                    8201 West Regional Center
                      Plantation, Florida
14                    April 10, 2001
                      3:25 p.m.  -  4:15 p.m.
15

16
   APPEARANCES:
17
   STEWART LEE KARLIN, ESQ.
18  Attorney for the Plaintiff

19  CARLTON FIELDS
    BY:  CHRISTOPHER C. COPELAND, ESQ.
20  Attorneys for the Defendant

21

22
                      DEPOSITION
23                       OF
                    MARLENE McKAY
24

25

2

1                           I N D E X

2      WITNESS:  MARLENE McKAY
                                              PAGE
3      DIRECT EXAMINATION
       BY MR. KARLIN                            3
4
       CROSS EXAMINATION
5      BY MR. COPELAND                          20

6      REDIRECT EXAMINATION
       BY MR. KARLIN                            30
7
       RECROSS EXAMINATION
8      BY MR. COPELAND                          32

9                          EXHIBITS

10     Plaintiff's Exhibit Number One
       (Evaluation)                             7
11
       Plaintiff's Exhibit Number Two
12     (Evaluation)                             11

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          Deposition of MARLENE McKAY, a witness of

2     lawful age, taken by the Plaintiff for the purpose of

3     discovery and for use as evidence in the above-entitled

4     cause, wherein COREEN DIAZ is the Plaintiff, and

5     COLUMBIA HOSPITAL CORPORATION OF SOUTH BROWARD is the

6     Defendant, pending in the United States District Court

7     of the Southern District of Florida, pursuant to notice

8     heretofore filed, before NANCY D. SMITH, Registered

9     Professional Reporter and Notary Public in and for the

10    State of Florida at Large, at the offices of Westside

11    Regional Center, 8201 West Broward Blvd., Plantation,

12    Broward County, Florida on the 10th day of April

13    commencing at 3:25 p.m.

14                    ------------

15    Thereupon:

16                    MARLENE McKAY

17    a witness named in the notice heretofore filed being of

18    lawful age and being first duly sworn in the above

19    cause, testified on her oath as follows:

20                    DIRECT EXAMINATION

21    BY MR. KARLIN:

22         Q.    Good afternoon.

23         A.    Good afternoon.

24         Q.    My name is Stewart Karlin and I'm an attorney.

25    I represent Ms. Diaz who started a case against the

4

1    hospital.  You're here because you may have some

2    information pertaining to her claims.  Your testimony

3    today is under oath, so it's important for you to

4    understand the questions I'm asking here today.  If for

5    any reason you don't understand a question I'm asking,

6    please do not hesitate to let me know and I'll do my

7    best to rephrase it so you do understand it, okay?

8         A.   Okay.

9         Q.   You do need to verbalize all your responses.

10   If you shake your head or go uh-huh, it may be difficult

11   to interpret that so I would ask that you clearly

12   enunciate your responses.  Also, I ask you to wait until

13   my question is complete before answering because the

14   court reporter can't take down two people talking at the

15   same time.

16        A.   Okay.

17        Q.   Are you currently employed?

18        A.   Yes.

19        Q.   I should ask you, can you state your name

20   first please?

21        A.   My name is Marlene McKay.

22        Q.   And your residence address please?

23        A.   My residence address is 2060 Northwest 83rd

24   Avenue, Sunrise, zip code, 33322.

25        Q.   Are you currently employed?

5

1      A.    Yes.

2      Q.    And that's at Westside?

3      A.    Westside Regional.

4      Q.    And your position?

5      A.    Charge nurse, 4th floor.

6      Q.    How long have you been charge nurse

7  for, ballpark?

8      A.    About four or five years, almost five years.

9      Q.    And your responsibilities as a charge nurse?

10     A.    My responsibilities as a charge nurse, I make

11  the assignments for the staff for the shift that I

12  work.  I act as a resource person for the nurses on the

13  floor.  I take the doctor's orders.  I handle problems

14  with the physicians.  I am the person that the

15  physicians first come to when there is a problem on the

16  floor.

17     Q.    Do you prepare evaluations?

18     A.    Yes.

19     Q.    Supervise the staff?

20     A.    Yes.

21     Q.    Would it be the equivalent of being a shift

22  supervisor; would that be a fair?

23     A.    No.

24     Q.    How would your position be different?

25     A.    I work under the -- I would be under the

6

1    supervisor, the nurse manager.  I work under the nurse

2    manager of the floor, but I am not the supervisor per

3    se.

