1
2
3

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

              CASE NO.   00-6099-CIV-GRAHAM/TURNOFF

4
5
6
7
8
9
10
11

COREEN DIAZ,

                    Plaintiff,

vs.

COLUMBIA HOSPITAL CORPORATION
OF SOUTH BROWARD, AND COLUMBIA
HOSPITAL CORPORATION OF SOUTH
FLORIDA,

                    Defendant.

-------------------------------/

COPY

12
13
14
15

                              Westside Regional Center
                              8201 West Regional Center
                              Plantation, Florida
                              April 10, 2001
                              1:00 p.m. - 2:35 p.m.

16
17
18
19
20
21

APPEARANCES:

STEWART LEE KARLIN, ESQ.
Attorney for the Plaintiff

CARLTON FIELDS
BY:  CHRISTOPHER C. COPELAND, ESQ.
Attorneys for the Defendant

22
23
24
25

                         DEPOSITION
                            OF
                       LEE CHAYKIN

SCANNED

2

1                          I N D E X

2    WITNESS:  LEE CHAYKIN
                                              PAGE
3    DIRECT EXAMINATION
     BY MR. KARLIN                             3
4
     CROSS EXAMINATION
5    BY MR. COPELAND                          46

6    REDIRECT EXAMINATION
     BY MR. KARLIN                            57
7
                          EXHIBITS
8
     Plaintiff's Exhibit Number One
9    (Discipline dated 6/30)                  17
     Plaintiff's Exhibit Number Two
10   (E-mail)                                 18
     Plaintiff's Exhibit Number Three
11   (7-2-99 e-mail)                          20
     Plaintiff's Exhibit Number Four
12   (Response)                               21
     Plaintiff's Exhibit Number Five
13   (Memo)                                   29
     Plaintiff's Exhibit Number Six
14   (8-6-99 Memo)                            30
     Plaintiff's Exhibit Number Seven
15   (Note)                                   32
     Plaintiff's Exhibit Number Eight
16   (E-mail)                                 33
     Plaintiff's Exhibit Number Nine
17   (10-29-99 letter)                        34
     Plaintiff's Exhibit Number Ten
18   (1-25-00 counseling)                     35
     Plaintiff's Exhibit Number Eleven
19   (Grievance)                              37
     Plaintiff's Exhibit Number Twelve
20   (Statement)                              41
     Plaintiff's Exhibit Number Thirteen
21   (Addendum to grievance)                  43
     Defendant's Exhibit Number One
22   (Memo dated 9-10-99)                     47
     Defendant's Exhibit Number Two
23   (Letter)                                 50
     Defendant's Exhibit Number Three
24   (E-mail)                                 50
     Defendant's Exhibit Number Four
25   (E-mail)                                 51

3

1          Deposition of LEE CHAYKIN, a witness of lawful

2   age, taken by the Plaintiff for the purpose of discovery

3   and for use as evidence in the above-entitled cause,

4   wherein COREEN DIAZ is the Plaintiff, and COLUMBIA

5   HOSPITAL CORPORATION OF SOUTH BROWARD is the Defendant,

6   pending in the United States District Court of the

7   Southern District of Florida, pursuant to notice

8   heretofore filed, before NANCY D. SMITH, Registered

9   Professional Reporter and Notary Public in and for the

10  State of Florida at Large, at the offices of Westside

11  Regional Center, 8201 West Broward Blvd., Plantation,

12  Broward County, Florida on the 10th day of April

13  commencing at 1:10 p.m.

14                  ------------

15  Thereupon:

16                  LEE CHAYKIN

17  a witness named in the notice heretofore filed being of

18  lawful age and being first duly sworn in the above

19  cause, testified on his oath as follows:

20                  DIRECT EXAMINATION

21  BY MR. KARLIN:

22      Q.    Good afternoon.  My name is Stewart Karlin

23  and I'm an attorney representing Ms. Diaz in a case

24  she's commenced against Columbia Hospital.  Your

25  testimony today is under oath, so it is important for

4

1    you to understand the questions I'm asking here today.

2            If for any reason you don't understand, please

3    don't hesitate to let me know so you do understand it.

4    A couple of other things, try to wait until I'm done

5    completing my question before you give a response.  The

6    court reporter can't take down two people talking at the

7    same time.

8            And last, I don't expect your deposition will

9    take very long.  If you need to take a break, just let

10   me know.

11           Could you state your name for the record

12   please.

13       A.   My name is Lee Chaykin.

14       Q.   Where do you reside, Mr. Chaykin?

15       A.   You mean my residence?

16       Q.   Right.

17       A.   2942 Myrtle Oaks Circle, Davie, Florida 33328.

18       Q.   Are you currently employed?

19       A.   Yes, sir.

20       Q.   And where are you employed?

21       A.   Here at Westside Regional Medical Center.

22       Q.   In what capacity?

23       A.   Chief operating officer.

24       Q.   And how long you been the chief operating

25   officer for?

5

1    A.    Little bit less than two and a half years.

2    Q.    From about what time?

3    A.    Mid 1998.

4    Q.    And before that?

5    A.    I was the assistant administrator for Aventura

6    Hospital and Medical Center for about two years and

7    eight months.

8    Q.    As the chief operating officer, what are your

9    job responsibilities at Westside Regional?

10    A.    Basically, the day-to-day operation facility.

11    Responsible for ancillary departments and also the

12    administrative departments in the facility.

13    Q.    And who do you report to?

14    A.    Chief executive officer.

15    Q.    And what's that individual's name?

16    A.    Michael Joseph.

17    Q.    And how long you been reporting to Mr. Joseph?

18    A.    Same amount of time.

19    Q.    And who are your immediate subordinates?

20    A.    Right now the folks that report to me are all

21    of the ancillary and some clinical areas.  All ancillary

22    defined as support services.

23    Q.    So, for instance, there is a director of

24    nursing, he or she wouldn't report to you?

25    A.    No.  That person reports directly to the chief

6

1    reporting officer.

2        Q.    And other than Ms. Diaz, are you aware of any

3    other employee who's claimed race discrimination or

4    retaliation?

5        A.    Not to my knowledge.

6        Q.    So since you've been employed here, you are

7    not aware of -- just to make sure the record is clear on

8    this point -- of any employee that's claimed race

9    discrimination?

10       A.    Not to my knowledge, no.

11       Q.    Nor has claimed retaliation for whatever

12   reason?

13       A.    No, sir.

14       Q.    You know Ms. Diaz; is that correct?

15       A.    Yes.

16       Q.    How did you --

17       A.    When did I first come into contact with her?

18       Q.    Right.

19       A.    Mainly just on rounds.  My first interaction

20   with her was just seeing her as one of our caregivers on

21   the floor, and having an opportunity to meet her on the

22   floor.

23       Q.    Did it ever come to your attention where she

24   had an issue with respect to her preceptor program?

25       A.    Yes.  It did come to our former chief nursing

7

1    officer, a lady by the name of Kim Jutras.

2        Q.    Why don't you tell me how you got involved in

3    that issue.

4        A.    I heard there was an issue in conversations

5    with Kim in regards to Ms. Diaz where she had stated

6    that she felt that she should be reimbursed, and it was

7    to -- I wasn't clear about what that meant, for her time

8    here when she was, I guess, a resident or preceptee here

9    at the facility.

10        Q.    A preceptee is more or less a nurse who's

11    going through, for lack of a better term, an internship

12    type of thing or training session?

13        A.    Somebody who's getting on the job experience.

14        Q.    They refer to that as preceptor?

15        A.    Pretty much, yes.

16        Q.    Would it be fair to say that your

17    understanding of what she was alleging was that there

18    were two Caucasian nurses who were grandfathered in and

19    were getting paid for their preceptor program and she

20    wasn't?

21        A.    I wasn't familiar with there being a race

22    issue, just that there was a question of whether or not

23    she was due to be reimbursed for her time for work at

24    the facility or not based on what the practice at the

25    facility was and would have taken place with others.

8

1     Q.    Did you investigate that issue?

2     A.    What ultimately wound up happening was Kim had

3  met with Coreen as I understand it, had discussed the

4  parameters of the program, which did not allow for, nor

5  did not have any reimbursement as Kim understood it.

6  There were further investigations that took place as

7  part of us doing our routine audit for doing budgets.

8  What we had done was we had looked -- Kim had asked the

9  controller, who is the gentleman who's no longer here by

10  the name of Danny Reeves (phonetic), to look and see if

11  there had been anything paid through payroll to any of

12  these individuals.

13     Q.    Right.

14     A.    Any type of reimbursement for tuition or

15  anything such as that.

16     Q.    Right.

17     A.    And nothing showed up on the payroll system.

18  Doing a routine audit where Kim was working with the

19  controller in order to take a look at setting up her

20  budget for the next year, she noticed that one of the

21  individuals was paid not through the payroll system but

22  through the A.P. system.

23     Q.    What is the A.P. system?

24     A.    Accounts payable.

25     Q.    Okay.

9

1      A.    You have two systems, either through a vendor,

2    through A.P. or payroll through an employee.

3      Q.    Okay.

4      A.    In which there was a payment made to reimburse

5    one of the individuals for tuition.  And when that was

6    discovered, we met with Coreen and offered her -- we

7    explained the entire process.

8      Q.    Okay.

9      A.    Explained the mistake, and said it's only fair

10   for us to offer you this amount based on what your

11   tuition costs were.  At which point she said, I don't

12   know if it was you she was in consultation with or

13   someone else, that she had been advised by her attorney

14   not to accept that amount and had actually wound up

15   bringing it back to us.

16     Q.    Was her claim that they were actually getting

17   paid or do you understand whether or not she pointed to

18   two nurses; is that correct?

19     A.    I believe it's two nurses.

20     Q.    Did you do any research into those two nurses?

21     A.    Personally I did not do the research.  Kim did

22   that research into those two nurses.

23     Q.    Do you know whether or not they got paid or

24   not?

25     A.    My understanding was that they were not paid

10

1   for their time, but one of them was reimbursed for some

2   of their tuition expense.

3        Q.   Did you do any investigation yourself or you

4   relied on Kim?

5        A.   I relied on Kim's investigation.

6        Q.   Now, why were you involved if these were the

7   nurses -- how, since you're involved in the ancillary

8   service, how did you get involved in this issue?

9        A.   When there was a disciplinary action taken

10  against Ms. Diaz in response to an event that took place

11  to an event on the floor, she appealed that through our

12  grievance process, and through the grievance process it

13  came to me, and that's really what I became involved

14  with Ms. Brown-Diaz, was spending time with her, looking

15  at what transpired, her behavior on the floor that day,

16  and the fact that she had been written up for her

17  behavior on the floor and whether or not it was

18  appropriate for her to have been written up for her

19  behavior on the floor.

20       Q.   And why would you be involved in the

21  discipline of nurses, is that part of your --

22       A.   That's part of our grievance process.

23       Q.   Is that part of your normal responsibilities?

24       A.   It's part of our normal responsibility that

25  grievances go up through the chain of command.

11

1          Q.    And you would be part of that?  In other

2     words, it's your responsibility to hear grievances that

3     nurses bring in the event there is discipline?

4          A.    It could be, yes.

5          Q.    Have you been involved in other disciplinary

6     matters with nurses?

7          A.    Yes.  And employees throughout the facility.

8          Q.    So it would be fair to say then you don't have

9     any firsthand knowledge as to whether or not these two

10    nurses got paid or not, or whether or not her belief --

11    withdraw that.  You don't have any personal knowledge?

12         A.    I did not personally research it.

13         Q.    You didn't personally review the payroll

14    records?

15         A.    Did not personally review the payroll records,

16    but did rely on the person who is chief nursing

17    operator, controller to make an analysis complete and

18    come to their own judgments.

19         Q.    Do you know if the nurses were interviewed,

20    the two nurses?

21         A.    No, I did not.  I don't have knowledge of that

22    either.

23         Q.    Now, you said you were also involved in any

24    counselings or disciplines in connection with Ms. Diaz

25    in terms of reviewing paperwork or doing an

1    investigation.

2        A.    Only as part of her grievance procedures.

3        Q.    First of all, do you recall what incident you

4    were involved in?