4         Q.   Who do you report to?

5         A.   I report to my nurse manager.

6         Q.   Who is that?

7         A.   The acting intern director of our floor right

8    now is Eileen Ciotti.

9         Q.   And before Eileen Ciotti?

10        A.   Before Eileen Ciotti is Audrey Pringle

11   (phonetic) was the nurse manager.

12        Q.   And how long was she the nurse manager?

13        A.   Audrey Pringle, almost a year.

14        Q.   Before Mrs. Pringle?

15        A.   We had an interim director, her name was Sue

16   Wakat.

17        Q.   You know I'm going to have this marked

18   actually and then I'm going to take it and then copy it

19   and give you back a copy.  Mark it as evaluation for

20   '97, '98.

21             Have you ever filed a claim of discrimination

22   against Westside Hospital?

23        A.   No.

24        Q.   Did it come to your attention that Ms. Diaz

25   was claiming either some form of discrimination or

7

1   retaliation?

2       A.   No.  Could you repeat the question?

3       Q.   Did it come to your attention before she left

4   her job, I'm not talking about now, did it come to your

5   attention that she was claiming some form of either

6   discrimination or that she was retaliated against for

7   complaining about some discrimination?

8       A.   No.

9       Q.   Did the issue of whether or not she ever got

10  paid or got reimbursed for tuition on a preceptor

11  program, was that ever brought to your attention?

12      A.   No.

13      Q.   You were not involved in that issue at all?

14      A.   No, I was not.

15      Q.   Let me show you what's been marked as

16  Plaintiff's Exhibit Number One.  Did you prepare this

17  evaluation?  You can thumb through it if you like.

18          (Thereupon, the evaluation was marked as

19      Plaintiff's Exhibit Number One for Identification.)

20      A.   Part of this evaluation was done by me.

21      Q.   Is this done in conjunction with other

22  supervisor nurses?

23      A.   With the acting nurse manager at the time.

24      Q.   Who was that?

25      A.   Eileen Ciotti.

8

1        Q.    It states in the front the name of reviewer,

2   that's your name, right?

3        A.    Yes.   That's my name.

4        Q.    It would be fair to state that the evaluation

5   is somewhere between satisfactory and satisfactory plus?

6        A.    Yes.

7        Q.    .81; is that right?

8        A.    Yes.   Between satisfactory and satisfactory

9   plus.

10        Q.    During this year I believe this was her first

11   year as an R.N.   Did you have any significant

12   performance issues?  You can look through that if you

13   need to.

14        A.    I'm allowed to ask a question?

15        Q.    Sure.  If there is something unclear.

16        A.    When you say performance issues, do you mean

17   her skills as a nurse?

18        Q.    Or conduct or anything of that nature.  When I

19   mean performance, I mean performance as a nurse,

20   conduct, communication, everything that is entailed in

21   being an R.N..

22        A.    It's my recollection we sometimes -- well, I

23   sometimes had a problem with attitude.  As to her skills

24   she was basically a new nurse, but she was not a problem

25   in her skills, but in her attitude at times with the

9

1    working with the team.

2         Q.    Do you know why then where it says

3    interpersonal skills here you had an opportunity to rate

4    her where it says consistently demonstrates as positive

5    attitude three, that would be satisfactory?

6         A.    Satisfactory plus.

7         Q.    Right.  So that would not be reflected in her

8    evaluation; is that correct, at least in this particular

9    rating?

10        A.    Satisfactory plus, that means that most of the

11   time she did get along with peers and patients, but

12   there are times too when she -- it doesn't always

13   reflect that she's always excellent at interpersonal.

14        Q.    It didn't say it was excellent, it said it was

15   satisfactory.

16        A     Satisfactory plus.

17        Q.    You would have had an opportunity in this

18   evaluation to note any specific examples of any problems

19   that you had with her, would that be right?

20        A.    If I had a problem with her?

21        Q.    Yes.

22        A.    Is that what you're saying?

23        Q.    It's a specific example.  If there was

24   something like on such and such a date you exhibited the

25   following behavior, could you have noted that in this

**10**

1    evaluation as an example of where she needs to improve?

2        A.    I'm not sure what you're asking.

3        Q.    Let me ask you this.  You would view a

4    performance appraisal as a vehicle to let the employee

5    know how he or she was doing during this annual

6    evaluation during the '97, 98 year; is that correct?

7        A.    Yes.  But we would not list.

8        Q.    It's a positive tool to let people know what

9    they are doing right and constructively criticize them

10   in order to improve the areas where they need to be

11   improved; would that be fair?