5        A.    There was an issue when Lynn Mathis, who was

6    our director of human resources at the time, tried to

7    contact Coreen on the floor and was actually responding

8    to her in regards to this issue, and the analysis that

9    had taken place, who would have been paid, what had been

10   paid, et cetera, which Coreen refused to take the call

11   and had asked others on the floor to lie on her behalf

12   in regards to the fact that she was no longer on the

13   floor, even though she still was.

14       Q.    It was your understanding Ms. Diaz asked

15   employees to lie on her behalf?

16       A.    Yes, that's what I understand.

17       Q.    Did you partake in the investigation itself?

18       A.    Yes, I did.

19       Q.    Who did you interview?

20       A.    I interviewed -- I don't have the names.  I do

21   not recall the names at this point.  I interviewed the

22   people who were on the floor.  I also spoke to the

23   director of human resources in regards to the accounts

24   that took place.

25       Q.    And did you come to any conclusions?

13

1      A.    I came to the conclusion that unfortunately
2  Ms. Diaz decided that she didn't want to take the call
3  and asked people to lie on her behalf, and say that she
4  wasn't there when she was, and basically behaved
5  inappropriately while here in the facility.
6      Q.    Do you recall what Ms. Diaz's position was?
7      A.    As far as?
8      Q.    Did she admit to the allegations or did she
9  have different --
10      A.    She had a different perception.
11      Q.    And what was her perception?
12      A.    Her perception was she did not remember being
13  called.  She did not remember there was an issue of
14  trying to be called.  She didn't remember asking other
15  people to lie on her behalf, even though they had
16  recounted that she had asked that.
17      Q.    So she basically denied what happened, would
18  that be a fair characterization?
19      A.    Exactly.
20      Q.    Do you know whether or not one of the
21  employees that Ms. Diaz was claiming received pay was
22  Donna Boccella, B-O-C-C-E-L-L-A?
23      A.    I'm sorry, I don't recall that.
24      Q.    Jennifer Stephan (phonetic)?
25      A.    I don't recall.

14

1    Q.    Michelle Plunkett (phonetic)?

2    A.    I don't recall those names at this time.

3    Q.    Were you involved in any other discipline in

4    connection with Ms. Diaz?

5    A.    Just, again, through the grievance process in

6    regards to what was appropriate.  She had actually made

7    a claim that she felt that she was being harassed at the

8    time and, again, we looked into that.  We have a normal

9    chart audit process that we have as part of QA.  She had

10   felt that that chart audit process was singling her out

11   per se, and it really was not.  Just doing chart audits

12   is standard in a health facility for you to do chart

13   audits.

14       She felt that she had been discriminated

15   against in regards to an issue when we had a hurricane

16   that was coming in and that she was not part of the

17   hurricane plan.  It was an issue with a charge nurse.

18   What it came down to is the charge nurse just didn't

19   feel she needed help from anyone else.  It was really

20   that simple.  She felt she could handle the duties,

21   calling people and didn't need any assistance.

22   Q.    Did she, as part of her defense, feel that she

23   was being retaliated against by the hospital in

24   connection with the discipline that you were

25   investigating?

15

1        A.    That was her perception, but I didn't find

2   anything to substantiate that.

3        Q.    Would it be a fair statement to say that

4   before her bringing up the issue of, for lack of a

5   better term, the alleged pay discrepancy with the two

6   white nurses in the preceptor program, she had no prior

7   counselings, or suspensions, or warnings of any kind in

8   the personnel file?

9        A.    That would be difficult for me to comment on

10  at this time without the file in front of me.

11       Q.    When she raised the issue, did she raise the

12  issue with you that she was being retaliated against?

13       A.    She had raised it with me only through the

14  grievance process that she didn't agree that she should

15  have been counseled.

16       Q.    Did you go back and look at her personnel file

17  to see whether she had any prior discipline history or

18  counseling?

19       A.    I don't have a clear recollection of that.  I

20  can honestly tell you that.  It's been some time.

21       Q.    Did you ever meet with her in person --

22       A.    Yes, I did.

23       Q.    -- on the issue of the pay?

24       A.    Yes, I did.  I met with her actually

25  personally in regards to the fact that we had found one

16

1   of these other folks had been paid through the accounts

2   payable process and offered her the same.

3       Q.   Did you ever make the claim to her that she

4   should be a team player?

5       A.   I don't recall saying that.

6       Q.   No?

7       A.   Personally, I don't recall saying that.

8       Q.   And when you say you don't recall, does that

9   mean you're denying it or you don't remember?

10      A.   It's not really my vocabulary to say that to

11  somebody in that type of situation.  If you're talking

12  to people about accomplishing a goal on a floor,

13  cleaning a floor together, you need to act as a team is

14  something I would say.  I don't see how that would even

15  pertain to this particular discussion.

16      Q.   Did you review any documentation when you made

17  the determination on the issue of preceptor?

18      A.   My issue had to do with the grievance,

19  specifically that she had been disciplined

20  inappropriately due to her behavior on the floor when

21  Lynn Mathis had contacted her or attempted to contact

22  her on the floor.

23      Q.   So you are saying that you really weren't

24  dealing with the issue of the payment on the preceptor?

25      A.   I did not personally do the audit.  Again, I

17

1    relied on the information from the individuals whose

2    responsibility it was to reveal it and research it.

3         Q.   Let me have this marked as Plaintiff's Exhibit

4    Number One, discipline dated 6/30.

5              (Thereupon, the discipline dated 6/30 was

6         marked as Plaintiff's Exhibit Number One for

7         Identification.)

8         Q.   Let me show you what's been marked as

9    Plaintiff's Exhibit Number One.  Is that the counseling

10   that you referred to before?  Was that the one that you

11   were involved in?  Is this the one that was subsequent?

12        A.   I believe this was the one that she grieved

13   to me, that's correct.

14        Q.   I don't see here in the counseling that you

15   told employees to lie for her.

16        A.   I don't know.

17             MR. COPELAND:  Object to form.

18   BY MR. KARLIN:

19        Q.   I'll ask you, is there anything in this

20   Plaintiff's Exhibit Number One that refers to her

21   telling employees to lie for her?

22        A.   There is nothing in this particular document,

23   but in the interviews which were conducted with the

24   employees on the floor that's what became evident.

25   I don't know what see attached speaks to here.  I don't

1    know if these were e-mails attached.

2        Q.    Let me have mark as Plaintiff's Exhibit Number

3    Two a note from Sue Wakat.

4            (Thereupon, the e-mail was marked as

5        Plaintiff's Exhibit Number Two for Identification.)

6        Q.    Is there anything in Plaintiff's Exhibit Two

7    where it references that she told employees to lie for

8    her?

9        A    I don't see it written here.

10        Q.    Was the gist of the counseling, your

11   understanding is she refused to take a call from her

12   supervisor?

13        A.    Not her direct supervisor, but a member of

14   senior leadership who was the H.R. director at that

15   time, Lynn Mathis.

16        Q.    What was her position?

17        A.    Director of human resources.

18        Q.    Do you know what she was calling about?

19        A.    She was calling to discuss with Coreen exactly

20   this issue of the reimbursements to the individuals and

21   the question and she was going to give her some

22   follow-up, try to bring to closure.  That's what I

23   believe it was.

24        Q.    Was it Ms. Diaz's position that she was, at

25   the time, involved with a patient and couldn't get to

19

1    the phone because of patient care?

2        A.    I'm not sure what her position was.

3        Q.    Hypothetically, if she was involved with a

4    patient at the time and involved in patient care and

5    thus wasn't able to get the phone immediately, would

6    that have been a violation of any disciplinary code?

7        A.    There is nothing that says that she can't pick

8    up the phone and say, I will be with you in a minute.

9    I'm with a patient right now.

10        Q.    But if she's involved in treating a patient in

11    a room, would that be a violation?

12        A.    That's not what this states here.    It states

13    that she was at the nursing desk doing some

14    documentation, according to this, and there really isn't

15    any reason that she couldn't have taken the phone call.

16    Even if you're in a patient room, unless you're

17    responding to a code, there's no reason you can't pick

18    up a phone, I'm busy with a patient, I'll call you back

19    in a minute.

20        Q.    Have you ever disciplined anyone else with

21    respect to not taking a telephone call before?    Has this

22    ever come up before?

23        A.    I have disciplined individuals as far as

24    proper communication within the facility.    Make sure the

25    communication is done timely, appropriately, and

1  properly.

2      Q.   Have you ever disciplined anyone for not

3  taking a phone call?

4      A.   Not specifically, but I would consider this a

5  communication issue.

6      Q.   This was her not taking a phone call from the

7  human resource director?

8      A.   To me it's a communication issue, yes.

9      Q.   Let me have this marked as Plaintiff's Exhibit

10 Number Three.  It's a note from Ms. Mathis, e-mail dated

11 July 2nd, 1999.

12          (Thereupon, the e-mail dated 7-2-99 was marked

13      as Plaintiff's Exhibit Number Three for

14      Identification.)

15          MR. COPELAND:  From Lori Davis.

16 BY MR. KARLIN:

17     Q.   It would be a fair characterization to make

18 that Ms. Davis made a statement that she told Ms.

19 Mathis, she said that she was not there?

20     A.   I'm sorry, was that a question?

21     Q.   Is this your reference to her telling

22 employees to lie?

23     A.   I guess I would gather from the third line

24 down that's what it states.  She said, tell her that I'm

25 not here.

```
 1              MR. COPELAND:  Just for the record, who was
 2        the person that made that statement?
 3              THE WITNESS:  This individual, Lori B. Davis.
 4              MR. COPELAND:  I didn't understand who said
 5        tell her I'm not here.
 6              THE WITNESS:  Coreen Brown-Diaz.  And later
 7        she found her sitting around the corner doing
 8        documentation is what this e-mail says.
 9   BY MR. KARLIN:
10        Q.   Let me have this marked as Exhibit Number
11   Four, it's Ms. Diaz's response to this incident.  Have
12   you seen this response before?
13              (Thereupon, the response was marked as
14        Plaintiff's Exhibit Number Four for
15        Identification.)
16        A.   I don't believe it was a response.  I think it
17   was just a letter she had written to me trying to
18   outline from her point of view what she believed to be
19   true.
20        Q.   Do you know whether or not it was true that
21   someone from human resources told her that the payment
22   on the preceptor program was on a case by case basis?
23        A.   I cannot speak for what other people may have
24   said to her, but that was not my understanding of the
25   policy or the practice at the time.
```

22

1      Q.    Do you know whether or not on or around June

2  29th Mrs. Mathis questioned -- Did you ask?  Let me

3  state it another way.

4          Did you ask Mrs. Mathis about whether or not

5  she questioned Ms. Diaz as to whether the determination

6  is going to be at a meeting, referenced in that

7  paragraph?

8      A.    I'm sorry?

9      Q.    It says on 6/29, the day in question,

10 Mrs. Mathis questioned me twice regarding the attendance

11 of an attorney at a meeting.

12     A.    I do recall something from the past where

13 Coreen wanted to bring an attorney and/or her mother to

14 some of these meetings in regard to questions that she

15 had on grievance policy and procedure which does not

16 allow for attorneys or afford attorneys a role, and that

17 was communicated to her.  I don't know whether or not

18 Mrs. Mathis said it to her once, twice, or never did,

19 but I do know that that was a question brought up by her

20 and we let her know that was not part of our process.

21     Q.    On the bottom it says 1540, she lists

22 chronological log of events between 1500 and 1514,

23 1511-1514, I assume these are military times she's

24 referring to?

25     A.    That's typical for nurses to use military

23

1    time.

2        Q.    At 1542 says was interrupted by Mrs. Mathis.

3    I explained to Mrs. Mathis I was attempting to finish my

4    work, clock out, and go home, and we can talk about this

5    in the morning.  Mrs. Mathis stated we needed a response

6    to legal counsel at a meeting.  Mrs. Mathis also stated

7    that she needed to have response by noon on 6/30 or

8    there would not be a meeting.

9            Do you know if that particular statement, did

10   you ask Mrs. Mathis about that particular statement by

11   Ms. Diaz?

12       A.    I believe if we have our days correct here,

13   this particular day that she is speaking about is the

14   day in which, if we go back to Plaintiff's Exhibit

15   Number Three, she states that she had a conversation

16   with Mrs. Mathis yet her co-workers and supervisor on

17   the floor stated that she avoided the conversations with

18   Mrs. Mathis.  So I don't know that any of this

19   conversation actually occurred or did not occur.