12       A.    Yes.

13       Q.    And you do note here, to be fair to you,

14   maintain things of development, maintain positive

15   attitude, do you know what this word is?

16       A.    That's Eileen Ciotti's writing, it's not

17   mine.

18       Q.    Is this her writing here?

19       A.    This is all Eileen Ciotti's writing.  This one

20   section is mine.

21            MR. COPELAND:  For the record, she's referring

22       to box A on summary of development.

23   BY MR. KARLIN:

24       Q.    Let me show you the next evaluation.  Let me

25   have this mark as Plaintiff's Exhibit Number Two, it's

11

1    the '98, '99 evaluation.

2            (Thereupon, the evaluation was marked as

3        Plaintiff's Exhibit Number Two for Identification.)

4        Q.    I ask you to review this.  Were you the

5    reviewer on this evaluation?

6        A.    Yes.

7        Q.    And did you have input from anybody when you

8    prepared this evaluation?

9        A.    May I?

10        Q.    Sure.

11        A.    Sue Wakat was the interim director at the

12    time that this evaluation was done.  I did not see the

13    final.

14        Q.    It would be a fair characterization to state

15    that the things that declined from a three to a one was

16    her attitude in this evaluation; would that be right?

17        A.    Could you repeat the question?

18        Q.    The one rating that went down is in the area

19    of interpersonal skills where I think everything was

20    marked a two except for her attitude which went down to

21    a one?

22            MR. COPELAND:  Page 15.

23            THE WITNESS:  Went down to a 1.8.

24    BY MR. KARLIN:

25        Q.    Her attitude went from a three to a one?

12

1      A.   Yes.

2      Q.   And everything else went from a three to a

3   two?

4      A.   Yes.

5      Q.   Would you agree with me, and I'm going to

6   show you page 16 of the '97, 98 summary and then over

7   here is the '98, '99 summary that the biggest drop was

8   in her interpersonal skills, from a three to a 1.8; is

9   that right?

10     A.   Yes.

11     Q.   Nothing else showed more than, everything else

12  was less than a one in terms of the adjustments of the

13  score?

14     A.   Yes.

15     Q.   Her patient care went from .4; is that

16  right?  Her documentation went down to .5?  Utilization

17  went down slightly a little over, I think, .12?

18     A.   Yes.

19     Q.   General went down .65?

20     A.   Yes.

21     Q.   And actually her -- the Columbia Westside

22  standards went down one just to be accurate?

23     A.   Yes.

24     Q.   And overall rating dropped to .81 to .58?

25     A.   Yes.

13

1      Q.    Now, were you involved at all in any of the

2  disciplinary action that were taken against Ms. Diaz in

3  1999?

4      A.    No.

5      Q.    Were you a witness to any of the events that

6  took place?

7      A.    No.

8      Q.    I'm going to have two exhibits here, but let

9  me just show you a memo dated -- I'm not going to have

10  it marked again.  6/29/99, were you a witness to this

11  event at all?

12          MR. COPELAND:  It's Plaintiff's Number One

13      to Marlene McKay's depo, just for the record.

14  BY MR. KARLIN:

15      Q.    Right.

16      A.    No.

17      Q.    Now, let me show you what's been previously

18  marked in Ms. McKay's depo as Plaintiff's Exhibit Number

19  Ten and ask you if you were a witness to anything that

20  occurred here?  Have you had a chance to review it?

21      A.    I reviewed it.  I am not sure if this is the

22  incident that I was a witness to because it does not

23  mention the name of the person who was involved with the

24  incident I witnessed.

25      Q.    What do you recall about the incident?

14

1      A.    There was an incident one day on the floor, I

2  don't exactly recall the date.

3      Q.    Right.

4      A.    There was a patient rep on the floor, we had

5  patient reps that would go around checking on patients,

6  and there was patients who wanted to go to the

7  bathroom.  And she happened to be one of Coreen's

8  patients.  The patient rep tried to get Coreen, called

9  for Coreen to go assist this patient.

10     Q.    Are their nurse's aides that do that as well?

11     A.    Yes.  There are nurses aides that do that as

12 well.

13     Q.    And do you know whether or not any effort was

14 made to get a nurse's aide at that point?

15     A.    I can't recall, to be honest.  I can't

16 recall.  I can't recall, but I know they also came to me

17 at the desk.  I do recall that, and I went down to the

18 room and on my way into the room Coreen met me at the

19 doorway at the time and we both went into the room and

20 assisted the patient at the same time.  But I do not

21 recall if an effort was made for an assistant.