20       Q.    Did you ask Mrs. Mathis as to whether or not

21   she had any conversations?

22       A.    I'm not trying to be evasive, I do not know

23   the answer to that question.  I cannot recall.

24       Q.    1600 finish charting my patient.  You don't

25   know whether or not 1540 is true or not, you never asked

24

1   Mrs. Mathis that?

2        MR. COPELAND:  Object to the form.

3   BY MR. KARLIN:

4        Q.    You don't know if it's true or not true

5   because you never asked Mrs. Mathis that?

6        A.    I don't recall whether I asked Mrs. Mathis

7   specifically this question that you're asking me in

8   regards to this letter, that's what I'm stating to you.

9        Q.    Since you weren't there and since Mrs. Diaz

10  maintains this is what occurred, and you don't recall

11  whether you asked Mrs. Mathis this, then you don't know

12  whether or not this particular statement was true or

13  not?

14       A.    What I did do, as I mentioned to you, I spoke

15  to Mrs. Mathis about what transpired and her attempts to

16  try and contact Ms. Brown-Diaz.  I spoke to the

17  individuals on the floor who were caregivers with her on

18  the floor, and asked what her behavior was and what took

19  place during that time frame.  This particular outline

20  that she gives, I could not substantiate or not

21  substantiate based on the time frames that she gives.

22  That's not something I could substantiate.

23            What I was able to do was speak to the folks

24  who were employed in the facility and gather information

25  from them in regards to what transpired.

25

1       Q.    Between 1540 and 1600, about middle way down,

2    during the time 1510 to 1515, Mrs. Mathis, in her own

3    statement, overhead paged me three times and called the

4    nursing floor at least five times in order to question

5    me on whether or not I was going to have legal counsel

6    present at a meeting with her.  I had already discussed

7    this matter with Ms. Jutras's secretary and Mrs. Mathis

8    earlier that same day.

9            Do you know whether or not that statement is

10   true or not?

11      A.    I do not know.  Again, I do not know whether

12   that statement that Coreen has written here is true or

13   not.

14      Q.    Did you ask Mrs. Mathis specifically whether

15   or not what Ms. Diaz said, as set forth in that

16   particular section of what I just read, was true or not?

17      A.    What I specifically asked Lynn was what her

18   recollection was of the events.  She explained that she

19   tried to contact Ms. Brown-Diaz several times on the

20   floor, was not able to get a hold of her, and later

21   found out that she was avoiding the phone calls and

22   asking other folks to state that she wasn't there when

23   she actually was.

24      Q.    Do you know whether or not the purpose of her

25   telephone calls was to find out whether or not an

1    attorney was going to be present at the meeting?

2        A.    I do not know.

3        Q.    Did you ask her, gee, why were you so

4    desperately trying to reach her?

5            MR. COPELAND:  Object to the form.

6    BY MR. KARLIN:

7        Q.    Reach Ms. Diaz, why was it so critical for

8    her to reach her?

9        A.    My understanding of why Lynn was going to be

10   calling Coreen was for her to discuss the results, as I

11   had stated before, in regards to her investigation, in

12   regards to what was transpiring, or what the research

13   had been that Kim Jutras and Danny Reeves had

14   accomplished at that time.

15       Q.    Do you know why, after she couldn't get

16   through once or twice, why didn't she leave a message?

17   Do you know why it was urgent for her to reach her?

18       A.    Other than the fact that she wanted to

19   follow-up and bring the issue to closure, no.

20       Q.    You don't know whether or not she was trying

21   to reach her to discuss whether or not she was going to

22   bring an attorney to the meeting because she didn't ask

23   her that question; is that fair?

24           MR. COPELAND:  Object to the form.

25       Argumentative.

27

1          THE WITNESS:  That's difficult for me to

2     answer.

3  BY MR. KARLIN:

4     Q.   You don't know whether or not that was the

5  reason for her telephone call, is that right, because

6  you said you didn't ask her that?

7          MR. COPELAND:  Asked and answered.  Go ahead

8     and answer it.

9          THE WITNESS:  My issue is that a person is

10    trying to contact her to discuss answering

11    questions that she had.  She refused the telephone

12    call and then asked other folks that were on the

13    floor to mislead the people calling, which are Lynn

14    Mathis, in whether she was there.

15  BY MR. KARLIN:

16    Q.   Wasn't it Ms. Diaz'S position now that listen,

17  she wanted to know if she was going to bring an attorney

18  to the meeting.  I already advised her personally I

19  wasn't sure at this point, I advised her secretary, I

20  wasn't sure at this point, and she was calling me on the

21  same issue about the meeting on which I've already

22  discussed.  I'm about to clock out, I have to take care

23  of these patients and get back to her in the morning.

24    A.   That's not what transpired from what I had

25  researched and found out.  That's what's stated in her

28

1    letter, but, again, that's not what transpired from what

2    I have seen, from what I was able to discover.

3         Q.   She maintains that she was extremely busy at

4    the time.  She was monitoring a patient that was

5    receiving blood for the first 15 minutes as hospital

6    protocol requires, and it would be negligent of her if

7    that patient had a transfusion reaction while she was on

8    the phone with Mrs. Mathis.

9              Is that statement accurate in terms of her

10   leaving a patient?  Do you know if that's true or not?

11        A.   Again, there are phones in every patient

12   room.  There isn't any particular reason why somebody

13   wouldn't be able to pick up the phone, I'm busy with a

14   patient, I'll give you a call back in a minute.

15        Q.   Isn't that what she told one of the nurses,

16   that she was too busy with patients?

17        A.   Not according to this particular e-mail right

18   here.  It states that she said, let them know I'm not

19   here, I'm off, I'm going home.  And then later on they

20   found her in an area doing something, we assume

21   documenting, but we don't know.

22             MR. COPELAND:  Referring to Exhibit Three?

23             THE WITNESS:  Yes.

24   BY MR. KARLIN:

25        Q.   Let me have marked as Plaintiff's Exhibit

29

1    Number Five the memo from Mrs. Kim Jutras.  Is that how

2    you pronounce her name?

3         A.    That's correct.

4               (Thereupon, the memo was marked as Plaintiff's

5         Exhibit Number Five for Identification.)

6         Q.    She's no longer with the hospital,

7    Mrs. Jutras?

8         A.    That's correct.

9         Q.    Do you know where she is employed?

10        A.    I believe she's at Coral Springs Medical

11   Center.

12        Q.    Now, here it says we have checked payroll

13   records for reimbursement and AP records for expense

14   reimbursements.  We cannot find that we paid these two

15   ladies for any BCC reimbursements.

16        A.    That was the statement made by Danny Reeves

17   who was the controller.

18        Q.    So this is what you were relying on when you

19   made the conclusion?

20        A.    That's correct.

21        Q.    And the e-mail below, is that your e-mail

22   that's July 2nd?

23        A.    That's Kim requesting the information from

24   Danny for two specific individuals.

25        Q.    And that's the two I think I mispronounced

1    their name, Donna Shambo and Cathy Stiglich.

2            Let me have marked as Plaintiff's Exhibit

3    Number Six a memo from the file from Mr. Chaykin dated

4    August 6, '99.  Is this your memo to Ms. Diaz?

5            (Thereupon, the memo dated 8-6-99 was marked

6        as Plaintiff's Exhibit Number Six for

7        Identification.)

8        A.    Yes, sir.

9        Q.    In response to her grievance?

10       A.    Yes, sir.  Yes, it is.  I'm sorry, my throat

11   is sore.

12       Q.    Regarding the internship policy, employees

13   that participate in a new graduate preceptor program are

14   paid an additional stipend, is that different than

15   having your tuition reimbursed?

16       A.    The employees that are graduated from a

17   preceptor program would be what I would define as a

18   practice as being people from a BSN type program, BSN

19   meaning a bachelor of sciences for nursing.  Broward

20   Community College or Miami-Dade Community College are

21   different programs, those are AA prepared nurses.

22       Q.    And did you know whether or not the two other

23   employees that are referenced in the e-mail, they were

24   the new graduate preceptor program or they were from the

25   community college program?

31

1          A.    Let me just flip this back over again.

2                MR. COPELAND:   Referring to Exhibit Number

3          Five.

4    BY MR. KARLIN:

5          Q.    Right.

6          A.    What I wrote in this memo I was basing this

7    memo on this information, okay.  Subsequent to this memo

8    is when, again, as I mentioned to you, through looking

9    at budgets and the different cost centers we had seen

10   one of the individuals did receive payment for tuition,

11   and that's why we came back to Coreen and stated that

12   through a further audit looking at a different place, we

13   had found this was an issue and offered her that amount

14   at which point she declined to accept that amount.

15         Q.    And is that your handwriting on the bottom?

16         A.    Yes, sir, it is.

17         Q.    Meeting began at 4 p.m.

18         A.    Yes, sir.

19         Q.    Meeting ended at 4:11 p.m.

20         A.    That's correct.

21         Q.    Is that mother?

22         A.    Yes.

23         Q.    What does that say?

24         A.    Mother entered.  Her mother was waiting out in

25   the foyer, originally, and wanted to enter with Coreen

1    into the office with me.  I spoke to her and I explained

2    that it was not appropriate.  I could only speak to

3    Coreen in regards to Coreen's issues.  She re-entered

4    the administrative office at 4:16 p.m., stated that she

5    was disappointed with the outcome of her daughter's

6    meeting and would be forced to fight the injustice.

7    Aracelis, who was our secretary at the time, both told

8    the mother that we could not discuss her daughter's case

9    with her.  That's what we basically both told her.

10        Q.    That took place between 4:00 and 4:11?

11        A.    I sat down with Coreen, gave her a copy of

12    this memo.  Actually, I believe I signed the original of

13    this memo, explained, went through what my research had

14    shown based on a response to her request, and at the

15    time she quietly took the memo and left my office at

16    that time, and her mother reappeared.

17        Q.    Let me have marked as Exhibit Number Seven a

18    letter, a note from Kim.  Is that Lynn Mathis, do you

19    know?

20            (Thereupon, the note was marked as Plaintiff's

21        Exhibit Number Seven for Identification.)

22        A.    I would assume that's who it is, yes.

23        Q.    Is that in reference to running a cross

24    reimbursement?

25        A.    What I described to you before, that is

33

1    correct.

2        Q.    It appears maybe there was something maybe

3    attached to this but it's not here now.

4        A.    Did you receive something attached to

5    this?  You should have.

6        Q.    I'll take a look at it.

7        A.    I believe, I don't want to speculate, I

8    believe something originally was attached to that.

9        Q.    Let me have marked as Plaintiff's Exhibit

10   Number Eight, I would just note this has been inked out,

11   not redacted, and I would ask for a clean copy or ask

12   for an explanation of why this was redacted.

13            (Thereupon, the e-mail was marked as

14        Plaintiff's Exhibit Number Eight for

15        Identification.)

16            MR. COPELAND:  Having not redacted it, I

17        assume it was privileged information.

18            MR. KARLIN:  I would ask just for an

19        explanation.  I don't see how it would be

20        privileged because it was from Mrs. Lynn.

21   BY MR. KARLIN:

22        Q.    Do you know who Joseph Michael is?

23            MR. COPELAND:  It may contain a patient name

24        or patient information.

25            THE WITNESS:  Michael Joseph is the gentleman

34

1     who I mentioned was the chief executive officer.

2     E-mail puts last names first.  So that was, I

3     gather, an e-mail from Lynn directly to Michael in

4     regards to the research that I believe is referred

5     to in this memo, this note from Kim, Exhibit Number

6     Seven.

7  BY MR. KARLIN:

8     Q.   And this is, I presume, another e-mail.  Is

9  this the first time you have seen this e-mail?

10    A.   Again, this was discussed several times.  I

11 don't particularly remember seeing this e-mail before.

12 It looks like it was copied to me.

13    Q.   Let me have marked as Exhibit Number Nine a

14 letter dated 10/29/99.

15         (Thereupon, the 10/29/99 letter was marked as

16    Plaintiff's Exhibit Number Nine for

17    Identification.)

18    A.   Can I just make one comment.  I don't remember

19 the original form of this letter and I don't know why

20 the word further is struck out.