22     Q.    If it was what?

23     A.    I do not recall if an effort was made to ask a

24 PCA, the nurse's aide to go in the room.

25     Q.    Would that have been the better practice

15

1   simply because the nurse's time is more valuable than a

2   patient's aides time in terms of patient care?

3        A.   No.  All members of staff are required to help

4   a patient.

5        Q.   I understand that.  I understand that would be

6   part of her responsibilities to do that if asked.  But

7   the question would be, would it have been the better

8   practice or is it the better practice for the patient

9   rep to first try to find a nurse's aide as opposed to

10  registered nurse whose value to the patients, in terms

11  of time and cost, is more valuable then a nurse's aide

12  to assist?

13          MR. COPELAND:  Object to the form.

14  BY MR. KARLIN:

15       Q.   You can answer the question.

16       A.   No.

17       Q.   So it wouldn't be the better practice for A

18  patient rep to ask, at least ascertain whether or not a

19  nurse's aide was available first before asking an R.N.

20  to assist in taking a patient to the bathroom?

21       A.   No.  I wouldn't say it's a better practice.

22       Q.   So you met Ms. Diaz at the door.  Did you take

23  the patient and put the patient and assist the patient

24  to the bathroom?

25       A    Yes, we both did.

16

1      Q.    Did the patient actually go to the bathroom?

2      A.    Yes.

3      Q.    Is the bathroom in the patient's room?

4      A.    Yes.

5      Q.    Now, if you were there already why was

6   Ms. Diaz necessary?  Why did you need two, a charge

7   nurse and a registered nurse, and patient rep to take

8   the patient to the bathroom?

9           MR. COPELAND:  Object to the form.

10          THE WITNESS:  The patient rep was not in the

11      room to take her to the bathroom.

12   BY MR. KARLIN:

13      Q.    But the question I guess is, if you were

14   already there because you said Ms. Diaz and then you

15   were already at the door, either why did you stay or why

16   did she stay?  Why did you both need to get the patient

17   to the bathroom?

18      A.    Patient needed assistance and asked assistance

19   because she couldn't walk by herself as I recall, so we

20   both assisted her to the bathroom and then helped her

21   back from the bathroom to the bed.

22      Q.    She went into the bathroom, I assume she

23   closed the door?

24      A.    We were standing outside the door.

25      Q.    The door was closed I assume?

1        A.    Not locked.

2        Q.    But closed.   And how long did she spend in the

3   bathroom?

4        A.    I don't recall exactly how long.

5        Q.    A minute or two?

6        A.    Couple of minutes.

7        Q.    Is that when she made the statement about the

8   patient reps?

9        A.    Actually, she made the statement when we were

10   helping the patient back to bed.

11        Q.    Back to bed?

12        A.    In the presence of the patient.

13        Q.    Did the patient hear the statement?

14        A.    Yes.

15        Q.    How do you know?

16        A.    Well, she said it in the presence of the

17   patient.

18        Q.    How old is the patient?

19        A.    I don't recall.

20        Q.    Elderly, over 80, over 70?

21        A.    I don't recall.

22        Q.    Did the patient react at all to the

23   statement?

24        A.    No.

25        Q.    Did you report her because she made the

18

1    statement?

2        A.    No.

3        Q.    Was it Mrs. Fogarty who reported her?

4        A.    Yes.

5        Q.    Mrs. Fogarty is the patient rep?

6        A.    Mrs. Fogarty was a patient rep.

7        Q.    And where was Mrs. Fogarty at that point?

8            MR. COPELAND:  Objection to form.  Time and

9        where.

10   BY MR. KARLIN:

11       Q.    When she made the statement.

12       A.    Standing in the hallway.

13       Q.    Where in the hallway?

14       A.    Outside of the room in the hallway.

15       Q.    Close to the nurse's desk?

16       A.    That room, as I recall, is about midway down

17   the hallway from the nurse's desk on the west wing.

18       Q.    And why was she standing in the hallway; if

19   you know?

20       A.    I don't know.

21       Q.    And she, to the best of your knowledge, you

22   didn't complain about the comment, Mrs. Fogarty

23   complained about the comment to Mrs. Wakat; is that

24   correct?

25       A.    To the best of my knowledge.

19

1      Q.    You didn't decide to discipline or recommend a
2   discipline regarding Ms. Diaz, that was done by someone
3   else; is that right?