21    Q.   I have several drafts of a letter.  Do you

22 remember sending a letter, if not this letter a letter

23 similar to this one?

24    A.   Actually, it wasn't a letter that was sent to

25 her.  It has her address on it, but I'm sorry.  I'm

1    incorrect.  I first met with her and then I believe it

2    was sent certified mail to her as well.

3         Q.   Now, there was a subsequent counseling of her

4    on or about 1/25/2000.  Were you involved at all in that

5    particular discipline?

6         A.   Can you refresh my memory?

7         Q.   Sure.  Let me have marked as Plaintiff's

8    Exhibit Number Ten the counseling dated 1/25/00.

9              (Thereupon, the counseling dated 1/25/00 was

10             marked as Plaintiff's Exhibit Number Ten for

11             Identification.)

12        A.   Oh, yes.  Okay.

13        Q.   Were you involved at all in the investigation

14   on this matter?

15        A.   Yes.  Once it was grieved to me, yes.  Coreen

16   had grieved this particular suspension due to her

17   comments and action on the floor.

18        Q.   The first counseling didn't result in a

19   suspension; is that correct?

20        A.   I don't believe so.  I think it's a

21   progressive discipline.  We have a copy of it.  I

22   believe that was a written reprimand.  Let's just go

23   back for a second.  It's marked as being a written

24   reprimand.  And the next step is the progressive

25   discipline would be suspension, that's correct.

36

1          Q.    And what was your understanding of what was

2     being charged?

3          A.    We, at the time, had a program by which every

4     department manager in the building had assigned rooms,

5     including myself, and we would go on a daily basis

6     around and see if there were issues that we could take

7     care of for patients.  If you were a patient in the

8     hospital and assigned one of my rooms I would come in

9     and say to you, good morning Mr. Karlin, is there

10    anything I can assist you with today.  Is there anything

11    I can to do to make you more comfortable.  Any questions

12    I can answer or get the right people here to answer

13    right questions for you.

14          It's a program that we had for quite sometime

15    and there was a person who was involved with this

16    program by the name of Wanda Fogarty who was the

17    director of radiology and Wanda needed some assistance,

18    as I recall, in regards to a patient.  There was a

19    request that had come from the patient in regards to

20    either being moved or something such as that.  It's

21    pretty standard, it's not pretty standard, it is

22    standard if a patient asks to be moved or if they ask

23    for water or something, that's specifically some sort of

24    interaction which we go back to the primary caregiver.

25    For example, if you were my nurse you would know if I'm

1    going to be going down for a CT and couldn't drink

2    water, even though you might ask for water I might not

3    be able to give it to you.

4        Q.   Right.

5        A.   When Wanda questioned who the individual was

6    who is taking care of that patient Coreen had made some

7    disparaging remarks in regard to the patient rep

8    program, asking what's the point of these people, they

9    are useless.  I'm serious, what is the point of these

10   reps when I have to do it myself anyway, which really

11   defeats the entire purpose of trying to have somebody up

12   there assisting with patient's needs by creating a

13   negative environment for the patient and also the other

14   co-workers.  So subsequently she was written up for that

15   behavior.

16       Q.   Who was the patient rep?

17       A.   Person by the name of Wanda Fogarty as I

18   mentioned.  I believe you will be spending some time

19   with her at some point.

20       Q.   I don't think she was available today.

21       A.   She's on vacation.

22       Q.   Let me have marked as Plaintiff's Exhibit

23   Eleven the grievance dated 2/2/2000.

24            (Thereupon, the grievance was marked as

25       Plaintiff's Exhibit Number Eleven for

38

1          Identification.)

2          Q.    Basically, Mrs. Diaz's position was that she

3    did make the comment, but it was made in her office, 4th

4    floor nurse manager, confidence in her office.  If that

5    was true, I'm not saying it was true or not true, if

6    that was true, would that have been a violation at that

7    particular point since it wasn't in front of a patient?

8          A.    I would say it would be a concern that anyone

9    could bring up a concern with a manager.  At which point

10   it would be the manager's role to discuss those concerns

11   and try to explain what the issue was and point of the

12   program.   It's a different venue then in front of a

13   patient in a public area making discouraging,

14   disparaging remarks about the facility and the patient

15   reps which are there to help.

16         Q.    She said she spoke to Sue Wakat, it was said

17   to Sue Wakat not to Mrs. Fogarty.  Maybe Mrs. Fogarty

18   was present, but it was not in front of the patient?

19         A.    That's not what I found to be true.

20         Q.    Then she states it's puzzling to me that on

21   more than one occasion Mrs. Fogarty has been rude and

22   discourteous in the presence of patients and their

23   family yet no disciplinary action has been brought

24   against Mrs. Fogarty.

25               Would it be fair to say, and correct me I'm

1  wrong, that even if it was all true that she is still

2  being treated differently because Mrs. Fogarty has done

3  the same thing without any consequence at all?

4       A.   Not to my recollection.  And, again, I have

5  been here two and a half years and Mrs. Fogarty has

6  never had any issues with being discourteous to any

7  family, patients, staff.

8       Q.   Did you ask Ms. Diaz for any specifics as to

9  that particular statement?

10      A.   Actually, I do remember speaking to her about

11 that.  I do not remember her giving me any specifics

12 other than that general statement that she's making

13 here.

14      Q.   Have you ever had any disciplinary action

15 before regarding a nurse being rude?

16      A.   Not that I've been directly involved with.

17 That would fall under the purview of the chief nursing

18 officer.

19      Q.   As I understand it, your main complaint wasn't

20 that she was voicing her dissatisfaction or concern

21 about this particular program, it was that it was done

22 in front of a patient which will reflect badly on the

23 hospital, would that be accurate?

24      A.   It was done in an improper venue and improper

25 time, that's correct.

40

1      Q.   Have you had any other nurses who have done

2  something of that nature who have complained about

3  something that was going on, if it was hospital policy

4  or procedure, in front of patients which result in any

5  form of discipline?

6      A.   I don't follow the question.  Not something

7  that I have been directly involved with.  That would

8  fall under the purview of the chief nursing officer to

9  deal with those as they occur.

10     Q.   The question then would be, why would you be

11 involved in this particular case?  Is it because she

12 filed a grievance?

13     A.   That is correct.

14     Q.   You would only get involved if there's a

15 grievance filed?

16     A.   That's correct.

17     Q.   You have not been involved in anything other

18 than with respect to a nurse criticizing either hospital

19 policy or practice in front of a patient before other

20 than Ms. Diaz?

21     A.   No.  Other than if it's brought to me as a

22 grievance it would get to me at that point.

23     Q.   Nothing like this where someone is, again,

24 criticizing the hospital policy or practice in front of

25 a patient has been grieved to you before other than that

41

1  situation?

2      A.    Not that I can recall.  May I ask you a

3  question?

4      Q.    Sure.

5      A.    How are we doing on time?

6      Q.    We are almost done.

7      A.    Okay.  May I make a quick call?

8      Q.    Sure.

9            (Thereupon, a brief recess was had.)

10     Q.    Who is Marlene McKay?

11     A.    Name does not ring a bell at this point.

12     Q.    Marlene McKay, M-C-K-A-Y?

13     A.    I'm sorry, it doesn't ring a bell at this

14  time.

15     Q.    Anyone in human resources?

16     A.    No.  I don't believe she's an employee in

17  human resources.

18     Q.    I know who she is now, never mind.

19     A.    Okay.

20     Q.    Let me have this marked as Plaintiff's Exhibit

21  Number Twelve.  It's a statement from Marlene McKay.

22           (Thereupon, the statement was marked as

23       Plaintiff's Exhibit Number Twelve for

24       Identification.)

25     Q.    Did you get a chance to review the statement?

42

1      A.   Yes, sir.

2      Q.   Did you interview Mrs. McKay?

3      A.   I don't remember personally interviewing

4  Mrs. McKay, but I do remember reading a written

5  statement.

6      Q.   It would be fair to state, as she indicates,

7  the statement was made, as I think everybody has

8  acknowledged, but it doesn't indicate whether or not the

9  patient overheard the statement in her statement to whom

10 it may concern?

11     A.   I would disagree.  It states I walked down to

12 the room, Coreen and I met at the door room and

13 proceeded to assist the patient.  Coreen stated, what

14 are the patient reps for?  Why can't they help the

15 patients?  I told her that was our job.  Comments were

16 overheard by Wanda who was standing in the hallway at

17 the time.  She said it directly in front of the patient.

18     Q.   Where is that?

19     A.   Right here.

20     Q.   She said that she assists the patient to the

21 bathroom.  You don't know if the patient was in the

22 bathroom when the statements were made.  Does it say

23 that the patient overheard the statement in this

24 particular statement?

25     A.   When somebody writes, we assisted a patient to

43

1    the restroom and they both said the patient was in the

2    restroom, they were assisting the patient to the

3    restroom, you're interpreting it one way.  You can state

4    and interpret whatever you wish to, but I do not agree

5    with your interpretation.

6        Q.    Okay.  Let me have marked as Plaintiff's

7    Exhibit Number Thirteen an e-mail from Ms. Diaz.  It's

8    titled addendum to grievance.

9            (Thereupon, the e-mail was marked as

10           Plaintiff's Exhibit Number Thirteen for

11           Identification.)

12       A.    Okay.

13       Q.    Did you ever speak to Mrs. Khan?

14       A.    I don't recall, who is Mrs. Khan?

15       Q.    She's an R.N.  I'm sorry, I thought that was

16   an employee.

17       A.    That was the patient.

18       Q.    Do you know whether or not that was true that

19   she was interrupted in the middle of the procedure?

20       A.    Again, if we go back to previous Exhibit

21   Number Twelve, Marlene McKay states what the events were

22   that took place.  I don't know, I cannot speak for what

23   Coreen was or wasn't doing.  She did respond to the page

24   and meet Marlene McKay at the patient's doorway.

25       Q.    She identifies that Mrs. Fogarty is rude to

1    staff members such as S. Gorrell, L. Doyle, A. Ferguson.

2    Were any statements obtained from any of those

3    individuals?

4        A.    Not that I recall.

5        Q.    If an employee is discourteous to staff

6    members, that would be a violation of policy as well;

7    would that be correct?

8        A.    That would be correct.

9        Q.    You chose not to investigate that particular

10   allegation that she made against Mrs. Fogarty, would

11   that be fair?

12       A.    They are two separate issues.

13       Q.    You chose not to investigate that, would that

14   be fair?

15       A.    They are two separate issues.

16       Q.    You chose not to investigate that, would that

17   be fair?

18       A.    They are two separate issues.  I don't know

19   exactly where that's going.

20       Q.    You didn't get any statements as to whether or

21   not Mrs. Fogarty was rude and unprofessional, would that

22   be right?

23       A.    I had spoken with the nurse manager on the

24   floor, Sue Wakat, that's another person who this issue

25   has been supposedly brought up to, and Sue Wakat did not

45

1    state there were any issue or issues that were brought

2    to her at that time.

3        Q.   She was making a charge that Mrs. Fogarty

4    shows less than professional behavior to certain staff

5    members.  She named three nurses besides herself and you

6    did not investigate that charge; is that fair?

7        A.   Yes.  It was a separate issue.

8        Q.   You didn't investigate that separate issue?

9             MR. COPELAND:  Asked and answered.

10            MR. KARLIN:  I'm not getting a response.

11            MR. COPELAND:  It's not the answer you want.

12   BY MR. KARLIN:

13       Q.   I understand it was a separate issue, nothing

14   to do with that particular investigation.  She raised a

15   charge against this particular nurse.  Did you

16   investigate that particular charge?

17       A.   I continue to contend it was a separate issue.

18       Q.   Did you investigate that separate issue?

19            MR. COPELAND:  Asked and answered.  Move on.

20   BY MR. KARLIN:

21       Q.   Did you investigate it?  Did you do anything?

22   Did you get a statement from Mrs. Doyle?

23       A.   Separate issue, sir.

24       Q.   Is this a yes or no?

25       A.   No, it was a separate issue.

1      Q.    Did you get a statement from Mrs. Doyle?  I am

2    entitled to a response.  Did you get a statement from

3    Mrs. Doyle as to whether or not Mrs. Fogarty was

4    unprofessional and rude?