4      A.    Can you repeat the question?

5      Q.    Other than providing a statement, you didn't
6   partake in the decision to discipline Ms. Diaz?

7      A.    No, I did not.

8      Q.    Have you ever heard any of other nurses who
9   had made any kind of statements about something that has
10  happened complaining that a nurse isn't there in front
11  of a patient or complaining that something wasn't done
12  by the hospital in front of a patient before?

13     A.    No.

14     Q.    You've never heard an employee make any sort
15  of comment in front of a patient before criticizing
16  anything about the hospital?

17     A.    Not in a patient room, I've never had the
18  experience.

19     Q.    So this was the first and only time that's
20  ever happened to you?

21     A.    In the patient's room, yes.

22     Q.    How about out of the patient's room but in
23  front of the patient in the hallway?

24     A.    No.  Not in front of the patient.

25     Q.    And is this the statement that you prepared?

20

1    I'm going to show you that it's been previously marked

2    as Plaintiff's Exhibit Number 12.

3        A.   Yes, I remember this.

4        Q.   I'm going to show you what's been previously

5    marked as Defendant's Exhibit Four.  Is this an e-mail

6    that you got from Mrs. Wakat?  Do you recall receiving

7    that?

8        A.   I don't recall.

9        Q.   You don't recall receiving that?

10       A.   No.

11           MR. KARLIN:  I don't have anything further.

12                    CROSS EXAMINATION

13   BY MR. COPELAND:

14       Q.   Marlene, I don't mean to ask the obvious, but

15   the record that we're taking here is blind.  Are you of

16   African American descent?

17       A.   No, I'm not.

18       Q.   Are you classified for race purposes as an

19   African American?

20       A.   No.

21       Q.   Do you have any background in African

22   American?

23       A.   No.

24       Q.   What is your race?

25       A.   I'm Jamaican.

21

1    Q.    Okay.  I apologize.  Would that also be known

2    as a Black American now?

3    A.    No.

4    Q.    Black naturalized American?  Are you an

5    American citizen?

6    A.    Black naturalized American, yes.

7    Q.    I don't mean to pin labels but it's a blind

8    record here.  I'm just trying to clarify that.  As a

9    black naturalized American or Jamaican, have you

10   experienced any hostile attitude towards you from any of

11   the administration from the hospital?

12   A.    No.

13   Q.    Have you witnessed any of the black Americans

14   or black employees being treated any differently than

15   any of the white employees or other employees at the

16   hospital?

17   A.    No.

18   Q.    To your knowledge, do you have any information

19   whereby Ms. Diaz was singled out or treated differently

20   in any way as a result of her race?

21   A.    No.

22   Q.    Did she ever complain to you about she felt

23   she was being singled out and treated differently

24   because of her race?

25   A.    Yes.

22

1      Q.    And was that in regards to the payment for or

2    by not being paid for precepting?

3      A.    No.

4      Q.    What were her complaints?

5      A.    As well as I could recall, she complained that

6    -- can you ask that question again?

7      Q.    What complaints or what type of discrimination

8    did she tell you she felt she was suffering as a result

9    of her race?

10     A.    None.

11     Q.    Did she complain about she thought she was

12   being retaliated against for having complained or filed

13   any complaint with the hospital?

14     A.    No.

15     Q.    Were you ever directed or instructed by anyone

16   at the hospital to treat Ms. Diaz any differently than

17   any other employee?

18     A.    No, I was not.

19     Q.    Were you instructed in anyway to lower her

20   scores on her '98 or '99 evaluation as opposed to her

21   '97, '98 evaluation?

22     A.    No, I was not.

23     Q.    Were you the individual who graded her on her

24   interpersonal skills by actually circling the numbers?

25     A.    Yes.

23

1      Q.    That would be for both the '97 and '98?

2      A.    May I see the '98 again?

3      Q.    This is the '97 and '98 and you must have the

4    '99.

5      A.    This is the '98, '99.

6      Q.    I guess looking at the '98, '99 evaluation,

7    interpersonal skills page 15, did you circle those

8    numbers?

9      A.    That's not my handwriting.

10          MR. KARLIN:  I didn't hear you.  You have to

11      speak up.

12          THE WITNESS:  I am not sure.  I can't recall.

13    BY MR. COPELAND:

14      Q.    Now, at least at the beginning of the

15    evaluation it says the name of reviewer and you're

16    listed as the reviewer.

17      A.    But it was done in collaboration with the

18    interim director at the time.  She also had an input.

19      Q.    Was the general practice and procedure at this

20    time that you would fill out the evaluation, hand it to

21    Sue Wakat who would give comments and maybe suggest

22    changes one way or the other?