5      A.    I think I previously stated I did not recall

6    speaking to Mrs. Doyle with regards to Mrs. Fogarty.  I

7    perceive it as a separate issue.

8      Q.    That would be the same answer for Mrs. Gorrell

9    and Mrs. Ferguson; is that right?

10      A.    That would be correct.  Can I be excused for

11    one minute please?

12      Q.    Sure.

13      A.    Thanks.

14            (Thereupon, a brief recess was had.)

15            MR. KARLIN:  I have nothing further.

16                      CROSS EXAMINATION

17    BY MR. COPELAND:

18      Q.    Let me try to get you out of here if we can.

19    I'm going to show you what I'll have marked as

20    Defendant's Exhibit One.  It's a memo to yourself from

21    Glenn Mathis dated September 10th, 1999 which seems to

22    summarize the events concerning Coreen Diaz from June 1,

23    1999 through September 3rd, 1999 and I'll ask you if you

24    recall receiving that?

25            (Thereupon, the memo dated 9-10-99 was marked

47

1      as Defendant's Exhibit Number One for

2      Identification.)

3      A.    Yes, I do.

4      Q.    Did you review it at the time?

5      A.    Yes, I did.

6      Q.    Does it, to your understanding, reflect the

7   events that occurred or transpired to Coreen Diaz they

8   were investigated?

9      A.    Yes, and also Mr. Reeves.

10      Q.    In regards for the preceptor program there is

11   some discussion about there was a change in the

12   preceptor program?

13      A.    Uh-huh.

14      Q.    Can you tell me what that change was and what

15   was the significance in relation to Ms. Diaz's claim

16   that she should be paid for time spent precepting?

17      A.    Well, there was a change basically based on

18   the nursing shortage, and the way that we were

19   approaching and dealing with these nurses and there was

20   ultimately a change in the way that we practiced

21   reimbursing people for their tuition.

22      Q.    Were they, in fact, paid for time spent

23   working here under a new program?

24      A.    Uh-huh.

25      Q.    And was that program developed by the

48

1   hospital?

2       A.   Yes, it was.

3       Q.   Now, the program that Ms. Diaz was in, was

4   that a program that was administered by BCC and Broward

5   Community College?

6       A.   Yes, it was.

7       Q.   Were there other employee graduates that went

8   through that same program here at the hospital besides

9   Ms. Diaz?

10      A.   As I understand it, yes, there were.

11      Q.   Do you have any knowledge if any of the

12  individuals that went through the BCC preceptor were

13  paid for time spent precepting?

14      A.   Not for the time spent precepting.  Possibly

15  for tuition.

16      Q.   Was Ms. Diaz's claiming that she should be

17  paid for time spent precepting as opposed to being

18  reimbursed for tuition or was it for both?

19      A.   My understanding it was for both.

20      Q.   Now, I guess at some point in time when you

21  developed your own program you began paying the

22  graduates when they were precepting; is that right?

23      A.   That's correct.

24      Q.   Why did you make the decision to then pay

25  them?

1      A    Because of the shortage and trying to attract

2  people here to the campus and also an opportunity to

3  train people, have them familiarized with the hospital

4  system and the infrastructure here.

5      Q.   Do you have any knowledge if Westside went to

6  BCC to set up the program or were they approached by BCC

7  in regards to the preceptorship program?

8      A.   I have no knowledge of that personally.

9      Q.   I believe at some point in time, it looks

10  like September or October of 1999 when you said Kim was

11  doing a reconciliation for the budget here that you

12  learned that there was one individual who had been

13  reimbursed for tuition; is that correct?

14      A.   It looked like the name of the individual was

15  Sergio Salmon (phonetic).

16      Q.   Was that any of the individuals to whom

17  Ms. Diaz was asserting were paid and she was not?

18      A.   No.  She was asserting two different

19  individuals.

20      Q.   Now, upon learning of that did you then make

21  the decision to make her the same consideration that

22  this one individual has?

23      A.   Yes, we did.

24      Q.   Do you know if all individuals were reimbursed

25  for their tuition or just an isolated incident?

1      A.   As far as we were aware, it was an isolated

2   incident.

3      Q.   Do you know the circumstances about that?

4      A.   All I know we had made the payment and that

5   payment also was made to her.

6      Q.   You said you had sent a letter to Ms. Diaz via

7   certified mail.  Is this a copy of the letter that you

8   sent to her?

9      A.   Yes.

10      Q.   I'll have that marked as Exhibit Number Two.

11          (Thereupon, the letter was marked as

12      Defendant's Exhibit Number Two for Identification.)

13      Q.   I believe you stated that Ms. Diaz had

14   refused to accept the $350; is that correct?

15      A.   That's correct.

16      Q.   Did she communicate this to you in an e-mail?

17      A.   Yes, she did.

18      Q.   Is this a copy of the e-mail where she refused

19   the acceptance?

20          (Thereupon, the e-mail was marked as

21      Defendant's Exhibit Number Three for

22      Identification.)

23      A.   That's number three.

24      Q.   Do you know the individuals she was asserting

25   or individuals who participated in the program at the

51

1   same time that she did, or was participating in the new

2   program which was administered by Westside?

3       A.    I don't have a recollection of that at this

4   time.

5       Q.    Part of the investigation into the accident

6   concerning Wanda Fogarty, did Mrs. Fogarty provide a

7   statement as to what took place?

8       A.    Yes.

9       Q.    We'll have this marked as the next Exhibit

10  Number Four.

11          (Thereupon, the e-mail was marked as

12          Defendant's Exhibit Number Four for

13          Identification.)

14      Q.    Is that a copy of the e-mail that she provided

15  to you or her statement of what took place on that day?

16      A.    Yes, it is.

17      Q.    In here it says Coreen stated in a very loud

18  voice in verbalizing what is the point of these patient

19  reps if they are got going to do anything.  Did your

20  investigation confirm that that is in fact what had

21  occurred?

22      A.    Uh-huh.

23      Q.    Why is it that you felt that based upon the

24  grievance that the write-up and suspension of her was

25  appropriate under the circumstances?

52

1      A.    If she had concerns in regards to the

2  grievance there is an appropriate venue which she can

3  communicate her concern.  It's not appropriate to

4  communicate these types of concerns in front of patients

5  or family members or physicians.  It's our efforts to

6  make it as painless a process of people who are here.

7      Q.    Did Ms. Diaz ever deny making the statements

8  that were attributed to her?

9      A.    Only in the grievance rebuttal that she has

10 through the grievance request I should say.

11     Q.    Is it true she denied that they were made, but

12 not that the statements were made?

13     A.    That's correct.

14     Q.    Was her grievance with you more of what she

15 felt was appropriate under the circumstances as opposed

16 to whether or not it was an appropriate action at all,

17 or did she feel that she had done absolutely nothing

18 wrong?

19     A.    She had felt that she had done nothing wrong.

20     Q.    Did you review the e-mails?  Did you speak

21 with Mrs. Fogarty as well?

22     A.    Absolutely.

23     Q.    Did she also confirm with you what is stated

24 in the e-mail?

25     A.    Yes.

53

1      Q.    I believe there was the e-mail as well in this

2   written statement we have.

3      A.    From Marlene McKay.

4      Q.    From Marlene McKay.  By the way, is Marlene

5   McKay, was she the charge nurse, do you know, that

6   worked on the floor?

7      A.    I believe she was.  We can go back and check

8   the records.

9      Q.    Do you happen to know if she's African

10  American?

11     A.    I don't know.

12     Q.    When Ms. Diaz complained about not being paid

13  for precepting, did she form the complaint in the basis

14  that she was being treated differently based upon her

15  race?

16     A.    Not that I was aware of at that time.  That

17  conversation really took place between she, her manager,

18  which was Sue Wakat and Kim Jutras who did the research,

19  and Danny Reeves.  I didn't become involved until the

20  grievance became an issue.

21     Q.    Did you, during the course of any of your

22  investigations, ever undercover any information which

23  led you to believe that she was being singled out or

24  treated differently because of her race?

25     A.    No.

54

1      Q.   Did you uncover in the course of any of your

2   investigation or any of the grievance, find any

3   information other than Ms. Diaz's own assertion in

4   statements which supported her contention that she was

5   being retaliated against in any way for lodging any

6   complaints with the hospital?

7      A.   No, I did not.

8      Q.   Do you know if Ms. Diaz's behavior, do you

9   know if she had any behavioral problems on the floor

10  while she was here?

11     A.   I am aware from her manager's evaluation of

12  her verbally and also I believe her last evaluation

13  shows from an interpersonal standpoint.  Sometimes she

14  had issues communicating with people effectively.  I had

15  always heard or had heard that she was a good technical

16  nurse.  Sometimes lacked the ability to communicate

17  effectively with caregivers or peers.

18     Q.   Did the lack of her ability to communicate

19  effectively and appropriately and under proper

20  circumstances, was that the core issue behind most of

21  the reasons or the problems that you experienced with

22  Ms. Diaz?

23     A.   Yes, what I believe so.

24     Q.   Now, on Defendant's Exhibit Number One there

25  is also an indication from Lynn Mathis of what took

1   place in regards to the time when she was trying to

2   contact her on the floor.  I think it's written down as

3   June 29th, 1999.  Does that refresh your recollection as

4   to why Mrs. Mathis was trying to contact Mrs. Diaz?

5        A.   Again, I believe that the reason they were

6   trying to contact Mrs. Diaz was in order to discuss what

7   their findings were in regards to this preceptor issue.

8        Q.   Was there any issue on whether Ms. Diaz

9   refused to tell Lynn Mathis on Kim Jutras who she was

10  planning on bringing to a meeting they were attempting

11  to schedule?

12       A.   There was concern, as I understand it from

13  speaking with Kim and also Lynn, she had tried to bring

14  either a lawyer and/or, again, her mother into the

15  process which is not appropriate, nor is it afforded by

16  our grievance process or disciplinary action process.

17       Q.   Do you know if Mrs. Mathis -- I guess at some

18  point in time Mrs. Mathis went to the floor and

19  confronted Ms. Diaz, is that your recollection of what

20  took place at the end of that day?  It's actually not

21  indicated on that.  Do you have any recollection of

22  that?

23       A.   No, I do not.

24       Q.   And regards to the incident involving Wanda

25  Fogarty, or was there any circumstances in that case

1    which would make it inappropriate for Mrs. Fogarty to

2    assist a patient to the bathroom if they were requesting

3    assistance?

4         A.    Specifically, the condition of the patient was

5    either unknown to her or I believe that in the e-mail

6    that you just showed me that Wanda sent there was a

7    green leaf on the door frame.  Green leaves on our door

8    frames specifically denote that people are more likely

9    to fall or could have a propensity to fall, so they

10   would need to be assisted by more than one caregiver and

11   make sure it's appropriate for them to leave the bed, or

12   if they needed to use the urinal or needed to use a bed

13   pan.  So it would be normal for her to ask a caregiver

14   what's the appropriate thing to do for this individual.

15        Q.    And who is the caregiver that they would have

16   to go to?

17        A.    It appears she went to the desk and that's

18   when Coreen was called because I believe it was Coreen's

19   patient.  And she would be the person who would know the

20   most about what was happening with that patient at that

21   time and be able to direct and also assist

22   appropriately.

23        Q.    As a policy and practice in the hospital, you,

24   as a patient rep or as an administrator, are you

25   permitted to assist patients in the rooms or is that

57

1    something that is relegated to the caregivers exclusive

2    domain?

3        A.    Demonstrated competency has to be in the file

4    for any type of invasive interaction with a patient.

5    For example, if somebody asked me if they wanted to be

6    moved, I would check with the caregiver, make sure it

7    was appropriate to do so, and try to take care of the

8    person's needs.  Again, we are not directly involved

9    with the patient's care for that shift or that day or

10   that stay, so we need to rely on them to tell us what's

11   appropriate or inappropriate in regards to managing that

12   patient and assisting them.

13       Q.    Had Mrs. Fogarty assisted this patient to the

14   restroom, given the information that you know from the

15   green flags on her door and everything else, would that

16   have been appropriate?