23      A.    Yes.

24      Q.    Do you understand if that's what took place on

25    this evaluation as well?

24

1      A.    Yes.

2      Q.    Do you agree with the evaluation as far as

3  interpersonal skills that she received for the time

4  frame?

5      A.    Yes.

6      Q.    Now, there was a drop in interpersonal skills

7  and they discussed that a little bit.  Was there a

8  reason why her rating went down from one year to the

9  next?

10      A.    Yes, there was a reason.

11      Q.    What was that reason?

12      A.    Her attitude had deteriorated I should say.

13  At the nurse's station she would pass comments.  She

14  also had problems with some of the members of the staff,

15  not everybody, that she didn't get along with some of

16  the members of the staff.

17      Q.    Fair to say you were having more problems with

18  her interpersonal skills in her second year as a nurse

19  as opposed to her first year?

20      A.    Yes.

21      Q.    Now, on the statement that you gave in

22  regards to the incident with Wanda Fogarty, there's an

23  indication in here that the PCA was busy so you paged

24  the nurse.  Does that refresh your memory if you did

25  attempt to try to get a PCA to assist the patient first?

25

1      A.    I think it was paged from the desk.  I'm not

2  sure if I'm the one who paged or if it was the secretary

3  who paged.

4      Q.    But does that refresh your recollection that

5  at least when you wrote this a PCA wasn't available to

6  assist?

7      A.    Yes.

8      Q.    Now, in reviewing the statement that

9  Mrs. Fogarty made about the incident, and I think you

10  read it before, does the statement that she gave, does

11  that comport with your recollection of the events as

12  they occurred?

13          MR. KARLIN:  I'll object.  She testified

14      exactly what happened.  You're asking for a

15      conclusion from someone else's statement.

16          THE WITNESS:  Could you repeat the question?

17  BY MR. COPELAND:

18      Q.    Sure.  In reviewing Mrs. Fogarty's statement,

19  does that comport with your understanding of the events

20  as they occurred on that day?

21      A.    Yes.

22      Q.    Was Mrs. Fogarty exaggerating in anyway or do

23  you see anything in here where she was lying or making

24  something up that did not occur?

25      A.    No.

26

1      Q.    Were you aware at the time that this incident

2   occurred whether or not Mrs. Diaz was involved in any

3   litigation with the hospital?

4      A.    No.

5      Q.    Before she left the hospital, did you have any

6   understanding whether she was involved in any litigation

7   with the hospital?

8      A.    No.

9      Q.    You reviewed the suspension and write-up that

10  she received as a result of that incident.   In your

11  capacity as a charge nurse and supervisor, do you agree

12  that the action that was taken was appropriate?

13     A.    Yes.

14     Q.    Do you know Mrs. Fogarty?

15     A.    Not personally.

16     Q.    Do you know her as a director of radiology?

17     A.    Yes.

18     Q.    Did you have any understanding of how she got

19  along with other employees or individuals in the

20  hospital?

21     A.    No.

22     Q.    Have you ever heard anyone ever complain about

23  her or the way that she interacted with other employees?

24     A.    No.

25     Q.    Did Mrs. Diaz ever, during this incident,

27

1    advise you that she felt concern because she was being

2    pulled out of a patient room where she was performing

3    other functions?

4         A.    No.

5         Q.    When the statement was made, was the statement

6    in regards to patient reps and their usefulness or lack

7    thereof as made by Mrs. Diaz, was that made to Sue Wakat

8    in her presence?

9         A.    No.

10        Q.    You know Ms. McKay?

11        A.    Marlene McKay.

12        Q.    Did he speak to you in regards to what had

13   occurred in this incident at any time?

14        A.    No.

15        Q.    Did you find Ms. Diaz's behavior and her

16   statement at that point in time inappropriate?

17        A.    Yes.

18        Q.    Now, were you familiar with the preceptor

19   program at the time that Ms. Diaz was going through that

20   program?

21        A.    No.

22        Q.    Do you know of other individuals that went

23   through the preceptor program at the same time she did?

24        A.    No.  I can't think of anybody.

25        Q.    Do you know if there ever was a time when

28

1  individuals who precepted who were not precepted for the

2  time they were precepted?

3          MR. KARLIN:  I'm going to object.  She's

4      obviously not competent to testify.  She's

5      speculating taking up transcript time with somebody

6      who is not competent on this issue.

7  BY MR. COPELAND:

8      Q.  If you know.

9      A.  Well, I precepted an employee once when I was

10  a nurse on the floor and I don't think she was paid.  I

11  don't think she was paid.