17       A.    It would not have been appropriate and it

18   could have led to risk which is why she did what she

19   did.  She looked for information and tried to seek out

20   the appropriate people to assist her.

21            MR. COPELAND:  I have nothing further.

22                 REDIRECT EXAMINATION

23   BY MR. KARLIN:

24       Q.    On the evaluation it summarizes her ability to

25   communicate, would that be under interpersonal skills?

58

1      A.   I believe it would.

2      Q.   I'm not going to have this marked.  I would

3    assume a three on her evaluation would be considered

4    above average; would that be fair?

5      A.   Let's take a look at the grading scale on the

6    front of the evaluation and the interpersonal section

7    itself.

8      Q.   Sure.  The only reason I'm not having it

9    marked is it's front and back and only the front was

10   copied.

11     A.   Which one is that time period for?

12     Q.   This would have been '97, '98.  This was

13   before any of her allegations.

14     A.   What's that one for?

15     Q.   I got '99.

16     A.   Can I take a look at that one for a second.

17     Q.   This is the one I'm showing you.

18     A.   I understand.

19     Q.   This is pre-evaluation.  They are all marked

20   three.

21     A.   For what's marked here, that's correct.

22     Q.   And that would be under this, that would be

23   satisfactory plus; is that correct?

24     A.   That's correct.  Could I see the other

25   evaluation or no?

59

1       Q.    By the way, did Mrs. McKay ever file a

2   discrimination complaint?

3       A.    I'm sorry?

4       Q.    Do you know if Mrs. McKay ever claimed that

5   she was discriminated against?

6       A.    Not to my knowledge.    That was interpersonal

7   right there, you passed it at the bottom of that.

8       Q.    There it would indicate -- it's all two's

9   except for her attitudes deteriorated somehow in 1999;

10  would that be fair?

11      A.    That's what it appears on the evaluation,

12  that's correct.

13            MR. KARLIN:    I have nothing further.

14            MR. COPELAND:    Nothing further.    He will

15       read.

16       (Thereupon, the deposition concluded at 2:35 p.m.)

17

18

19

20

21

22

23

24

25

60

CERTIFICATE OF OATH

1

2

3

4  STATE OF FLORIDA      )

5  COUNTY OF BROWARD      )

6

7

8

9          I, the undersigned authority, certify that LEE

10  CHAYKIN personally appeared before me and was duly

11  sworn.

12

13          WITNESS, my hand and official seal this 17th

14  day of April, 2001.

15

16

17          OFFICIAL NOTARY SEAL
              NANCY D SMITH
18    NOTARY PUBLIC STATE OF FLORIDA
              COMMISSION NO. CC757...
19    MY COMMISSION EXP...

20

21          _Nancy_

22          NANCY D. SMITH, RPR,

23          Notary Public - State of Florida

24          My Commission Expires: 7-07-2002

25

61

1                REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA    )

4    COUNTY OF BROWARD    )

5

6            I, NANCY D. SMITH, Registered Professional

7    Reporter, certify that I was authorized to and did

8    stenographically report the deposition of LEE CHAYKIN,

9    that a review of the transcript was requested, and that

10   the transcript is a true and complete record of my

11   stenographic notes.

12

13           I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the action.

18

19           DATED this 17th day of April, 2001.

20

21

22

23           _____

24           Nancy D. Smith, RPR

25

62

DOWNTOWN REPORTING
337 East Las Olas Boulevard
Fort Lauderdale, FL    33301
954-522-3376

April 17, 2001

LEE CHAYKIN
C/o CHRISTOPHER COPELAND, ESQ.
CARLTON FIELDS
222 Lakeview Avenue
Suite 1400
West Palm Beach, FL    33401-6149

Re:  DIAZ vs. COLUMBIA HOSPITAL CORPORATION

Dear Mr. Chaykin:

At the conclusion of your deposition given in the above-styled cause you indicated you wished to read and sign the transcript.

This letter is to advise you that the transcript of your deposition is now ready.  You may call (954) 522-3376 to schedule an appointment to read and sign your deposition transcript; however, if you are a party in this action and your attorney has ordered a copy of this transcript, you may wish to read his copy and forward to us a photostatic copy of your signed correction sheet.

If you would like to waive your signature at this time, please so advise.  If not, please be advised that your transcript will be available for your signature for two weeks from the date of this letter.

Thank you.

Sincerely,

Nancy D. Smith

cc:  Christopher Copeland, Esq.

63

AFFIDAVIT

1

2    STATE OF FLORIDA        )
     COUNTY OF BROWARD       )
3
            I, LEE CHAYKIN, being first duly sworn, do
4    hereby acknowledge that I did read a true and certified
     copy of my deposition which was taken in the case of
5    DIAZ vs. COLUMBIA HOSPITAL CORPORATION taken on April
     10, 2001, and the corrections I desire to make are as
6    indicated on the attached Errata Sheet.

7            Done and signed this _____day of
     _____, 2001.
8

9                              _____

10                              CERTIFICATE

11   STATE OF FLORIDA        )
     COUNTY OF BROWARD       )
12
            Before me personally appeared_____,
13   to me well known and known to me to be the person
     described in and who executed the foregoing instrument
14   and acknowledged to and before me that he executed the
     said instrument in the capacity and for the purpose
15   therein expressed.

16           Witness my hand and official seal, this __day
     of_____, 2001.
17

18                              _____
                                NOTARY PUBLIC
19
     Commission Expires:
20

21

22

23

24

25

64

1
<u>TO BE EXECUTED BY THE NOTARY</u>
<u>IF THE DEPONENT DOES NOT SIGN:</u>

2

3

4

5
I hereby certify that a letter with reference to reading and signing deposition was mailed to the witness on April 17, 2001, and that:

6

7
( )  Witness refused to sign, giving the following reason:

8

9

10

11
( )  Neither the witness nor her attorney has responded to request to read and sign.

12

13

14

15

16

17

18
_____          _____
Date                                    Notary Public
                                           State of Florida

19

20

21

22

23

24

25

65

1

2               E R R A T A    S H E E T

3

4    STATE OF FLORIDA)

5    COUNTY OF BROWARD)

6

7        I, Lee Chaykin, the undersigned deponent, have this

8    date read the foregoing pages of my deposition numbered

9    1 through 59, and with the suggestions noted below, if

10   any, these constitute a true and accurate transcription

11   of my deposition given on the 10th day of April, 2001 at

12   the time and place stated therein:

13

14   PAGE NUMBER          LINE NUMBER          SUGGESTION/REASON

15

16

17

18

19

20

21

22                              _____

23                                    LEE CHAYKIN

24

25

# Westside
# Regional Medical Center

~COUNSELING / CORRECTIV
DISCIPLINE RECOR

This form is to be used to record ALL details of a session during which an employee is instructed by a supervisor that a change in behavior is necessa

| Employee Name | Department | Job Title | Date of Occurrence |
|---|---|---|---|
| Coveen Brown-Diaz | Nursing - 4th | RN | 6.29.99 |

Detailed explanation of reason(s) for discussion. *(Include what action was wrong and why it cannot continue.)*

At 7:00 Coveen hung up on the HR Director, between 7:10 pm and 7:50 pm Coveen refused to take the calls of the HR Director. Coveen was paged x7, refused to answer. At 7:40 the HR Dir finally spoke to the employee - when asked why she did

Instruction given to employee to correct action

not answer pages she stated she clocked out and was trying to go home to her son. Kronos confirmed Coveen clocked out at 7:56 pm. 2 employees verbally confirmed Coveen refusing the calls. (see attach

Anticipated supervisory action if act continues

Further infractions of hospital (personnel or depart-mental) policy will result in progressive disciplinary action

| ACTION TAKEN | ☐ VERBAL REPRIMAND | ☒ WRITTEN REPRIMAND | Suspension - Beginning date ☐ YES | Return to work Time / Day | Report To |
|---|---|---|---|---|---|

Failure to change behavior as indicated, or involvement in other situations requiring formal discussion, may result in disciplinary actions, including suspension without pay or discharge, depending on the nature of the situation.

Supervisor's Signature  6/30/99                    Date  6/

A copy of this document will be placed in my personnel file. If I improve on this act within the necessary period, this notice will not be used in further disciplinary sessions with me, unless the violations are related. I understand that I have the right to appeal through formal grievance procedure. My signature indicates I have received a copy of this form.

Employee remarks

PLAINTIFF'S
EXHIBIT NO. 1
FOR IDENTIFICATION
DATE: 4-10-01    RPTR:

000117

| Employee Signature | Date | Witness Signature (employee refused to sign) | Date |
|---|---|---|---|
| | | Sue Wakal | 6/30/9 |

12051

For: MATHIS,LYNN
        Fri Jul 2, 1999 7:05 pm

From: SUE WAKAT
Taken by: SUE WAKAT (476-3940)

On Tuesday, June 29th I was entering Human Resources at approximately 1540.  Lillain and Lynn were at the door and asked me to go to the employee entrance and watch for Coreen Brown-Diaz and have her come to human resources when she came down.

I waited for about 10 minutes and then called up to 4th floor.  Lori Davis, the secretary, answered and I asked for Coreen.  Lori asked me to hold on and then placed the telephone on hold.  When she came back to the telephone she said that she was not going to lie for Coreen and that Coreen was avoiding the telephone.

I went up to the 4th floor and found Coreen at a meditech computer in the physician area.  I sat down next to her while she was charting and said that we needed to go down and see Lynn in Human Resources.  She stated that she did not have time to talk to her and that she was busy working.  Also that she need to pick up her son at day care and was she (Lynn) going to pay for the extra time he was there.  I advised her that Lynn Mathias was senior leadership and that if she called and wanted to speak to her, this is what she needed to do.  She still refused and said that she could talk to Lynn tomorrow.  I said I would have to call Lynn and see if this was satisfactory.  When I called, Lillian answered and said that Lynn need to speak to Coreen so I handed the telephon to Coreen and she had a conversation with Lynn.

When she hung up, Coreen stated that "this is harrassment" and "she has no right to bother me when I am taking care of patients."

She completed her charting and left about 1615.

Sue Wakat

Sue Wakat
7/2/99


PLAINTIFF'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE: 4-10-01
RPTR:

000120

For: MATHIS, LYNN                From: LOR___. DAVIS
    Fri Jul 2, 1999 4:37 pm           Taken by: LORI B. DAVIS (476-3940)

HI LYNN,

THIS IS REGARDING THE CONVERSATION WE HAD. LYNN MATHIS HAD CALLED DURRING CHANGE OF
SHIFT AND ASKED FOR CORRINE I TURNED AROUND AND SAW CORRINE I TOLD HER SHE HAD A PHONE
CALL FROM LYNN IN H.R. SHE SAID I AM NOT HERE TELL HER I AM NOT HERE I'M OFF I'M GOING
HOME AND SHE TURNED AND WALKED TOWARD THE ELEVATORS AROUND THE CORNER WHERE I LOST SIGHT
OF HER. I THEN TOLD LYNN, CORRINE HAD LEFT FOR THE DAY. LYNN TOLD ME IT WAS VERY
IMPORTANT TO GET IN TOUCH WITH HER AND IF I SAW HER TO TELL HER TO CALL LYNN. I
CONTINUED ON WITH MY WORK WHEN I RECEIVED A PHONE CALL FROM SUE WAKAT SHE ASKED ME IF
CORRINE WAS STILL THERE I SAID NO I THINK SHE LEFT SHE ASKED ME IF I COULD CHECK. I
TURNED AROUND AND CORRINE WAS SITTING AROUND THE CORNER I TOLD HER SUE WAKAT WAS ON THE
PHONE. SHE SAID NO I AM NOT HERE DID YOU TELL THEM I WAS HERE? I ANSWERED NO! SHE SAID
TELL THEM I AM NOT HERE. I THEN TURNED TO MARLENE ELLIS AND I TOLD HER I'M NOT DOING
THIS I'M NOT GOING TO LIE FOR HER. MARLENE ELLIS THEN TOLD CORRINE COME TO THE PHONE AND
HANDLE YOURE OWN PROBLEMS AND LEAVE LORI OUT OF THIS. CORRINE THEN TOLD ME TO PLACE SUE
ON HOLD AFTER NOT PICKING THE PHONE UP I THEN PICKED IT UP SUE ASKED ME WHAT IS GOING ON
I TOLD SUE SHE IS HERE BUT SHE WILL NOT COME TO THE PHONE SUE ASKED ME IF SHE HAD TO
COME UP THERE TO 4TH FLOOR AND PHYSICALLY GET HER I TOLD HER I GUESS?
SHE IS ASKING ME TO TELL YOU SHE IS NOT HERE AND THEN SHE TOLD ME TO JUST PLACE YOU ON
HOLD. SUE SAID OK AND THAT WAS THE END OF THE CONVERSATION.