12      Q.  Okay.  Do you know if --

13      A.  I was a nurse preceptor at the time.

14      Q.  Did you precept?

15      A.  I precepted an employee who just started.

16      Q.  You were the preceptor?

17      A.  I was a preceptor.

18      Q.  You were the preceptee or the intern?

19      A.  No.

20      Q.  Did you ever witness any behavior that was

21  done to Ms. Diaz by any of the supervisors which you

22  felt was unfair or unjustified?

23      A.  Could you repeat the question.

24      Q.  Did you ever witness anyone treat Ms. Diaz in

25  a manner which you felt was unfair or unjustified?

29

1      A.    No.

2      Q.    Were you the charge nurse when she resigned

3    her position?

4      A.    Yes.

5      Q.    Did she come into work that day that she

6    resigned?

7      A.    Yes.

8      Q.    Did she give you any advance notice before

9    resigning?

10     A.    No.

11     Q.    Did that cause you any problem?

12     A.    Yes, it did.

13     Q.    What kind of problem did that cause?

14     A.    Shortage of staff.  Not being able to give the

15   proper care to the patient.  We would have to divy her

16   patient load up between the other staff.

17     Q.    Do you understand in a policy or procedure if

18   an individual is either not going to show up for work or

19   plans on leaving employment that they are to give as

20   much advance notice as possible?

21     A.    Yes.

22     Q.    Why is that?

23     A.    So that adequate coverage can be obtained for

24   the floor for patient care, and overall for the patient

25   satisfaction so that they have adequate care and that's

30

1    it.

2    　　　　MR. COPELAND:  You don't have to add if you

3    　　don't want to.  I don't have anything further.

4    　　　　MR. KARLIN:  I just have a couple more.

5    　　　　　　　　REDIRECT EXAMINATION

6    BY MR. KARLIN:

7    　　Q.    This warning that is Plaintiff's Exhibits Ten,

8    this is not in your handwriting, right?

9    　　A.    No, that's not my handwriting.

10   　　Q.    You didn't see decide to give her this three

11   day suspension?

12   　　A.    No.

13   　　Q.    In fact, you didn't even report the incident

14   until asked to provide a statement?

15   　　A.    Right.

16   　　Q.    Therefore, you didn't think at the time even

17   though the comment may have been inappropriate, it

18   didn't, in your mind, rise to a level of a disciplinary

19   action because if it did you would have done something

20   about it at the time; would that be fair?

21   　　　　MR. COPELAND:  Object to the form.

22   　　Argumentative.

23   　　　　THE WITNESS:  Could you repeat that?

24   　　(Thereupon, the above-referred to question was read

25   　　back by the court reporter.)

31

1            THE WITNESS:  As I recall, I did mention to

2       her that it was inappropriate and I believe her

3       comments were, at the time, I don't care.

4  BY MR. KARLIN:

5       Q.   But you didn't, yourself, initiate any

6  disciplinary action?

7       A.   No, I did not.

8       Q.   At the time you didn't because even though you

9  thought it might have been inappropriate and you told

10  her so, you responded in that way, you, at that point in

11  time, didn't feel that it was enough to initiate a

12  disciplinary action?

13      A.   I don't know.

14      Q.   You don't know?

15      A.   I don't know.

16      Q.   But it would be fair to say, just so the

17  record is clear, you didn't initiate a disciplinary

18  action, that came from Mrs. Wakat?

19      A.   Right.  I did not initiate a disciplinary

20  action.

21      Q.   I note that your statement is provided a week

22  after the event took place.

23      A.   I was asked to, yes.

24           MR. KARLIN:  That's about it.

25                   RECROSS EXAMINATION

32

BY MR. COPELAND:

    Q.    Just to clear up with one follow-up.  Do you know if Mrs. Wakat initiated the disciplinary proceeding or if it was initiated as a result of a complaint lodged by Mrs. Fogarty?

    A.    I think it was initiated as a result of the complaint that was lodged.

        MR. COPELAND:  Okay.  Nothing further.

        MR. KARLIN:  Okay.

        MR. COPELAND:  She will read.

    (Thereupon, the deposition concluded at 4:15 p.m.)

33

1                        CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA        )

5    COUNTY OF BROWARD        )

6

7

8

9            I, the undersigned authority, certify that

10   MARLENE McKAY personally appeared before me and was duly

11   sworn.

12

13           WITNESS, my hand and official seal this 17th

14   day of April, 2001.