*Lori Davis 9-10-99*

PLAINTIFF'S
EXHIBIT NO. 3
FOR IDENTIFICATION
DATE: 4-10-01   RPTR:
PENGAD-Bayonne, N.J.

7/5/99

To: Mr. Chaykin.

From: Coreen Brown-Diaz (R.N.)

Re: Resolution of Solution.

First of all I would lke to state that I enjoy my position here at West Side Regional. Nursing provides me the opportunity in making a positive difference in people lives.

My personal folder reflects my dedication to the profession. And I am pleased to have the numerous accomadations in my file from patients, their families, as well as from staff members.

Originally I asked for clarification re: the internship of newly graduated Registered Nurses. I asked Human Resources for clarification of the policy and they told me that treatment was determined by a case by case basis, and they could not give me a definitive answer. Therefore, I went to the next level in the chain of command and I spoke with Mrs. Jutras. A meeting was set up between myself, Mrs. Jutras, and Mrs. Mathis for 7/1/99.

On 6/29/99 the day in question, Mrs. Mathis questioned me twice regarding the attendance of an attorney at the meeting. I also spoke with Mrs. Jutras' secretary earlier that day regarding the same matter.

Here is a chronological log of the events that occurred from 1510-1600 on 6/29/99

1500- 1514 I was in room 433-1 pt Whitney, Virgina initiating a blood transfusion.

Spoke to Mrs. Mathis briefly regarding our meeting on 7/1/99, ended the conversation and I told her thank you and good-bye.

1511-1514 returned to room 433-1 pt Whitney to asess her during the first 15mins of receiving a blood by product as per protocol states.

1514-1550 At this time I am reporting off to the oncoming shift. No overhead pages were heard by myself or the nurses that I reported off to. L. Coloquan(R.N) and              , were all present  during the time I was attempting to report off.

1540- Report was interrupted by Mrs.Mathis , I explained to Mrs. Mathis that  I was attempting to finish my work clock out and go home, that we can talk about this in the morning. Mrs. Mathis stated "she needed a response on whether I was going to have legal counsel at the meeting . Mrs. Mathis also stated that she needs to have a repsones by noon of 6/30/99 or there will not be a meeting.

1540-1600 Finished charting on my patients and punchd out at 1556pm. Gathered my belongings re-opened a couple of charts to add a few things to them and then left.

During the time from 1510-1550 Mrs. Mathis in her own statement overhead paged me 3 times and called the nursing floor at least 5 times. In order to question me on whether or not I was going to have legal counsel present at a meeting with her. I had already discussed this matter



PLAINTIFF'S
EXHIBIT NO. 4
FOR IDENTIFICATION
DATE: 4-10-01
RPTR:

with Mrs. Jutras' secretary, and Mrs. Mathis earlier that same day.

Mid-Morning and change of shift are the most chaotic times of day for nurses. During this time Its not feasible to respond to phone calls while I'm on the floor attempting to perform my daily duties as a Registered Nurse and to fulfill my responsibilities as a team leader.

Furthermore, Mrs. Mathis proceeded to state that my actions were negligent and my conduct detrimental to customer service contrary to the hospitals best interest. This statement is contrived and could not be farther from the truth.

It would have been negligent for me not to have monitored the pt receiving the blood for the first fifteen minutes as hospital protocol requires. It would have been negligent if that pt had a transfusion reaction while I was on the phone with Mrs. Mathis.

Let me re-interate, all I wanted was to have one question answered regarding the hospitals policy on Internships. What criteria is used to decide who receives pay while interning and who does not? In conclusion, I am seeking the following:

1. Clarification of the policy re Internship and why I was differently than other interns whom I have observed.

2. The purging of Mrs. Mathis report from my permanent record , because it was not based on my professional performance. Instead it was a retaliatory measure taken because I questioned the Internship policy.

3. The elimination of any further harassment related to this issue.

Sincerely,

Coreen Brown-Diaz

For: CHAYKIN, LEE B                          From: KIM JUTRAS
     Mon Jul 12, 1999 8:38 pm          Taken by: KIM JUTRAS (3915)

Lee--Are you planning to meet with Coreen Diaz-Brown this week?
ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt
Tue Jul 6, 1999 5:38 pm                          From: DANNY J REEVES

Kim,

We have checked payroll records for tuition reimbursement and AP records for expense report
reimbursement for 1997 and 1998.  We cannot find that we paid these two ladies for any BCC
reimbursement.

DJR

ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt
Fri Jul 2, 1999 7:51 pm                          From: KIM JUTRAS

Danny--Please let me know when I may have the information about tuition reimbursements
for these
employees: Cathy Stiglich
           Donna Shambo

Thanks!

Lynn and Sue--Michele Slane thinks these people were reimbursed at the time Corrine was
also going through her program.. Danny will let us know.
-----------------------------------------------------------------------------------------
SENT TO: DANNY J REEVES, LYNN MATHIS, SUE WAKAT

ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt
-----------------------------------------------------------------------------------------
SENT TO: KIM JUTRAS, SUE WAKAT, LYNN MATHIS

ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt

PLAINTIFF'S 5
EXHIBIT NO.
FOR IDENTIFICATION
7-10-c1
DATE:          RPTR: 2s

000130

# Westside Regional
# Medical Center

8201 West Broward Boulevard
Plantation, Florida 33324
Phone (954) 473-6600

PLAINTIFF'S
EXHIBIT NO. 6
FOR IDENTIFICATION
DATE: 4-10-01   RPTR:

To:          Coreen M. Brown – Diaz, R.N.

CC:          Personnel File

From:        Lee Chaykin, COO

Subject:     Response to Grievance Request Dated July 7th, 1999

Date:        August 6, 1999

---

On July 7th, 1999 I received your grievance memo in which you raised three specific concerns. You requested clarification regarding the internship policy regarding how reimbursement can be obtained. A request was made to purge the corrective discipline record from your permanent file that was given to you by the Director of Human Resources. And to discontinue any further perceived harassment regarding these issues.

Regarding the internship policy, employees that participate in the new graduate preceptor program are paid an additional stipend. Individuals that are part of a Community College program do not receive any additional remuneration.

The request to purge the corrective discipline record from your permanent file that was given to you by the Director of Human Resources is denied. My findings corroborate and substantiate that the corrective action was appropriate for the related offence.

As far as the question of perceived harassment in regards to the aforementioned issues I find no evidence or intent to directly or indirectly harass, threaten, or intimidate you as part of this process.

000141

- Meeting Began 4:00 p.m.
- Meeting Ended 4:11 p.m.                    @ 4:16 p.m.
- Mother reentered Administrative office and
  stated that she was disappointed
  with the outcome of her daughter's
  meeting and would be forced to "fight
  the injustice". Amarilis and I both told
  the mother that we could not discuss her
  daughter with her.

**Westside Regional
Medical Center**

8201 West Broward Boulevard
Plantation, Florida 33324
Phone: (954) 476-3917
Fax: (954) 452-2133

**Kimberley A. Jutras**
*Chief Nursing Officer*

9/24/99

Lynn,

I came across this when doing budget for Medical Unit. Please advise if we paid a sponsorship for this employee in this amount. If not, this could've been payment to Broward Community College for his preceptor/intern program (the same one as Coreen Diaz-Brown!) We need to know.

Thanks
Kim

PLAINTIFF'S
EXHIBIT NO. 7
FOR IDENTIFICATION
DATE: 4-10-d  RPTR:

**Mathis Lynn**

| | |
|---|---|
| From: | Mathis Lynn |
| Sent: | Wednesday, October 13, 1999 11:48 AM |
| To: | Joseph Michael |
| Subject: | research.... |

I have done some more research on the check found in Kim's budget meeting......seems it was a reimbursement to Sergio Salamone for B CC preceptor program...also, a check was issued directly to BCC, PRIOR to his hire date......it looks as if it was a "condition of hire" circumstance. (You approved it) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Do you want me to contact her for a receipt of how much her program cost? or go with the amount on Sergio's check. I'm going into an interview now........let me know if we need to meet....thank you.

*Lynn Mathis*
*Director Human Resources*
*Westside Regional Medical Center*
*954-476-3996*

MJ —
If you approve the attached letter,
I will process AC AP. thank you,

Lynn

PLAINTIFF'S
EXHIBIT NO. 8
FOR IDENTIFICATION
DATE: 4-10-01   RPTR:

October 29, 1999


Ms. Coreen Brown-Diaz
4041 NW 16 St.
Apt 102 C
Lauderhill, FL   33313

Dear Ms. Brown-Diaz:

In ~~further~~ researching the preceptor program at Westside Regional Medical Center, it has been determined that you will receive reimbursement for the preceptor program given at Broward Community College. Enclosed please find a check for the amount of  $350.00. We at Westside Regional Medical Center take pride in our employees and strive to always do what is fair and equitable for all.

Thank you for bringing this to our attention.


Respectfully,



Lee B. Chaykin
Chief Operating Officer


cc: Michael Joseph, CEO
    Kim Jutras, CNO
    Robert Carrel, CFO
    Personnel File



PLAINTIFF'S 9
EXHIBIT NO. ___
FOR IDENTIFICATION
DATE: 4-10-01  RPTR:

# Westside
# Regional Medical Center

**COUNSELING / CORRECTIVE
DISCIPLINE RECORD**

This form is to be used to record ALL details of a session during which an employee is instructed by a supervisor that a change in behavior is necessary.

| Employee Name | Department | Job Title | Date of Occurrence |
|---|---|---|---|
| Coreen Brown-Diaz | 614 | RN | 1/25/00 |

Detailed explanation of reason(s) for discussion. (Include what action was wrong and why it cannot continue.)

failure to maintain a professional work environment and exhibiting behavior which is contrary to the Hospital's best interests. Specifically, on 1/25 Coreen made a comment about a pt. rep. to the effect that -- "what is the point of these pt. reps. if they are not going to do anything? (continuing) I am serious, what is the point of these pt. reps. When question by myself as to whether she made these statements, Coreen admitted she had. This undermines the mission of the Hospital to promote pt. satisfaction. Conduct that interferes with operations, discredits the Hospital or is

Instruction given to employee to correct action offensive to patients or fellow employees will not be tolerated.

Refrain from unprofessional conduct or any conduct that interferes with operations, discredits the Hospital, is contrary to the Hospital's best interests or is offensive to patients or fellow employees Conduct self in a manner so as to promote the best interests of the hospital.

Anticipated supervisory action if act continues
Any further infraction of departmental or personnel policy will result in progressive disciplinary process.
J. Wakidin 1/28/00

| ACTION TAKEN | ☐ VERBAL REPRIMAND | ☐ WRITTEN REPRIMAND | Suspension - Beginning date ☒ YES 1/28/00 | Return to work Time / Day 2/1/00 | Report To 4th Floor |
|---|---|---|---|---|---|

Failure to change behavior as indicated, or involvement in other situations requiring formal discussion, may result in disciplinary actions, including suspension without pay or discharge, depending on the nature of the situation.

Any further infraction of departmental or personnel policy will result in progressive disciplinary process

Supervisor's Signature: Ju Wakidin     Date

A copy of this document will be placed in my personnel file. If I improve on this act within the necessary period, this notice will not be used in further disciplinary sessions with me, unless the violations are related. I understand that I have the right to appeal through formal grievance procedure. My signature indicates I have received a copy of this form.

Employee remarks

Employee Signature     Date     Witness Signature (employee refused to sign)

Employee chose not to sign JW 1/28/00

Ju Wakidin RN 1/28/00


PLAINTIFF'S
EXHIBIT NO. 10
FOR IDENTIFICATION
DATE: 4-10-01
PENGAD-Bayonne, N.J.