15

16

17                                    NOTARY SEAL
                                   NCY D SMITH
18                              STATE OF FLORIDA
                                   NO. CC757393
                                   JULY 7, 2002

19

20

21   _____

22   NANCY D. SMITH, RPR,

23   Notary Public - State of Florida

24   My Commission Expires: 7-07-2002

25

34

1              REPORTER'S DEPOSITION CERTIFICATE

2

3   STATE OF FLORIDA    )

4   COUNTY OF BROWARD    )

5

6          I, NANCY D. SMITH, Registered Professional

7   Reporter, certify that I was authorized to and did

8   stenographically report the deposition of MARLENE McKAY,

9   that a review of the transcript was requested, and that

10  the transcript is a true and complete record of my

11  stenographic notes.

12

13         I further certify that I am not a relative,

14  employee, attorney, or counsel of any of the parties,

15  nor am I a relative or employee of any of the parties'

16  attorney or counsel connected with the action, nor am I

17  financially interested in the action.

18

19         DATED this 17th day of April, 2001.

20

21

22

23         _____

24         Nancy D. Smith, RPR

25

35

DOWNTOWN REPORTING
337 East Las Olas Boulevard
Fort Lauderdale, FL    33301
954-522-3376

April 17, 2001

MARLENE McKAY
C/o CHRISTOPHER COPELAND, ESQ.
CARLTON FIELDS
222 Lakeview Avenue
Suite 1400
West Palm Beach, FL    33401-6149

Re:  DIAZ vs. COLUMBIA HOSPITAL CORPORATION

Dear Ms. McKay:

At the conclusion of your deposition given in the
above-styled cause you indicated you wished to read and
sign the transcript.

This letter is to advise you that the transcript of your
deposition is now ready.  You may call (954) 522-3376 to
schedule an appointment to read and sign your deposition
transcript; however, if you are a party in this action
and your attorney has ordered a copy of this transcript,
you may wish to read his copy and forward to us a
photostatic copy of your signed correction sheet.

If you would like to waive your signature at this time,
please so advise.  If not, please be advised that your
transcript will be available for your signature for two
weeks from the date of this letter.

Thank you.

Sincerely,

Nancy D. Smith

cc:  Christopher Copeland, Esq.

36

1                          AFFIDAVIT

2   STATE OF FLORIDA      )
    COUNTY OF BROWARD      )
3

4          I, MARLENE McKAY, being first duly sworn, do
    hereby acknowledge that I did read a true and certified
    copy of my deposition which was taken in the case of
5   DIAZ vs. COLUMBIA HOSPITAL CORPORATION taken on April
    10, 2001, and the corrections I desire to make are as
6   indicated on the attached Errata Sheet.

7          Done and signed this _____day of
    _____, 2001.
8

9                        _____

10                         CERTIFICATE

11  STATE OF FLORIDA      )
    COUNTY OF BROWARD      )
12

13         Before me personally appeared_____,
    to me well known and known to me to be the person
    described in and who executed the foregoing instrument
14  and acknowledged to and before me that he executed the
    said instrument in the capacity and for the purpose
15  therein expressed.

16         Witness my hand and official seal, this __day
    of_____, 2001.
17

18                        _____

19                        NOTARY PUBLIC

20  Commission Expires:

21

22

23

24

25

37

1             <u>TO BE EXECUTED BY THE NOTARY</u>

2             <u>IF THE DEPONENT DOES NOT SIGN</u>:

3

4

       I hereby certify that a letter with reference to reading

5   and signing deposition was mailed to the witness on

       April 17, 2001, and that:

6

7   ( )  Witness refused to sign, giving the following

       reason:

8

9

10

11  ( )  Neither the witness nor her attorney has responded

      to request to read and sign.

12

13

14

15

16

17

18   ———————————        ———————————

    Date                    Notary Public

19                         State of Florida

20

21

22

23

24

25

38

1

2                    E R R A T A    S H E E T

3

4    STATE OF FLORIDA)

5    COUNTY OF BROWARD)

6

7        I, Marlene McKay, the undersigned deponent, have

8    this date read the foregoing pages of my deposition

9    numbered 1 through 32, and with the suggestions noted

10   below, if any, these constitute a true and accurate

11   transcription of my deposition given on the 10th day of

12   April, 2001 at the time and place stated therein:

13

14   PAGE NUMBER              LINE NUMBER        SUGGESTION/REASON

15

16

17

18

19

20

21

22                              _____

23                                   MARLENE McKAY

24

25