EMPLOYEE GRIEVANCE REPORT

| Employee Name | Department | Date Submitted |
|---|---|---|
| Coreen Brown-Dix | 1614 Medical / Oncology | 2-2-2000 |

Have previous steps of the grievance procedure been completed? ☐ YES ☐ NO
If yes, give date.

## GRIEVANCE

State CLEARLY and ACCURATELY all details concerned with your grievance.
Be sure to include ALL dates and names of all concerned.

The disciplinary action of suspension that I received was done solely in retaliation to the lawsuit that I have filed against West Side Regional for discrimination. What was said to S. Wakat (acting 4th Floor Nurse Manager) was spoken in confidence in her office.

It's puzzling to me that on more than one occaision Ms. Fogarty has been rude & discourteous to other staff members in the presence of patients & thier families. Yet no disciplinary action has been brought against Ms. Fogarty.

## SOLUTION

Indicate below what steps you think the company should take in order to satisfy this grievance.

I demand that this suspension be removed from my record & I receive the 3 days (1/28/00 - 1/31/00) back pay that I am entitled to. If the suspension is not removed I will file a suit with the EEOC. Because this suspension is purely a retaliory act which is contrary to my civil rights.

enclosures (2)   Coreen Brown-Dix

I understand that if a settlement to my satisfaction is not reached, I may proceed to the next step in the grievance procedure.

Employee Signature
X

Employee: Retain yellow copy for your records.

PLAINTIFF'S
EXHIBIT NO. 11
FOR IDENTIFICATION
DATE: 4-10-0  
RPTR:
PENGAD-Bayonne, N.J.

| This is to certify receipt of your grievance at this stop of the Grievance Procedure. | Grievance is at step No. | Supervision Signature |
|---|---|---|
|  |  | X |



2/2/00

To Whom it May Concern.

On Tuesday January 25th 2000. I was approached at the nursing station by Wanda Fogarty. She was making her pt. Rep. rounds. Pt. in 418-2 Needed help to go to bathroom. The PCA was busy so I paiged the nurse Coreen Brown-Diaz by intercom to the room. Upon noticing that Coreen did not respond. I walked down to the room. Coreen and I met at the doorway and proceeded to assist the pt. to the bathroom. While doing this Coreen stated "What are the pt. Reps. For?" and "Why can't they help the pts." I told her this was our job. The comments were overheard by Wanda who was Standing in the hallway at the time.

Submitted by
Marlene McKay RN.

PLAINTIFF'S
EXHIBIT NO. 12
FOR IDENTIFICATION
DATE: 4-10-01   RPTR: ___
PENGAD-Bayonne, N.J.

```
For: BROWN-DIAZ,COREEN M.              From: COREEN M. BROWN-DIAZ
      Mon Feb 7, 2000 4:24 pm      Taken by: COREEN M. BROWN-DIAZ ()
```

ADDENDUM TO GREIVANCE.

GOOD AFTERNOON MRS JUTRAS;

I FELT THAT IT WAS NECESSARY FOR ME TO PUT IN WRITING SOME OF THE EVENTS THAT I TALKED TO YOU ABOUT IN YOUR OFC ON 2/2/00.

RE; MRS.FOGARTY

AGAIN LIKE I STATED TO YOU EARLIER, SHE STOPPED ME FROM PERFORMING MY DUTIES AS A RN. I WAS IN 424-1 MRS KHAN, (A CARDIOLOGIST'S MOTHER). I WAS ATTEMPTING TO D/C A SALINE LOCK AND RESITE HER IF POSSIBLE. JUST AS I WAS ABOUT TO D/C THE IV CATHETER MRS. FOGARTY CAME AND IN A RUDE AND ABRUPT MANNER SAID " THAT PT OVER THERE NEEDS TO GO TO THE BATHROOM". I STATED BACK TO MRS. FOGARTY WELL RIGHT NOW I'M IN THE MIDDLE OF SOMETHING AND I CAN'T CAN YOU CALL HELEN (THE PCA) ON THE FLOOR.  AT THAT TIME MRS. FOGARTY LEFT THE ROOM FOR ABOUT 30SECONDS AND THEN CAME BACK IN AND STATED SHE IS REFERRING TO THE PCA IS BUSY AND THAT I NEED TO GO BECAUSE THAT PT IN 418-2 NEEDED TO USE THE RESTROOM.  MRS. FOGARTY OBVIOUSLY SAW ME ATTEMPTING TO DO A PROCEDURE ON THIS OTHER PT AND SHE CONT TO BE RUDE AND UNPROFESSIONAL.  MRS KHAN (THE PT IN 424-1) STATED "WHAT'S WRONG WITH HER".  I MADE NO COMMENT, STOPPED WHAT I WAS DOING AND ASSISTED THE PT IN 418-2 TO THE BATHROOM.

MRS JUTRAS, ASSISTING THE PT TO THE BATHROOM WAS AND IS NOT THE ISSUE, I HAVE NO PROBLEM WITH THAT WHAT SO EVER, THAT IS PART OF THE JOB.  HOWEVER I WAS NOT THE ONLY PERSON ON THAT WING THAT MRS. FOGARTY COULD HAVE GONE TO.  MRS. FOGARTY WAS RUDE AND UNPROFESSIONAL AND DISCOURTEOUS.  ALSO NOTING THAT THIS WAS AND HAS NOT BEEN THE FIRST TIME THAT MRS. FOGARTY HAS DISPLAYED LESS THAN APPROPRIATE BEHAVIOR TOWARDS STAFF MEMBERS. AND IF YOU WOULD LIKE TO QUESTION THOSE STAFF MEMBERS THEY ARE S.GORRELL(LPN) L. DOYLE (RN) AND A. FERGUSON (LPN) AND MYSELF.  THIS ISSUE HAS BEEN BROUGHT TO THE ATTENTION TO S. WAKAT (4TH FLOOR MANAGER) ON NUMEROUS OCCAISONS.

PLEASE FEEL FREE TO CONTACT ME IF YOU HAVE ANY QUESTIONS.

THANK YOU FOR YOUR TIME


COREEN BROWN-DIAZ.
-----------------------------------------------------------------------------------
SENT TO: KIM JUTRAS, COREEN M. BROWN-DIAZ



PENGAD-Bayonne, N. J.    PLAINTIFF'S
EXHIBIT NO. 13
FOR IDENTIFICATION
DATE: 4-10-d    RPTR: ni

# Westside Regional
# Medical Center

8201 West Broward Boulevard
Plantation, Florida 33324
Phone (954) 473-6600

# MEMO

**To:**      Lee Chaykin

**From:**    Lynn Mathis

**Subject:** Coreen Brown-Diaz, R.N.

**Date:**    September 10, 1999

The sequence of events surrounding Coreen Brown-Diaz are as follows:

June 1, 1999 - I met with Coreen regarding clarifications between the preceptor program and the Broward Community College Program. The BCC program - student pays the school, and as part of the clinical curriculum the student is placed in a local hospital for 192 hours (unpaid), there is no commitment on either the part of the hospital or the student to remain at that facility after the 192 hours. About one year later, Westside Regional began an extended orientation program, culminating in a formal preceptor program where a new grad would be employed and paid while they are precepting.

June 2, 1999 - I responded to Coreen regarding the review of our meeting, further clarification of preceptor program vs. Broward Community College program.

June 3, 1999 -Request from Coreen to me regarding printed documentation regarding the changes from our facility using the BCC program vs. preceptor program (none available-advised)

June 29, 1999- I was advised by Mary Maenza of Administration that Coreen had intentions of bringing someone into the meeting scheduled for July 1, 1999 with Kim Jutras, CNO and myself-Kim requested I find out who would be attending. I called the floor where Coreen was assigned and left a message for her to return my call. When I received no return call by 3p, I began calling floor for Coreen. She refused my calls and/or pages.

June 30, 1999- I issued corrective action against Coreen for unprofessional behavior, as a result of the aforementioned events of 6/29/99

July 1, 1999- Coreen met with Kim Jutras, CNO, again clairifying the differences between the preceptor program and the program offered through the community college,

DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE: 4-10-01   RPTR: 2

Lee Chaykin
Page 2
September 9, 1999

July 7, 1999- Coreen grieved corrective action, stating she was treated differently than other
RN's , wanted the corrective action removed from her file, and her claims of
harassment to cease.

July 14, 1999- Coreen requested a meeting with Lee Chaykin, COO regarding grievance and
corrective action issued by Lynn Mathis, Director/Human Resources

August 6, 1999- meeting between Lee and Coreen -responses:
1. BCC and preceptor program are different, she is not due any additional funds.
2. Corrective action is not to be removed from file, appropriate as stands.
3. No evidence of intent to directly or indirectly harass, threaten or intimidate.
(Copy attached)

Sept 3, 1999- Letter form Stewart Lee Karlin, Attorney, received; Corporate Human Resources
and Legal notified.

# Westside Regional
# Medical Center

8201 West Broward Boulevard
Plantation, Florida 33324
Phone (954) 473-6600

November 5, 1999

Ms. Coreen Brown-Diaz
4041 NW 16th Street, Apt. 102C
Lauderhill, FL 33313

Dear Ms. Brown-Diaz,

After researching the preceptor program at Westside Regional Medical Center, it has been determined that you are entitled to receive reimbursement for the preceptor program given at Broward Community College. Attached please find a check in the amount of $350.00. We at Westside Regional Medical Center take pride in our employees and strive to always do what is fair and equitable for all.

Sincerely,

Lee B. Chaykin
Chief Operating Officer

LBC/ar

cc:    Michael G. Joseph, CEO
       Kim Jutras, CNO
       Rob Carrel, CFO
       Personnel File

P 006 798 711

**Receipt for Certified Mail**
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

Sent to
Coreen Brown Diaz
Street and No.
4041 nw 16 St. #102C
P.O., State and ZIP Code
Lauderhill FL 33313

| | |
|---|---|
| Postage | $ .33 |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | 11/10/99 |

PS Form 3800, June 1991

DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
4-10-01
DATE:    RPTR:

For: MATHIS,LYNN                          From: LEE B CHAYKIN
     Thur Nov 18, 1999 8:04 am       Taken by: LEE B CHAYKIN ((954)452-2139)

please palce in your file
‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡
Fri Nov 12, 1999 3:55 pm                              From: COREEN M. BROWN-DIAZ

RE 11/5/99

I HAVE SPOKEN WITH MY ATTORNEY, AND AT THIS TIME I HAVE BEEN ADVISED NOT TO ACCEPT YOUR
OFFER.   THANK YOU FOR YOU PATIENCE.

COREEN BROWN-DIAZ.



‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡



To: MCKAY, MARLENE M                    From: SUE WAKAT
    Fri Jan 28, 2000 4:23 pm            Taken by: SUE WAKAT (476-3940)

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
Tue Jan 25, 2000 11:40 am                              From: DEBRA L BRINDLEY

Please read and advise Thanks
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
Tue Jan 25, 2000 9:30 am                               From: WANDA S FOGARTY

Debi, while visiting my pt. in 418 today, little frail lady she was motioning that she
needed to use the restroom, I put on her call light, then proceeded to try to find her
nurse. Noted on the board it was Coreen's pt. found her, she asked that I locate the PCA.
Emma found her for me, she was busy, the desk, intercommed back to Coreen that she needed
to attend to the pt because PCA was busy, and Coreen walked in the room and in a very loud
voice was verbalizing "What is the point of these pts reps if they are not going to do
anything?"... she said it several times to another RN who walked in. , continuing ,,,
saying I am serious, what is the point of these Pts. Reps,  I was standing outside of 419
waiting for Dr. Sandler to leave, so of course I overheard the whole exchange.
I wore a new suit today to do WWW and I did not really want to take a pt. to the bathroom,
believing that surely there was staff to take care of this; besides not knowing if she was
even allowed out of bed.. She had green leaves on her door. Most of the girls on 4 are
very nice, but this nurse is something.
Please clarify what your expectation would be in this circumstance. Thanks, Wanda
------------------------------------------------------------------------------------------
SENT TO: DEBRA L BRINDLEY, SUE WAKAT

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
------------------------------------------------------------------------------------------
SENT TO: SUE WAKAT, KIM JUTRAS

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::


DEFENDANT'S
EXHIBIT NO. 4
FOR IDENTIFICATION
4-10-01
DATE:              RPTR: