34

1

2                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
3                  FORT LAUDERDALE DIVISION

4           CASE NO. 00-6099-CIV-GRAHAM/TURNOFF

5

6    CAREEN DIAZ,

7                              Plaintiff,

8    vs.

9    COLUMBIA HOSPITAL CORPORATION OF
     SOUTH BROWARD, AND COLUMBIA HOSPITAL
10   CORPORATION OF SOUTH FLORIDA,

11                              Defendants.
     _____/
12

13        CONTINUED DEPOSITION OF COREEN DIAZ

14

15           Taken before Barbara DeSimone,

     Registered Professional Reporter, Notary Public
16
     in and for the State of Florida At Large,
17
     pursuant to Notice of Taking Deposition filed
18
     by the Defendants in the above cause.
19
                         -   -   -
20

21

22

23
     Friday, October 27, 2000
24   10 Fairway Drive
     Deerfield Beach, Florida
25   9:50 a.m. - 2:20 p.m.

CERTIFIED
COPY

35

1    APPEARANCES:

2        On behalf of the Plaintiff:

3            STEWART LEE KARLIN, P.A.
             400 Southeast Eighth Street
4            Fort Lauderdale, Florida 33316
             Phone: (954) 462-1201
5            BY:  STEWART LEE KARLIN, ESQ.

6

7        On behalf of the Defendants:

8            LEVY KNEEN MARIANI CURTIN
             KORNFELD & del RUSSO, P.A.
9            1400 Centrepark Boulevard
             Suite 1000
10           West Palm Beach, Florida 33401
             Phone: (561) 478-4700
11           BY:  ALEXANDER D. del RUSSO, ESQ.

12

13                          -   -   -
                        I N D E X
14                          -   -   -

15   WITNESS:   COREEN DIAZ

16   EXAMINATION     DIRECT   CROSS   REDIRECT   RECROSS

17   BY MR. del RUSSO   37
     BY MR. KARLIN              216
18

19

20   EXHIBITS          FOR IDENTIFICATION          PAGE

21   Defendants' Exhibit 1......................... 57
     Defendants' Exhibit 2......................... 60
22   Defendants' Exhibit 3......................... 63
     Defendants' Exhibit 4......................... 64
23   Defendants' Exhibit 5......................... 81

24

25

1

EXHIBITS (Continued.)

2

EXHIBITS          FOR IDENTIFICATION                PAGE

3

Defendants' Exhibit 6......................... 89

4   Defendants' Exhibit 7......................... 111
    Defendants' Exhibit 8......................... 117

5   Defendants' Exhibit 9......................... 118
    Defendants' Exhibit 10........................ 120

6   Defendants' Exhibit 11........................ 123
    Defendants' Exhibit 12........................ 125

7   Defendants' Exhibit 13........................ 139
    Defendants' Exhibit 14........................ 141

8   Defendants' Exhibit 15........................ 149
    Defendants' Exhibit 16........................ 150

9   Defendants' Exhibit 17........................ 151
    Defendants' Exhibit 18........................ 153

10  Defendants' Exhibit 19........................ 157
    Defendants' Exhibit 20........................ 159

11  Defendants' Exhibit 21........................ 174
    Defendants' Exhibit 22........................ 182

12  Defendants' Exhibit 23........................ 185
    Defendants' Exhibit 24........................ 187

13  Defendants' Exhibit 25........................ 187
    Defendants' Exhibit 26........................ 188

14  Defendants' Exhibit 27........................ 195
    Defendants' Exhibit 28........................ 196

15  Defendants' Exhibit 29........................ 197
    Defendants' Exhibit 30........................ 201

16  Defendants' Exhibit 31........................ 203
    Defendants' Exhibit 32........................ 203

17  Defendants' Exhibit 33........................ 204
    Defendants' Exhibit 34........................ 207

18  Defendants' Exhibit 35........................ 210
    Defendants' Exhibit 36........................ 210

19  Defendants' Exhibit 37........................ 211

20

21

22

23

24

25

## $

$1.50 45:20
$14 40:14, 15, 16; 41:19,
21
$2 45:20
$300 67:25
$350 67:25; 183:15, 23;
184:21; 186:3, 14; 187:9
$6 81:24

## 1

1 57:14, 17; 117:24;
118:5; 126:9; 127:2;
128:23; 139:25; 210:16
10 39:18; 120:5, 8
11 85:23; 95:10; 123:12,
19, 23; 125:14
12 39:18; 125:9, 11;
163:8; 187:20; 188:3
12-hour 44:10; 45:12, 15,
24
13 139:11, 14; 142:5
14 82:2, 2; 124:4; 141:9,
12; 159:25; 207:4
14-something 82:2
14.58 82:2
14th 153:16
15 91:9; 149:19, 22;
176:23
16 46:18; 150:21, 24
16-week 39:18
16.97 40:19, 20; 41:25;
42:2
16.98 40:21; 46:15, 17, 18
16th 124:10
17 81:12; 90:6; 151:21;
152:3
18 153:14, 17
18-24 115:3, 17
19 157:10, 13; 175:13
1993 39:6, 12; 59:3
1995 60:7, 10, 20
1997 56:23; 60:10, 20;
81:12; 158:9
1998 89:20
1999 47:4; 107:21; 112:9;
114:19; 117:24; 118:15;
139:15; 141:12; 157:13;
166:13; 175:3; 182:14;
184:4
1:13 142:6
1st 126:1

## 2

2 57:23; 58:16; 60:23;
61:1; 118:15; 201:21
20 91:9; 159:6, 9
2000 192:8, 14; 201:21;
207:4; 210:16, 23

## 3

3 63:20, 23; 85:23; 95:10;
120:8, 15; 210:23
30 149:22; 150:8; 201:17,
20
30th 143:19
31 203:15, 17
32 203:21, 23
33 204:11, 14
34 207:1, 4
35 210:12, 15
36 46:17, 18; 210:20, 23
37 211:22, 25
3p 82:8; 85:10

## 4

4 64:9, 12
40 46:16
40-hour 46:9
401(k 43:16, 17, 20

## 5

5 81:8, 11; 176:12, 17, 20;
182:14; 184:4; 185:19
5/99 112:1

## 6

6 89:16, 19; 157:13
60th 38:10
64-bed 171:24

## 7

7 111:4, 7; 131:23; 203:19
7/1/99 125:20
70-bed 171:24
72 46:10, 13
7:30 209:6
7a 45:23; 82:8; 85:10
7p 45:23

## 8

8 117:21, 23; 204:14
8.25 62:21
8.50 62:21
8/95 59:24
80 171:24
88 56:20

## 9

9 39:6; 118:11, 14
97 48:9; 56:4; 81:7
98 40:19; 42:2; 89:23;
110:14
99 47:9; 95:4; 106:3;
200:18, 21
9th 39:11

## A

able 135:17
abnormal 84:17
above 59:11; 120:18;
124:3, 8; 197:2
accept 185:13, 25;
186:18; 187:9, 10
acceptable 103:14, 16
accepted 74:12; 130:10
accolade 151:16
accolades 179:21
accommodations 188:9
accompanied 174:20
according 9:17, 22
accounts 184:14
accrue 42:16
accruing 42:25
accuchecks 63:19
accumulate 42:13
accurate 64:17, 25;
150:12; 152:11; 204:7
Acknowledgment 61:2
ACLS 116:7; 135:7
acquaintance 55:19, 20
acquaintances 54:1
acquaintanceship
88:23
across 128:14
act 144:15; 145:23;
146:6; 160:10, 21; 161:8,
17; 162:2, 4; 164:4, 13, 15;
165:7, 10; 170:9; 171:9;
198:7, 13, 20; 199:18, 23;
201:1; 216:24
acting 84:7; 98:24;
101:17, 21
action 157:1; 199:14
actions 137:19; 138:6;
167:2; 168:6; 212:21;
214:12
acts 163:19; 167:8, 9;

189:14, 14; 190:4, 6, 10;
202:16, 17; 216:22
actual 41:9
Actually 46:10; 67:11;
99:4; 100:11; 120:9;
133:4; 138:9; 197:3
add 155:23, 23; 164:7;
170:4, 14; 201:12
addition 74:19
additional 158:3, 5;
190:1
address 183:3
administration 48:11;
87:17; 88:4; 171:14;
207:12, 22
administrative 124:9
adverse 167:22; 168:6;
169:14
adversely 166:23;
173:11
advised 150:14
advocate 179:16
affect 50:20
affiliated 72:2, 8
African-American
100:16, 18, 20; 119:24;
191:23
African-Hispanic 101:1
afternoon 141:25; 147:5
again 37:16; 54:7; 70:23;
73:25; 82:22; 92:23;
99:11, 12; 108:3, 6; 113:3;
117:20; 121:1; 128:9, 16;
129:12, 12; 145:6; 158:24;
171:7; 181:21; 197:21
against 76:15, 20, 21;
77:5, 7, 7; 129:17, 22;
130:4, 25; 132:8; 133:6,
13, 21; 134:6; 138:2, 7, 21;
141:18; 160:3, 6; 161:14;
163:10, 13, 20; 164:4, 15;
167:9; 170:2, 15; 181:8,
20; 182:1; 196:10; 199:24;
200:1, 4; 205:25; 212:23
agency 47:5, 8, 14
ago 37:13; 53:14; 55:13;
94:15; 174:12
agree 46:22; 47:1, 2;
102:24; 103:7; 124:13;
179:4; 206:10; 211:19;
214:8; 215:12
agreed 211:16
agreeing 131:14
Agreement 63:24; 77:20;
212:1
agreements 77:12
ahead 68:23; 96:22;
161:4; 168:1; 210:5
ahold 139:5
Alex 37:10
algorithms 135:11
Alisha 53:23; 100:12, 14,
16; 101:6; 204:25
alleges 131:23
allow 168:10; 181:3;

189:25; 198:15
allowed 71:8, 18
alluding 216:5
almost 143:4
alone 157:20
along 77:25; 86:9, 11;
89:5; 128:7; 136:3;
172:22; 177:7; 195:5;
199:19, 20
alternate 173:1
always 162:10; 179:20
amount 42:22, 24; 68:2;
72:17; 91:10; 92:22;
134:1; 182:9, 20; 183:15,
18, 20; 186:6; 213:6
anger 103:2
annual 42:17; 89:20, 23;
90:2, 8; 91:4; 175:5, 8
answered 90:19; 168:10;
198:15
anti-inflammatory
106:23
anymore 53:25; 70:17;
214:5
Apparently 195:3, 8
appear 64:17; 197:3;
201:4
appears 64:12, 25;
89:19; 117:24; 120:8, 19;
125:13; 130:21; 175:2;
185:18; 187:19; 204:6, 14;
207:4; 210:15, 23
apples 117:14, 19
Application 57:18, 20;
58:17; 210:16, 18
applied 56:14; 115:2;
174:7; 209:21, 24
apply 74:3; 80:2; 174:5,
14
approached 55:3
appropriate 77:2;
124:24; 127:17
appropriately 166:22
approximately 41:11;
47:7; 81:3; 95:1; 98:7;
117:3; 194:3
April 41:10; 106:3; 112:4
area 61:24; 170:25;
171:22
arguing 162:15
Arisella 157:22
arm 143:13
around 39:11; 40:15, 22;
41:12; 42:2; 62:7; 68:1;
94:2; 108:7; 143:13;
176:12; 181:23; 195:13;
209:6, 7
arrangement 212:10
aside 102:12
aspect 119:18; 168:12
aspects 51:24
assign 172:2
assigned 61:19; 164:17,
23; 172:7; 189:21
assignment 63:2; 104:6;

CAREEN DIAZ v.
COLUMBIA HOSPITAL CORPORATION OF S. BROWARD

164:18; 172:17
**assignments** 47:13, 20; 84:15
**assist** 84:16; 170:17, 22; 171:1; 181:4; 189:25
**assistance** 63:5
**assistant** 64:21; 124:9; 140:16; 157:22
**Assistants** 38:20, 23; 39:22, 24
**assume** 39:25; 72:5; 75:23; 91:1; 116:10; 121:14; 148:22; 175:23, 24; 183:10
**attached** 180:9; 185:5
**attempting** 163:12; 205:5
**attend** 38:22; 40:2; 49:4; 71:25; 126:23; 127:25; 128:1, 5
**attended** 39:15; 41:13; 49:9; 71:12; 137:3
**attending** 56:16; 58:14; 212:16
**attention** 114:13
**attitude** 86:17; 176:25; 177:12, 22; 179:20; 213:13; 216:24
**attorney** 148:23, 24; 149:1, 2
**audibly** 37:25
**August** 48:9; 60:7, 10, 20; 76:1; 157:13
**aunt** 215:3
**automatically** 80:4
**available** 43:24; 61:21
**average** 45:20
**averages** 45:20
**award** 151:17
**aware** 107:10
**away** 96:6; 99:14; 144:24

**B**

**B** 92:6; 108:22; 177:15
**B.J** 53:24; 67:6, 11, 11; 80:14; 100:20; 113:15
**back** 37:15; 62:13; 63:18; 64:2; 72:18; 78:8; 83:16; 85:20; 91:14; 96:19; 97:21; 101:15; 128:22; 130:6; 132:14, 23; 138:9; 144:21; 147:23; 154:7; 155:18, 20; 156:1, 16; 165:21; 166:13; 176:12; 179:18; 180:16; 181:21; 188:13; 192:20; 193:8; 195:13; 200:12; 205:16, 19; 216:12
**background** 38:18
**bad** 91:25; 199:16; 200:2; 201:5
**badge** 79:17, 19
**balance** 86:12
**base** 130:20

**based** 42:22; 60:1; 61:19; 152:10; 194:4
**basic** 43:11; 47:18; 48:12; 116:4
**Basically** 127:3, 9; 129:14; 153:6
**basis** 42:17; 46:21; 49:18; 50:16, 20; 61:15, 17; 62:16; 69:15; 82:19, 21; 98:12; 121:25; 134:21; 160:19
**bathroom** 192:18; 193:6, 7, 8; 194:8, 10
**BCC** 56:16, 19, 21; 65:5, 22; 66:3, 5, 8, 11; 67:15, 18, 20; 68:9, 11, 16, 17; 69:2, 20, 20, 23; 70:3, 5, 10, 19; 71:4, 7, 16, 18, 18, 24; 72:8, 14, 18, 19, 23, 24; 73:3; 75:10, 22; 77:15, 18, 21, 24; 113:4, 6, 18, 22, 25; 114:4; 121:19; 157:7, 7; 158:7; 159:3; 183:18; 184:16
**BCC's** 72:2
**beach** 171:22
**became** 73:16; 74:15; 78:4; 79:24; 80:25; 81:1, 14, 19; 82:1; 83:4; 90:9; 95:6, 22; 97:13; 98:6, 10; 99:3, 15; 101:10; 109:19; 123:9
**become** 70:15; 73:8, 11, 18; 79:1; 94:21; 107:10; 160:23; 161:6
**becoming** 72:11, 12; 130:9; 157:1
**bed** 193:8
**began** 40:8, 11; 56:1, 6, 18; 75:4; 83:22; 88:16; 109:1, 2; 138:2; 210:2; 211:5, 8
**begin** 40:20
**beginning** 40:14, 22; 78:24; 122:1, 2
**begins** 111:24
**behavior** 86:17; 92:16; 100:5; 101:19; 102:18
**behavioral** 94:5
**belief** 69:15; 160:9, 19
**belong** 64:21
**benefit** 44:8
**benefits** 42:4, 6, 9; 43:3, 13; 44:3
**berate** 191:6
**Besides** 49:12, 13; 60:21, 22; 79:9; 168:12; 172:22; 199:19; 201:3
**best** 55:1; 59:8, 10; 60:2; 125:5; 126:25; 129:9; 137:17; 138:5; 184:11; 192:12; 212:20; 213:9
**better** 49:25; 99:4; 112:6; 168:12, 13
**big** 100:8; 128:8; 148:10; 148:8; 173:25

**bills** 215:3
**bit** 63:16; 69:18; 176:13; 178:11; 211:12
**bits** 92:5
**biweekly** 40:12; 46:12
**blood** 63:4, 4, 18; 143:3; 144:20; 145:1; 155:19
**Boccela** 108:20; 152:17
**book** 61:9
**borrow** 215:2
**both** 57:10, 11; 75:7; 91:1, 2; 92:5; 104:18; 109:5; 119:23; 163:9; 176:8; 177:11
**bottom** 61:5; 90:6; 120:14; 123:22; 125:15, 16; 175:13; 188:4; 197:1; 211:3; 212:4
**break** 87:3; 190:13
**brief** 117:1; 152:4
**briefly** 38:9; 195:12
**Brindly** 15:25, 25; 196:8
**bring** 127:21, 22, 23; 128:9, 10, 12, 18; 132:12, 18; 139:24; 140:5, 8, 13, 21; 142:14; 146:16; 148:18; 149:4, 14
**bringing** 142:11, 16; 146:10, 24; 148:6, 11, 11, 15; 149:1, 2, 12
**broad** 92:18
**broke** 50:10
**broken** 50:9
**brought** 105:1; 128:7; 186:23; 208:4, 6, 13
**Broward** 65:8; 69:20; 72:5; 74:9; 112:24; 113:1, 4

**C**

**C** 108:22, 22, 22
**calendar** 46:5
**call** 58:10; 82:16; 102:6; 142:6, 23; 145:19; 148:24; 155:15; 156:8, 13; 171:21; 192:20
**called** 39:22; 42:14; 128:18, 19, 20; 140:23; 141:2, 3, 4, 5, 5; 165:20; 187:5; 192:16, 17; 195:4, 6; 209:2, 6
**calling** 84:16; 132:17
**calls** 132:11; 141:19, 22; 145:4; 149:6; 193:15
**came** 61:10; 109:5; 110:15; 123:5; 128:14; 131:2; 169:1, 2; 183:15; 192:20; 200:12; 209:6, 14
**can** 42:14; 43:3, 8; 47:19; 49:7; 51:15; 54:6; 55:1; 59:8, 10, 17, 20; 60:2; 63:16; 66:15, 19; 70:15; 76:8; 86:7; 87:18; 88:14, 19; 93:17; 118:6; 125:5;
**126:25; 129:9; 130:19; 134:7; 135:7; 137:24; 138:5; 148:22; 150:24; 152:3; 159:10; 174:4, 18; 180:15; 184:11; 190:13; 192:12; 199:15; 204:7; 212:20; 213:9; 216:16
**cancel** 148:23
**cancelled** 79:11, 11
**capacity** 56:3
**captioned** 57:18; 61:1; 63:23
**card** 47:16, 17, 18, 19, 22; 48:4, 4; 79:17; 188:15
**care** 41:7; 44:21, 24; 58:20; 59:6, 9; 64:21; 82:23; 92:21; 102:2; 103:9, 11, 22; 104:10, 12; 140:25; 171:25
**cared** 214:6
**carried** 213:22
**carry** 168:14
**cart** 93:23, 24
**Carter** 151:2
**case** 37:13; 105:22
**case-by-case** 121:25
**cash** 42:14, 16, 25
**categories** 178:13
**CCU** 212:10; 212:16
**Celebrex** 106:19
**census** 104:4
**Center** 40:6, 11, 25; 41:16; 42:5; 43:5, 15; 44:5; 46:11, 24; 50:13; 59:12, 22; 60:3, 7, 17; 209:18; 210:17, 24; 211:1, 9, 17, 20; 212:11, 22; 213:23; 215:13, 17, 19, 24
**cents** 91:9
**certain** 69:13; 72:17; 78:4; 135:10, 11; 182:9; 215:3
**certificate** 39:5
**certification** 38:19; 39:4, 9; 48:11, 14, 17, 22; 49:5; 135:15; 136:21; 137:4
**certifications** 49:8
**certified** 116:7
**CFO** 87:16; 88:12; 153:9, 10
**chain** 77:2; 84:24; 85:3; 87:13; 124:25; 138:9
**chance** 122:18; 152:9; 191:1; 197:13
**change** 81:22, 24; 86:13; 143:4, 4; 144:19; 145:7; 179:4
**changed** 39:23; 52:6; 56:12, 12; 178:2, 13, 15, 16, 17, 24; 213:13
**changes** 205:8
**characterization** 85:3
**charge** 84:11, 13, 21, 25; 85:6, 9, 12, 20, 24; 86:1; 89:3; 94:16; 95:7, 10, 18,

21; 96:20, 23; 97:6; 98:17; 99:6, 12; 101:17, 18; 170:18, 20; 171:1, 1, 2, 25; 172:2, 7, 16, 22, 24; 173:4, 13; 181:5; 190:1; 205:17
**charges** 85:22; 173:1; 212:16
**chart** 168:12, 13; 179:23
**charting** 96:3
**charts** 167:10, 11, 13, 17, 24; 168:2, 8, 19, 25; 169:12; 172:1; 181:2; 189:23
**Chaykin** 88:11; 138:11, 14, 15; 153:5, 8, 18, 20; 155:3; 157:16, 19; 160:2; 162:2; 180:23; 182:15; 183:21; 184:12, 24; 185:19; 186:13; 187:4, 20; 189:18; 202:1, 4; 203:9
**Chaykin's** 156:16; 160:9; 170:4; 184:8
**check** 183:23; 184:21; 185:5, 6, 8, 10, 11, 13, 23, 25; 186:14, 18; 214:2
**checking** 63:4; 155:19; 156:2; 180:25; 189:20
**chemo** 103:9
**chemotherapeutic** 191:19
**chemotherapy** 48:10, 12
**chief** 123:15; 125:24
**child** 42:10
**choice** 66:4, 6, 10
**chose** 206:13
**Christopher's** 214:1
**Chuck** 207:16, 17; 208:6; 209:2
**Ciotti** 57:8; 62:12, 14; 66:12; 70:14; 73:6; 78:19; 84:2, 3; 88:17, 21; 90:16; 91:12; 94:21; 97:14; 112:20; 122:7
**circled** 177:1
**circumstances** 101:9; 103:4, 14, 16; 110:5; 132:6; 151:6
**claim** 129:15; 160:4; 180:17; 213:4; 214:23
**claimed** 137:25
**claiming** 205:24
**claims** 51:10; 52:1, 19; 53:8; 54:12, 16; 170:3; 212:18; 213:5; 214:24
**clarification** 127:3; 130:17; 152:14
**class** 47:24, 25; 48:1; 209:19; 213:23
**cleaning** 63:3
**clear** 38:4; 66:18; 169:13
**clinical** 65:12
**clinicals** 65:7
**clock** 79:12, 13
**clocking** 200:9
**close** 162:18; 171:23

**closely** 163:11; 167:10, 13, 24; 168:2, 8, 20, 25; 169:12; 181:2; 189:24

**clothes** 209:16

**CNA** 56:9; 63:14

**CNAs** 56:11

**co-workers** 50:23; 53:15, 20; 55:2; 94:11; 107:5; 171:6; 205:2

**colleague** 115:2, 5

**collection** 188:24

**College** 69:21; 112:24; 113:1; 158:4

**Colloquan** 154:11; 155:4; 156:21

**color** 129:18, 23; 130:5; 131:21; 132:1, 9; 137:21

**comfortable** 37:24

**coming** 47:15, 23; 72:20; 95:11; 132:23; 147:4; 193:1; 205:11; 209:3

**command** 77:2; 84:24; 85:4; 87:13; 124:25; 138:9

**comment** 56:5; 93:21, 25; 125:19; 170:5; 174:17; 177:14, 18, 20; 189:18; 194:11, 18, 22; 200:21

**comments** 92:2, 9; 96:10; 176:3, 7; 179:13; 199:5

**Commission** 204:1

**commitment** 134:4, 19

**commitments** 78:3

**communication** 123:25

**Community** 69:20; 112:24; 113:1; 158:4

**compared** 136:13

**comparing** 117:14, 19

**complain** 96:5

**complained** 163:9

**complaining** 213:11

**complaint** 131:23; 163:8; 205:4

**complaints** 138:1; 196:13; 205:11, 12, 15, 19, 23; 206:3

**completed** 40:24; 41:24; 56:22; 65:21, 24; 67:14; 79:23; 80:5; 170:7

**computer** 111:20; 195:12, 13

**concentrate** 145:11

**concern** 105:7, 12; 107:25; 108:10; 142:10; 186:23

**concerning** 51:25; 52:13; 77:13; 79:7; 80:19; 92:16; 103:22; 120:24; 153:21; 154:13; 158:21, 23; 170:6; 180:13; 187:12; 189:19; 192:4; 194:22; 205:20, 21; 208:18; 214:11

**concerns** 104:23; 106:1; 107:3; 116:14; 117:11;

**124:20; 163:20**

**concluded** 217:6

**conclusion** 185:23

**condition** 49:21, 24, 25; 84:17; 211:18

**conditions** 50:19; 131:25

**conduct** 99:25; 101:20; 137:19; 156:7; 167:8; 169:14; 180:17, 19; 190:5; 213:10

**confidential** 102:5

**confrontations** 94:10

**connection** 52:18; 57:1; 70:3; 71:16; 77:11; 91:4; 124:20, 22; 135:21; 139:7; 156:6; 157:6; 167:16; 170:2, 16; 175:16; 180:25; 182:6, 20; 183:22; 186:14; 187:12; 189:21; 195:24; 201:15; 202:21, 22; 212:18

**consequences** 167:23; 168:23; 199:21

**consequently** 37:19

**consider** 55:17; 73:23; 165:15

**consistent** 81:18

**Consistently** 176:25

**constant** 149:6

**consult** 53:12

**consulted** 51:7; 214:10

**contact** 86:3; 97:7

**contents** 151:15

**context** 159:18; 161:23

**continue** 37:12; 98:16; 162:22

**continued** 162:24

**contract** 115:4, 18; 136:25

**contradicted** 174:23

**contradicts** 177:6

**contribute** 43:20

**conversation** 52:3; 102:17; 110:9; 142:22; 148:13; 214:9

**COO** 153:10, 11; 162:8

**copies** 208:6; 216:6, 12, 14

**copy** 57:20; 61:11; 72:25; 111:8, 13, 14, 15, 16, 18; 149:23; 150:1; 152:4; 189:7; 201:20; 203:18, 25; 207:5; 208:1, 4, 12; 210:14

**Coral** 38:22; 39:22

**COREEN** 37:4; 213:20

**correctly** 194:3

**counsel** 216:16

**counseled** 92:15, 24; 93:15; 94:5

**counseling** 169:15

**counselors** 51:9

**count** 53:10

**County** 65:8

**couple** 60:12; 61:23;

**63:19; 75:8; 100:11; 116:16; 130:11; 144:24; 209:12; 216:14**

**course** 39:19; 40:2; 41:5, 6, 8, 14, 24; 56:22; 66:2; 67:14; 70:18; 71:25; 110:9; 114:24; 115:3, 10, 24; 116:1, 9; 127:16; 129:11; 134:4; 135:18; 136:1, 2, 6, 8, 13, 21, 25; 137:4, 9; 174:7, 13; 186:2, 5; 187:3, 3; 212:16

**courses** 48:13; 49:5, 8, 12; 65:24; 137:8, 15

**court** 37:18; 38:2

**cover** 173:13; 209:10

**covered** 210:4; 216:22

**CPR** 47:16, 17; 48:4

**crass** 108:4

**criteria** 127:11

**Critical** 41:7

**criticisms** 179:13

**critiqued** 91:5, 25; 94:5

**CROSS-EXAMINATION** 216:19

**cry** 86:25

**crying** 87:2

**current** 40:18; 47:22, 24; 48:23

**currently** 42:4, 25; 43:14; 44:21; 45:3, 12; 48:10; 49:19, 22; 50:12, 15; 63:17; 106:4, 11, 12, 17; 217:4

**cut** 215:7, 9

## D

**daily** 50:20; 98:12

**damaged** 212:21

**damages** 213:3; 214:22

**date** 39:4; 81:18; 89:1; 112:5; 118:5; 125:20

**dated** 39:6; 81:12; 120:8; 123:23; 124:4, 9; 139:15; 153:16; 182:14; 184:4; 185:19; 187:20; 188:3; 207:4

**dates** 59:17; 171:16; 172:17

**daughter** 193:12

**Davis** 147:2, 4, 8, 9, 9; 154:2; 156:18

**day** 50:22; 58:9; 76:4, 6; 82:13; 85:13; 95:12; 102:6, 7; 118:7, 7, 7; 120:18; 122:24; 128:21; 132:11; 139:19; 140:21; 142:2; 143:15, 18; 145:6; 147:11; 148:17; 149:7; 187:4; 200:9; 205:22; 206:3; 208:20, 24; 209:20, 20; 211:5

**daycare** 145:4, 20; 214:1

**days** 44:10; 45:15, 25; 46:2, 5; 61:22; 76:4, 8;

**82:7, 7, 14; 85:25; 144:24; 172:23; 206:23; 215:6; 216:2, 4**

**deal** 95:8; 98:11; 107:7, 7; 128:8; 149:8

**dealings** 89:10

**dealt** 75:21; 138:24

**Debbie** 85:15; 200:10, 13, 21

**Deborah** 195:20, 25; 196:8

**December** 47:9

**decided** 172:15; 209:22

**decision** 98:2, 5; 160:20; 173:3, 9; 208:18

**decisions** 89:12; 127:11; 130:20

**Defendants** 57:14; 60:23; 63:20, 23; 64:9; 81:8; 89:16; 111:4; 117:21; 118:11; 120:5; 123:12; 125:9; 139:11, 14; 141:9; 149:19; 150:21; 151:21; 153:14; 157:10; 159:6; 174:24; 182:11; 185:15; 187:16, 25; 188:19; 195:16; 196:16; 197:9; 201:17; 203:15, 21; 204:11; 207:1; 210:12, 20; 211:22; 216:23

**deformity** 50:7

**degraded** 173:24

**degree** 63:11

**del** 37:9, 11; 104:20; 106:14; 169:17, 21; 176:18; 190:14; 216:15; 217:4

**deliver** 201:24; 207:10

**delivered** 154:15; 157:16; 183:4

**demeanor** 52:6; 213:13

**demonstrate** 177:22

**demonstrates** 176:25

**denial** 170:5

**denied** 180:23; 189:18

**dental** 42:11; 43:7; 44:13, 18

**department** 83:3; 188:11

**Dependent** 43:7, 7, 8

**depends** 42:18; 103:1; 155:2

**depo** 210:5

**deposed** 38:9

**deposition** 37:12; 39:2; 58:25; 61:1; 81:11; 117:24; 203:24; 217:5

**depression** 52:22, 24

**derogatory** 142:18; 160:12

**descent** 101:2

**describe** 49:17; 86:7; 88:19; 99:1; 192:12

**describing** 199:21

**description** 64:12, 25

**detail** 52:5; 179:11

**determine** 113:25; 187:8

**develop** 67:1; 107:24

**Diana** 60:16

**DIAZ** 37:4, 10; 46:22; 49:16; 55:23; 56:8; 57:16; 58:1; 61:3; 63:22; 65:3; 71:6; 88:19; 91:3; 104:22; 111:7; 125:17; 129:15; 130:24; 131:19; 155:12; 159:1; 161:24; 163:17; 175:12; 180:16; 182:4; 183:17; 187:8; 190:16; 211:16; 212:9; 214:8

**diem** 61:15, 17

**difference** 56:8; 58:7; 63:18; 76:24; 136:19, 24

**different** 48:6; 65:8; 114:6; 123:1; 130:3; 131:24; 133:22; 163:18; 207:24

**differential** 44:11; 45:18; 46:4, 16, 17, 19; 82:10; 215:18

**differently** 129:16, 21; 130:18; 131:4, 6, 12, 20; 132:4, 8, 10; 133:3, 7, 14, 16; 137:21; 152:15; 163:3

**difficult** 116:5

**DIRECT** 37:8

**directly** 54:18; 98:4; 188:13

**director** 73:1; 98:6, 11; 111:2, 10; 116:12; 155:15

**disability** 42:7; 43:6; 45:2, 3

**disagree** 76:18

**disagreed** 179:16

**disagreements** 95:24; 96:1

**disciplinary** 144:3; 195:5

**disciplined** 167:15

**discovery** 216:10

**discriminated** 76:14, 20, 21; 77:7; 129:17, 22; 130:4, 25; 132:7; 133:13, 21; 134:6; 212:23

**discrimination** 130:22; 137:20; 200:1; 201:4

**discuss** 51:24; 90:15; 124:16; 216:16

**discussed** 38:8; 54:12, 14, 15; 91:12, 18; 117:10; 119:18; 127:1; 144:1, 2; 164:3; 170:6, 13; 177:25; 179:8; 180:4, 12; 184:12; 200:25; 201:7

**discussing** 90:12; 92:1; 101:11; 102:3; 178:21, 22; 179:11

**discussion** 100:8; 127:6

**discussions** 52:12; 80:7; 120:23; 121:2

**distinction** 163:5

**distress** 168:18; 169:20; 174:3

**doctor** 51:12, 13

**doctors** 84:16; 88:24; 214:10

**document** 57:17; 59:2, 25; 60:25; 61:4, 8, 9; 63:22; 64:1, 4, 6, 14, 17; 77:24; 89:18, 22, 25; 90:23; 120:10; 123:19; 126:5; 150:25; 151:7; 159:8; 167:11; 175:6; 203:25; 210:14, 22; 211:24

**documentation** 64:23

**documenting** 206:2

**documents** 80:23; 182:3; 188:9, 17, 24; 189:8

**DON** 87:16; 88:9; 111:1, 2, 17; 116:23

**done** 91:21; 95:13; 156:24; 165:19; 175:21; 217:4

**Donna** 108:14, 18; 109:12, 25; 110:23; 114:15; 152:16, 22

**Donna's** 108:14

**door** 194:17; 199:3; 208:14, 15

**doors** 77:3

**down** 37:18; 59:20; 90:11, 15; 91:13; 96:3; 112:13; 130:11; 143:10; 179:19; 187:16; 193:1; 195:6

**downstairs** 143:14

**Dr** 51:14, 17, 19; 53:5; 199:7, 11; 214:9

**draft** 111:7, 12, 19

**draw** 63:18

**drawing** 63:4

**dress** 209:16

**dressed** 209:14, 16

**dressing** 205:7

**drop** 188:14, 15

**drugs** 116:5

**duly** 37:5

**during** 58:9; 65:19; 67:5; 75:5; 80:9; 92:14; 94:6, 9; 95:9; 97:7; 99:14; 105:16, 16; 114:14; 119:13; 127:16; 129:10; 143:2; 144:19; 145:7; 148:13; 170:18, 19; 172:16, 18; 173:5, 5, 7; 179:8, 14; 181:5; 192:9; 194:18; 203:12; 205:17; 215:3, 3

**duties** 62:24; 64:18; 133:2; 140:25; 144:20; 205:7

---

**E**

E 51:16; 85:18, 18, 18; 108:22

**e-mail** 117:25; 118:2, 13, 15, 18, 21; 119:2, 9, 17; 120:3, 7, 15, 16, 19, 20; 123:19, 22, 25; 124:3, 5, 8,

11; 137:11; 139:13, 18; 140:19; 142:4; 149:22; 150:1, 13; 153:16, 18; 185:18, 20; 187:19, 21, 23; 188:4, 5; 195:9, 19; 196:8; 203:19; 204:15, 16; 205:5, 13

**e-mailed** 195:3

**e-mails** 116:16, 18; 120:10, 24; 125:14; 188:3

**earlier** 39:2; 56:5; 58:25; 82:13; 88:15; 96:13; 108:9; 109:7; 112:2; 123:14; 124:19; 142:6; 160:1; 211:13

**economic** 214:22

**education** 75:19, 20

**educational** 38:17; 72:16; 73:1; 137:11, 12

**educator** 75:19; 113:4

**effect** 110:11; 184:16; 193:3, 5, 25; 194:19; 202:18

**effective** 208:25

**eight** 44:9; 76:2; 82:13; 178:8, 13

**eight-hour** 45:25; 46:2; 76:4, 6, 8

**eight-week** 112:15; 187:3

**Eileen** 57:8; 62:12, 13; 66:12; 70:14; 73:6; 78:19, 23; 84:1, 3; 88:17; 90:16, 20; 91:12; 93:4; 94:1, 21; 97:14, 19; 112:20; 113:14

**either** 50:11; 71:11; 74:11; 85:13; 102:25; 116:7; 150:17; 158:13; 169:18

**EKG** 135:5

**else** 38:15; 57:6; 78:21; 79:6; 88:13; 101:24; 109:12; 110:6; 121:13; 126:16; 127:15; 133:12; 138:20; 140:5, 13; 144:9; 156:23; 157:5; 164:2, 6; 169:10; 170:1, 14; 173:21, 23; 179:7, 24; 180:3, 12; 181:7, 19; 183:25; 184:9, 23; 192:20, 21; 194:7, 12, 16; 198:4; 199:4, 12; 201:11

**Embarrassed** 173:22

**embarrassment** 77:10; 199:20; 213:19

**emergencies** 76:9

**emergency** 134:2, 15; 135:2, 14, 14, 18, 21, 25; 137:3

**Emma** 53:25; 55:11, 17; 100:22; 154:5; 155:9

**emotional** 51:9; 168:18, 22; 169:7, 19; 173:15; 174:1, 2; 181:22; 213:7, 10

**employed** 40:5; 45:6; 59:3; 73:18; 114:13, 17, 18, 21; 130:7

**employee** 42:19; 43:13, 15, 21, 25; 49:2, 10, 11; 61:12; 70:24; 79:17; 81:1; 88:5; 112:23; 163:13; 177:13; 199:16; 200:2; 201:5; 211:19; 212:11, 15

**employees** 54:4, 21; 67:9; 73:14, 16, 20; 99:25; 158:2; 161:17; 162:1; 166:15; 177:16; 191:2, 6; 192:5

**employer** 59:11

**employer's** 58:20

**employment** 42:5; 43:1, 4; 44:4, 14, 19, 25; 46:24; 52:10; 55:24; 57:2, 18, 21; 58:2, 13; 60:9, 19; 74:12, 15, 19; 86:13; 122:18; 131:25; 133:22; 206:7, 14; 209:17, 22; 210:16

**empty** 165:9, 12; 166:19

**encompassed** 41:4

**end** 40:22; 47:4; 64:15; 76:2; 86:15; 88:11; 142:21; 148:17; 177:12; 192:7, 13

**endangered** 103:6

**ending** 41:10

**engage** 99:25

**enough** 103:8; 128:3

**enroll** 67:17, 20; 68:6; 72:15

**enrolled** 56:20; 65:4, 25; 68:11, 15, 17; 71:24

**entitled** 184:16

**ER** 135:6, 12, 14; 136:9, 23; 137:1, 4, 8, 15

**especially** 144:22

**estimate** 82:25

**evaluate** 80:11

**evaluation** 89:20, 23; 90:3, 9, 12; 91:5, 13; 92:12; 174:19, 22; 175:2, 5, 9, 16, 18, 21, 22; 176:3, 9, 14; 177:1; 179:9; 180:10, 14

**evaluations** 80:7, 19; 90:22; 176:16

**Even** 38:1; 112:22; 115:23; 116:1; 131:9, 14; 137:16; 142:7; 145:3; 196:9

**evening** 85:19; 172:24

**evenings** 58:8; 61:23; 85:15; 172:23

**event** 164:13; 172:6; 195:1; 212:14

**events** 151:14; 154:14; 163:18; 190:4

**eventually** 185:7

**everybody** 96:12; 113:13; 181:22

**everyone** 37:19

**evidence** 162:9

**exact** 91:10

**Exactly** 141:11

**EXAMINATION** 37:8

**example** 62:24; 104:16; 176:15

**excellent** 157:3

**exceptional** 160:13

**excessive** 205:25

**Exchange** 60:13

**Excuse** 83:10; 148:5; 170:4

**exercise** 43:23

**exhausted** 133:12; 189:13

**exhaustive** 181:16

**Exhibit** 57:14, 17; 60:23; 61:1; 63:20, 23; 64:9, 11; 81:8, 11; 89:16, 19; 111:4, 6; 117:21, 23; 118:11, 14; 120:5, 8; 123:12, 18; 125:9, 11, 14; 139:11, 14; 141:9, 12; 142:5; 149:19, 21; 150:21, 24; 151:21; 152:3; 153:14, 17; 157:10, 12; 159:6, 9, 25; 174:24; 175:1; 182:11, 14; 185:15, 17; 187:16, 18, 25; 188:3, 19, 21; 195:16, 18; 196:16, 18; 197:9, 12; 201:17, 19; 203:15, 17, 21, 23; 204:11, 14; 207:1, 3; 210:12, 15, 20, 23; 211:22, 25; 216:23

**existed** 158:8

**existence** 165:22

**existing** 136:23

**exists** 121:18

**expect** 186:9

**expected** 187:1

**experience** 115:20; 116:2

**expired** 48:19, 19, 23, 24

**Explain** 45:17; 47:19; 66:15; 117:18; 206:13; 212:20

**express** 116:13

**expressed** 108:10

**extended** 119:4

**extent** 52:2; 84:13; 85:21; 95:7; 98:10

**extra** 216:1

**extreme** 213:18

**eyes** 206:17

---

**F**

F 154:11

**facility** 59:15, 19; 112:23; 203:2

**fact** 55:12; 104:23; 105:1, 7; 107:25; 113:21; 146:7; 155:13; 165:11, 19; 167:23; 168:6, 24; 169:11; 173:20; 186:23; 198:17; 199:23; 201:3; 205:21; 209:10

**facts** 145:22; 160:8

**factual** 150:11

**Faga** 62:13

**Fagan** 62:13; 84:1

**fair** 49:21, 21, 23; 50:1; 58:2; 74:17; 85:3; 86:4, 6; 89:7, 10, 13; 92:12; 99:21; 101:7; 121:15; 123:2; 130:24; 131:21; 158:17; 176:9, 16, 20; 177:2, 5; 186:15; 211:10; 213:7

**fairly** 89:24

**false** 163:13

**familiar** 170:23

**families** 93:8; 179:22; 205:11

**family** 50:23; 89:4; 93:11; 128:2; 188:14; 205:20

**far** 80:12; 152:11, 12; 204:6; 216:12

**fast** 189:21

**fault** 206:22

**favorable** 179:5

**favorably** 178:25; 179:1

**February** 47:10; 56:4; 201:21; 203:19; 204:14

**federal** 216:6

**fee** 67:20, 23; 68:5; 72:14; 184:15

**feeding** 63:3

**feel** 89:5, 7, 9; 91:21; 92:12; 99:20; 103:14; 146:18; 161:11; 169:5; 173:25; 176:9, 16; 177:2, 4, 20

**feeling** 88:1; 173:24

**feelings** 173:16, 20

**felt** 87:23; 91:24; 101:20; 124:19; 133:3; 146:14; 160:14; 181:1; 205:21; 206:3, 17

**Ferguson** 53:23; 100:14, 16; 204:25

**few** 37:14; 38:7; 182:3

**field** 63:10; 82:23

**Fifteen** 178:7

**fifth** 83:20

**file** 151:15, 18; 156:25; 157:2, 3; 160:11, 12; 188:25; 202:19

**filed** 151:23; 152:5; 153:4, 22; 180:23; 196:10; 200:3; 201:14; 202:13; 204:1; 210:18

**fill** 72:17

**filled** 57:21, 25; 59:18; 80:18; 106:20; 107:1; 175:20

**Finally** 70:22

**financially** 214:23; 215:1

**find** 169:10

**finish** 37:20; 145:21; 193:9

**finished** 41:1; 48:1; 66:2; 132:21

**finishing** 63:1; 68:24; 163:18

GREEN DIAZ

GREEN DIAZ (CONT'D)

COLUMBIA HOSPITAL CORPORATION OF S. BROWARD

October 27, 2000

**fired** 206:11, 20, 21
**first** 37:5; 51:17; 54:2, 8; 55:25; 56:6, 14, 20; 64:13; 69:1; 90:8; 92:14; 94:6, 9; 106:1; 107:10, 23; 111:25; 112:3, 6; 115:24; 116:24; 118:1; 119:1; 121:9; 128:11, 18; 130:6; 138:25; 139:2; 141:16; 149:25; 152:3; 155:22; 174:11; 182:18; 207:25; 210:5; 212:3
**Five** 41:11; 45:25; 46:2; 51:5, 6; 76:4; 82:13; 104:19; 154:22, 23; 178:13, 16; 206:24
**float** 104:5, 13; 115:22
**floating** 101:12; 103:25; 104:2
**floor** 61:24; 62:5, 5, 6, 11; 83:3, 9, 11, 12, 15, 16, 17, 17, 20, 23; 84:4, 8, 10, 14; 85:4, 14; 88:11, 16; 89:2; 94:22; 95:22; 97:20, 20, 22, 25; 98:8; 99:3, 22; 103:25; 104:1, 3, 6, 7; 134:15; 135:3; 140:23; 141:19; 147:2; 171:5; 172:7; 179:23; 187:6; 188:13; 207:19, 25
**floors** 83:15; 115:16
**Florida** 231:1
**FMC** 59:14
**focus** 113:20
**Fogarty** 111:11; 190:18; 191:2; 192:8, 17; 195:8, 20; 196:7, 9; 202:23
**Fogarty's** 192:4
**folder** 199:15
**follow** 66:21; 74:24; 122:23, 25
**following** 66:24; 79:10; 122:24; 143:18
**follows** 37:6
**foolish** 149:17
**Foreman** 154:11; 155:4; 156:21
**forget** 159:17
**forgot** 51:22
**form** 66:17; 92:18; 102:8; 106:7; 141:13; 161:18; 167:25
**formal** 119:3; 129:13
**former** 54:4; 55:2; 109:19
**forth** 101:15; 132:14; 144:21; 155:20; 156:2
**found** 130:10; 145:13; 184:15, 18
**four** 46:5; 141:24; 143:6; 147:5; 148:1; 178:16; 204:22; 206:24; 209:7, 8; 213:16; 216:2
**fours** 176:15
**fourth** 62:5, 11; 83:9, 11, 12, 23; 84:4, 8, 10; 85:14; 88:11, 16; 94:22; 95:22;

---

97:20, 25; 98:3; 99:3, 22; 112:13; 134:14; 135:3; 147:2; 207:19
**frame** 59:1, 21; 60:2
**friend** 55:18
**friendship** 88:22
**full-time** 42:19; 50:15; 58:1, 13; 81:1, 14, 19; 166:15
**function** 122:22; 193:19
**functions** 66:22; 83:14; 128:17
**further** 179:11; 216:17; 217:3

---

## G

**gap** 210:1
**gave** 111:16, 18; 189:6, 8; 209:12
**general** 49:18; 72:6; 74:9; 110:8; 162:7; 194:23
**generally** 96:17
**get-together** 54:2
**given** 82:20; 106:17, 19; 120:2; 122:17; 131:9, 15, 15; 205:25
**giving** 132:16; 145:15; 154:16; 156:1; 216:24
**goals** 91:15; 92:2, 7, 10
**goes** 112:22; 114:12; 150:13; 172:23; 199:19, 20
**Gonzalez** 54:7; 100:24
**good** 37:10; 140:17, 18; 144:6; 169:4; 173:16; 177:7, 13; 194:20; 214:5
**Gorrell** 191:20, 21, 25
**gossip** 97:18; 99:13; 108:6
**graduate** 158:2, 7, 19; 159:2
**graduated** 66:3
**graduation** 39:6
**grandfather** 70:15; 122:3; 130:8
**grandfathered** 73:13; 76:23; 122:12, 17, 20; 130:13, 15; 131:16, 17; 132:5
**grandfathering** 71:1; 122:21
**granted** 134:18, 22
**grapevine** 108:2; 109:9; 110:22
**grievance** 138:11, 13; 151:24; 153:3, 21; 156:24; 157:6, 13; 160:4, 9, 20, 21; 170:5; 180:23; 189:18; 201:14, 21; 202:3, 13
**grieving** 99:15
**group** 96:11; 214:5
**guess** 72:16; 77:3; 87:12; 106:3; 133:8, 9; 156:5; 173:15; 179:19; 181:21

---

**guy** 68:19

---

## H

**half** 54:23
**hallway** 93:2, 16, 22, 24; 199:8
**hand** 50:4, 5, 8, 9; 143:12; 208:8, 9; 209:5
**Handbook** 61:2, 12
**handed** 182:24, 25; 207:12, 15; 208:5, 21, 25
**handheld** 143:10
**handle** 89:3; 93:19; 97:3; 143:3
**handled** 88:23
**handling** 72:19; 203:10
**handwriting** 111:22, 22; 125:16, 17; 159:13; 176:5
**handwritten** 125:15; 159:10; 197:12
**hanging** 139:20; 144:20
**happened** 52:4; 102:3; 116:12, 17; 146:22; 153:3; 184:5; 193:16; 194:25; 206:5; 213:20, 20; 215:11
**happening** 87:23; 205:17
**happy** 37:23; 206:16; 213:14
**happy-go-lucky** 52:7
**harassment** 133:4; 141:20
**hardest** 115:16
**harm** 213:7, 10
**Health** 42:10; 49:18; 50:18; 51:4, 8; 53:6, 10; 58:20; 59:5, 9; 82:23
**healthy** 50:25; 51:2
**hear** 93:17; 99:24; 110:3; 132:24, 25; 145:9, 10, 14, 16, 17; 154:17; 192:4
**heard** 93:7; 97:5, 18, 24; 99:13; 102:16; 108:2; 109:8; 110:6, 20, 22; 138:14; 161:22, 23, 24; 162:6; 191:10, 11, 16; 200:13, 14, 20; 213:20
**hearing** 96:22; 155:11
**heart** 135:5
**held** 143:12; 185:22, 22
**help** 59:4; 92:20, 22, 25; 93:13; 126:6; 165:1; 171:6, 7, 19, 20; 192:22, 25; 193:6, 17
**helped** 170:23; 173:8
**helper** 172:24
**helping** 60:11; 85:25
**helps** 39:8
**higher** 46:23; 63:11, 11
**hired** 61:14; 122:25
**history** 49:17
**hold** 185:8
**Hollywood** 40:5, 11, 25;

---

41:16; 42:5; 43:1, 4, 15; 44:4, 8, 10, 14, 22; 45:3, 13, 18, 22; 46:6, 10, 23; 50:12; 209:18, 21; 210:3, 16, 24, 25; 211:8, 17, 19; 212:10; 213:23; 215:13, 17, 19, 23
**home** 59:1; 110:25; 146:21; 147:11; 149:16; 183:4
**hospital** 48:6; 56:1, 10, 15; 57:2; 61:25; 62:4, 7; 67:2, 7; 70:11, 16; 71:7, 23; 72:2, 7, 11; 73:19; 74:4, 19; 75:7; 77:8, 13, 24; 78:16; 79:1; 80:25; 81:15; 82:5, 20; 84:14; 93:22; 94:7, 11; 100:1; 101:22; 104:23; 105:7, 13, 17; 106:2; 107:4; 109:2; 110:24; 112:1, 7, 24; 113:3, 19; 116:14; 123:5, 10; 131:20; 133:13, 21; 134:6; 136:16; 137:13, 14; 138:1, 6; 141:17; 144:16; 147:20; 158:6, 20; 159:1; 160:5; 161:16, 25; 164:14; 165:18; 166:8; 167:8; 170:2, 15; 172:9; 174:14, 20; 177:13; 180:17; 181:7, 19, 25; 182:8, 19; 183:2, 8, 15; 186:21; 187:2; 189:25; 190:5, 5, 21; 196:10; 198:8; 199:13, 22; 200:4, 14, 22; 201:2; 202:2, 17; 207:11, 21; 208:17; 209:9
**hospital's** 88:3; 121:18; 162:24; 183:22
**hospitals** 65:8; 70:6, 6; 71:13, 14, 19; 73:24; 74:7, 12, 14; 121:10; 171:23
**hour** 40:15, 15, 16, 19, 21; 41:19, 22; 42:1; 45:21; 46:16; 154:20, 22
**Hourly** 40:13, 14; 46:8, 15, 23; 215:15
**hours** 42:14, 16, 18, 22, 25; 44:8, 9; 46:5, 16, 17, 18; 62:19; 72:16; 74:1, 2, 23; 82:13, 25; 166:14; 209:12; 215:16, 25
**human** 57:3; 87:16; 88:6; 111:1, 10, 17, 19; 116:11; 125:1; 151:12; 155:15; 188:10; 201:25; 204:1
**humiliated** 173:24
**humiliation** 199:19
**hundred** 44:1; 118:10, 24; 176:1
**hung** 132:19; 139:10; 156:10
**hurricane** 170:18, 19; 171:21, 21, 22; 172:18, 21; 173:5, 5; 181:5
**hurt** 173:16, 21
**husband** 99:13

---

## I

**ICU** 83:17
**idea** 66:24; 187:5
**identification** 57:15; 60:24; 63:21; 64:10; 81:9; 89:17; 111:5; 117:22; 118:12; 120:6; 123:13; 125:10; 139:12; 141:10; 149:20; 150:22; 151:22; 153:15; 157:11; 159:7, 9; 174:25; 182:12; 185:16; 187:17; 188:1, 20; 195:17; 196:17; 197:10; 201:18; 203:16, 22; 204:12, 20; 207:2; 210:13, 21; 211:23
**identify** 87:14; 150:24; 152:4; 159:11
**identifying** 89:25
**ill** 171:16
**illnesses** 50:19
**Imitrex** 60:16; 86:2
**immediate** 60:16; 86:2
**immediately** 159:19; 209:1
**implemented** 159:2
**improve** 91:16
**inappropriate** 100:2, 6; 102:19, 25; 104:16; 127:22
**inappropriately** 101:21
**incidence** 151:12
**incident** 102:9, 15; 139:8; 181:18; 189:12; 190:2, 17; 192:7, 13; 194:19; 198:21; 202:22, 23
**incidents** 102:16; 103:21; 191:1, 5; 192:2
**including** 190:10
**income** 216:7
**inconsistent** 177:21
**increase** 81:24; 91:4, 7; 175:16
**increased** 41:25
**indicate** 165:1
**Individuals** 158:4
**information** 60:5; 70:22, 23; 107:23; 145:11; 158:12
**informing** 205:16
**initial** 116:20; 117:7; 119:13
**Initially** 145:25; 183:18
**initials** 197:3, 6
**injured** 50:3, 3; 212:21
**injuries** 50:11
**injury** 50:5
**ins** 110:19
**inside** 157:24
**instance** 101:25; 104:15; 131:18; 132:3; 133:23; 134:9; 141:16; 160:5; 164:14; 166:18; 167:5; 181:10

instances 55:13; 94:4; 101:4; 123:6; 130:1; 132:7; 163:18; 180:19, 19; 181:17

instead 45:25; 136:22; 188:10; 208:24; 213:15

instituted 158:6; 165:20

instructor 40:1

Insurance 42:7; 43:7, 7, 8, 10; 44:13, 18, 21, 24; 45:2, 3; 214:15, 18, 20

intangible 169:18

intend 140:8

intended 140:13; 149:13

intention 139:24; 140:5

interact 85:21, 24; 98:11

interacting 95:11

interaction 95:13; 192:4

interested 53:3; 72:11; 130:2

intern 70:11; 79:19; 110:13; 123:4

internal 51:22

interns 152:15; 157:8

internship 112:25; 113:2, 5, 12, 23; 114:2, 5, 9, 14; 186:25

internships 121:11; 127:10

interpret 162:20; 163:5; 173:17

interviewed 57:1, 6, 12

into 52:5; 100:7; 102:2; 135:12; 141:23; 145:9; 147:24; 164:17, 19; 166:19; 188:25; 192:24; 193:24; 202:3

introducing 69:17

invasive 63:19

investigate 156:24

investigation 153:21; 156:17; 157:6; 202:3, 5

involved 68:21; 90:18; 101:6

involvement 75:12; 77:13; 78:12, 16; 79:8; 80:9, 19; 104:24; 109:22; 131:1

involving 104:8; 202:23

issue 101:10; 104:8; 112:3, 7; 144:23; 148:11; 155:12; 182:2, 6; 186:23; 189:12

issues 52:13; 54:16; 94:6; 96:17; 103:22; 107:7; 110:24; 124:16; 129:7; 174:1; 187:12; 205:14; 206:1, 15

item 176:24

IV 192:16, 23; 193:9

## J

Jackson 151:2

January 56:4; 60:10, 20; 192:7, 13; 195:19

Jennifer 108:18; 109:12; 110:1, 23; 114:15; 134:12, 13, 24; 136:21; 152:17, 20; 163:11; 173:16; 209:21; 210:7, 7

job 57:9; 64:13, 25; 73:23; 74:3; 87:6; 89:14; 91:20; 163:11; 173:16; 209:21; 210:7, 7

Johnston 53:24; 67:6; 80:14; 100:20

July 40:23; 126:1, 9; 127:2; 128:23; 139:25; 153:16

June 40:22; 117:24; 118:5, 15; 120:8, 15; 123:23; 124:4, 10; 139:15; 141:12; 149:22; 150:8; 154:25; 214:20

Jutras 88:9; 111:18; 116:16, 23; 123:23; 124:1, 4, 6, 14, 17, 21; 125:2, 22; 126:8, 13; 127:7, 16; 128:18, 19, 19; 140:1, 2, 15; 141:4; 146:2; 149:10, 23; 151:9; 164:16; 165:4, 23; 166:19; 167:6; 180:25; 184:13; 189:20; 202:21; 203:19

Jutras'secretary 124:9

## K

KARLIN 66:17; 81:6; 89:24; 92:17; 104:19; 106:12; 128:25; 161:18; 162:14, 19; 164:6, 10; 167:25; 168:9; 169:13, 19; 170:11; 175:6, 10, 24; 176:4, 17, 19; 178:10; 179:2; 197:16; 198:14; 201:11, 22; 204:9, 17; 210:4; 212:25; 213:3; 215:21; 216:20; 217:2

keep 53:19, 22; 54:5; 189:7; 216:6

keeping 160:11

kept 77:1; 79:20; 86:18, 20; 117:20; 132:17; 144:6; 188:17

kid 149:16; 216:1

Kim 88:9; 123:23; 125:22; 202:20

kind 91:24; 169:2, 3; 213:1

knee 50:3, 5, 6; 106:19, 25

knew 74:1; 86:14, 16; 116:4; 196:9, 11, 12, 15; 200:3, 8

Knowing 135:10, 10; 214:4

knowledge 97:16; 134:21; 135:24; 137:17; 151:14; 154:13; 158:25; 166:7, 10

known 103:12; 115:1

knows 151:17, 19

## L

L 85:18; 108:22; 154:10

labs 84:17

lady 37:17; 192:19, 22

language 101:19; 112:17

last 38:9; 47:3; 54:8; 55:16; 57:4; 62:12; 75:25; 88:7; 107:15; 108:14, 17, 24; 152:7, 13; 191:18; 207:18

later 47:25; 70:22, 23; 93:15; 102:13; 114:23; 129:25; 130:2; 132:19; 133:24; 140:20; 145:13; 180:2; 194:11; 195:7, 12; 196:3; 209:3, 19; 216:16

laughter 103:2

lawsuit 51:11; 52:1, 20; 53:9; 54:12, 13, 15, 16, 22; 55:4, 6; 67:10, 12; 76:13; 129:16; 137:25; 170:3, 16; 196:10; 199:25; 200:4; 205:14, 24; 212:19; 213:5, 12; 214:24

lawyer 149:13

lead 145:22

leader 91:24; 169:3, 4, 4

leaf 175:3

learn 66:25; 121:17; 123:3; 131:2

learned 116:9; 123:3; 140:13; 182:18; 196:4

learning 67:1

least 64:19; 124:13, 21, 22; 145:5, 5; 160:14; 211:20

leave 82:22; 98:19; 200:12; 206:13; 208:18

leaving 203:2

led 102:9; 107:24; 154:14; 181:18; 189:12; 190:2, 17; 192:14; 195:1

Lee 88:11; 138:11, 14; 150:17

left 37:17; 46:24; 60:6; 137:19, 23; 144:25; 148:3; 202:24; 210:2

length 133:15

lengthy 89:24

less 134:1

letter 110:25; 111:8, 8, 12, 25; 112:13, 22; 113:11, 18; 114:23; 116:11; 117:11; 182:14, 16, 23; 183:12, 22; 184:3, 6, 25; 185:1, 4, 9, 22; 188:15; 207:4, 6, 10; 208:1; 210:23, 25

level 63:11; 198:10, 11, 18

license 48:8; 66:3; 70:14; 114:10; 145:2

licensed 56:10

licensure 112:14

lieu 74:4; 155:18

life 43:8, 10; 47:18; 48:17, 21; 50:20

light 164:19, 21, 25; 165:1, 4; 166:1, 20; 167:6; 181:1; 189:22

likely 97:2

limited 95:13, 16; 97:7

line 112:13; 130:11; 145:2

Lisa 62:12; 84:1; 191:17, 18, 23

list 137:12; 170:8, 14; 172:9, 21; 181:16

listed 59:11; 92:2, 9; 154:4; 190:9

listen 155:22

listened 138:11; 160:15

lists 58:19

little 63:16; 69:18; 92:18; 161:12; 178:10; 206:18; 211:12; 216:1

LM 197:8

located 77:23; 83:8

long 39:17; 41:8; 55:13; 75:24; 98:20; 154:19, 24; 164:19; 165:5, 13, 25; 166:20; 167:7, 20; 174:11; 175:6; 215:5

longer 44:8; 73:13; 132:13; 147:15, 19; 203:9; 206:16

look 39:7; 57:19; 58:16; 61:3; 63:25; 81:13; 89:22; 111:7; 118:15; 120:11; 125:7, 12; 139:11, 12; 141:13, 23; 154:7; 157:14; 181:24; 199:15; 200:2; 201:5; 216:13

looked 156:25; 160:14

looking 39:7; 58:1, 4, 13; 59:4, 20; 60:1, 5; 73:23; 112:5; 119:17; 126:5; 167:10; 176:14; 186:8, 9, 10, 20, 22; 187:10; 216:23

looks 213:21

Lori 147:2, 4; 154:1, 2; 156:17

lot 98:13; 144:7; 169:23, 25; 214:4; 215:25

lounge 208:2

loved 87:7

LPN 63:5, 7, 11, 13; 155:22, 22; 156:1

lunch 142:8, 9

Lynn 88:8; 125:22; 126:8; 138:12; 155:17; 195:5, 6

## M

M 197:21

ma'am 39:3; 44:13; 46:14; 48:3; 49:8, 14, 20;

licensed 56:10

50:18; 53:14; 54:11; 57:23; 58:24; 63:9; 66:19, 24; 71:6; 76:19; 81:11; 83:25; 84:24; 87:10; 89:18; 90:5; 96:16; 103:13; 105:4; 109:7; 113:25; 114:18; 118:1; 120:7; 123:2, 24; 129:5; 131:11; 137:25; 139:13; 141:11; 147:18; 149:11, 22; 152:2, 10; 156:5; 160:3; 162:16; 166:18; 168:16; 184:20; 186:11; 188:23; 197:13; 203:24; 204:13; 210:14; 216:9, 17

mailed 182:23; 184:6; 185:6, 7

mailing 183:3

mailman 183:9, 11

main 186:23

mainly 88:23; 152:21

maintain 179:20

Mais 40:1

major 131:22

makes 50:22, 24; 106:8

making 40:16, 20; 52:8; 88:25; 93:25; 156:2; 169:5; 215:14

management 88:3; 181:23

manager 57:8; 72:25; 84:3, 7; 85:1, 7; 87:16; 88:10, 16; 89:4; 94:21; 95:7, 22; 96:18, 19; 97:13, 19, 21; 98:3, 24; 99:3, 5, 10, 16; 101:17; 102:1; 125:1; 184:14; 190:22; 205:17

managers 161:25; 171:14

mandatory 49:12

many 42:16, 18; 48:25; 92:21; 93:12, 19; 97:11; 98:14; 141:22; 155:2; 166:12; 174:23

March 39:6, 11, 12; 40:8; 41:9; 59:3; 207:4; 210:16, 23

Maria 54:7; 100:24

Marjorie 151:2

mark 81:11; 83:20; 89:19; 125:11; 150:23; 159:9; 182:13; 188:2; 197:11; 210:15

marked 57:14, 17; 60:23, 25; 63:20, 23; 64:9, 11; 81:8; 89:16; 111:4, 6; 117:21, 23; 118:11, 13; 120:5, 8; 123:12, 18; 125:9; 139:11; 141:9, 11; 149:19, 21; 150:21; 151:21; 152:2; 153:14, 17; 157:10, 12; 159:6; 174:24; 175:1; 182:11; 185:15, 17; 187:16, 18, 25; 188:19, 21; 195:16, 18; 196:16, 18; 197:9; 201:17, 19; 203:15, 17, 21; 204:11, 14; 207:1,

3; 210:12, 20; 211:22, 24

**marking** 139:14; 203:23; 210:22

**Marlene** 53:23; 55:11, 21; 85:11, 22, 25; 86:2; 89:9; 90:17; 95:12; 98:16; 100:18; 170:18; 171:6, 16; 172:15; 173:2, 8; 175:20; 193:1, 24; 194:9; 198:2; 204:25

**Mary** 141:5

**Marybeth** 73:1; 75:15, 16; 78:1, 22; 113:14

**Mathis** 88:6, 8; 116:16, 19, 25; 117:8, 25; 118:3, 6, 15, 19, 23; 119:6, 14; 120:2, 15, 16, 19, 21; 121:4; 125:11, 23; 126:8, 14, 15; 128:13, 20, 24; 129:3, 7, 10; 132:12; 138:8, 10, 12, 15; 139:4, 20; 140:2, 12, 20; 141:3, 4; 142:17; 143:11, 14, 20, 24; 144:11; 145:24, 25; 147:6, 10, 15, 19, 25; 148:13; 149:22; 150:18; 151:10, 25; 155:18; 156:9, 14; 172:14; 180:22; 188:5, 25; 189:8, 17; 195:5, 6; 196:4; 197:7

**matter** 86:20; 87:2

**matters** 38:8

**May** 37:15; 68:16; 87:25; 91:17; 94:5; 103:13, 22; 105:5; 106:3; 112:4, 8, 8, 9; 119:18; 123:3; 140:12; 188:22

**maybe** 39:18; 45:20; 47:9; 54:23; 55:15; 75:8; 82:2, 25; 91:9; 160:16; 186:11; 200:17; 206:3

**McKay** 53:24; 55:12, 21; 85:11, 22; 86:1, 10; 89:9; 90:17; 98:16; 100:18; 170:18; 171:16; 172:15, 22; 175:20; 181:5; 189:25; 193:1, 24; 194:4, 6; 197:22; 198:2

**McKay's** 95:12

**mean** 38:2; 39:10; 49:22; 50:21; 53:11; 58:8; 69:9; 71:15; 77:23; 80:13; 81:16; 83:18; 87:3, 21; 90:21; 95:15; 97:9; 104:2; 105:24; 106:13; 111:12; 114:18; 116:4; 122:17, 19, 21; 126:19; 127:19; 128:18; 131:13; 140:24; 141:2, 4; 142:18; 155:1; 157:8; 162:23; 164:25; 165:14; 169:14; 172:6; 173:15; 176:17; 185:1; 187:1

**meaning** 111:2; 162:21; 171:14

**means** 58:9; 77:2; 104:4; 114:20; 122:21; 171:22, 23

**meant** 38:4; 117:18

**Medical** 40:5, 11, 25; 41:16; 42:5, 10; 43:4, 15; 44:5; 45:4; 46:10, 23; 49:17; 50:12; 51:12, 13; 59:12, 22; 60:3, 7, 17; 83:7, 12; 209:18; 210:17, 24, 25; 211:9, 17, 19; 212:10, 22; 213:23; 215:13, 17, 19, 24

**medication** 52:23; 106:4

**medications** 52:17; 106:9, 11; 135:10

**medicine** 51:23

**meds** 205:8

**meet** 57:11; 125:2; 143:20; 157:20

**meeting** 107:8; 116:19, 21, 24; 117:2, 7; 118:6, 22; 119:3, 9, 13, 14; 120:3; 123:15; 124:15, 23; 125:5, 22, 24; 126:18, 20, 21, 23; 127:1, 8, 16, 19, 20, 25; 128:1, 5, 23, 24; 129:2, 6, 11; 132:12, 19; 139:24, 25; 140:3, 6, 8, 14, 22; 142:11, 14, 21; 144:23; 146:1, 10, 24; 148:7, 12, 15, 18, 24; 149:9, 14; 151:9, 9, 10; 153:5, 12; 159:17, 20; 162:3, 7; 175:19; 179:14, 25; 180:4, 13; 183:21, 24, 25; 184:2, 5, 7, 12, 24; 185:23; 202:20, 25; 203:4, 13

**meetings** 162:7

**Megali** 54:8; 115:7

**member** 128:2; 162:10; 188:14

**members** 94:3; 95:17; 205:20

**memo** 81:12

**memory** 39:8; 59:5; 112:6; 119:18; 126:6; 133:12

**mental** 50:18; 51:2, 4, 8; 168:12; 214:11

**mentally** 206:25

**mention** 119:14; 129:25

**mentioned** 37:15; 53:14; 54:6, 11; 88:15; 94:15; 96:13; 119:2, 8, 12; 123:14; 124:18; 134:1; 138:15; 160:1; 195:8

**message** 161:15

**met** 37:11; 119:6; 126:3, 8, 13; 157:19; 177:25; 187:4; 196:3

**Michael** 150:17

**Michelle** 107:15; 109:11; 110:21; 123:8; 152:19

**Michelle's** 107:15

**Mid-morning** 143:16

**middle** 76:1; 93:24

**might** 38:2, 3; 54:1; 55:15; 82:19; 89:12; 90:24; 95:12; 108:3; 122:24; 151:7; 156:23;

163:1, 4; 199:4; 203:6, 12; 206:18

**migraines** 106:10

**mind** 128:6

**mine** 47:23; 115:2

**minute** 134:9; 154:8; 181:15

**minutes** 104:19; 154:22, 23

**mirror** 208:2

**Miss** 46:22; 49:16; 55:23; 56:8; 57:16; 58:1; 61:3; 63:22; 65:3; 71:6; 86:9; 88:19, 21; 91:3; 104:14, 22; 111:7; 116:16, 16, 19, 23, 25; 117:8, 25; 118:2, 6, 15, 19, 22; 119:6, 14; 120:2, 15, 16, 19, 20; 121:4; 122:7; 124:1, 4, 6, 8, 14, 17, 21, 25; 125:2, 17; 126:8, 13, 14; 127:7, 15; 128:13, 18, 18, 19, 20, 24; 129:3, 6, 10, 15; 130:24; 131:19; 132:12; 138:10, 15, 16; 139:4, 20; 140:1, 2, 2, 12, 19; 141:2, 4; 143:20, 24; 144:4, 6, 11; 145:24, 25; 147:6, 8, 9, 9; 10, 15, 19, 25; 148:13; 149:10, 22, 23; 150:18; 151:10, 25; 155:10, 12, 17; 156:8, 14; 159:1; 161:24; 163:17; 165:3, 3, 23, 23; 166:19, 19; 167:5, 6, 14, 23; 168:7, 7, 24; 169:11; 172:13; 175:12; 177:24; 179:8; 180:13, 16, 22, 24, 24; 181:1, 5, 10; 182:4; 183:17; 187:7; 188:5, 25; 189:8, 17, 17, 20, 20, 23, 25; 190:16; 191:2; 192:4, 8; 194:4, 6; 195:8; 196:4, 7; 203:19; 211:16; 212:9; 214:8

**mistake** 206:18

**MM** 197:3

**mom** 146:21; 149:17

**moment** 53:14; 57:19; 88:1; 89:21; 94:15; 102:13; 106:18; 118:14; 120:9; 125:12; 133:11; 141:13; 187:7; 204:4

**money** 182:9, 20; 214:6; 215:2, 13

**monitored** 163:11; 167:12

**monitoring** 167:10, 24; 168:2, 7, 19, 24; 169:12; 181:2; 189:23

**month** 115:17

**months** 37:13; 130:11; 135:8

**more** 45:20, 20; 52:13; 55:6, 19, 19; 63:16; 86:15; 92:20; 97:2; 99:16, 17, 19; 119:6; 132:11; 133:5, 6, 8; 145:18; 146:17; 167:10, 13, 24; 168:2, 8, 19, 25;

169:12; 178:24; 179:3, 5, 21; 181:2; 189:2, 24; 199:14; 214:14; 215:13, 16

**morning** 37:10; 150:7; 206:24; 208:24; 209:7, 8

**most** 39:18; 61:22; 76:6; 82:25; 86:3; 89:8; 121:10; 194:5

**mother** 126:21; 127:18, 21, 23; 128:4, 12; 140:9; 142:16; 151:2, 7, 11

**mother's** 151:13

**motive** 184:22

**moved** 178:8

**Mrs** 40:1; 126:15; 138:8; 140:15; 141:4; 142:16; 143:10, 14; 146:1; 151:9, 25; 155:9; 164:16, 16; 172:14; 184:13; 192:16; 197:7

**much** 47:1, 15; 52:5; 62:3, 7; 63:14; 96:4; 97:20; 187:7; 203:9

**muscle** 106:8

**myself** 42:10; 51:6; 61:22; 101:25; 113:4; 117:8; 204:24

# N

**N** 85:18

**name** 37:10; 39:23; 51:17; 54:8, 8; 55:2; 57:4; 62:13; 68:25; 69:1; 72:22; 88:7; 107:15; 108:15, 17, 24; 172:8, 22, 25; 191:18; 197:2; 207:16, 18

**named** 38:22; 47:5; 54:23; 147:2

**names** 34:3; 87:18; 91:2; 94:15; 108:13; 119:14

**nastily** 193:4

**nasty** 193:13

**National** 58:20; 59:5, 9

**nature** 144:8

**necessarily** 82:22

**necessary** 171:3

**need** 42:15; 63:3; 71:20; 91:21; 93:12; 103:10; 106:10; 135:2, 4, 7; 145:10; 150:15; 155:23; 160:23; 161:6; 165:1, 15; 171:6, 7; 172:10; 192:20, 21; 205:8

**needed** 58:10; 63:5; 74:2; 116:6; 169:5; 171:19, 20; 192:18

**needle** 192:19

**needs** 104:5

**negative** 142:17; 177:12; 199:14

**negatives** 161:14

**new** 70:18; 158:2, 14, 19; 159:2; 177:12, 16

**newly** 114:13

**next** 102:5, 6, 7; 116:13, 17; 132:23; 138:10; 164:13; 175:4, 8; 194:25; 209:20; 210:7

**nice** 128:3

**Nights** 85:16

**nine** 178:8, 14

**nine-week** 187:3

**None** 197:21

**nonetheless** 130:16

**nonsteroidal** 106:22

**nor** 154:5

**normally** 52:7

**Northwest** 38:10; 137:14

**Notary** 37:5

**note** 160:12; 208:21, 25; 212:1, 7

**notes** 64:23; 125:15; 159:11, 15, 20; 197:12, 14, 17; 209:5

**notice** 208:17; 209:12

**Novelette** 85:16

**November** 59:3; 182:14; 184:4; 185:19; 187:20; 188:3; 200:17, 20

**number** 42:22; 144:25; 176:12, 23, 24; 177:1; 178:16; 186:4, 5

**numbers** 175:21; 176:14; 215:21, 22

**Nurse** 39:24; 48:4; 56:2; 57:8; 63:5, 7; 65:13; 66:21, 23; 72:12, 12, 25; 73:8, 11; 74:15; 78:5; 79:1, 19, 24; 80:4, 25; 81:19; 82:1, 5; 83:4, 23; 84:3, 7, 13; 85:1, 7, 9, 24; 88:10, 15; 89:3, 4; 92:15; 94:16, 21; 95:6, 7, 22; 96:18, 19, 20, 23; 97:6, 13, 19, 21; 98:3, 24; 99:3, 4, 10, 12, 16, 21; 100:9, 10; 101:17; 102:1; 103:7, 25; 104:2, 5, 11; 109:3; 115:16; 122:23; 123:9; 134:1; 136:3, 8, 9, 13, 23; 137:2; 144:7; 147:1; 152:19; 154:19; 155:4, 4; 156:21, 21; 160:18; 164:18; 171:1, 1, 2, 25; 172:16, 24; 173:4, 13, 16; 181:5; 190:1; 205:16, 17

**nurse's** 66:22; 93:23, 24; 165:1, 25; 166:20; 167:6; 181:1; 189:22

**Nurses** 38:23; 39:22; 53:10; 64:23; 68:10, 15; 73:15, 16, 18; 76:22, 25; 84:11, 14, 21, 24, 25; 85:6, 12; 92:20, 22; 96:6, 8, 11, 17, 24; 98:14; 100:8; 102:17; 105:2, 14; 107:11; 108:8, 10, 13; 109:1, 9, 19, 22; 110:13; 114:14, 22; 119:2, 8, 9, 11, 15, 23; 122:3, 10; 123:2; 128:8; 130:12; 131:3, 7, 12;

132:4, 9, 15; 133:18, 25;
134:10; 145:15; 154:4, 10,
16; 155:8, 14; 165:18, 24;
166:8, 12, 13; 171:12;
172:2, 7; 181:23; 186:24;
188:15, 16; 205:6; 208:23
**Nursing** 38:19; 48:7;
56:16, 19; 59:1; 63:10, 24;
65:5, 22; 66:3; 68:11, 16;
69:4; 91:20; 111:2, 10;
114:10; 116:12; 123:15;
125:25; 128:17; 133:2;
140:25; 144:20; 151:18;
177:16; 187:6; 207:13, 14,
20, 22; 213:14
**nursingwise** 132:22

# O

**O** 85:18; 108:22
**o'clock** 44:11; 45:19, 21;
82:22; 213:16
**Oakland** 38:19; 39:23
**object** 66:17; 92:17;
161:18; 162:14, 19;
167:25; 168:9; 198:14;
215:21
**objected** 181:4
**Objection** 92:18
**obligated** 212:15
**observe** 191:1, 8; 192:3
**observed** 101:16, 20;
191:5
**obtain** 49:5
**obtained** 114:9
**obtaining** 48:13
**occasion** 52:14; 54:11;
87:1
**occasionally** 53:15
**occurred** 55:15
**occurs** 143:5
**October** 55:16; 76:2;
81:5, 12; 200:17, 20
**off** 42:12; 58:9; 74:23;
95:12; 111:20; 127:6;
132:22; 155:13, 18, 20;
167:11; 188:14, 15; 215:7,
9
**offensive** 102:19, 25;
174:17
**offered** 52:23; 57:9;
74:13; 114:24; 115:9, 11,
23; 116:1; 136:16, 20, 24;
137:8; 173:12; 182:8;
186:13, 21
**offering** 71:14; 182:19;
184:21
**offhand** 67:24; 72:10;
94:8; 117:5; 125:7; 192:6
**office** 51:19; 93:2; 102:2,
4, 5; 124:14; 126:15;
143:11, 14; 151:12;
157:25; 184:8; 185:4;
193:15; 195:4, 6; 198:22;
199:2; 200:10; 207:20, 23,
24

**officer** 123:16; 125:25
**often** 62:15; 82:24
**old** 50:6; 59:14
**Once** 74:21; 75:3; 98:6;
99:2; 110:20, 21; 119:6
**oncology** 83:7, 12
**one** 37:22; 48:19, 23, 23,
24; 49:6, 6; 52:14; 58:19;
62:11; 67:9; 68:19; 73:25;
76:13; 77:19; 85:25;
91:22; 92:19; 94:15;
95:12; 100:11; 101:6, 12;
103:20, 24, 24; 104:3;
105:10, 11; 107:8; 110:16;
114:3; 115:6, 6, 7, 16;
123:8, 14; 125:13; 130:13;
131:18; 133:24, 25;
134:10, 10; 138:10, 12;
142:9; 143:2; 153:25;
158:18, 25; 159:24;
166:25; 170:20; 171:25;
174:9; 176:10, 24; 177:1;
178:2, 3, 5, 6, 15, 15, 18,
24; 179:15; 186:4; 195:22;
196:1; 199:14, 25; 200:9;
205:2, 9; 206:18; 208:4, 6,
6, 8, 9; 210:7; 216:21, 24
**one-page** 159:10
**one-year** 39:14
**ones** 54:6, 21; 154:17;
178:15
**ongoing** 50:6
**only** 44:7, 9; 48:5; 51:12;
58:5; 70:10; 71:7, 23;
72:11; 73:11; 76:24;
78:25; 103:24; 114:3;
148:22; 149:9; 153:23;
165:16; 174:7; 198:5;
204:18
**open** 99:17, 17; 194:17;
199:3
**opinion** 84:19
**opportunity** 95:8; 192:3;
215:23; 216:3
**option** 43:19; 131:9, 15
**optional** 43:6
**options** 43:23
**orally** 163:9
**oranges** 117:14, 19
**order** 63:10; 68:6; 73:8,
18; 159:16
**organizations** 121:10
**orient** 177:12
**orientation** 41:2, 21, 23;
119:4
**orientations** 127:4
**orientee** 68:20
**orientees** 177:16
**orienting** 110:10
**original** 172:9; 185:9, 10,
11
**Originally** 56:20
**originals** 189:9, 10
**ostracized** 87:6, 22
**ostracizing** 87:11; 88:4

**others** 53:25; 97:6;
177:8; 191:10
**Otherwise** 46:8
**out** 57:21, 25; 59:23;
72:17; 80:18; 87:3; 98:19;
124:25; 130:10, 15;
137:19, 23; 145:13, 18;
159:16; 169:10; 171:6, 7;
173:18; 177:13; 178:5, 7;
179:5; 192:17; 193:2, 4, 6,
7; 194:1, 10; 200:9; 205:8;
209:5
**outs** 110:19
**Outside** 126:21, 22;
127:21; 151:11; 157:24
**over** 52:8; 76:8; 91:14,
24; 92:5, 9, 23; 95:25;
103:8; 104:23; 105:7;
107:25; 113:5; 115:17;
117:20; 128:9, 9; 148:11;
149:6; 176:23; 192:22
**overall** 49:18
**overflow** 83:21
**overhead** 132:24;
145:14; 154:18
**overheard** 101:5;
198:25; 199:1, 5
**overtime** 82:15, 18, 24;
215:24; 216:4
**overworked** 205:22
**own** 60:1; 72:6; 97:3;
135:24; 153:21

# P

**p.m** 217:5
**page** 57:23; 58:16; 61:5;
64:2; 90:6; 111:21;
120:14; 125:17; 145:16;
152:7, 13; 175:13; 176:12,
15, 17, 20, 23; 178:6, 22;
179:10, 11; 188:22; 197:1,
12; 212:3, 6
**paged** 128:8, 16
**pages** 145:14, 17;
154:18; 155:11; 188:23
**paging** 132:24, 25; 133:1;
145:13
**paid** 41:13, 16, 19, 21;
42:12; 46:8, 15; 48:14;
49:9, 10; 72:14; 75:5;
76:10, 16; 78:11; 79:3;
104:24; 105:3, 8, 15, 24,
25, 25; 107:11, 17, 25;
108:3, 11; 109:9, 13, 22;
110:1, 4, 9, 21, 23; 112:25;
113:2, 11, 22; 114:1, 14;
117:16; 123:4; 130:16, 18;
131:1, 3, 8, 10, 14; 132:4;
133:17; 158:3; 183:18;
186:24; 196:13; 211:13;
215:9
**pain** 212:25
**painkiller** 106:6, 21
**paired** 137:1
**paper** 178:5

**paperwork** 72:18, 20;
76:9; 113:5; 117:5;
120:25; 121:3; 125:8;
127:12; 130:19, 23;
139:22; 141:23; 145:18;
162:9; 202:10
**paragraph** 131:23;
158:1; 163:8; 197:20
**parenthesis** 197:21
**parents** 215:2
**Park** 38:19; 39:23
**Parkway** 74:8
**Part** 41:20, 20; 58:4;
61:22; 64:20, 22; 65:12;
68:8; 71:8, 17; 72:8, 20;
74:18; 75:11; 78:13;
80:12; 89:8, 14; 91:14;
130:8; 137:5; 158:4;
162:6, 8; 168:17; 169:7;
178:9; 194:5
**part-time** 61:15; 62:1
**participate** 65:16;
112:15; 115:9; 158:2;
183:18
**participated** 65:9; 69:8;
76:17; 122:11; 158:9, 20;
159:3
**participating** 107:11;
162:25; 182:7; 211:9, 18
**participation** 76:11;
79:3; 105:8; 108:1;
109:10; 110:2; 121:18;
123:4; 133:17; 136:20;
186:14; 187:13; 196:14;
211:14
**particular** 61:18, 24;
67:4; 82:5; 83:2; 106:17
**parts** 92:6
**passed** 99:14
**passing** 205:8
**past** 51:5, 6
**Patient** 50:10; 64:21;
89:3; 93:12; 102:2; 103:6,
8, 12, 22, 23; 104:4, 8, 10,
12; 132:16; 135:11;
138:13; 144:21, 25;
145:12; 155:19; 156:2;
164:22, 25; 165:15, 20;
167:16; 179:16; 192:18,
23, 25; 193:6, 10, 11;
194:8, 20, 23; 196:2;
205:10; 214:6
**patient's** 63:4; 89:4;
93:11; 132:14; 191:7;
192:15, 25; 193:2, 4, 12;
194:1, 9
**patients** 63:3, 3; 92:21;
93:8, 8, 12, 17, 19; 103:9;
141:1; 155:2, 24; 179:22,
22; 188:12; 205:11, 20, 20
**pay** 49:4; 67:20; 68:5, 9;
78:16; 82:24; 83:1;
174:21; 175:15, 15; 187:2;
213:25; 214:3; 215:3
**payable** 184:14
**PCA** 38:18; 39:4, 9; 56:2,
6, 9; 61:14; 62:1, 10, 16,

23; 63:6, 13, 16; 64:5, 7,
13, 19; 65:1, 4; 70:13;
74:20, 22, 23; 75:3; 81:23;
91:23; 109:15; 130:7;
169:2; 205:7
**PCAs** 56:10; 91:23;
109:18, 19; 114:21;
130:12; 132:23; 205:9
**pending** 197:16
**people** 53:15, 20; 54:10,
17, 23; 55:9; 74:1; 80:8;
87:12, 22; 94:2; 130:8;
132:23; 138:24; 153:1;
160:15; 169:6; 172:25;
179:23; 204:22; 214:5
**per** 40:21; 45:15; 46:5,
15; 61:15, 17; 82:25
**perceive** 161:8; 170:9;
202:16
**percent** 44:2; 118:10, 24;
176:1
**perception** 96:16, 24
**perfectionism** 91:20
**perform** 66:22
**performed** 166:24
**Perhaps** 40:22; 58:8;
118:7; 216:15
**period** 41:18; 47:7; 59:9,
18; 78:4; 83:1; 97:7; 173:6;
209:25
**periods** 181:6
**person** 50:25; 51:2; 52:7;
55:7; 57:3; 86:3; 113:4, 6;
139:24; 140:22; 146:15;
148:11; 191:11, 13
**person's** 54:8; 146:16
**personal** 156:25; 157:2,
3
**personally** 110:1, 3;
191:8
**personnel** 151:15
**Persons** 191:14, 15
**pertaining** 159:24
**phone** 102:6; 128:14;
132:13, 20; 139:20;
140:25; 141:19, 22;
142:23; 144:22; 145:2, 3;
155:15; 215:7, 8
**photocopies** 189:10
**photocopy** 125:13;
180:6
**physical** 214:11
**physically** 77:23;
143:12; 171:17; 209:4
**physician** 51:21
**Physicians** 60:13
**pick** 140:24
**pieces** 92:5
**place** 55:14; 67:14;
94:21; 97:14; 115:24;
121:9; 125:6; 127:2;
143:1; 151:14; 154:14;
184:2, 7; 192:13; 199:15;
200:16; 203:3
**places** 174:23



**plan** 43:11; 139:23
**Plantation** 51:20; 137:14
**player** 160:24; 161:3, 7; 162:4, 10, 12, 18, 21; 170:6; 189:19
**players** 160:23; 161:6; 162:3, 17
**please** 45:17; 51:15; 58:17; 63:25; 87:15; 88:2, 19; 113:21; 118:14; 123:21; 125:12; 129:20; 150:25; 157:14; 161:5; 163:18; 175:3; 179:2; 204:4
**Plunkett** 107:15, 16; 110:21; 123:8; 152:19
**plus** 42:14, 16, 25; 46:16, 17, 18
**point** 39:21; 41:24; 49:23; 56:15; 58:12; 65:9; 73:25; 88:2; 91:18; 94:20; 104:22; 105:6; 115:21; 119:5; 120:1; 123:15; 124:14, 22; 146:23; 148:14; 149:12; 159:3; 162:15; 174:9; 182:5, 8; 185:2; 186:21; 200:4, 5
**policies** 158:15, 21, 23
**policy** 70:25; 71:1; 101:12; 112:1; 121:5, 6, 8, 11, 12, 12, 15, 17, 20, 24; 127:4, 9; 129:13, 13; 130:17; 158:16; 162:22, 24; 172:6
**pool** 58:6, 7; 63:24
**position** 64:12; 75:18; 190:21; 206:20
**positive** 176:25; 177:22; 179:20; 216:24
**possession** 188:8
**possible** 81:17
**possibly** 112:4; 114:3
**post** 172:21; 208:1
**potential** 144:7
**practitioner** 53:10
**practitioners** 51:4; 53:7
**pre** 172:20, 21
**precept** 70:11; 71:8, 19; 136:8, 14
**precepted** 70:6; 136:22
**preceptor** 41:4; 68:20; 72:17; 74:24; 77:19, 25; 79:10; 80:11, 14; 107:12; 109:10; 110:13; 119:3; 122:19, 23; 123:5; 135:19; 136:3, 10; 158:3, 7, 8, 19; 159:2, 4; 163:21; 177:7, 16; 182:7, 20; 183:19; 187:3; 196:14; 211:10
**preceptored** 186:7
**preceptoring** 105:16, 19, 20, 21; 107:13; 110:10; 123:9; 152:20
**preceptors** 121:11
**preceptorship** 40:25; 41:1, 3; 65:10, 16, 25;

66:9, 11; 67:5, 13, 17, 21; 68:6, 9, 12, 17; 69:11, 16, 24; 70:1, 5, 10, 25; 71:4, 12, 18, 24, 25; 72:2, 8, 15, 21; 73:2, 8, 17; 74:5, 11, 18, 21, 24; 75:4, 12, 24; 76:11, 17; 77:11, 14, 19; 78:12, 14, 17; 79:2, 7, 8, 14, 23; 80:9, 12, 20; 104:25; 105:3, 9, 15, 19; 108:1; 109:23; 110:2; 112:15; 114:6; 121:19; 122:11; 131:2; 133:18; 163:1; 186:15
**preceptorship/interns** 121:7
**preceptorships** 71:15; 127:4
**prefer** 45:24; 46:2
**preferred** 150:16
**prehurricane** 172:9
**preliminary** 38:7
**prepare** 159:15
**prepared** 159:11; 206:25
**prescribe** 52:17
**prescription** 52:23
**prescriptions** 106:16
**presence** 194:7
**present** 54:4; 117:6; 126:16; 127:19; 143:22; 146:1; 150:15, 17; 157:23; 171:17, 18; 183:25; 184:9; 194:12, 16; 199:7, 10
**presented** 90:13; 143:8; 150:7
**presents** 135:12
**pretty** 62:3, 7; 63:14
**prevented** 50:11
**previously** 37:11; 39:22; 112:19; 161:25
**prior** 58:19; 95:6; 107:3; 122:10, 13; 162:2, 4; 175:22; 192:7
**privileges** 131:25
**probably** 91:1; 94:3, 3; 98:13; 99:14; 102:23; 111:19; 151:8; 203:9
**problem** 50:6; 84:18; 85:5; 89:2
**problems** 51:9, 25; 52:18; 53:7; 86:9; 88:24; 95:20; 96:14, 18, 25; 97:1; 107:4, 6; 137:1; 191:1, 5; 192:3, 9
**proceeded** 157:3
**PROCEEDINGS** 37:1
**process** 203:2
**profession** 63:12
**professional** 53:11; 86:7; 88:20; 99:1, 9
**professions** 63:10
**program** 39:14, 16, 17; 40:25; 43:17, 21; 65:5, 10, 17, 22, 25; 66:5, 8, 9, 11, 15; 67:5, 13, 18, 21; 68:7, 11, 12, 17, 22; 69:7, 11,

16, 24; 70:1, 5, 10; 71:9, 13, 18, 24, 25; 72:3, 6, 9, 15, 21; 73:2, 8, 12; 74:5, 11, 18, 21, 24; 75:4, 12, 24; 76:11, 17; 77:12, 14; 78:12, 17; 79:2, 3, 7, 8, 14, 24; 80:5, 10, 20; 104:25; 105:9, 19, 22; 107:12; 108:1, 11; 109:23; 110:2, 13, 17; 112:16; 119:3, 4; 121:19; 122:11, 19; 123:5; 131:2; 133:18; 158:3, 5, 7, 8, 9, 14, 19; 159:2, 4; 163:1, 21; 165:20, 21; 182:7, 21; 183:19; 186:15; 187:13; 196:2, 14; 211:10, 14, 18
**promises** 78:3
**promissory** 212:1, 6
**promoted** 82:1
**promotion** 174:5, 14
**proof** 130:23; 158:11, 12
**proud** 151:18
**provide** 163:13
**provided** 90:22
**Ps** 213:18
**psychiatrist** 51:8
**psychiatrists** 51:3; 53:6
**psychologist** 51:8
**psychologists** 51:4; 53:6
**Public** 37:5
**pulled** 193:2, 3; 194:1
**punch** 79:12; 206:17
**punched** 145:18
**pushed** 74:22
**put** 42:18; 62:19; 102:12; 109:8; 110:23; 164:19; 179:19; 188:25; 192:19; 193:8; 208:14; 216:3
**puts** 164:25

# Q

**Qs** 213:18
**quit** 84:1; 214:15
**quote** 111:25; 115:1; 119:2; 150:13; 162:3, 17, 18; 176:24; 177:15; 194:3

# R

**race** 129:17, 22; 130:4; 131:20; 132:1, 9; 137:21
**racially** 174:17
**radiology** 62:6; 190:22
**raise** 91:4, 8; 102:21; 103:3, 15; 105:7; 106:1; 110:24; 162:11; 163:20; 174:21; 175:15; 180:1
**raised** 51:10; 52:1, 19; 54:13, 16; 100:8; 101:5, 10, 14; 102:16; 103:4; 104:23; 105:5, 12; 107:3;

112:3, 7; 170:3; 187:12; 205:14; 206:1; 212:19; 213:5; 214:24
**raising** 102:24; 103:1, 21; 104:14, 16; 124:20; 205:13
**ran** 69:23; 70:1; 193:24
**range** 62:22; 82:3
**rarely** 167:15
**rate** 46:9, 15, 23; 215:15
**rating** 177:2; 178:13; 179:4
**ratings** 90:22; 176:20; 178:24
**reaction** 145:1; 156:3
**read** 59:17; 116:4; 144:3; 150:13; 152:9; 153:6, 6; 157:4, 7; 184:25; 185:1; 204:4
**reading** 111:24; 144:12; 156:15; 160:22; 185:3, 4
**reads** 119:2; 158:1; 176:24; 177:15
**ready** 145:8; 190:8; 192:19; 200:12
**really** 48:25; 50:21; 54:9; 55:5; 62:2; 68:2; 71:5; 85:23, 24; 114:4; 129:4; 144:2, 14; 149:9; 167:18; 170:19; 192:11; 203:5; 206:21; 214:5
**reason** 58:12, 24; 76:14; 85:24; 113:17; 132:1; 156:12; 198:19; 215:8; 216:9
**reasons** 51:5; 53:11; 76:13; 97:16; 146:5; 199:17
**recall** 43:3, 8; 47:7; 48:25; 49:15; 54:2, 6; 55:1, 12; 57:6; 58:25; 59:8, 10; 60:2, 4, 19, 22; 61:7, 8, 9; 62:9, 15; 68:2; 74:16; 75:2; 77:16, 20; 78:2; 79:6; 81:13; 83:15; 90:11; 91:11, 17; 92:1, 4; 93:9; 94:4, 9; 95:1; 98:7, 21; 99:9; 101:4, 7, 24; 102:17; 116:15, 24; 117:12; 118:2, 9, 10, 18, 21; 119:5; 120:11, 16, 20, 23; 121:2; 124:5, 11; 125:6; 126:25; 127:7, 13, 15; 128:22, 23; 129:9; 134:7; 139:16, 21; 143:17; 144:4, 9, 11; 147:4, 8; 150:1, 4, 18; 152:11, 12; 153:18; 154:24; 160:25; 174:4, 18; 177:4, 24; 178:20; 179:7, 13, 24; 180:2, 12, 15; 182:8, 15; 183:21; 184:2, 11, 23; 185:20; 187:21, 23; 192:12; 202:15; 203:1, 3, 5, 6; 204:7, 16; 210:25
**recalled** 43:13
**Receipt** 61:2
**receive** 43:4, 10, 14; 46:4; 48:21; 49:1; 61:11;

82:10; 158:5; 174:19; 175:15; 183:12; 216:10
**received** 38:18; 39:4, 9; 48:7; 66:3; 81:16; 90:3, 9; 91:3; 107:24; 112:14; 118:22; 140:19; 150:1; 151:25; 174:22; 180:22; 184:3; 185:2
**receiving** 42:4; 43:13; 44:4; 53:3; 61:9; 81:13; 118:2, 18; 120:20; 124:5, 11; 139:16; 150:4; 152:5; 182:15; 210:25
**recently** 99:13; 114:12, 17
**receptive** 99:17, 19
**recess** 104:21; 190:15
**recognize** 57:20; 61:4; 64:1, 4, 6; 89:22; 90:2; 98:7; 123:25; 141:14; 157:15, 17; 175:4, 8; 188:4; 195:19; 197:17; 201:20; 203:18, 25; 207:5; 210:17; 211:25
**recognizes** 176:5
**recollection** 60:1, 6; 81:19; 92:8; 117:9; 202:12; 203:12
**recommend** 52:16
**recommendations** 179:22
**record** 127:6; 144:3
**records** 79:20; 88:25
**refer** 112:19
**reference** 112:5; 113:21; 118:5
**referred** 108:9; 111:9; 113:10; 154:10; 188:9
**referring** 64:22; 93:5; 96:14; 114:15; 117:15; 119:10; 124:21; 139:25; 150:14; 152:16, 25; 177:14, 18; 178:6
**refers** 119:8; 120:14; 123:22; 139:23; 140:3
**reflect** 188:24
**reflecting** 123:19
**reflection** 64:18
**reflects** 149:23
**refresh** 39:8; 59:4; 112:6; 126:6
**refreshes** 119:17
**refuse** 150:6, 10; 196:24
**refusing** 155:14
**regarding** 52:13; 102:1; 103:25; 121:18; 138:13; 144:23; 164:8; 198:21
**regards** 92:25; 155:11
**Regional** 44:6; 112:16; 212:22
**registered** 66:20, 23; 82:1; 114:14, 22; 115:15
**regular** 107:6, 6
**regulations** 56:12
**reimburse** 182:9, 19

**reimbursed** 162:25; 182:6; 184:15, 18

**reimbursement** 186:1, 2

**relate** 147:14, 19; 161:16

**related** 142:22; 166:18

**Relations** 204:2

**relationship** 86:8; 88:20, 20; 99:2, 9

**relaxant** 106:8

**remain** 72:13; 78:3; 211:19; 212:11, 14

**remarks** 80:19, 22

**remember** 39:10; 52:2, 3, 4; 55:25; 56:18, 25; 57:4; 60:11; 64:20; 67:23, 25; 69:1, 17; 74:8, 9; 77:15, 17, 21; 78:22, 23; 81:3, 17, 25; 90:17, 20; 91:3, 7, 9, 19, 22; 92:19; 93:1; 94:24; 95:4; 98:21; 100:4, 7, 10, 12; 108:14, 17, 18, 24; 110:8; 113:14; 114:4; 115:7; 117:3, 6; 125:6; 126:4; 127:10; 128:16; 129:10; 130:14; 132:16; 141:5, 15; 142:7; 145:7, 18; 146:20; 147:12, 16, 21, 22, 22, 23; 148:4; 157:8; 160:22; 170:17; 172:12; 178:22; 179:10, 11; 183:20, 24; 191:17; 196:20; 201:25; 202:1, 20; 203:8; 207:18

**remembered** 112:2

**reminded** 150:15

**remove** 202:19

**remuneration** 158:5

**rep** 102:2; 138:13; 196:2

**repay** 212:15

**repeat** 37:16, 24

**repercussions** 162:21; 163:4

**rephrase** 37:23; 65:20

**replaced** 97:25

**replied** 202:6

**reply** 180:6, 9; 202:9, 11, 13, 15

**report** 83:22; 84:25; 132:22; 145:8, 8, 15; 147:13, 16; 153:6, 6; 154:4, 7, 17, 19; 155:20, 22, 23, 24; 156:1; 195:5

**reported** 75:11; 84:6, 25

**reporter** 37:18; 38:3

**reporting** 155:13, 18

**repercussions** 163:2

**representatives** 165:20

**represented** 157:2

**reprimand** 141:12; 143:9; 144:12, 15; 163:12, 23; 164:3, 9, 10; 167:4; 180:21; 189:16

**reprimanded** 165:14; 166:17; 167:15

**reps** 194:20, 23

**request** 92:25; 116:21; 124:15; 153:12

**requested** 116:18; 123:15; 202:25; 216:10

**requesting** 121:3

**require** 49:13

**required** 134:22

**requires** 135:6

**research** 184:13

**reside** 38:10, 13

**resign** 206:7; 209:22

**resignation** 207:6; 208:25

**resigned** 52:9; 206:12

**resolve** 107:9

**resource** 57:3; 87:16

**resources** 88:6; 111:1, 10, 17, 19; 116:12; 125:1; 151:12; 155:16; 188:10; 201:25

**respect** 153:3

**respects** 67:10

**respond** 156:8, 13; 165:5, 25; 166:21; 167:7

**responded** 37:6; 166:22; 189:22

**response** 97:3; 116:15; 120:2, 19; 124:3; 151:24; 156:20; 157:13, 15; 158:1; 160:4, 9, 20; 188:6

**responses** 77:4

**responsibilities** 62:25; 64:18; 66:23; 75:1; 122:22

**responsive** 124:15, 17

**rest** 64:24; 155:25

**result** 51:10; 52:19; 166:17; 168:6; 169:11; 173:11; 213:5, 10; 214:12, 23

**results** 51:25; 53:8

**retaliate** 138:2; 205:25

**retaliated** 77:5, 7; 133:6; 138:20; 160:2; 163:10; 170:2, 15; 181:8, 20; 182:1

**retaliating** 141:17

**retaliation** 130:1; 133:8, 10; 138:7, 25; 141:21; 144:16; 145:23; 146:6; 160:5, 10, 21; 161:9; 163:19; 164:15; 165:8, 11; 167:3, 9; 170:10; 171:10; 180:18, 20; 181:17; 189:15; 190:6, 11; 198:8, 13, 20; 199:13, 18, 23; 201:1, 1; 216:22, 25

**Retaliatory** 77:9; 164:4; 202:17

**returns** 216:7

**review** 152:10; 179:8; 197:14

**reviewed** 64:14; 91:13

**reviewing** 204:5

**rhythm** 116:4; 135:5, 5

**rhythms** 116:4, 5; 135:6

**Ridge** 38:22; 39:22

**right** 37:17; 39:2, 20; 41:23; 44:12; 49:16; 51:7; 54:10; 55:1, 17, 23; 56:24, 25; 61:14; 67:3, 13; 68:4; 74:17; 77:25; 79:16; 83:2; 84:10, 23; 85:8; 87:1, 14; 91:17; 96:13; 97:5, 15, 24; 98:9; 99:8, 20; 100:4; 101:4; 102:12; 106:13; 112:8, 22; 113:17; 114:23; 116:11; 118:21; 119:1; 121:14; 122:14; 124:3, 18; 125:19; 126:19; 129:8, 15; 130:2, 24; 131:18; 134:5, 8, 20; 135:9; 136:18, 19; 137:18; 138:25; 145:12; 151:23; 153:2, 11; 160:19; 164:13, 22; 165:3; 170:1; 171:15; 176:11; 178:15; 180:3; 181:10; 183:14; 186:19; 189:11; 192:2; 194:25; 196:3; 197:2, 2; 198:12; 199:12; 200:24; 202:12; 205:12; 208:23; 209:11; 216:17

**RN** 63:2, 12, 13; 66:25; 67:1, 4; 70:15; 74:25; 75:1; 81:14, 23; 90:9; 101:6; 130:9, 9; 155:21

**Roberto** 51:18, 19; 214:9

**role** 74:22

**roles** 66:22; 74:25; 122:22

**room** 132:14; 134:2; 135:2, 14, 18, 21, 25; 137:4; 145:9; 147:24; 164:17, 19, 20, 22; 165:9, 11; 166:19; 189:20; 191:7; 192:16, 17, 22, 25; 193:2, 4; 194:1, 9; 198:6

**rough** 111:19

**roughly** 40:15

**rounds** 66:25; 67:5

**routine** 170:24

**rules** 56:12

**run** 91:23; 182:3

**run-in** 95:23

**run-ins** 94:10; 95:20; 192:9

**RUSSO** 37:9, 11; 104:20; 106:14; 169:17, 21; 176:18; 190:14; 216:15; 217:4

# S

**S** 51:16

**sad** 50:22, 24; 52:8

**Saez** 51:14, 17, 19; 53:5; 214:9, 10

**safety** 103:23; 104:8

**salary** 40:10, 18; 41:25; 62:20; 81:22, 25

**same** 38:24, 25; 39:1, 25; 55:22; 57:11; 59:14; 60:18; 62:8; 143:12, 18, 21; 179:19; 187:4, 6

**Sandler** 199:7, 11

**sat** 91:12

**satisfied** 120:1

**saw** 158:14, 21; 164:18; 165:3, 4; 166:4, 6

**saying** 52:5; 69:18; 78:15; 91:19; 93:15; 103:13; 117:20; 129:10, 12; 147:9, 12, 16, 21, 22; 150:18; 160:22, 25; 198:23; 215:8

**scan** 79:12

**schedule** 66:22; 74:25; 76:7; 79:10; 82:20; 122:24, 25; 124:15, 23

**scheduled** 208:20, 23

**scheduling** 88:24

**School** 38:19, 22, 23, 25; 39:1, 21, 23, 24; 40:3; 56:16; 58:14; 66:13; 68:16; 69:5

**scrubs** 209:14

**scrutinized** 161:13

**sealed** 208:14, 15

**season** 170:19; 171:21; 173:5

**second** 62:6; 83:15, 16, 17; 97:19, 22; 129:2, 5, 6; 138:12; 158:1; 168:11; 173:13; 181:9; 182:2; 197:20; 212:6

**secretary** 128:19; 140:15; 154:1

**section** 64:24

**seeing** 61:8

**seek** 127:3; 130:17; 174:9

**seeking** 120:25

**seemed** 115:18

**send** 72:18; 92:22; 188:13; 204:17, 20

**sending** 111:9; 116:15; 120:16; 153:18; 185:20; 187:21, 23; 204:16

**sense** 38:5; 146:22; 194:23

**sent** 80:23, 24; 110:25; 111:9, 25; 116:11; 124:1; 139:18; 149:23; 188:5; 195:9; 196:8; 203:19; 204:22; 205:6

**sentence** 119:1

**separate** 71:14; 72:6; 202:18

**September** 55:16; 89:20, 23; 175:2

**Sergio** 69:1; 115:6, 8

**Serves** 177:15

**service** 60:12

**services** 60:12, 21, 22; 191:19

**set** 42:22, 24; 70:18; 76:7; 170:20; 189:7; 196:2

**settle** 187:11

**seven** 41:11

**several** 37:13; 84:5; 123:19; 140:23

**Shambo** 108:16, 19

**sheet** 159:10; 172:9, 13

**shift** 44:11; 45:18, 22; 46:4, 16, 17, 19; 61:18; 82:5, 10; 85:10, 13, 19; 91:22; 123:1; 132:23; 143:4, 4; 144:19; 145:7; 215:18; 216:1

**shifts** 45:12, 24; 85:13

**shortcoming** 186:12

**shoulder** 143:13

**shoulders** 168:15

**show** 39:5; 57:16; 60:25; 63:22; 64:11; 81:10; 89:18; 111:6; 118:13; 120:7; 123:18; 130:19, 22; 139:13; 141:11; 149:21; 150:23; 151:16; 152:2; 153:16; 157:12; 158:10; 159:8; 175:1; 182:13; 185:17; 187:18; 188:2, 21; 195:18; 196:18; 197:11; 201:19; 203:17, 23; 204:13; 207:3; 209:4; 210:14, 22; 211:24

**showed** 195:12

**showing** 117:23; 126:2

**shown** 125:14; 142:5

**shows** 59:2; 162:9

**shut** 77:3; 208:14

**sick** 98:19; 171:7

**side** 74:22; 85:13; 193:20

**sign** 77:12; 115:3, 17; 134:18; 136:25; 150:6, 10; 172:13; 196:24; 211:5

**sign-in** 172:13

**signature** 57:23; 61:5, 6; 64:2, 3, 15, 16; 90:5; 152:7; 175:12; 197:7; 207:8; 211:3; 212:3, 7

**signed** 64:5, 7; 70:4, 9; 77:16, 17, 22, 24; 78:2; 111:13, 14, 18; 204:1

**signing** 61:7; 77:15, 21

**signs** 63:1; 167:11

**similar** 68:5; 135:4; 165:24

**simply** 155:14

**sit** 90:15

**sitting** 49:7; 90:11; 96:3; 173:18; 205:9

**situation** 206:16

**six** 41:11; 135:8, 19; 137:2

**size** 121:10

**skip** 176:12, 23

**sleepy** 106:8

somebody 92:23; 107:13; 190:20

someone 75:11; 109:12; 110:6; 128:7; 140:5, 13, 21; 142:11, 14; 143:9; 156:11; 160:2; 171:19, 20; 177:12; 183:4, 8; 184:15, 17

sometime 110:14; 143:6; 148:1

sometimes 50:24; 61:22; 82:15; 85:15, 19; 86:23, 23; 96:2; 213:22

somewhere 62:21

son 38:13

son's 145:3, 19

soon 70:15

Sorry 44:17; 51:1; 53:2; 73:1; 96:22; 107:20; 108:5; 115:25; 138:19; 169:24; 216:21

sought 74:14

source 151:13

South 59:14

Spanish 100:25

speak 106:13; 140:20; 145:6; 147:25; 155:4, 5; 156:21; 179:2

speaking 87:19; 139:19

specialized 135:1

specific 71:6; 128:23; 175:7; 176:16

specifically 88:3; 91:11; 96:11; 119:15; 127:8; 138:6; 146:3; 152:16; 160:25

spell 51:15; 85:17; 108:21

spent 79:13; 187:2

spoke 51:12; 53:5; 93:10; 128:13; 138:10; 140:15; 144:22; 145:5; 147:13, 23; 156:17; 209:2

spoken 54:18; 67:10, 11; 147:17

staff 75:19; 84:14, 24; 88:24; 94:3; 95:17; 96:5, 8, 11, 15, 17; 98:14; 99:21; 107:6, 8; 165:24; 166:13

Staffing 47:5, 21; 63:24; 96:2

stages 99:15

stand 193:5, 18; 194:2

stands 69:20

start 86:25; 87:2; 139:1; 158:24; 192:16, 23; 193:9; 209:17

started 37:12; 60:4; 69:18; 70:2; 73:3; 74:21; 82:4; 128:8; 130:6, 12; 132:22; 138:8; 141:20; 163:20; 209:19; 211:9

starting 40:10; 47:4, 9; 124:25

state 152:13; 205:5

stated 139:9; 150:14;

152:10; 198:18

statement 58:2; 86:5, 6; 101:7; 121:15; 122:5, 7; 131:21; 157:4; 158:17; 163:13; 186:16; 211:10; 213:7

states 163:8

stating 71:21

station 96:6; 100:8; 128:9; 132:15; 171:12; 181:23; 188:15, 16

stay 134:4, 19

stayed 167:19

stepfather 182:25

Stephan 108:25, 25; 152:17

still 38:10; 40:5, 16; 50:23; 66:19; 67:7; 99:15; 144:20, 23; 148:17; 165:14; 205:23; 214:1

stipend 158:3

stock 43:18, 23

stonewalled 124:19

stop 47:13; 129:5; 192:24

stopped 48:1

stopping 128:16; 133:2

strength 177:15

strengths 91:15; 92:6; 177:11

stress 77:10; 168:22; 169:7; 174:3; 213:6, 10, 22, 22

strip 116:4

stroke 183:1

strong 98:14; 103:8

stub 42:3

student 71:24

students 71:8, 12, 19; 78:7, 10; 177:17

studies 56:19, 22; 65:12, 21; 67:15

study 65:24; 66:2

subject 41:6; 129:14

subjected 131:24; 133:21

subsequent 188:23

substance 205:4

substantial 213:6

such-and-such 55:7

sudden 171:24

Sue 85:19; 88:10; 94:16; 95:14, 24; 96:1, 18; 98:3, 23; 99:2; 101:5, 13; 103:21; 138:12; 141:7; 143:23; 168:19; 175:19; 193:14; 194:11, 13, 13, 14, 15; 195:3, 4, 4, 9, 15; 196:4, 8, 22; 197:2; 198:22; 199:2, 5; 200:3; 204:15, 20, 23; 208:7, 8, 9, 13

Sue's 199:2

suffer 50:19; 168:23; 173:11

suffered 166:23; 167:22;

168:5, 16, 18, 23; 169:8, 11, 18; 174:2; 213:6, 9; 214:23; 215:1

suffering 213:1

sugar 63:4

suggest 37:20; 162:1

suggestion 177:21

suggestions 37:14

suing 200:13, 22; 201:3; 202:17

sum 178:12

summary 92:9; 177:10, 14

summer 56:23

supervise 84:13, 20; 190:23

supervised 84:7

supervising 72:20

supervision 63:6; 84:18

supervisor 60:16; 62:9; 75:10; 83:24; 86:3; 89:10; 207:13, 14, 21

supervisor's 207:20

supervisors 86:4; 90:12; 92:16; 94:11; 107:5; 161:25; 174:16; 207:24

supplement 198:16

support 47:18; 48:17, 21; 128:2, 12; 140:10; 160:8

supposed 149:9; 160:17; 172:3, 5; 173:7

sure 59:17; 68:3; 88:25; 133:11; 156:2; 164:11; 167:20; 170:7; 181:16; 190:14

surgery 98:22

surgical 83:16

Susan 191:19, 25; 193:14, 14

suspended 77:9; 102:10; 181:19; 189:13; 190:3, 17; 192:14; 195:2; 196:5; 200:6; 215:4, 5, 10

suspending 199:23

suspension 181:13; 190:10; 196:19; 198:20; 199:18; 201:1, 15; 202:19, 21; 213:19

switch 97:17

sworn 37:6

symptoms 214:11

synthetic 106:7

system 42:13

T

T 85:18, 18

tagged 16:3

talk 55:23; 86:24; 88:1; 102:13; 107:7, 8; 130:1; 133:10; 134:8; 149:17; 160:16; 181:15; 187:6; 189:11; 190:1, 16

talked 132:2; 133:15;

137:18; 142:9; 155:17; 160:15; 163:22; 167:4, 5; 179:15; 180:21, 22, 24; 181:3; 189:16, 17, 19, 22, 24; 211:12

talking 90:20; 94:1; 96:3, 4; 102:3, 9; 127:24; 132:12; 146:3; 171:15; 174:1; 200:10

talks 114:24

tangible 169:14, 18

taped 208:15

taught 116:9

tax 216:7

team 155:21, 21, 25; 160:23, 23; 161:2, 6, 7, 17; 162:2, 3, 4, 6, 9, 10, 10, 12, 17, 18, 20; 169:3, 4, 4; 170:6; 189:19

teamed 66:20

tears 87:3

teary-eyed 87:4

tele 83:17; 134:3; 135:5; 136:5, 25; 137:8; 174:7, 13

telemetry 83:18; 114:24; 115:3, 10, 20, 22; 116:2, 9; 136:12, 13, 21

telephone 147:6

telling 48:20; 64:20; 78:23; 91:22; 128:11; 144:6; 145:11; 147:5, 8, 22; 162:8; 203:8

temp 47:4, 8, 20; 48:3

temporary 48:5

ten 66:21; 76:2, 2

tendering 183:23

terms 38:17; 49:16; 50:18; 60:9; 63:9; 86:4, 16; 89:10; 100:5; 116:13; 131:25; 133:12, 22; 164:3; 194:25; 200:25; 214:22; 215:15, 16

test 165:18, 24; 166:24

testified 129:1

testimony 48:3; 70:9, 12, 13; 71:22; 135:13, 16; 168:20

tests 166:25

theory 41:9

therapists 214:11

therapy 52:16

thereabouts 40:15

thereafter 41:25

Thereupon 37:3

thinking 87:4; 102:4; 198:22; 213:16, 25

third 62:5; 83:15, 17

Thomas 60:16; 75:17, 17

Thompson 75:17

though 38:2; 112:23

thought 100:1, 5; 102:18; 185:6

threatened 163:12

threatening 161:10, 11

three 44:11; 45:15, 19, 21, 24; 46:5; 75:8; 82:22; 126:17, 18, 21; 127:1; 138:23; 141:24; 143:5, 6; 145:5; 147:5; 148:1; 215:6

threes 176:15

throughout 62:3; 122:23; 128:20; 149:7

thumb 50:9, 10; 106:5

tight 50:23

till 47:10

times 75:8; 84:5; 99:23; 100:11; 140:23, 24; 143:2; 145:6

tired 97:19

title 146:17

today 37:12; 49:7; 213:18

told 38:18; 39:3; 47:3; 60:14; 66:4, 6, 10; 71:2; 73:4, 5, 7; 75:9; 76:23; 78:13, 15, 19, 25; 79:4, 6; 87:21; 107:16, 17; 109:14; 112:14, 20, 20, 23; 113:1, 13, 18, 22; 114:1; 122:1, 2, 5, 8; 130:7, 14, 16; 134:24; 146:5; 147:18; 148:18; 153:23, 25; 155:3; 156:6, 14, 17; 169:21; 171:4; 173:12, 13; 180:1; 185:7; 192:17; 193:1, 16, 16; 209:2; 211:13

took 67:14; 97:13; 122:6; 125:6; 127:2; 138:6; 151:14; 154:14; 158:8; 162:23; 192:13; 203:3

top 103:10; 111:21, 24; 188:5, 22

total 42:22; 180:1

touch 53:19, 22; 54:5

toward 206:4

towards 72:16; 86:15; 88:10; 99:25; 213:14

Training 39:23; 130:14; 135:1, 25

transcribed 38:3

transfer 134:2, 18, 22; 136:12; 174:10

transferred 134:14; 135:23, 24; 137:1; 206:4

transfusion 132:17

transmission 150:2

transmissions 123:20

transpired 195:7; 206:4

treated 116:9, 21; 130:3, 18; 131:4, 6, 11, 20; 132:3, 8, 10; 133:3, 7, 14, 16; 152:14; 163:3

treating 137:20

treatment 52:16

tried 161:15, 16

trouble 167:21; 168:13, 14

troublemaker 171:11; 173:18

Trudy 57:3

**Trudy's** 57:4
**true** 48:15, 16; 65:11; 70:8; 122:6; 152:11; 156:11; 162:16; 163:15; 204:7; 211:16
**truly** 214:6
**truthful** 179:3
**try** 91:23; 107:9
**trying** 70:18; 95:2; 108:17; 113:25; 116:13; 124:23; 131:5; 139:4; 142:8; 143:3; 145:21; 167:1, 20; 169:10; 170:17; 187:8; 191:17; 192:23; 201:4
**tuned** 130:15
**turn** 104:13; 165:4; 176:11
**turned** 166:20; 167:6; 179:5; 195:13
**turns** 177:13
**twelve** 66:21, 21; 76:3; 215:25
**twelve-hour** 216:1
**two** 50:11; 55:12; 74:11; 75:8; 76:22, 24; 82:25; 101:4; 102:15; 105:2, 14; 108:3, 8, 10, 13; 109:1, 17, 22; 110:12; 114:13; 115:17; 117:16; 119:11, 15; 120:10, 24; 123:6; 130:11, 18; 131:7, 12; 133:25, 25; 134:10; 144:25; 145:15; 152:21; 153:1; 154:4, 10, 16; 155:8; 157:20; 172:2, 7; 178:18; 179:19; 186:5, 24; 188:3; 200:1; 207:24; 208:6; 211:20; 212:11; 214:2
**Tylenol** 106:15
**type** 51:21; 93:21; 135:1; 161:13; 165:18, 24
**typed** 39:11; 110:25
**types** 95:25; 191:4
**typical** 62:24
**typically** 154:20

# U

**Uh-hum** 44:15; 52:25; 58:18, 21; 62:8; 80:15; 94:17; 95:19; 96:9; 97:11; 98:1; 107:1, 18; 112:10; 113:24; 119:20; 125:21; 126:10; 133:19; 138:17; 139:17; 142:12; 143:19; 154:3, 9; 163:24; 178:22; 180:8; 183:5; 185:12; 197:5; 216:8
**uh-hums** 38:1
**Uh-uh** 161:19
**uh-uhs** 38:1
**ultimately** 104:11; 125:2; 147:25; 192:14; 195:1
**Ultram** 106:5

**under** 43:11; 63:6; 92:2, 9; 96:24; 177:15; 206:15
**underlying** 202:22
**undersigned** 37:5
**understaffed** 103:7
**understood** 103:7
**unemployed** 210:1
**unfounded** 163:12
**unit** 83:2; 153:25
**Universal** 59:12, 22; 60:3, 6, 17
**unless** 48:4; 74:22; 85:5, 25
**unprofessional** 100:1, 6
**unprofessionally** 101:21
**unreasonable** 115:19
**unsafe** 92:21
**unsure** 39:3; 45:9, 10
**untrue** 122:4
**up** 39:11; 47:9, 23; 54:24; 63:1; 66:20; 70:2, 4, 10, 18; 77:9; 88:25; 102:7; 104:4; 105:1; 110:25; 115:20; 132:19; 137:2; 139:7, 9, 10, 19, 20; 140:24; 145:18, 21; 156:7, 10, 12; 170:20; 171:5; 172:22; 173:1; 177:12; 179:2; 181:23; 183:15; 186:24; 195:4; 196:2, 22; 198:24; 206:24; 209:4; 213:14, 16
**upgraded** 114:22
**upon** 91:16
**upset** 149:5, 6, 15
**use** 42:14; 127:11; 173:4, 4; 192:18; 193:19
**used** 53:16, 20; 71:2; 206:23, 23; 213:14
**using** 79:16; 118:5

# V

**V** 85:18
**vacation** 42:12
**valid** 48:4
**validate** 47:16
**varied** 61:21
**vary** 61:19; 62:18
**Verbal** 205:23
**verbally** 92:19, 24; 155:23; 163:9; 165:14; 170:11
**vested** 44:2
**Vioxx** 106:24
**vision** 42:11; 44:21, 24
**visiting** 188:14
**vital** 63:1
**voice** 101:13; 102:16, 21, 24; 103:1, 4, 15, 22; 104:15, 16
**voiced** 196:13
**voices** 100:9; 101:5, 10

**voluntary** 82:19, 21
**volunteered** 170:22
**volunteering** 181:4

# W

**wait** 214:1
**waited** 116:15
**waiting** 194:9
**Wakat** 85:19; 88:10; 94:16; 96:18; 98:3, 23; 99:2; 101:5, 13; 103:21; 104:14; 138:12, 16; 141:7; 143:23; 144:4, 6; 151:25; 164:16; 165:3, 23; 166:19; 167:5, 14, 23; 168:7, 19, 24; 169:12; 172:14; 175:19; 177:24; 179:8; 180:13, 24; 181:1; 189:17, 20, 23; 193:14, 14; 194:12; 196:4, 8, 22; 200:3; 204:15, 20, 23
**Wakat's** 197:2
**wake** 206:23; 213:14, 16
**walk** 181:23
**walked** 143:10, 13
**Wanda** 72:22; 75:21; 113:7, 8, 14; 114:2; 190:18; 192:16; 194:1; 195:3, 20; 196:9; 198:24, 25; 202:23
**warned** 97:8, 10
**warning** 150:6; 151:24; 152:5; 154:15; 156:6; 173:6; 181:6
**warrant** 189:10
**watch** 171:22; 213:17
**watched** 161:12; 164:16, 17
**Way** 38:11; 45:19; 69:20; 71:11, 20, 20; 73:11; 76:1; 78:25, 25; 93:2, 6; 103:20; 110:16; 128:13; 130:12; 133:3, 20; 134:5, 11; 146:8, 11, 14; 150:16; 158:13, 18, 25; 169:17, 17; 174:2; 181:25; 196:7; 213:4
**weaknesses** 91:15; 92:2, 6, 10
**week** 45:15; 46:6, 9; 58:10; 62:18, 18; 72:18; 76:5; 82:14; 195:7
**week-by-week** 46:21
**weekends** 58:5, 8
**weekly** 62:16
**weeks** 41:11; 66:21; 76:2, 3; 135:20; 137:2; 214:2
**Weissman** 85:16; 200:10, 21
**weren't** 53:3; 76:16; 98:14; 105:19, 24; 124:21; 137:7; 149:12; 152:25; 162:25; 206:10; 209:9, 10
**Westside** 43:14, 17, 18, 21, 25; 44:6, 9, 19, 25; 72:12; 82:6; 83:3; 84:11;

45:7; 46:25; 48:14; 49:2, 4, 10, 11; 50:23; 52:4, 10, 13; 53:16, 20; 54:5; 55:8, 24; 56:15; 57:21; 61:15; 62:1, 17; 64:19; 65:4, 10; 66:1, 14; 68:6; 69:8; 70:3, 7, 12; 71:7, 19, 22; 72:10, 25; 73:3, 4, 9, 12, 16; 74:1, 5, 15; 75:13; 76:20; 77:3, 16, 22; 78:3, 10, 12; 79:18, 25; 81:20; 83:4; 86:13; 87:9, 10, 22; 88:5; 94:13; 102:22; 103:5; 109:2; 112:16; 113:13; 114:25; 121:22; 129:16, 21; 132:7; 137:19; 138:21, 24; 162:1; 163:19; 166:13; 174:6; 189:14; 190:25; 192:10; 195:24; 206:8, 14, 15, 25, 25; 209:5, 23; 210:2; 212:21; 213:11, 15; 214:13; 215:14, 16
**Westside's** 61:11; 68:8
**What's** 47:17; 55:6, 7; 56:8; 58:7; 62:12; 69:15; 86:20; 87:4; 134:21; 136:4; 157:2; 205:17
**white** 76:25
**whited** 178:5, 7
**whiteout** 178:4, 9
**whole** 52:2, 6; 62:7; 96:17; 99:20; 128:21; 130:19; 166:14; 186:6, 25; 207:21; 213:13
**whose** 101:13; 104:13; 172:25; 197:6
**willing** 187:9, 11
**Wimbley** 53:25; 55:17; 100:22; 154:6; 155:9, 9, 10
**wing** 155:2; 171:24, 24; 192:15; 205:9
**withdrawn** 86:15
**within** 51:5; 62:21; 65:8; 88:3; 135:8; 166:8
**without** 117:5; 122:18; 134:22; 135:14, 18; 137:1
**WITNESS** 37:7; 81:7; 190:13; 205:1
**witnesses** 155:6, 7; 197:21, 24
**word** 114:6
**words** 146:9; 178:12
**work** 40:11; 42:23; 44:8; 45:22; 46:6, 9; 47:4, 8; 48:2, 3; 50:9; 53:16, 24; 55:19, 20; 56:10, 14; 58:4; 61:15, 20; 62:16, 19; 63:6; 70:19; 74:10, 18, 23; 75:2, 3; 82:20, 24; 92:16; 135:2, 13, 17; 145:21; 163:11; 167:16; 205:25; 208:20, 23; 209:3; 213:15; 214:5; 215:24
**workday** 95:9; 192:9
**worked** 44:6; 59:1, 5, 9, 18, 22; 60:3; 61:19, 25; 62:3, 5, 10; 64:19; 66:16; 72:12; 82:6; 83:3; 84:11;

85:9; 92:14; 94:6; 96:24; 99:22; 115:15, 18; 147:1; 174:6; 190:25; 215:16
**working** 45:12, 24; 50:12, 15; 56:1; 60:6; 61:25; 65:3; 74:4; 75:4; 79:13; 80:8; 82:4, 12, 13; 83:23; 88:16; 94:13; 103:5; 109:1, 2; 135:3; 152:24; 155:13; 211:6, 8; 216:3
**workplace** 102:25; 103:15; 104:17
**works** 45:18
**write** 198:24
**writeup** 102:8; 139:3; 145:23; 146:4; 156:15; 160:11; 181:9; 198:7, 11; 201:5, 6
**writing** 77:13; 156:7; 163:10; 177:6, 10; 179:17
**written** 77:9; 78:3; 80:13, 13, 13, 18, 22; 102:7; 121:12, 12, 20, 24; 129:13; 134:19; 139:7, 19; 141:12; 143:8; 144:12; 150:6; 151:7, 24; 152:5; 154:15; 156:6, 12; 158:15, 16, 21, 22; 163:22; 164:2, 10; 167:4; 169:15; 176:8; 180:9, 21; 189:16; 196:19, 22; 197:15, 18; 199:20; 199:18; 202:13
**wrong** 86:14; 136:4; 167:19
**wrote** 59:20; 121:24; 139:9; 159:20; 176:2, 6; 195:4
**WSMC** 111:25

# X



**Xerox** 178:11

# Y



**y'all** 95:25
**year** 39:16; 40:8, 23; 47:11; 55:16; 81:6; 92:14; 94:6, 9
**year's** 175:22
**years** 51:5, 6; 115:17; 211:20; 212:12
**yelling** 100:7; 147:23
**Yup** 200:23

# Z

**Z** 51:16

1                    P R O C E E D I N G S

2                              -   -   -

3    Thereupon,

4                    COREEN DIAZ,

5    being by the undersigned Notary Public first duly

6    sworn, responded as follows:

7                    THE WITNESS:  I do.

8                    DIRECT EXAMINATION

9    BY MR. del RUSSO:

10       Q    Ms. Diaz, good morning.  My name is Alex

11   del Russo.  I know we had met previously.  We're here

12   today to continue your deposition that was started in

13   this case several months ago.

14                   So I have a few suggestions.  I know I

15   mentioned them to you back in May and I'm going to

16   repeat them again.

17                   This lady to your left, my right, is a

18   court reporter.  She is going to take down everything

19   that everyone says.  So consequently I'd like to

20   suggest that you let me finish my question before you

21   answer it.

22                   If you don't understand one of my

23   questions, just tell me.  I'll be happy to rephrase

24   or repeat it so you are comfortable with the question

25   before you answer it.  You have to answer audibly.

1    You can't answer with uh-hums and uh-uhs.  Even

2    though I might know what you mean, the court

3    reporter, when it's transcribed, it might not be

4    clear whether you meant to answer with a yes or a no.

5              Does that all make sense?

6    A    Yes.

7    Q    Let me ask you a few preliminary

8    questions.  These are matters that we discussed

9    briefly last time you were being deposed.

10             Do you still reside at 2650 Northwest 60th

11   Way?

12   A    Yes.

13   Q    You reside there with your son?

14   A    Yes.

15   Q    Anyone else?

16   A    No.

17   Q    Now, in terms of your educational

18   background you had told me that you received your PCA

19   certification from Oakland Park School of Nursing

20   Assistants.  Is that correct?

21   A    Yes.

22   Q    Did you attend a school named Coral Ridge

23   Nurses Assistants School?

24   A    Yes.  That's the same.

25   Q    That's the same school?

1    A    That's the same school.

2    Q    All right.  In your earlier deposition,

3    ma'am, you had told me that you were unsure of the

4    date in which you received your PCA certification.

5         I'm going to show you a certificate of

6    graduation dated March 9, 1993 and ask if you could

7    just look at that and by looking at it tell me if

8    that helps refresh your memory as to when you

9    received your PCA certification.

10    A    I don't remember when, but I mean, this is

11    typed up on the 9th.  It has to be around March.

12    Q    March of 1993?

13    A    That's correct.

14    Q    Was that a one-year program that you

15    attended?

16    A    No.  That was not a year program.

17    Q    How long of a program was it?

18    A    At the most, maybe 10 to 12, 16-week

19    course.

20    Q    All right.  And it's your understanding

21    that at some point in time that school which had

22    previously been called Coral Ridge Nurses Assistants

23    Training School changed its name to Oakland Park

24    Nurse Assistants School?

25    A    That's what I assume.  It's the same

40

1    instructor, Mrs. Mais.

2        Q        You didn't attend another course at another

3    school?

4        A        No, I did not.

5        Q        Are you still employed at Hollywood Medical

6    Center?

7        A        Yes, I am.

8        Q        And you began there in March of this year?

9        A        That is correct.

10        Q        What was your starting salary when you

11    began to work at Hollywood Medical Center?

12        A        Going on what, biweekly, what?

13        Q        Hourly.

14        A        Hourly?  In the beginning it was $14 an

15    hour, thereabouts.  Yes, roughly around $14 an hour.

16        Q        Are you still making $14 an hour?

17        A        No, not at this time.

18        Q        What is your current salary?

19        A        16.97, 98 an hour.

20        Q        And when did you begin making 16.97 or

21    16.98 per hour?

22        A        Perhaps around the end of June, beginning

23    of July of this year.

24        Q        Was it when you completed your

25    preceptorship program at Hollywood Medical Center?

41

1     A      When I finished their preceptorship and

2   orientation.

3     Q      What was the preceptorship in?

4     A      Well, the preceptor was encompassed in the

5   course.

6     Q      What was the subject of the course?

7     A      Critical care.

8     Q      How long of a course was it?

9     A      The actual theory, between March and the

10   ending of April, I believe.

11     Q      Five, six, seven weeks, approximately?

12     A      Around that time.

13     Q      Were you paid while you attended that

14   course?

15     A      Yes.

16     Q      You were paid by Hollywood Medical Center?

17     A      Yes.

18     Q      That would have been the period of time

19   that you were being paid $14 an hour?

20     A      Part of that time, yes, but part of that

21   time when I was doing an orientation I was paid $14

22   an hour too.

23     Q      All right. And after the orientation and

24   after you completed that course, at some point

25   thereafter your salary was increased to 16.97 an

1  hour.  Is that correct?

2      A      Yes, around 16.97, 98.  I don't have the

3  stub.

4      Q      Are you currently receiving any benefits

5  from your employment at Hollywood Medical Center?

6      A      Benefits like?

7      Q      Insurance, disability.

8      A      Yes.

9      Q      Tell me what your benefits are.

10     A      Health, medical for myself and my child,

11  dental, vision.

12     Q      Paid time off, any vacation time?

13     A      Their system is that you accumulate, what

14  is it called, cash plus hours, and you can use it for

15  what you need them.

16     Q      How many cash plus hours do you accrue now

17  on an annual basis?

18     A      It depends on how many hours you put in.

19     Q      Are you a full-time employee?

20     A      Yes.

21     Q      It's your understanding that there isn't a

22  set amount, it's based on the total number of hours

23  you work?

24     A      No, it's not a set amount.

25     Q      Are you currently accruing cash plus hours

43

1    through your employment at Hollywood?

2        A      Yes.

3        Q      Any other benefits you can recall that you

4    receive through your employment at Hollywood Medical

5    Center?

6        A      Disability is optional.  I think I said

7    dental.  Dependent insurance, dependent insurance,

8    dependent life insurance.  That's all I can recall I

9    have.

10       Q      Do you receive life insurance?

11       A      That's under their basic plan, yes.

12       Q      Let me ask you this:  Were there any

13   benefits you recalled receiving as an employee of

14   Westside which you do not receive currently as an

15   employee at Hollywood Medical Center?

16       A      Their 401(k).

17       Q      There was a 401(k) program at Westside?

18       A      Westside, and also there was the stock

19   option.

20       Q      Did you contribute anything to the 401(k)

21   program while you were an employee at Westside?

22       A      Yes.

23       Q      Did you exercise any of the stock options

24   that were made available to you while you were an

25   employee at Westside?

1    A    I wasn't -- I don't believe I was a hundred

2  percent vested.

3    Q    Are there any benefits that you are now

4  receiving through your employment at Hollywood

5  Medical Center which you did not have while you

6  worked at Westside Regional?

7    A    The only thing, I don't think it's a

8  benefit, it's, I work longer hours at Hollywood

9  because Westside you could only do eight hours.

10  Hollywood you do 12-hour days, so you get like a

11  shift differential after three o'clock.

12    Q    All right.  Did I understand you to say,

13  ma'am, you have dental insurance through your

14  employment at Hollywood?

15    A    Uh-hum.

16    Q    That's a yes?

17    A    Yes, that's a yes.  Sorry.

18    Q    Did you have dental insurance through your

19  employment at Westside?

20    A    Yes.

21    Q    Do you currently have vision care insurance

22  at Hollywood?

23    A    Yes.

24    Q    Did you have vision care insurance through

25  your employment at Westside?

45

1      A      Yes.

2      Q      What about disability insurance, do you

3  currently have disability insurance at Hollywood

4  Medical?

5      A      Yes.

6      Q      Did you have that when you were employed at

7  Westside?

8      A      I believe so.

9      Q      You are unsure?

10     A      Yes, I'm unsure, but I believe, I believe

11  so.

12     Q      You are currently working 12-hour shifts at

13  Hollywood, I understand?

14     A      Yes.

15     Q      Would that be three 12-hour days per week?

16     A      Yes.

17     Q      Explain to me, would you please, how the

18  shift differential works at Hollywood.

19     A      After three o'clock, the way that you

20  average it, it averages maybe $1.50 more, $2 more an

21  hour after three o'clock.

22     Q      What shift do you work at Hollywood?

23     A      7a to 7p.

24     Q      Do you prefer working three 12-hour shifts

25  instead of five eight-hour days?

46

1     A     No.

2     Q     You prefer five, eight-hour days?

3     A     Yes.

4     Q     You receive the shift differential then for

5   four hours for each of those three days per calendar

6   week when you work at Hollywood?

7     A     Yes.

8     Q     Otherwise are you being paid your hourly

9   rate for a 40-hour work week?

10     A     Actually it's 72 at Hollywood Medical

11   Center.

12     Q     Biweekly?

13     A     72.

14     Q     Okay.  My question, ma'am, is, do you know

15   if you are being paid your hourly rate of 16.98 per

16   hour for 40 hours plus shift differential, or is it

17   16.98 for 36 hours plus shift differential?

18     A     It's 16, the 16.98 for the 36 hours plus

19   shift differential.

20     Q     Okay.

21     A     They do on a week-by-week basis.

22     Q     Would you agree with me, Miss Diaz, that

23   you have a higher hourly rate at Hollywood Medical

24   Center than when you left your employment at

25   Westside?

1      A      Yes, I agree with you.  Not by much, but I

2    agree with you.

3      Q      You also had told me last time that you,

4    starting at the end of 1999, did some work for a temp

5    agency named All About Staffing.  Is that correct?

6      A      Yes.

7      Q      Do you recall approximately the time period

8    that you did temp work for that agency?

9      A      Starting in December of maybe '99 on up

10   till about February.

11     Q      Of this year?

12     A      Yes.

13     Q      Why did you stop taking assignments from

14   that agency?

15     A      Because it was coming to be too much and I

16   had to get -- I think my CPR card I had to validate.

17     Q      What's a CPR card?

18     A      Basic life support card.

19     Q      Can you explain to me what that card had to

20   do with whether you were taking temp assignments at

21   All About Staffing?

22     A      You had to -- your card had to be current

23   and mine was coming up to the time where it was not

24   going to be current and I was going to take a class,

25   I know I was going to take a class later on so I

48

1    stopped until I finished taking the class.

2        Q      You can't work, is it my understanding from

3    your testimony, ma'am, that you can't work as a temp

4    nurse unless you have a card, CPR card that's valid?

5        A      That's correct.  Only as a temporary.  The

6    hospital, it's different.

7        Q      Okay.  Now, you received your nursing

8    license when?

9        A      August of '97, I believe.

10       Q      You currently have a chemotherapy

11   administration certification.  Is that correct?

12       A      Basic chemotherapy, yes.

13       Q      And the courses for obtaining that

14   certification were paid for by Westside.  Isn't that

15   true?

16       A      That's true.

17       Q      You also have a life support certification

18   as well?

19       A      But that's expired.  That's the expired one

20   that I was telling you about.

21       Q      When did you receive that life support

22   certification?

23       A      The expired one or the current one?

24       Q      Expired one.

25       A      I really don't recall.  I've had so many.

49

1      Q      Did you receive it while you were an

2    employee at Westside?

3      A      Yes.

4      Q      Did Westside pay for you to attend the

5    courses to obtain that certification?

6      A      One they did and one they didn't.

7      Q      Can you think as you are sitting today,

8    ma'am, of any other courses or certifications that

9    you attended that were paid for when you were an

10   employee, paid for by Westside while you were an

11   employee of Westside?

12     A      Besides their mandatory courses that they

13   require you to go to?  Besides those?

14     Q      Yes, ma'am.

15     A      Okay.  No.  I can't recall.

16     Q      All right.  Now, Miss Diaz, in terms of

17   your medical history, how would you describe your

18   general health on an overall basis?

19     A      Currently?

20     Q      Yes, ma'am.

21     A      It's in fair condition, I would say.  Fair.

22     Q      When you say "currently," does that mean

23   that it was at some point in time not in fair

24   condition?

25     A      It was in better condition before.  Now

50

1    it's fair.

2        Q      Before what?

3        A      Before I injured my knee and injured my

4    hand.

5        Q      How did you injury your knee and your hand?

6        A      My knee is an old ongoing problem.  I have

7    a deformity.

8        Q      What about your hand?

9        A      My hand, my thumb was broken at work.

10    Patient broke my thumb.

11        Q      Have either of these two injuries prevented

12    you from currently working at Hollywood Medical

13    Center?

14        A      No.

15        Q      Are you currently working on a full-time

16    basis?

17        A      Yes.

18        Q      In terms of your mental health, ma'am, do

19    you suffer from any illnesses or conditions that

20    affect your life on a daily basis?

21        A      Not really.  I mean, well, just the other

22    day, you know, it makes you sad because I see some of

23    the co-workers at Westside, we're still tight family,

24    and it makes me sad that I'm not there sometimes, but

25    other than that, no.  I think I'm a healthy person.

1    Q    I'm sorry?

2    A    I said I think I'm a healthy mental person.

3    Q    Have you gone to see any psychiatrists or

4    psychologists or mental health practitioners for any

5    reasons within the past five years?

6    A    Past five years?  No, not for myself.

7    Q    All right.  Have you consulted with any

8    psychiatrist or psychologist or mental health

9    counselors for any emotional problems that you

10   believe are the result of the claims you've raised in

11   this lawsuit?

12   A    I only spoke with my medical doctor.

13   Q    And who is your medical doctor?

14   A    At that time it was Dr. Saez.

15   Q    Can you spell that for me, please?

16   A    S A E Z.

17   Q    Do you know Dr. Saez' first name?

18   A    Roberto.

19   Q    Where is Dr. Roberto Saez' office?

20   A    It's in Plantation.

21   Q    What type of physician is he?

22   A    I don't know -- I forgot if he's internal

23   medicine or DO.

24   Q    And what aspects did you discuss with him

25   concerning problems that you believe are the results

52

1    of the claims you raised in this lawsuit?

2       A    I don't remember the whole extent of the

3    conversation.  I remember him asking, asking me some

4    things of what happened at Westside and I remember

5    saying I can't go into it too much in detail, and he

6    says, Well, your whole demeanor changed, because

7    normally I'm a happy-go-lucky person.  I said, Yes,

8    some things over there are making me very sad.

9       Q    Was that before or after you resigned your

10   employment at Westside?

11      A    That was before.

12      Q    Did you have your discussions with him

13   concerning these issues regarding Westside on more

14   than one occasion?

15      A    I don't believe so.

16      Q    Did he recommend any treatment or therapy

17   to you or prescribe any medications to you in

18   connection with the problems that you believe were

19   the result of the claims you've raised in this

20   lawsuit?

21      A    He asked me if I wanted anything for

22   depression.  I said no.

23      Q    So he offered you a prescription medication

24   for depression?

25      A    Uh-hum.

53

1      Q      Is the answer yes?

2      A      Yes.  Sorry.

3      Q      You weren't interested in receiving that?

4      A      No.

5      Q      Other than Dr. Saez, have you spoke to any

6   other psychiatrists or psychologists or health

7   practitioners for any problems that you believe are

8   the results of the claims you've made in this

9   lawsuit?

10     A      Do health practitioner nurses count or no?

11     Q      I mean for professional reasons.  Did you

12  consult with anyone?

13     A      No, I believe that was it.

14     Q      You mentioned a moment ago, ma'am, that you

15  would occasionally see co-workers or people that you

16  used to work with when you were at Westside.  Is that

17  correct?

18     A      Yes.

19     Q      You keep in touch then I take it with

20  people that used to be your co-workers at Westside?

21     A      Yes.

22     Q      Who do you keep in touch with?

23     A      Alisha Ferguson.  Let's see.  Marlene

24  McKay, B.J. Johnston.  She doesn't work there

25  anymore.  Okay.  Emma Wimbley, and others are

54

1    acquaintances that we might see when we're having a

2    get-together but I don't recall like their first

3    names.

4        Q    Any other present or former employees of

5    Westside that you keep in touch with other than the

6    ones you've already mentioned that you can recall?

7        A    Maria Gonzalez. And again I don't know

8    this person's last name. Her first name is Megali.

9    That's really it.

10       Q    All right, now with any of these people

11   you've mentioned, ma'am, have you on any occasion

12   discussed your lawsuit or the claims that you've

13   raised in your lawsuit with them?

14       A    Have I discussed? No.

15       Q    You have not discussed your lawsuit or any

16   of the issues or claims you've raised in your lawsuit

17   with any of these people?

18       A    I haven't spoken to them directly about it,

19   no, but they have come to me and asked me questions

20   about it, yes.

21       Q    Which ones of these employees have asked

22   you questions about your lawsuit?

23       A    About maybe half of the people I named and

24   then there are some that I don't know that come up

25   and ask me.

1      Q     All right.  Tell me as best you can recall

2   by name which of your former co-workers have

3   approached you and asked you questions about your

4   lawsuit.

5      A     They are really not questions about my

6   lawsuit.  It's more like what's going on with you and

7   such-and-such person or what's going on with you and

8   Westside.

9      Q     Okay.  Which of these people have asked you

10  that?

11     A     It would have to be Emma asked me, Marlene

12  McKay.  Those two for a fact I recall.

13     Q     How long ago did those instances take

14  place?

15     A     This might have occurred maybe in

16  September, October of last year.

17     Q     All right.  Do you consider Emma Wimbley to

18  be a friend of yours?

19     A     She is more of a work acquaintance.  More

20  of a work acquaintance.

21     Q     What about Marlene McKay?

22     A     The same.

23     Q     Okay.  All right.  Let's talk, Miss Diaz,

24  about your employment at Westside.

25           Do you remember when it was that you first

1    began working at the hospital?

2        A      As a nurse or as a PCA?

3        Q      In any capacity.

4        A      January or February of '97, I believe.

5        Q      I take it by your earlier comment that you

6    first began there as a PCA?

7        A      Yes.

8        Q      What's the difference, Miss Diaz, between a

9    PCA and a CNA?

10       A      PCAs are licensed to work in the hospital.

11   CNAs are not.  At that time.  I don't know if things

12   have changed or rules or regulations have changed

13   since then.

14       Q      Now, when you first applied to work at the

15   hospital at Westside were you at that point in time

16   attending nursing school at BCC?

17       A      Yes.

18       Q      Do you remember when it was you began your

19   nursing studies at BCC?

20       A      Originally '88 is when I first enrolled in

21   BCC.

22       Q      I take it you completed the course studies

23   in the summer of 1997?

24       A      Right.

25       Q      All right.  And do you remember who it was

 1    that you interviewed with in connection with your

 2    employment at the hospital?

 3         A    Trudy.  It was the human resource person.

 4         Q    Do you remember Trudy's last name?

 5         A    No, I don't.

 6         Q    Anyone else that you recall you interviewed

 7    with?

 8         A    And Eileen Ciotti was the nurse manager.

 9         Q    Who offered you the job?

10         A    They both did.

11         Q    Did you meet with both of them at the same

12    time when you interviewed with them?

13         A    I don't believe so.

14              (Defendants' Exhibit 1 was marked for

15         identification.)

16         Q    I'm going to show you, Miss Diaz, a

17    document that I've marked as Exhibit 1, it's

18    captioned Application for Employment, and ask you if

19    you would take a moment, look at that and tell me if

20    you recognize that as a copy of the application that

21    you filled out for employment at Westside.

22         A    Yes.

23         Q    Is that your signature on page 2, ma'am?

24         A    Yes.

25         Q    Now, I take it when you filled this out,

58

1    Miss Diaz, you were not looking for full-time

2    employment.  Is that a fair statement?

3         A     Yes.   That's correct.

4         Q     You were looking to work part time on

5    weekends only, correct?

6         A     Yes, or in their pool.

7         Q     What's the difference between pool and

8    weekends?  Does that mean evenings perhaps?

9         A     No.   That means if I had a day off during

10   the week that they would call me if they needed me

11   and if I could come in.

12        Q     Was the reason that you were at that point

13   not looking for full-time employment because you were

14   attending school?

15        A     Yes.

16        Q     Now, could you look at page 2 of that

17   application with me, please.

18        A     Uh-hum.

19        Q     Do you see it lists as one of your prior

20   employer's National Health Care?

21        A     Uh-hum.

22        Q     That's a yes?

23        A     Yes.

24        Q     The reason I'm asking you, ma'am, is

25   earlier in your deposition you did not recall the

1    time frame at which you worked at that nursing home.

2    And according to this document it shows that you were

3    employed from March through November of 1993.

4             By looking at that does that help refresh

5    your memory as to when you worked at National Health

6    Care?

7        A    Yes.

8        Q    And is that, best as you can recall, the

9    time period that you worked at National Health Care?

10       A    As best as I can recall, yes.

11       Q    The employer above that is listed as

12   Universal Medical Center.

13       A    Yes.  Okay.

14       Q    Is that the same as the old FMC South

15   facility?

16       A    I believe so.

17       Q    I'm not sure I can read the dates that you

18   filled in for the period that you worked at that

19   facility.

20            By looking at what you wrote down can you

21   tell me what time, what the time frame was that you

22   worked at Universal Medical Center?

23       A    Not "from."  I can't make out "from," but

24   to 8/95.

25       Q    That's what the document says but by

1    looking at that and based on your own recollection

2    can you tell me as best you recall the time frame

3    that you worked at Universal Medical Center?

4         A     No, I can't recall when I started.

5         Q     By looking at this information is it your

6    recollection that you left working at Universal

7    Medical Center in August of 1995?

8         A     Yes.

9         Q     What then did you do in terms of employment

10   between August 1995 and January of 1997, if anything?

11        A     I remember helping with an answering

12   service, couple of answering services.

13        Q     Is that the Physicians Exchange you had

14   told me about?

15        A     Yes, I believe so.

16        Q     Was Diana Thomas your immediate supervisor

17   at Universal Medical Center?

18        A     Yes.

19        Q     Any other employment you recall that you

20   had between August 1995 and January of 1997?

21        A     Besides the answering services, I can't

22   recall besides the answering services.

23              (Defendants' Exhibit 2 was marked for

24        identification.)

25        Q     Let me show you a document that I've marked

1    as Exhibit 2 to your deposition.  It's captioned

2    Acknowledgment of Receipt of Handbook.

3              I'd ask you, Miss Diaz, to take a look at

4    that and tell me if you recognize the document and if

5    that's your signature at the bottom of the page.

6         A    Yes, that's my signature.

7         Q    Do you recall signing it, or if not, do you

8    recall seeing the document before?

9         A    I recall receiving the book, the document

10   it came in, yes.

11        Q    Did you also receive a copy of Westside's

12   Employee Handbook?

13        A    Yes.

14        Q    All right, now, you were hired as a PCA to

15   work at Westside on a part-time or per diem basis.

16   Is that correct?

17        A    Per diem basis, yes.

18        Q    Was there a particular shift that you

19   worked on or did it vary based on when they assigned

20   work to you?

21        A    It varied on what I was available to do

22   myself.  For the most part it was days.  Sometimes I

23   could do a couple of evenings.

24        Q    Was there a particular floor or area of the

25   hospital in which you worked when you were working at

1    Westside as a part-time PCA?

2        A        Not really.

3        Q        You pretty much worked throughout the

4    hospital?

5        A        I worked on the fourth floor, third floor,

6    second floor and then radiology.

7        Q        Pretty much around the whole hospital?

8        A        Uh-hum.

9        Q        Who was your supervisor, if you recall,

10    when you worked as a PCA?

11        A        It would be fourth floor.  At one time it

12    was Eileen Ciotti.  Then Lisa -- what's her last

13    name? -- Fagan, Faga, and then back to Eileen

14    Ciotti.

15        Q        Do you recall how often it was, say, on a

16    weekly basis that you would work as a PCA at

17    Westside?

18        A        No, because it would vary from week to week

19    what hours I would work, what I would put in.

20        Q        What was your salary?

21        A        Between 8.25 or 8.50, somewhere within that

22    range.

23        Q        And what does a PCA do?  What would have

24    been an example of your typical duties and

25    responsibilities?

1     A     Taking vital signs, finishing up my

2  assignment which the RN made for me, which would be

3  cleaning patients, feeding patients if need be,

4  drawing blood, checking the patient's blood sugar or

5  whatever assistance the nurse or LPN needed.

6     Q     Does the PCA work under the supervision of

7  a nurse or an LPN?

8     A     Yes.

9     Q     Just so I understand, ma'am, in terms of

10  the order of the professions in the nursing field, is

11  an LPN a higher degree or a higher level of the

12  profession than an RN?

13     A     No.  RN, LPN and PCA.

14     Q     And then CNA, or is that pretty much the

15  same?

16     A     No.  PCA can do a little bit more things,

17  at that time.  Currently I don't know if there is any

18  difference now, but back then we could draw blood, do

19  accuchecks and a couple other invasive things.

20          (Defendants' Exhibit 3 was marked for

21      identification.)

22     Q     Miss Diaz, I'm going to show you a document

23  I marked as Defendants' Exhibit 3.  It's captioned

24  Nursing Staffing Pool Agreement.

25          Take a look at that, please, and tell me if

1    you recognize that document and if that's your

2    signature in the back of the page.

3        A    Yes, that's my signature.

4        Q    Do you recognize that document?

5        A    This is what I signed when I was a PCA.

6        Q    But you do recognize it as a document that

7    you signed when you were a PCA?

8        A    Yes.

9            (Defendants' Exhibit 4 was marked for

10        identification.)

11        Q    Let me show you what I marked as Exhibit

12    4.  It appears to be a position description for the

13    job of PCA, and I'm going to ask you first if after

14    you've reviewed the document whether that's your

15    signature at the end of it.

16        A    Yes, that's my signature.

17        Q    Does that document appear to be an accurate

18    reflection of the duties and responsibilities of a

19    PCA, at least as to you when you worked at Westside?

20        A    Yes, but I remember telling this part

21    doesn't belong for patient care assistant.

22        Q    What part are you referring to?

23        A    About documentation on the nurses' notes.

24        Q    So other than that section, the rest of it

25    appears to be an accurate description of your job as

1    a PCA?

2        A    Yes.

3        Q    Now, Miss Diaz, while you were working at

4    Westside as a PCA you at the same time were enrolled

5    in the nursing program at BCC.  Is that correct?

6        A    Yes.

7        Q    Where did you do your clinicals?

8        A    Different hospitals within Broward County.

9        Q    At some point in time you participated in

10   the preceptorship program at Westside.  Isn't that

11   true?

12       A    But that wasn't part of my clinical studies

13   as a nurse.

14       Q    I didn't ask you that.

15       A    Okay.

16       Q    Did you participate in the preceptorship

17   program?

18       A    Yes.

19       Q    Was that before, during or after --

20   rephrase that.

21            Was that after you completed your studies

22   in the nursing program at BCC?

23       A    Yes.

24       Q    So you completed your courses of study, you

25   then enrolled in the preceptorship program at

1   Westside.  Is that correct?

2       A      No.  I finished my course of study,

3   graduated from BCC, received my nursing license, then

4   I was told that I didn't have any other choice but to

5   take the BCC program.

6       Q      You were told you didn't have any choice

7   but to do what?

8       A      But to take the BCC program, the

9   preceptorship program.

10      Q      Who told you that you had no choice but to

11  take the BCC preceptorship program?

12      A      Eileen Ciotti.

13      Q      Anyone at the school?

14      A      No.  It was from Westside.

15      Q      Can you explain to me how that program

16  worked?

17             MR. KARLIN:  I'll object to the form.  It's

18          not very clear as to what you are asking her.

19      Q      You can still answer the question, ma'am.

20      A      I would be teamed up with a registered

21  nurse for twelve, ten to twelve weeks, follow that

22  nurse's schedule, perform the functions and roles and

23  responsibilities as a registered nurse.

24      Q      Was the idea, ma'am, that by following or

25  doing the rounds with the RN that you would learn,

1    develop a learning as to how to be an RN at the

2    hospital?

3        A    Right, yes.

4        Q    Was there a particular RN that you did the

5    rounds with during this preceptorship program?

6        A    B.J. Johnston.

7        Q    Is she still at the hospital?

8        A    Yes.

9        Q    She is one of the employees that you have

10   since spoken to in some respects about your lawsuit?

11       A    B.J., no.  Actually I have spoken to B.J.,

12   but not about the lawsuit.

13       Q    All right.  And this preceptorship program

14   I take it took place after you completed your course

15   of studies at BCC?

16       A    Yes.

17       Q    Did you have to enroll in the preceptorship

18   program at BCC?

19       A    Yes.

20       Q    Did you have to pay a fee to BCC to enroll

21   in the preceptorship program?

22       A    Yes.

23       Q    Do you remember what the fee was?

24       A    Not offhand, no.

25       Q    Do you remember if it was $300 or $350?

68

1    A    It could have been around that, but I don't

2    really recall the amount.

3    Q    You are not sure?

4    A    Right.

5    Q    Did you have to pay a similar fee to

6    Westside in order to enroll in the preceptorship

7    program?

8    A    No.  That was part of Westside's

9    preceptorship that I had to pay BCC.

10    Q    Do you know of any other nurses who went

11    through the nursing program at BCC who also enrolled

12    in the preceptorship program at the same time that

13    you did?

14    A    No.

15    Q    Did you know of any nurses who enrolled,

16    may not have gone to the nursing school with BCC but

17    who enrolled in the preceptorship program through BCC

18    at the same time you did?

19    A    There was one guy that they said was a

20    preceptor there, was an orientee there.

21    Q    At the same time that you were involved in

22    that program?

23    A    He was ahead of me.  I think he was

24    finishing.

25    Q    What was his name?

69

1    A    I remember his first name.  Sergio.

2    Q    Did he go to BCC with you?

3    A    No.

4    Q    Do you know where he went to nursing

5    school?

6    A    No, I do not.

7    Q    Do you know what the program was that he

8    participated in at Westside?

9    A    What do you mean?

10    Q    Do you know whether he was in the

11    preceptorship program as well?

12    A    I said I believe so.

13    Q    Are you certain?

14    A    I believe so.

15    Q    And what's the basis for your belief that

16    he also was in the preceptorship program?

17    A    Because I remember them introducing me to

18    him saying that he started a little bit before me.

19    Q    Okay.  Now, is it your understanding that

20    BCC -- by the way, BCC stands for Broward Community

21    College, I take it?

22    A    Yes.

23    Q    Is it your understanding that BCC ran the

24    preceptorship program?

25    A    No.

1    Q    Who ran the preceptorship program?

2    A    That was something that was started up by

3  Westside in connection with BCC.

4    Q    Do you know if you had signed up for the

5  preceptorship program at BCC that you could have

6  precepted at other hospitals, that is, hospitals

7  other than Westside?

8    A    No, that's not true.

9    Q    So it's your testimony that if you signed

10  up for the preceptorship program at BCC, the only

11  hospital that you could precept at or intern at was

12  Westside.  Is that your testimony?

13    A    No.  My testimony is as a PCA I asked

14  Eileen Ciotti, you know, I'm going to have my license

15  soon, can you grandfather me in to become an RN at

16  the hospital?

17        She said that they don't do that anymore,

18  that they are trying to set up a new course through

19  BCC that I would have to take if I wanted to work

20  there.

21        I said, Okay.  She would give me the

22  information later.  Finally she did give me the

23  information later and then I asked her again, since

24  I'm already an employee there, I don't understand why

25  I have to go through a preceptorship when the policy,

71

1    not the policy, but grandfathering in is what I was

2    told that they used to do.

3              She said no, that we have to do this

4    preceptorship with BCC.

5        Q    But that's not really what I asked you,

6    Miss Diaz.  My specific question, ma'am, is whether

7    you know if Westside was the only hospital that BCC

8    allowed students to precept at as part of that

9    program?

10       A    Do I know?  No, I don't know.

11       Q    You don't know either way as to whether

12   other students could have attended the preceptorship

13   program at other hospitals?

14       A    Other hospitals and separate were offering

15   preceptorships, if that's what you mean, but not in

16   connection with BCC.

17       Q    My question is, do you know if as part of

18   the preceptorship program at BCC, BCC allowed

19   students to precept at hospitals other than Westside?

20       A    The way -- you need -- the way you are

21   stating that question is no.

22       Q    Okay, so it's your testimony that Westside

23   was the only hospital where you could, where a

24   student enrolled in the BCC preceptorship program

25   could attend the preceptorship course or program?

1      A      At that time, yes, because no other

2  hospital was affiliated with BCC's preceptorship

3  program.

4      Q      How do you know that?

5      A      That I assume.  Like I said, I know Broward

6  General has their own separate program.

7      Q      How do you know that no other hospital was

8  affiliated with BCC as part of the preceptorship

9  program?

10      A      I don't know that offhand.  Westside was

11  the only hospital I was interested in becoming a

12  nurse, becoming a nurse at.  I already worked there.

13  I wanted to remain there.

14      Q      What did BCC do for the fee that you paid

15  to enroll in the preceptorship program?

16      A      I guess it went towards educational hours

17  and I know a preceptor had to fill out certain amount

18  of paperwork each week and send it back to BCC.

19      Q      Do you know who at BCC was handling or

20  supervising this paperwork that's coming in as part

21  of the preceptorship program?

22      A      I think her name was Wanda.

23      Q      This was at BCC?

24      A      That was at BCC, and then there was also

25  the nurse manager at Westside that they give a copy

73

1    to, or the educational director, I'm sorry, Marybeth.

2    Q    Do you know if the preceptorship program

3    was started by BCC or by Westside?

4    A    I was told it was by Westside.

5    Q    Who told you that?

6    A    Eileen Ciotti.

7    Q    So she told you that you had to go through

8    the preceptorship program in order to become a nurse

9    at Westside?

10   A    That's correct.

11   Q    And the only way to become a nurse at

12   Westside was to go through that program then?

13   A    Because they no longer grandfathered in

14   employees.

15   Q    Do you know if there were any other nurses

16   or any other employees who became nurses at Westside

17   who also had to go through this preceptorship program

18   in order to become employed as nurses at that

19   hospital?

20   A    That were already employees?

21   Q    Yes.

22   A    No.

23   Q    Did you consider looking for a job at other

24   hospitals?

25   A    At one point, yes, and again, I already

1   knew the people at Westside.  The hours were the

2   hours that I wanted and needed.

3       Q     Did you ever apply for a job at any other

4   hospital in lieu of working through this

5   preceptorship program at Westside?

6       A     Yes.

7       Q     Which hospitals?

8       A     I remember Parkway.  Let's see.  And I

9   remember Broward General.

10      Q     Would you have had to work in the

11  preceptorship program at either of those two

12  hospitals had you accepted employment there?

13      A     I was never offered so I don't know.

14      Q     Any other hospitals that you sought

15  employment at before you became a nurse at Westside?

16      A     Not that I recall, no.

17      Q     All right.  So is it fair to say that the

18  work you did as part of the preceptorship program was

19  then in addition to your employment at the hospital

20  as a PCA?

21      A     No.  Once I started their preceptorship,

22  PCA role was pushed to the side unless I wanted to

23  work off hours as a PCA.  I had to be there with my

24  preceptorship, with my preceptor, and follow her

25  schedule for the RN.  I had to do the roles and

1    responsibilities of an RN when she was there.

2        Q    So you didn't do any work, or do you recall

3    doing any work as a PCA at the hospital once you

4    began working in the preceptorship program?

5        A    Yes, because I wasn't paid during that

6    time.

7        Q    So you did both at the same time?

8        A    I think a couple, maybe two or three times.

9        Q    You told me that your -- well, let me ask

10   you this:  Did you have a supervisor at BCC or

11   someone that you reported to as part of your

12   involvement in the preceptorship program?

13       A    No.  She was at Westside.

14       Q    Who is she?

15       A    Marybeth.

16       Q    Marybeth who?

17       A    Thomas, Thompson, Thomas.

18       Q    And what was her position?

19       A    She was the staff educator, education.

20   Education.

21       Q    Do you know if she then dealt with Wanda at

22   BCC?

23       A    I would assume so.

24       Q    How long did the preceptorship program

25   last?

1      A      I think the middle of August all the way to

2   the end of October, so ten weeks, eight to ten,

3   twelve weeks.

4      Q      Was that an eight-hour day, five days a

5   week?

6      A      Most of the time it was an eight-hour day.

7      Q      There was no set schedule?

8      A      It's eight-hour days but you can go over,

9   paperwork and other things or emergencies.

10     Q      I take it you were not paid for your

11  participation in the preceptorship program?

12     A      Correct.

13     Q      That's one of the reasons for this lawsuit?

14     A      It was the reason I was discriminated

15  against.

16     Q      Because you weren't paid for the time you

17  participated in the preceptorship program?

18     A      I disagree with that.

19     Q      Tell me then, ma'am, how you believe

20  Westside discriminated against you.

21     A      I was discriminated against because I asked

22  questions about two other nurses that were

23  grandfathered in and then they told me they didn't do

24  that before and the only difference of those two

25  other nurses is that they were white.

1          When I kept asking questions and going

2    through the appropriate means of the chain of command

3    at Westside I guess doors were being shut, then I

4    wasn't getting any responses, and then I was

5    retaliated against.

6      Q      That's how you believe you were

7    discriminated against or retaliated against by the

8    hospital?

9      A      Retaliatory was being written up, suspended

10    and stress of all that and embarrassment of that.

11      Q      In connection with the preceptorship

12    program did you ever sign any agreements with the

13    hospital in writing concerning your involvement in

14    the preceptorship program?

15      A      I remember signing for BCC but I don't

16    recall if I signed something for Westside.

17      Q      Do you remember what it was that you signed

18    for BCC?

19      A      One was a preceptor, preceptorship

20    agreement or -- I can't recall what it was but I

21    remember signing it for BCC and every -- but it was

22    at Westside that I signed it.

23      Q      You mean you were physically located at the

24    hospital when you signed the document for BCC?

25      A      Right, along with my preceptor, and

1    Marybeth was there.

2        Q      Do you recall if you ever signed any

3    written promises or commitments to remain at Westside

4    for a certain period of time after you became a

5    nurse?

6        A      No.

7        Q      Do you know if any other students ever did?

8        A      Then?  Back then?

9        Q      At any time.

10       A      Not students for Westside, I don't believe.

11       Q      Do you know why you were not paid for your

12   involvement in the preceptorship program at Westside?

13       A      I was told that it was part of the

14   preceptorship.

15       Q      Are you saying that you were told that the

16   hospital didn't pay for involvement in the

17   preceptorship program?

18       A      That's correct.

19       Q      And you were told that by Eileen Ciotti?

20       A      Yes.

21       Q      By anyone else?

22       A      I don't remember if Marybeth said that to

23   me but I remember Eileen telling me about that in the

24   beginning.

25       Q      And she told you that the way, the only way

1   for you to become a nurse at the hospital was to go

2   through the preceptorship program and that you could

3   not be paid for your participation in that program.

4   Is that what she told you?

5        A    Yes.

6        Q    Do you recall anything else that she told

7   you concerning the preceptorship program or your

8   involvement in the preceptorship program?

9        A    Besides that, I would have the same

10  preceptor, following her schedule.  If she was

11  cancelled, then I was cancelled, not to come in.

12       Q    Did you have to punch a clock or scan a

13  clock for the time that you spent working in the

14  preceptorship program?

15       A    Yes.

16       Q    All right.  Now, were you using the same

17  time card or time badge that you had as an employee

18  for Westside?

19       A    No.  My badge said nurse intern on it.

20       Q    Do you know if records were ever kept of

21  that time?

22       A    No, I don't know.

23       Q    Now, after you completed the preceptorship

24  program I take it you then became a nurse at

25  Westside?

80

1    A    Yes.

2    Q    Was that something that you apply for?

3    A    No.

4    Q    They made you a nurse automatically after
5  you completed the program?

6    A    Yes.

7    Q    Did you have any discussions or evaluations
8  from any of the people that you were working with
9  during your involvement with the preceptorship
10  program?

11    A    My preceptor, she had to evaluate me.  That
12  was part of the preceptorship, but as far as, you
13  mean any written, written?  No written.

14    Q    Your preceptor was B.J. Johnston?

15    A    Uh-hum.

16    Q    That's a yes?

17    A    Yes.

18    Q    Do you know if she filled out any written
19  evaluations or remarks concerning your involvement in
20  the preceptorship program?

21    A    Yes.

22    Q    Do you know where those written remarks or
23  documents were sent?

24    A    No, I don't know where they were sent.

25    Q    When you became a nurse at the hospital you

81

1   also at that time became a full-time employee?

2       A    Yes.

3       Q    Do you remember approximately when that

4   was?

5       A    October.

6            MR. KARLIN:   What year?

7            THE WITNESS:   '97.

8            (Defendants' Exhibit 5 was marked for

9        identification.)

10      Q    I'm going to show you what I'm going to

11  mark as Exhibit 5 to your deposition, ma'am, it's a

12  memo dated October 17, 1997, ask if you could take a

13  look at that and tell me if you recall receiving that

14  at the time you became a full-time RN at the

15  hospital.

16      A    Okay.  I could have received this.  I mean,

17  I don't remember, but it's possible.

18      Q    Is the date consistent with your

19  recollection as to when you became a full-time nurse

20  at Westside?

21      A    Yes.

22      Q    How did your salary change when you went

23  from a PCA to an RN?

24      A    About $6 and change increase.

25      Q    Do you remember what your salary was when

1   you became or were promoted to a registered nurse?

2       A       14, maybe 14.58, 14-something, 14, in that

3   range.

4       Q       Okay.  Now, when you started working as a

5   nurse at the hospital was there a particular shift

6   that you worked at?

7       A       Days, yes.  Days.

8       Q       What is that, 7a to 3p?

9       A       Yes.

10      Q       Did you receive any shift differential?

11      A       No.

12      Q       You were working, I take it from what you

13  said earlier you were working eight hours a day, five

14  days a week?

15      A       Yes.  Sometimes overtime.

16      Q       Did you ever have to take call?

17      A       No.

18      Q       Was overtime something that you could do on

19  a voluntary basis or was it something that you might

20  have to do given the work schedule at the hospital?

21      A       Could be voluntary basis if you want it, or

22  again, you don't necessarily leave at three o'clock

23  in the health care field.

24      Q       How often did you work or get overtime pay?

25      A       I estimate maybe two hours at the most per

83

1    pay period.

2        Q      All right, now, was there a particular unit

3    or department or floor that you worked at when you

4    became a nurse at Westside?

5        A      Yes.

6        Q      And what was that?

7        A      Medical oncology.

8        Q      And where was that located?

9        A      Fourth floor.

10       Q      Excuse me?

11       A      Fourth floor.

12       Q      Fourth floor was medical oncology?

13       A      Yes.

14       Q      What were the functions on the other

15   floors, on the second and third floor, if you recall?

16       A      Second floor is surgical, and the back of

17   second floor is ICU.  Third floor is tele.

18       Q      You mean telemetry?

19       A      Yes.

20              And fifth floor was a question mark.  It

21   was an overflow.

22       Q      Who did you report to when you began

23   working as a nurse on the fourth floor?

24       A      Who was my supervisor or --

25       Q      Yes, ma'am.

84

1      A      Lisa Fagan.  Then she quit and Eileen

2  Ciotti.

3      Q      Wasn't Eileen Ciotti the nurse manager on

4  the fourth floor?

5      A      Several times, yes.

6      Q      At the time that you reported to her or she

7  supervised you she was acting as the nurse manager on

8  the fourth floor.  Is that correct?

9      A      Yes.

10     Q      All right.  Did the fourth floor also have

11  charge nurses that worked there as well?

12     A      Yes.

13     Q      To what extent did a charge nurse supervise

14  the staff nurses in the hospital, on the floor?

15     A      They would make the assignments.  They

16  would assist in calling doctors for things that were

17  abnormal.  If it was labs or a condition or if we had

18  a problem we could come to them for supervision or

19  their opinion.

20     Q      Did they also supervise you, they being the

21  charge nurses?

22     A      Yes.

23     Q      All right.  Just so I understand what the

24  chain of command was, ma'am, did the staff nurses

25  report to the charge nurses who then reported to the

1    nurse manager?

2        A        Yes.

3        Q        That's a fair characterization of the chain

4    of command, if you will, on that floor?

5        A        Yes, unless you were having a problem with

6    the charge nurses.

7        Q        Then you would go to the nurse manager?

8        A        Right.

9        Q        Who was the charge nurse that worked on the

10   7a to 3p shift with you?

11       A        That was Marlene McKay.

12       Q        Do you know who the other charge nurses

13   were for the shifts on either side of the day shift

14   on the fourth floor?

15       A        Evenings would be sometimes Debbie

16   Weissman.  Nights would be Novelette.

17       Q        Could you spell that?

18       A        N O V E L E T T E, I think.

19                Sometimes for the evening shift Sue Wakat

20   would be charge back then.

21       Q        To what extent did you interact with the

22   charges other than Marlene McKay?

23       A        For 3 to 11 I really wouldn't -- I had no

24   reason to really interact with the charge nurse

25   unless it was one of the days I was helping Marlene

1    McKay with charge.

2        Q       So Marlene would be your immediate

3    supervisor, the person that you had the most contact

4    with in terms of the supervisors.  Is that a fair

5    statement?

6        A       Yes.  Yes, that's a fair statement.

7        Q       Can you describe for me the professional

8    relationship that you had with her?  Did you get

9    along with her, did you have any problems with Miss

10   McKay?

11       A       No, I get along with her.

12       Q       What about for the balance of your

13   employment at Westside, did that ever change?

14       A       She knew something was wrong because I was

15   more withdrawn towards the end.

16       Q       How do you know what she knew in terms of

17   your behavior or your attitude?

18       A       She kept asking me.

19       Q       What did she say?

20       A       She kept asking me, What's the matter?  You

21   are not yourself.

22       Q       And what would you say to her?

23       A       Sometimes I would say nothing.  Sometimes

24   I'd tell her I don't want to talk about it or I'd

25   start to cry.

1    Q    All right.  So you on occasion, when she

2    asked you what was the matter you would start crying?

3    A    I wouldn't break out in tears, no.  I mean,

4    you'd get teary-eyed thinking of what's going on.

5    Q    What was going on?

6    A    I was being ostracized from a job that I

7    loved.

8    Q    By whom?

9    A    By Westside.

10    Q    I know, ma'am, but by whom at Westside?

11    Who was ostracizing you?

12    A    I guess the people that I went through the

13    chain of command.

14    Q    All right.  Could you identify them for me,

15    please.

16    A    Human resource manager, the DON, the CFO,

17    administration.

18    Q    Can you tell me their names?  I don't know

19    who you are speaking about.

20    A    Okay.

21    Q    I mean, you told me that you were

22    ostracized by people at Westside.

23    A    I said I felt like as if that was happening

24    to me.

25    Q    I understand that may have been your

1  feeling, and we'll talk about that in a moment, but

2  at this point I ask that you please tell me who

3  specifically within the hospital's management or

4  administration you believe were ostracizing you while

5  you were an employee at Westside.

6      A    Human resources would be Mathis, was her

7  last name.

8      Q    Lynn Mathis?

9      A    And Kim Jutras.  She was a DON.  Let's

10  see.  Sue Wakat.  She was the nurse manager towards

11  the end on the fourth floor.  Lee Chaykin.  He was

12  the CFO.  That's it.

13      Q    Anyone else?

14      A    No.  Not that I can think of.

15      Q    You mentioned earlier that your nurse

16  manager when you began working on the fourth floor

17  was Eileen Ciotti.

18      A    Yes.

19      Q    Can you describe for me, please, Miss Diaz,

20  your relationship, your professional relationship,

21  with Miss Ciotti?

22      A    It was not a friendship, I wouldn't say.

23  Like an acquaintanceship.  She mainly handled like

24  doctors having problems with the staff or scheduling,

25  things like that, making sure records were up to

89

1  date.

2          If there was a problem on the floor and the

3  charge nurse couldn't handle it, say, with a patient,

4  or a patient's family would go to the nurse manager.

5      Q    Do you feel that you got along with her?

6      A    Yes.

7      Q    Do you feel that she was fair to you?

8      A    For the most part.

9      Q    What about Marlene McKay, do you feel she

10  was a fair supervisor in terms of your dealings with

11  her?

12     A    Yes.  Might not like the decisions she made

13  but she was fair with me.

14     Q    That's part of her job?

15     A    Yes.

16          (Defendants' Exhibit 6 was marked for

17      identification.)

18     Q    Let me show you, ma'am, a document that I'm

19  going to mark as Exhibit 6.  It appears to be your

20  annual evaluation in September of 1998.

21          I'm going to ask if you'd take a moment and

22  look at that document and tell me if you recognize it

23  as your September '98 annual evaluation.

24          MR. KARLIN:  It's a fairly lengthy

25      document.  Other than identifying it, do you

1        want her to --

2        Q        Well, do you recognize that as an annual

3    evaluation that you received?

4        A        Yes.

5        Q        Is that your signature, ma'am, at the

6    bottom of page 17?

7        A        Yes.

8        Q        Would this have been the first annual

9    evaluation you received after you became an RN?

10        A        Yes.

11        Q        Do you recall sitting down with any of your

12    supervisors and discussing the evaluation at the time

13    it was presented to you?

14        A        Yes.

15        Q        Who did you sit down and discuss it with?

16        A        Eileen Ciotti.

17        Q        Do you remember if Marlene McKay was

18    involved in that as well?

19        A        I think she answered some of the

20    questions.  I remember talking to Eileen about it.

21        Q        By answer some of the questions you mean

22    provided some of the ratings or evaluations on this

23    document?

24        A        She might have.

25        Q        Do you know who did?

1    A    It's probably, I would assume it was both

2    of them because both their names are on it.

3    Q    Do you remember, Miss Diaz, if you received

4    an increase or a raise in connection with this annual

5    evaluation?

6    A    Yes.

7    Q    Do you remember what that increase or the

8    raise was?

9    A    Maybe 20 cents, 15.  I can't remember the

10   exact amount.

11   Q    Do you recall anything specifically that

12   was discussed with you by Eileen Ciotti when she sat

13   down and reviewed this evaluation with you?

14   A    Yes.  They go over the back part with you,

15   the strengths and goals or weaknesses, things to

16   improve upon.

17   Q    All right.  Tell me what you recall she may

18   have discussed with you at that point.

19   A    I remember her saying don't be a

20   perfectionism, is that nursing is a 24-hour job.

21   Don't feel like I need to get everything done in my

22   one shift, and I remember her telling me, because I

23   was a PCA, not to let the other PCAs like try to run

24   over me because now I'm their leader.  I kind of felt

25   bad about that.

1    Q    Do you recall her discussing any of the

2  comments listed under weaknesses or goals?

3    A    Yes.

4    Q    Tell me what you recall about that.

5    A    Just bits and pieces of us going over both

6  parts, A and B, the strengths and the weaknesses or

7  goals.

8    Q    You have some recollection that she went

9  over the comments that are listed under summary of

10  weaknesses or goals?

11    A    Yes.

12    Q    Did you feel this was a fair evaluation?

13    A    Yes.

14    Q    During that first year that you worked as a

15  nurse were you ever critiqued or counseled by any of

16  your supervisors concerning your behavior at work?

17         MR. KARLIN:  I'm going to object to the

18      form because it's a little broad.  Objection.

19    A    I remember verbally one time when I was

20  asking for help from more nurses, because it was

21  unsafe to take care of that many patients and the

22  amount of nurses we had for them, to help, send us

23  somebody, over and over again.

24    Q    So how were you then verbally counseled or

25  critiqued in regards to your request for help?

1      A      I just remember she said that wasn't the

2   way to ask, in the hallway.  Ask in her office.

3      Q      Who is the "she" that said that?

4      A      Eileen.

5      Q      And was she referring to what you said or

6   the way you said it?

7      A      What I said because it could be heard by

8   patients, or patients' families.

9      Q      What was it, if you recall, that you said

10  that she then spoke to you about?

11     A      That you don't let a patient's family or

12  patient know that this is too many patients, we need

13  help.

14     Q      I know, but what was it that you were

15  saying that she later counseled you --

16     A      You don't say that in the hallway where

17  patients can hear that.

18     Q      Say what?

19     A      This is too many patients.  We can't handle

20  this.

21     Q      Did you say, make that type of comment in

22  the hallway at the hospital?

23     A      We were at the nurse's cart, so, yes, the

24  nurse's cart is in the middle of the hallway.

25     Q      Who were you making that comment to?

1    A    No, I was talking to Eileen.

2    Q    Were there other people around?

3    A    Probably.  Probably other staff members.

4    Q    Do you recall any other instances when you
5  may have been counseled or critiqued for behavioral
6  issues during that first year that you worked at the
7  hospital?

8    A    No, not offhand.

9    Q    During that first year do you recall having
10  any confrontations or run-ins with any of your
11  co-workers or other supervisors at the hospital?

12    A    No.

13    Q    Did you like working at Westside?

14    A    Yes.

15    Q    One of the names you mentioned a moment ago
16  as another charge nurse was Sue Wakat.

17    A    Uh-hum.

18    Q    That's a yes?

19    A    Yes.

20    Q    At some point in time did she take the
21  place of Eileen Ciotti and become the nurse manager
22  on the fourth floor?

23    A    Yes.

24    Q    Do you remember when that was?

25    A    No.

1     Q     You don't recall approximately when?

2     A     I'm trying.

3     Q     Okay.

4     A     '99, but I don't know, I can't remember

5  which.

6     Q     Prior to the time she became the nurse

7  manager, when she was a charge nurse, to what extent

8  would you have had an opportunity to deal with her

9  during the workday?

10     A     Well, if she was doing charge for 3 to 11,

11  I wasn't interacting with her.  If she was coming in

12  on one of Marlene McKay's day off, which she might

13  have done, we all had very limited interaction with

14  Sue.

15     Q     What do you mean when you say "we all had

16  very limited"?

17     A     All the staff members.

18     Q     When she was a charge?

19     A     Uh-hum.

20     Q     Did you have any problems or run-ins with

21  her at the time that she was a charge, before she

22  became the nurse manager for the fourth floor?

23     A     It's not a run-in.  We all had

24  disagreements with Sue.

25     Q     Over what types of things would y'all have

1    disagreements with Sue on?

2        A        Sometimes it was staffing or she would

3    think that we were talking or sitting down charting

4    and talking too much.

5        Q        She would complain that the staff --

6        A        Get away from the nurses' station she would

7    tell us.

8        Q        To the staff nurses?

9        A        Uh-hum.

10       Q        Would she make those comments to you

11   specifically or to the staff nurses as a group?

12       A        No, to everybody.

13       Q        All right.  You mentioned earlier that "we

14   all had problems."  Who were you referring to?

15       A        The staff.

16       Q        Was it your perception, ma'am, that the

17   staff nurses generally as a whole had issues or

18   problems with Sue Wakat as the nurse manager?

19       A        No, not as a nurse manager.  I'm going back

20   when she was charge nurse.

21       Q        Okay.

22       A        We were hearing things -- sorry, go ahead.

23       Q        While she was a charge nurse was it your

24   perception that the other nurses that worked under

25   her had problems with her?

97

1    A    Not problems.  We just wouldn't -- we

2  wouldn't ask her things because more than likely her

3  response would be for us to handle it on our own

4  anyway.

5    Q    All right.  Now, I take it you heard these

6  things from others since when she was a charge nurse

7  you had limited contact with her during that period?

8    A    Yes.  I was warned, if that's what you

9  mean.

10    Q    Warned, about her?

11    A    Uh-hum.  Just don't ask too many

12  questions.  Don't --

13    Q    When she became the nurse manager she took

14  the place of Eileen Ciotti?

15    A    Right.

16    Q    Do you have any knowledge as to the reasons

17  for why there was a switch?

18    A    What I had heard through gossip was that

19  Eileen was tired of being nurse manager of second

20  floor and fourth floor.  It was too much.

21    Q    Did she go back to being the nurse manager

22  just for the second floor?

23    A    Yes.

24    Q    All right.  And had you heard then that

25  that's why she was replaced for the fourth floor?

98

1    A    Uh-hum.   Yes.

2    Q    Do you know who made the decision to make

3   Sue Wakat the nurse manager for the fourth floor?

4    A    I don't know directly who made the

5   decision.

6    Q    Once she became the director, and I

7   recognize you don't recall approximately when that

8   was --

9    A    Right.

10    Q    -- to what extent after she became the

11   director would you have to deal with her or interact

12   with her on a daily basis?

13    A    Probably at that time a lot because there

14   weren't too many strong staff nurses that have been

15   there for a while.

16    Q    Did Marlene McKay continue to be your

17   charge?

18    A    Yes, but she was, at that time she was, she

19   was out on sick leave also.

20    Q    For how long?

21    A    I don't recall.   I remember she had a

22   surgery.

23    Q    Was that at the time that Sue Wakat was

24   acting as the nurse manager?

25    A    Yes, I believe so.

1    Q    How would you describe the professional

2   relationship that you had with Sue Wakat once she

3   became the nurse manager for the fourth floor?

4    A    Actually it was better when she was nurse

5   manager.

6    Q    Than when she was a charge?

7    A    Yes.

8    Q    All right.  Tell me why or tell me what you

9   recall about your professional relationship with her,

10  while she was the nurse manager.

11   A    Again, this is going on, when she was the

12  charge nurse, and again this is going on through what

13  I heard as gossip, that her husband had recently

14  passed away during that time, so she probably was

15  still in the stages of grieving, but when she became

16  nurse manager she was more of a -- I don't want to

17  say open.  She was never open, but more receptive to

18  questions or if you ask her to come and do something

19  for you, she was more receptive in doing that.

20   Q    All right.  Did you feel that on the whole

21  she was fair to you as you being a staff nurse who

22  worked on the fourth floor?

23   A    At times she could be.

24   Q    Did you ever hear her say anything or

25  engage in any conduct towards other employees at the

1    hospital that you thought was unprofessional or

2    inappropriate?

3        A    Yes.

4        Q    All right.  Tell me what you remember in

5    terms of her behavior that you thought was

6    unprofessional or inappropriate.

7        A    I remember her not yelling but getting into

8    a big discussion at the nurses' station with raised

9    voices with another nurse.

10       Q    Do you remember who the other nurse was?

11       A    Actually it was a couple times.  One was

12   with Alisha.  The other time I don't remember who it

13   was.

14       Q    Alisha Ferguson?

15       A    Yes.

16       Q    Is Alisha Ferguson African-American?

17       A    Yes.

18       Q    Is Marlene McKay African-American?

19       A    Yes.

20       Q    Is B.J. Johnston African-American?

21       A    No.

22       Q    Emma Wimbley?

23       A    Yes.

24       Q    Maria Gonzalez?

25       A    She is Spanish.

1    Q    Do you know if she is of African-Hispanic

2    descent?

3    A    No.

4    Q    All right.  So you recall two instances

5    when you overheard raised voices between Sue Wakat

6    and another RN, one involved Alisha and you don't

7    recall the other.  Is that a fair statement?

8    A    Yes.

9    Q    Do you know the circumstances in which the

10   voices became raised, what the issue was they were

11   discussing?

12   A    One was a floating policy.  The other --

13   Q    Was it just Sue Wakat whose voice was

14   raised?

15   A    No.  It was back and forth.

16   Q    Was that something you observed when she

17   was acting as a charge or when she was nurse manager?

18   A    I think it was when she was charge.

19   Q    Any other behavior by her, language or

20   conduct that you observed where you felt she was

21   acting inappropriately or unprofessionally at the

22   hospital?

23   A    Yeah.  Yes.

24   Q    Tell me what else you recall.

25   A    This was an instance with myself.  This was

1  when she was nurse manager, and it was regarding a

2  patient care rep and we went into her office and we

3  were discussing what had happened, and I was talking

4  to her in her office thinking that nothing, what you

5  say in the office is confidential, and then next

6  thing I see the next day or I get a phone call the

7  next day and I come in and this is all written up on

8  a writeup form.

9      Q      Are you talking about the incident that led

10  to when you were suspended?

11     A      Correct.

12     Q      All right.  Let's put that aside for a

13  moment because we'll talk about that later.

14     A      Okay.

15     Q      Other than that incident and the two

16  incidents when you heard her in raised voice

17  conversation with other nurses, do you recall any

18  other behavior by her that you thought was

19  inappropriate or offensive?

20     A      Not at this time.

21     Q      Did you ever raise your voice when you were

22  at Westside?

23     A      Probably, yes.

24     Q      Would you agree that raising your voice in

25  the workplace is either inappropriate or offensive?

1    A    Depends on where you are raising your voice

2    at, in anger, laughter.

3    Q    Well, did you ever raise -- what would have

4    been the circumstances in which you raised your voice

5    while you were working at Westside?

6    A    If something endangered a patient, being

7    understaffed, or if I don't agree with a nurse taking

8    over a patient and I know she's not strong enough to

9    take care of -- we have chemo patients that, you

10   know, you need to be on top of things with them.   If

11   I don't think that they should be there taking care

12   of that patient, I would make it known.

13   Q    So are you saying, ma'am, there may be

14   circumstances when you feel that it's acceptable to

15   raise your voice in the workplace and there are other

16   circumstances where it would be not acceptable?

17   A    That's a yes and no answer.

18   Q    Yes and no answer?

19   A    That's a yes and no.

20   Q    Do you know one way or the other whether

21   the incidents in which Sue Wakat was raising her

22   voice may have been concerning issues of patient care

23   or patient safety?

24   A    The only one, the one that I was there for

25   was regarding floating a nurse from another floor to

104

1   another floor.

2       Q     What do you mean by floating a nurse from

3   one floor to another?

4       A     That means if our patient census isn't up

5   to what it needs to be, another nurse would float

6   from another floor to take an assignment on that

7   floor.

8       Q     Is that an issue involving patient safety?

9       A     No.

10      Q     Patient care?

11      A     Yes, because that nurse would ultimately

12  take care of the patient, but that had to be with

13  whose turn it was to float.

14      Q     So you believe that in Miss Wakat raising

15  her voice in that instance it would have been an

16  example of inappropriate voice raising in the

17  workplace?

18      A     Both of them, yes.

19            MR. KARLIN:  Take five minutes here?

20            MR. del RUSSO:  Okay.

21            (A recess was taken.)

22      Q     Miss Diaz, was there a point in time that

23  you raised concerns with the hospital over the fact

24  that you were not paid for your involvement in the

25  preceptorship program?

1    A    I also brought up the fact on how come the

2   other two nurses were -- did not have to go through

3   the preceptorship and they were paid.

4    Q    That's not what I'm asking you, ma'am.  You

5   may have raised that as well.

6         My question is, did you at some point in

7   time raise a concern with the hospital over the fact

8   that you were not paid for your participation in the

9   preceptorship program?

10    A    That was one of the things, yes.

11    Q    So that was one thing.  What was the other

12   thing, that other concern that you raised with the

13   hospital?

14    A    That those two nurses were -- did not have

15   to go through the preceptorship and they were paid

16   during, during the time they were preceptoring in the

17   hospital.

18    Q    Well, if they didn't go through the

19   preceptorship program, they weren't preceptoring?

20    A    They were preceptoring.

21    Q    So they were preceptoring but not in the

22   same program?  Do you know if that's the case?

23    A    I don't.  I didn't know then.  I don't know

24   now.  I know they weren't paid.  I mean, I know I

25   wasn't paid and they were paid.

1    Q    When did you first raise these concerns

2  with the hospital?

3    A    April or May, I guess, '99.

4    Q    Are you currently on any medication?

5    A    Ultram for my thumb.

6    Q    Is that a painkiller?

7    A    No.  That's an, it's like a synthetic form

8  of a muscle relaxant.  It makes you sleepy.

9    Q    Any other medications?

10    A    Imitrex if I need it for migraines.

11    Q    Any other medications you are currently on?

12        MR. KARLIN:  You say currently on.  You

13     mean right now as we speak?

14        MR. del RUSSO:  Yes.

15    A    Tylenol.

16    Q    What about any prescriptions you have been

17  given currently but you are not on at this particular

18  moment in time?

19    A    Celebrex for my knee that I've been given

20  and never filled.

21    Q    Is that a painkiller?

22    A    No.  It's a nonsteroidal

23  anti-inflammatory.

24        Vioxx.

25    Q    Also for your knee?

107

1      A      Uh-hum.  Which I don't, I haven't filled

2    that.

3      Q      Prior to the time you raised these concerns

4    with the hospital had you had any problems with your

5    supervisors or your co-workers?

6      A      Just regular, regular staff problems that

7    you talk about and deal, and issues that you deal

8    with at a staff meeting or you talk to one another to

9    try to resolve it.

10      Q      How did you first become aware that other

11    nurses were being paid for participating in a

12    preceptor program?

13      A      I was preceptoring somebody.

14      Q      Who?

15      A      Michelle.  Michelle's last name?  Plunkett,

16    Plunkett, and she told me.

17      Q      She told you she was being paid?

18      A      Uh-hum.

19      Q      That's a yes?

20      A      Yes, sorry.

21      Q      Was that in 1999?

22      A      Yes.

23      Q      All right.  Was that the first information

24    that you had received that led you to develop a

25    concern over the fact that you hadn't been paid for

1    your participation in the preceptorship program?

2        A      I had heard through the grapevine that the

3    other two might have been paid, but again I wasn't

4    going to go to them and be crass and ask them.

5        Q      All right.  I'm sorry.

6        A      I said and again that was gossip that's

7    gone around.

8        Q      Were those the same two nurses that you

9    referred to earlier when you said that you had

10   expressed a concern why two other nurses didn't have

11   to go through the program and were paid?

12       A      Yes.

13       Q      What are the names of those two nurses?

14       A      Donna.  I don't remember Donna's last

15   name.

16       Q      Was it Shambo?

17       A      No.  I'm trying to remember her last name.

18       Q      I'm asking, do you remember if it was Donna

19   Shambo?

20       A      Boccela.

21       Q      How do you spell that?

22       A      B O C, I don't know if it's C C E L A.

23       Q      And who was the other?

24       A      Jennifer.  I don't remember her last name.

25   It's Stephan, Stephan, something like that.

109

1      Q      Were these two nurses that began working at

2  Westside after you began working at the hospital as a

3  nurse?

4      A      Yes.

5      Q      So they both came after you?

6      A      Yes.

7      Q      Did I understand you to say earlier, ma'am,

8  that you had heard, as you put it, through the

9  grapevine that these nurses were paid for their

10 preceptor participation?

11     A      Yes.   After Michelle said something and

12 someone else said, the other, Donna and Jennifer were

13 paid, too.

14     Q      Who told you that?

15     A      It was a PCA.

16     Q      Did she tell you how she would know whether

17 two --

18     A      Because they were PCAs.

19     Q      They were former PCAs that became nurses?

20     A      Yes.

21     Q      Did she tell you how she would know that

22 these two nurses were paid for an involvement in a

23 preceptorship program?

24     A      No.

25     Q      And I take it you never asked Donna or

1    Jennifer personally whether they were paid for their

2    participation in the preceptorship program?

3        A     I never asked personally but I did hear

4    them say yes, they were paid.

5        Q     All right.  What were the circumstances in

6    which you heard them say that?  Did someone else ask

7    them?

8        A     I don't remember.  I think it was a general

9    conversation and said, Of course I would be paid if

10   I'm orienting or preceptoring, something to that

11   effect.

12       Q     Do you know when it was that those two

13   nurses went through the intern or preceptor program?

14       A     It had to be sometime in '98 because they

15   came after me.

16       Q     Do you know one way or the other whether

17   the program they went through was the same program

18   that you went through?

19       A     No, I don't know the ins and outs, no.

20       Q     All right.  Now, once you heard from

21   Michelle Plunkett that she was being paid and once

22   you after that heard through the grapevine, as you

23   put it, that Donna and Jennifer had been paid, how

24   did you then raise those issues with the hospital?

25       A     Went home and typed up a letter and sent it

111

1    to human resources and DON.

2        Q      DON meaning director of nursing?

3        A      Yes.

4              (Defendants' Exhibit 7 was marked for

5          identification.)

6        Q      Let me show you what I've marked as Exhibit

7    7, Miss Diaz, ask you to take a look at the draft of

8    that letter and tell me if that's a copy of a letter

9    that you had sent, that you just referred to sending

10   to human resources and the director of nursing.

11       A      Yes.

12       Q      Was this a draft of the letter?  I mean,

13   it's not a signed copy.  Or do you know?

14       A      No.  I signed the copy that I did give.

15       Q      And that's not a copy.

16             That is a copy of what you gave to the

17   human resources and the DON?

18       A      I signed a copy of what I gave to Jutras

19   and human resources.  This is probably a rough draft

20   off of the computer.

21       Q      Now on the top of that page there is some

22   handwriting.  Is that your handwriting?

23       A      Yes.

24       Q      It says at the top, begins by reading,

25   quote, This is the first letter that I sent to WSMC

1    when I questioned hospital policy 5/99.

2              I asked you earlier if you remembered when

3    it was when you first raised the issue and you said

4    possibly April or May.

5              By looking at that date reference does that

6    better refresh your memory as to when you first

7    raised this issue with the hospital?

8    A    Right.   May.   It's May.

9    Q    May of 1999?

10    A    Uh-hum.

11    Q    That's a yes?

12    A    Yes.

13    Q    Now, in the letter in the fourth line down

14    it says, When I received my licensure I was told that

15    I had to participate in an eight-week preceptorship

16    program at Westside Regional.

17              Do you see that language?

18    A    Yes.

19    Q    Does that refer to what you had previously

20    told me you had been told by Eileen Ciotti?

21    A    Yes.

22    Q    All right.   The letter goes on to say, Even

23    though I was an employee of this facility I was told

24    by the hospital and by Broward Community College that

25    I could not be paid for my internship.

113

1          Who at Broward Community College told you

2   that you could not be paid for your internship?

3      A     Again that was at the hospital.  The

4   educator and the person from Broward, BCC, and myself

5   going over all the paperwork for the internship.

6      Q     Who was the person at BCC?

7      A     That Wanda.

8      Q     Wanda?

9      A     Yes.

10     Q     Did she tell you as you referred to in this

11  letter that you could not be paid for your

12  internship?

13     A     It was told by everybody, by Westside, by

14  Marybeth, by Eileen, Wanda.  I don't remember if she

15  said that but I know she was there, B.J. was there

16  and I was there.

17     Q     All right.  Well, the reason I'm asking you

18  that is your letter says that you were told by BCC.

19     A     And the hospital.

20     Q     I understand, but I'm asking you to focus,

21  please, on your reference to the fact that you were

22  told by BCC that you could not be paid for your

23  internship.

24     A     Uh-hum.

25     Q     I'm trying to determine, ma'am, who at BCC

114

1    would have told you that you could not be paid for

2    your internship.  Was it Wanda?

3         A       Possibly because she's the only one I

4    really remember from BCC.

5         Q       Now, when you say "internship," is that the

6    same thing as the preceptorship, different word, same

7    thing?

8         A       Yes.

9         Q       This was an internship after you obtained

10   your nursing license?

11        A       Yes.

12        Q       Then it goes on to say, Recently it has

13   come to my attention that two newly employed

14   registered nurses were paid during their internship.

15             Are you referring to Donna and Jennifer?

16        A       Yes.

17        Q       When you say they were recently employed,

18   does that mean, ma'am, that they were employed in

19   1999?

20        A       No.  What it means is that they were

21   already employed there as PCAs like I was and

22   upgraded to registered nurses.

23        Q       All right.  Now, later on in the letter it

24   talks about the telemetry course you were offered at

25   Westside.

1                   It says, quote, It was made known to me

2          that a colleague of mine also applied for the

3          telemetry course would not have to sign the 18-24

4          contract.

5                   Who was that colleague?

6          A       One was Sergio, and another one was -- I

7          don't remember if it was Megali or not.  One was

8          Sergio.

9          Q       Were you offered to participate in the

10         telemetry course?

11         A       Yes.  They offered it to me.

12         Q       And did you?

13         A       No, I did not.

14         Q       Why not?

15         A       I already worked there as a registered

16         nurse.  I've been there on one of the hardest floors

17         for over two years.  For me to sign a 18-24 month

18         contract and I already worked there, it seemed

19         unreasonable.

20         Q       Had you had any telemetry experience up to

21         that point in time?

22         A       Yes.  We would float to telemetry.

23         Q       So why would you even have been offered the

24         course in the first place, if you know?

25         A       If, I'm sorry?

116

1    Q    Why would the course have even been offered

2  to you if you had telemetry experience?

3    A    Because at that time I did not know how to

4  read a rhythm strip.  I mean, I knew basic rhythms

5  but not difficult rhythms.  I didn't know the drugs

6  that you needed to make.  I did not know -- I wasn't

7  ACLS certified then either.

8    Q    Were those all things that you would have

9  learned or been taught in the telemetry course?

10    A    I would assume so.

11    Q    All right, so you sent this letter to human

12  resources and the director of nursing.  What happened

13  next in terms of how you were trying to express these

14  concerns to the hospital?

15    A    I waited for a response.  I recall sending

16  a couple e-mails to Miss Mathis and Miss Jutras.

17    Q    What happened next?

18    A    E-mails.  Then I requested to have a

19  meeting, I think, because Miss Mathis wasn't

20  answering my initial question.

21    Q    And who did you request to have a meeting

22  with?

23    A    Miss Jutras, the DON.

24    Q    Do you recall if you first had a meeting

25  with Miss Mathis?

117

1      A      Yes, I think I did.  I think I had a brief

2   meeting with her.

3      Q      Do you remember approximately when that

4   was?

5      A      Not offhand, not without my paperwork.

6      Q      Do you remember who was present?

7      A      The initial meeting?  I believe it was just

8   myself and Miss Mathis.

9      Q      Do you have any recollection as to what was

10  discussed?

11     A      Some of my concerns in my letter.

12     Q      Do you recall anything that she said to

13  you?

14     A      That I was comparing oranges to apples.

15     Q      What was she referring to, if you know?

16     A      I asked her why were those two paid and I

17  wasn't.

18     Q      And did she explain what she meant when she

19  said you were comparing oranges to apples?

20     A      No.  She just kept saying that over again.

21             (Defendants' Exhibit 8 was marked for

22          identification.)

23     Q      I'm showing you what I marked as Exhibit 8

24  to your deposition.  It appears to be a June 1, 1999

25  e-mail from Miss Mathis to you.

1           My question, ma'am, is going to be, first

2    of all, if you recall receiving that e-mail from Miss

3    Mathis.

4         A    Yes.

5         Q    Using the date of June 1 as a reference,

6    can you tell me whether your meeting with Miss Mathis

7    was on that same day or perhaps the day before or day

8    after?

9         A    I can't recall, but I think it was before

10   but I can't recall a hundred percent.

11           (Defendants' Exhibit 9 was marked for

12       identification.)

13        Q    Let me show you an e-mail which I've marked

14   as Exhibit 9 and ask you to please take a moment and

15   look at this June 2, 1999 e-mail from Miss Mathis to

16   you.

17        A    Okay.

18        Q    Do you recall receiving this e-mail from

19   Miss Mathis?

20        A    Yes.

21        Q    All right.  Do you recall if this e-mail

22   was received by you after your meeting with Miss

23   Mathis?

24        A    I think so but I'm not a hundred percent

25   but I think so.

119

1       Q       All right.  The first sentence in this

2    e-mail reads, quote, The nurses mentioned in our

3    meeting did not go through a formal preceptor program

4    but an extended orientation program.

5            Do you recall if at this point in time you

6    met with Miss Mathis more than once?

7       A       I don't think so.

8       Q       When it refers to the nurses mentioned in

9    the meeting, do you know which nurses this e-mail is

10   referring to?

11      A       These are the same two nurses that I

12   mentioned before.

13      Q       So during that meeting, that initial

14   meeting with Miss Mathis, did you mention the names

15   of those two nurses specifically?

16      A       Yes.

17      Q       So by looking at this e-mail it refreshes

18   your memory that you may have discussed that aspect

19   with her?

20      A       Uh-hum.

21      Q       That's a yes?

22      A       Yes.

23      Q       I take it both of those nurses are not

24   African-American?

25      A       No.

120

1    Q    At that point in time were you satisfied

2  with the response that Miss Mathis had given you

3  through the meeting and through this e-mail?

4    A    No.

5         (Defendants' Exhibit 10 was marked for

6     identification.)

7    Q    Let me show you an e-mail, ma'am, which is

8  marked as Exhibit 10, appears to be dated June 3, ask

9  you if you'd take a moment, and actually it's a

10  document with two e-mails on it, ask you if you'd

11  look at it and tell me if you recall having seen it

12  before.

13    A    Okay.

14    Q    Now, the bottom of that page refers to an

15  e-mail from you to Miss Mathis on June 3.  Do you

16  recall sending that e-mail to Miss Mathis?

17    A    Yes.

18    Q    And then above that on the same day there

19  appears to be an e-mail response from Miss Mathis to

20  you.  Do you recall receiving that e-mail from Miss

21  Mathis?

22    A    Yes.

23    Q    Do you recall having any discussions with

24  her other than through these two e-mails concerning

25  paperwork that you were seeking?

1    A    Say that again.

2    Q    Do you recall having any discussions with

3    her about paperwork that you were requesting from

4    Miss Mathis?

5    A    I wanted to see the policy.

6    Q    What policy?

7    A    On preceptorship/interns.

8    Q    How do you know there was a policy to see

9    in the first place?

10    A    Most organizations or hospitals that size

11    have a policy on internships and preceptors, a

12    written policy.  They have a written policy for

13    everything else.

14    Q    All right, so you would assume there was a

15    policy.  Fair statement?

16    A    Yes.

17    Q    Have you since come to learn that no policy

18    exists regarding the hospital's participation in the

19    BCC preceptorship program?

20    A    That there is no written policy that --

21    Q    Yes.

22    A    -- Westside has?

23    Q    That's correct.

24    A    No, they have no written policy.  She wrote

25    here it's made on a case-by-case basis, but that's

122

1   not what I was told in the beginning.

2        Q      What were you told in the beginning?

3        A      That they do not grandfather in nurses.

4        Q      Well, do you know if that was an untrue

5   statement at the time it was told to you?

6        A      I took it for being true.

7        Q      Was that the statement that Miss Ciotti

8   told you?

9        A      Yes.

10       Q      Do you know of any nurses prior to the time

11   you participated in the preceptorship program that

12   were grandfathered in?

13       A      No, not at that time.  Prior to when I was,

14   right?

15       Q      Correct.

16       A      No.

17       Q      By grandfathered in do you mean given the

18   chance for employment without going through the

19   preceptor program?  Is that what you mean by

20   grandfathered?

21       A      What I mean by grandfathering means doing

22   the same roles, responsibilities and function as a

23   nurse while you follow that same preceptor throughout

24   the day, following her schedule.  You might not have

25   to follow their schedule if you were hired for a

123

1  different shift.

2      Q      Is it fair to say, ma'am, that the nurses

3  who you since have learned or come to learn may have

4  been paid for their participation in an intern or

5  preceptor program all came to the hospital after you?

6      A      On these two instances, yes, because I

7  don't know who was before me.

8      Q      And Michelle Plunkett, the one that you

9  were preceptoring, also became a nurse at the

10  hospital after you?

11      A      Yes.

12             (Defendants' Exhibit 11 was marked for

13         identification.)

14      Q      Now, you mentioned earlier that you at one

15  point requested a meeting with the chief nursing

16  officer.  Is that correct?

17      A      Yes.

18      Q      Let me show you what I've marked as Exhibit

19  11.  It's a document reflecting several e-mail

20  transmissions, and I'm going to ask you to go through

21  that with me, please.

22             The bottom of it refers to an e-mail from

23  you to Kim Jutras dated June 11.

24             My question to you is going to be, ma'am,

25  whether you recognize that as an e-mail communication

1    that you sent to Miss Jutras.

2        A    Yes.

3        Q    And right above that is an e-mail response

4    from Miss Jutras to you dated June 14.

5            Do you recall receiving that e-mail from

6    Miss Jutras?

7        A    Yes.

8        Q    And above that is an e-mail from Miss

9    Jutras'secretary or administrative assistant dated

10   June 16th to you.

11           Do you recall receiving that e-mail?

12       A    Yes.

13       Q    Would you agree with me that at least at

14   that point in time Miss Jutras and her office were

15   responsive to your request to schedule a meeting to

16   discuss these issues?

17       A    Miss Jutras was responsive, yes.

18       Q    All right.  So when you had mentioned

19   earlier that you felt you were being stonewalled in

20   connection with the concerns you were raising, you

21   weren't referring to Miss Jutras, at least at this

22   point in time, and at least in connection with the

23   meeting that you were trying to schedule with her?

24       A    No, because I was going through appropriate

25   chain of command and that was starting out with Miss

125

1    Mathis, who was the manager of human resources.

2        Q      Ultimately you did meet with Miss Jutras,

3    didn't you?

4        A      Yes.

5        Q      Tell me about that meeting as best you can

6    recall.  Do you remember when it took place?

7        A      Not offhand.  I would have to look in the

8    paperwork.

9               (Defendants' Exhibit 12 was marked for

10        identification.)

11       Q      Let me mark this then as Exhibit No. 12,

12   ask you to take a moment and look at that, please.

13              It appears to be a photocopy of one of the

14   e-mails I had just shown you in Exhibit 11 but it has

15   some handwritten notes at the bottom.

16              Is the handwriting on the the bottom of

17   this page your handwriting, Miss Diaz?

18       A      Yes.

19       Q      Now, you see the comment on the right,

20   there is a date 7/1/99?

21       A      Uh-hum.

22       Q      Had meeting with Kim Jutras and Lynn

23   Mathis.

24              Was that the meeting you had with the chief

25   nursing officer?

126

1    A    On the 1st of July.

2    Q    That's why I'm showing it to you, because I

3  asked you when it was when you met with her.

4    A    I remember.

5    Q    Now, looking at this document, does that

6  help refresh your memory?

7    A    Yes.

8    Q    So you met with Miss Jutras and Lynn Mathis

9  on July 1?

10    A    Uh-hum.

11    Q    That's a yes?

12    A    Yes.

13    Q    Where was it that you met with Miss Jutras

14  and Miss Mathis?

15    A    In Mrs. Mathis' office.

16    Q    And was anyone else present other than the

17  three of you?

18    A    In the meeting?  Just the three of us.

19    Q    All right.  Well, what do you mean by that?

20    A    In the meeting itself, there was just the

21  three of us in the meeting.  Outside, my mother was

22  outside.

23    Q    She didn't attend that meeting?

24    A    No, she did not come in.

25    Q    Can you tell me as best you recall what was

127

1    discussed between the three of you in that meeting

2    that took place in July 1?

3        A       Basically I asked to seek clarification of

4    the policy on the preceptorships and orientations,

5    what have you.

6             (Discussion off the record.)

7        Q       Do you recall anything that Miss Jutras

8    said to you specifically at that meeting?

9        A       Basically that they didn't have a policy

10   for internships, and I remember asking, Well, what

11   criteria do you use to make your decisions?  That's

12   the paperwork that I asked to see.

13       Q       Do you recall what she said?

14       A       Didn't say anything.

15       Q       Do you recall anything else that Miss

16   Jutras said to you during the course of that meeting?

17       A       Yes.  She said it wasn't appropriate to

18   have my mother there.

19       Q       You mean present in the meeting?

20       A       She wasn't in the meeting.  She was

21   outside.  To bring my mother.

22       Q       She said inappropriate to bring her?

23       A       To bring my mother.

24       Q       She wasn't talking about whether she could

25   attend the meeting?

128

1    A    I didn't ask her to attend the meeting. I

2  just wanted support from a family member and she was

3  nice enough to come.

4    Q    Did you ask anyone whether your mother

5  could attend the meeting?

6    A    What I had asked was did they mind if I

7  brought someone along because I didn't think it was a

8  big deal until I started getting paged to the nurses'

9  station over and over again, who did I want to bring,

10 who did I want to bring?

11         And at first I was telling them, you know,

12 I wanted support, I wanted to bring my mother, until

13 I think I spoke with Miss Mathis, and the way she

14 came across on the phone at that time, I didn't say

15 who it was.

16         I remember getting paged again, stopping

17 doing my nursing functions, who was I going to

18 bring?  I mean, first Miss Jutras called, Miss

19 Jutras' secretary called me, then Miss Jutras, and

20 then before that Miss Mathis called me throughout

21 that whole day.

22    Q    Okay.  Do you recall, going back to this

23 meeting on July 1, do you recall anything specific

24 that Miss Mathis said to you at this meeting?

25         MR. KARLIN:  Other than what she's already

1           testified, I think?

2      Q      This is the second meeting now that you had

3    with Miss Mathis, isn't it?

4      A      She really didn't say --

5      Q      Let me stop you a second, ma'am.  Is this

6    the second meeting now that you've had with Miss

7    Mathis on the issues?

8      A      Right.

9      Q      Now, tell me as best you can recall

10   anything that you remember Miss Mathis saying during

11   the course of that meeting.

12     A      Again saying that, again there wasn't a

13   policy, wasn't a written formal policy on that

14   subject.  That's basically it.

15     Q      All right, now, Miss Diaz, you claim in

16   this lawsuit that Westside treated you differently,

17   discriminated against you because of your race and

18   your color.  Isn't that correct?

19     A      Yes.

20     Q      I'd like you to tell me, please, how you

21   believe Westside treated you differently,

22   discriminated against you because of your race and

23   your color.

24           And before you answer that let me just

25   mention I'm going to ask you later about the

1    instances of retaliation.  We'll talk about them

2    later, but right now I'm interested just in how you

3    believe they treated you different, how they

4    discriminated against you because of your race and

5    your color.

6         A     Okay.  Going back to when I first started,

7    I was already employed there as a PCA and I was told

8    that they didn't grandfather people in as part of my

9    RN, becoming an RN.

10             And I accepted that until I found out, you

11   know, couple months down the line these other two

12   nurses that started the same way I did as PCAs, they

13   got grandfathered in, and the one that I was

14   training.  I don't remember if she told me she got

15   grandfathered in.  I think I tuned her out after she

16   told me she got paid, but nonetheless, when I asked

17   to seek clarification on the policy, well, why was I

18   treated differently, why were these two paid for

19   their whole time?  Can you show me what paperwork you

20   have?  How do you base your decisions?  And I said,

21   you know, appears to me that it's -- this is

22   discrimination.  You can't show me any other, any

23   other paperwork or proof.

24        Q     All right, so is it fair to say, Miss Diaz,

25   that you believe you were discriminated against

1   because you were not paid for your involvement in the

2   preceptorship program while you came to learn that

3   other nurses were paid?

4       A       I was treated differently.

5       Q       I'm just trying --

6       A       I was treated differently than the other

7   two nurses.

8       Q       Because they were paid and you were not?

9       A       I wasn't even given that option of being

10  paid.

11      Q       Tell me, ma'am, how you were treated

12  differently than the other two nurses.

13      A       I mean, I'm agreeing with what you said,

14  that I was not paid and they were, but I wasn't even

15  given, like I said, given the option of being

16  grandfathered in.  That's what they were, they were

17  grandfathered in.

18      Q       All right.  So that would be one instance,

19  Miss Diaz, would it not, of how you believe the

20  hospital treated you differently because of your race

21  or your color?  Is that a fair statement?

22      A       That's the major incidence, yes.

23      Q       Your complaint alleges at paragraph 7 that

24  you believe you have been subjected to different

25  terms, conditions and privileges of employment by

132

1    reason of your race or your color.

2          Now, we've already talked about this

3    instance where you believe that you were treated

4    differently because these other nurses were paid and

5    you were not, that you were not grandfathered in.

6          Is there any other circumstances or

7    instances where you believe Westside discriminated

8    against you or treated you differently than other

9    nurses because of your race or your color?

10   A    I'd say treated differently because I

11   couldn't take any more calls that day of who I wanted

12   to bring to the meeting.  Miss Mathis, I was talking

13   to her on the phone and I couldn't, I could no longer

14   come back and forth from patient's room to the

15   nurses' station.

16         I remember that I was giving a patient

17   transfusion and she kept calling, and I said, Well,

18   I'll let you know who I'm going to bring to the

19   meeting later, and I said, Thank you, and hung up the

20   phone.

21         And at that time I finished doing what I

22   was doing nursingwise and started to report off to

23   the next shift, and people were coming back to me,

24   You don't hear them paging you overhead?  You don't

25   hear them paging?

1            Paging me where?

2            So stopping me from doing my nursing duties

3     is, was a way that I felt I was treated differently.

4     Actually, harassment.

5        Q     Well, is that more of how you believe you

6     were being retaliated against or more of why you

7     believe you were being treated differently?

8        A     I guess that's more of retaliation, I

9     guess.

10       Q     Okay.  And we'll talk about retaliation in

11    a moment.  I just want to make sure that I've

12    exhausted your memory in terms of how else you

13    believe the hospital discriminated against you or

14    treated you differently.

15            We've already talked at length about how

16    you believe you were treated differently because you

17    were not paid for your participation in the

18    preceptorship program and other nurses were.

19       A     Uh-hum.

20       Q     Is there any other way in which you believe

21    the hospital discriminated against you or subjected

22    you to different terms in your employment other than,

23    other than that instance?

24       A     No.  There is another one.  Later on the

25    two same -- well, one of those two nurses that I

134

1    mentioned who was a nurse a less amount of time than

2    I was asked for a transfer to the emergency room, and

3    this was after I asked to go to tele, and she did not

4    have to do a course, do a commitment to stay.

5        Q    All right.  Any other way in which you

6    believe the hospital discriminated against you?

7        A    Not that I can recall.

8        Q    All right.  Now let's talk about this

9    instance for a minute.

10        One of the two nurses -- which one was it,

11    by the way?

12        A    Jennifer.

13        Q    Jennifer.

14        -- asked to be transferred from the fourth

15    floor to emergency?

16        A    Yes.

17        Q    And it's your understanding that that

18    transfer was granted and she didn't have to sign any

19    written commitment to stay?

20        A    Right.

21        Q    What's the basis for your knowledge that

22    the transfer was granted without her required --

23        A    I asked her.

24        Q    You asked Jennifer and she told you?

25        A    Yes.

1    Q    What type of specialized training do you
2    need to work in the emergency room that you don't
3    have by working on the fourth floor?
4    A    It would be similar to what you would need
5    for tele, the rhythm, to know heart rhythm, EKG
6    rhythms.  I don't know if their ER requires that you
7    need to have ACLS.  Some of them you can get it
8    within six months of you being there.
9    Q    All right.
10    A    Knowing certain medications, knowing
11    certain algorithms of what to do when a patient
12    presents into the ER.
13    Q    So it's your testimony that you can't work
14    in an emergency room without having some emergency ER
15    certification?
16    A    No, that's not my testimony.
17    Q    Do you know if she was able to work in the
18    emergency room without taking the course?
19    A    I know that she had a preceptor for six
20    weeks there.
21    Q    In connection with the emergency room?
22    A    Yes.
23    Q    So when she transferred, you know from your
24    own knowledge that when she transferred from the
25    emergency room that she had to go through a training

1   course?

2       A       I didn't say course.  I said she had a

3   preceptor.  She was tagged along with another nurse.

4       Q       What's wrong with that?

5       A       Well, when I asked to go to the tele I

6   would have to go through the course.

7       Q       But wouldn't you have had to go through a

8   course, not just have a nurse precept you?

9       A       She went to the ER with just having a nurse

10  preceptor.

11      Q       I understand that, but when you wanted to

12  transfer to telemetry wouldn't you have to go through

13  a telemetry course as compared to just having a nurse

14  precept you?

15      A       You wouldn't have to, no.

16      Q       But that's what the hospital offered to

17  you?

18      A       Right.

19      Q       All right.  So wasn't the difference then

20  that you were being offered participation in a

21  telemetry course and certification while Jennifer

22  instead was just precepted, if you will, by an

23  existing ER nurse?

24      A       No.  The difference is that they offered me

25  a tele course and I had to sign a contract.  She was

 1    transferred to the ER without any problems and paired

 2    up with another nurse for six weeks.

 3        Q    Do you know if she attended an emergency

 4    room or ER certification course?

 5        A    No.  That part I don't know.

 6        Q    Okay.

 7        A    I did not ask her that but there weren't

 8    any ER courses being offered at the time, just a tele

 9    course.

10        Q    How do you know that?

11        A    You get an educational, in your e-mail, the

12    list of educational things that are going on.

13        Q    At the hospital?

14        A    That hospital, Plantation and Northwest.

15        Q    So there were no ER courses that she could

16    have taken at the time, even if she had wanted to?

17        A    To the best of my knowledge, yes.

18        Q    All right.  So have we talked -- have we

19    left out any other actions or conduct by Westside

20    which you believe was discrimination or treating you

21    differently because of your race or color?

22        A    That's it.

23        Q    So we haven't left anything out?

24        A    Not that I can think of of.

25        Q    You've also claimed in your lawsuit, ma'am,

1    that because you made complaints with the hospital

2    that they began to retaliate against you.  Is that

3    correct?

4        A    Yes.

5        Q    Tell me as best you can who was it at the

6    hospital that specifically took actions that were

7    retaliation against you.

8        A    Started with Mrs. Mathis and then going

9    back through the chain of command.  Actually it went

10   from Miss Mathis, then the next one was I spoke to

11   Lee Chaykin, who listened to my grievance, and then

12   the second one was Lynn Mathis with Sue Wakat, and

13   regarding a patient rep, and then my grievance was

14   heard by Lee Chaykin.

15       Q    So you mentioned Miss Mathis, Mr. Chaykin

16   and Miss Wakat?

17       A    Uh-hum.

18       Q    That's a yes?

19       A    Yes, sorry.

20       Q    Anyone else that you believe retaliated

21   against you from Westside?

22       A    No.  Those were --

23       Q    Those were the three?

24       A    People that I dealt with at Westside.

25       Q    All right.  When did the retaliation first

139

1   start?

2        A      The time before when I got -- the first

3   writeup I should say.

4        Q      Is that when Miss Mathis was trying to get

5   ahold of you?

6        A      Yes.

7        Q      And you were written up in connection with

8   that incident?

9        A      No.  She wrote me up.  She stated that I

10  hung up on her.

11              (Defendants' Exhibit 13 was marked for

12         identification.)

13       Q      I'm going to show you, ma'am, an e-mail

14  which I'm marking as Defendants' Exhibit 13, it's

15  dated June 29, 1999, and ask if you could look at

16  that and tell me if you recall receiving it.

17       A      Uh-hum.  Yes.

18       Q      Was that, was this e-mail sent to you the

19  same day that you were written up for not speaking to

20  Miss Mathis or for hanging up on her on the phone?

21       A      I can't recall.  I'd have to look at my

22  paperwork.

23       Q      Did you plan to -- this refers to your

24  intention to bring another person to our meeting.  Is

25  that referring to the July 1 meeting that you had

1    with Miss Jutras?

2        A    Miss Jutras and Miss Mathis.

3        Q    So it refers to that meeting?

4        A    Yes.

5        Q    Was it your intention to bring someone else

6    to the meeting?

7        A    Yes.

8        Q    Who did you intend to bring to the meeting?

9        A    My mother.

10       Q    Because you wanted support?

11       A    Exactly.

12       Q    Do you know how it was that Miss Mathis may

13   have learned that you intended to bring someone else

14   to the meeting?

15       A    I think I spoke to Mrs. Jutras' secretary

16   or assistant and I said I don't think that time will

17   be good for, I think I said us.  I think I said us.

18   That time wouldn't be good for us.

19       Q    After you received that e-mail from Miss

20   Mathis did you then speak to her later in that same

21   day about whether you were going to bring someone to

22   the meeting, and if so, who that person was?

23       A    They called me several times on the floor.

24   I mean, some of the times I couldn't pick up the

25   phone because I was doing nursing duties, taking care

1    of my patients.

2        Q        When you say "they called," you mean Miss

3    Mathis called you?

4        A        I mean Miss Mathis called me, Mrs. Jutras

5    called me.  I don't remember if Mary called me or

6    not.

7        Q        How about Sue Wakat?

8        A        I don't think so.

9                 (Defendants' Exhibit 14 was marked for

10          identification.)

11       Q        Let me show you, ma'am, what I've marked as

12   Exhibit 14. It's a June 29, 1999 written reprimand

13   form.  I ask you to take a moment, look at that and

14   tell me if you recognize it.

15       A        Yes, I remember.

16       Q        Would this have been the first instance

17   where you believe the hospital was retaliating

18   against you?

19       A        All the phone calls on the floor I think

20   started with harassment.  This would have been

21   retaliation.

22       Q        How many phone calls were there?

23       A        I have to look into my paperwork.

24       Q        Were they all between three and four in the

25   afternoon?

142

1       A       No.

2       Q       It was all day?

3       A       Yes.

4       Q       Was it after the time on the e-mail that I

5  had shown you as Exhibit No. 13?

6       A       No, there was a call earlier than 1:13.  I

7  don't even remember when but I know it was before

8  that because I was trying to go to lunch I think and

9  I talked to one of them before I went to lunch.

10      Q       Did it all concern whether you were

11 bringing someone to the meeting?

12      A       Uh-hum.  Yes.

13      Q       Why didn't you just tell them if you were

14 going to bring someone to the meeting?

15      A       Like I said before, I was going to tell

16 them it was my mother I was bringing until Mrs.

17 Mathis -- you have to -- she was very negative, very

18 derogatory.  I mean, you have --

19      Q       What did she say to you?

20      A       I had to tell her now or there won't be a

21 meeting and this will end now.

22      Q       That conversation where she just related

23 that to you, was that in a phone call that you had

24 with her?

25      A       Yes.

143

1    Q    When did that take place?

2    A    It was during one of the times after --

3    when I was trying to handle blood, so it was after,

4    it was almost change of shift, which change of shift

5    occurs at three.

6    Q    So it was sometime between three and four?

7    A    Correct.

8    Q    Now, were you presented with this written

9    reprimand, someone give this to you?

10   A    No.  I was handheld walked down to Mrs.

11   Mathis' office.

12   Q    So she physically held your hand?

13   A    Had her arm around my shoulder, walked me

14   downstairs to Mrs. Mathis' office.

15   Q    What time of the day was that?

16   A    I don't know.  Mid-morning.  I don't

17   recall.

18   Q    That was the following day?

19   A    Uh-hum.  The 30th.

20   Q    And did you meet with Miss Mathis?

21   A    Yes.

22   Q    Who was present?

23   A    Sue Wakat.

24   Q    And you and Miss Mathis?

25   A    Yes.

1    Q    What was discussed?

2    A    Nothing really was discussed.  I let her

3    read the disciplinary record.

4    Q    You don't recall anything that Miss Wakat

5    said?

6    A    Miss Wakat just kept telling me I'm a good

7    nurse and I have a lot of potential and things of

8    that nature.

9    Q    Do you recall anything else that she said?

10   A    Not at the time, no.

11   Q    Do you recall anything that Miss Mathis

12   said other than her reading this written reprimand to

13   you?

14   A    No, not really.

15   Q    You believed this reprimand was an act of

16   retaliation by the hospital?

17   A    Yes.

18   Q    Why do you believe that?

19   A    Because during time of change of shift I

20   still was doing nursing duties.  I was hanging blood

21   on the patient.  I can't come back and forth to the

22   phone, especially if I already spoke with them

23   regarding the issue and the meeting still was not --

24   it was a couple days away.

25            Number two, if I had left that patient and

1    she had a reaction from the blood, because I'm on the

2    phone, that's my license that's at line.  I can't

3    even come to the phone all the time when my son's

4    daycare calls me.

5            I spoke to her at least, at least three

6    times that day and then I did speak to her again

7    during that change of shift time.  Then I remember

8    getting ready to go and report.  We go and report.

9            We go into a room where you can't hear,

10   where you can't hear things because you need to

11   concentrate on what I'm telling this information to

12   you about a patient so you get it all right.

13           Later on I found out that they were paging

14   me overhead.  I didn't hear the pages.  I asked the

15   two nurses that I was giving report to, I said, Did

16   you hear them page me?  No.

17           I asked, Did you hear any pages?  No.  So I

18   remember finishing up more paperwork, punched out,

19   then I had to go, and then I got a call from my son's

20   daycare which I couldn't take, I couldn't take

21   because I was trying to finish up work.

22   Q      Okay.  Any other facts which lead you to

23   believe that this writeup was an act of retaliation

24   by Miss Mathis?

25   A      Initially I had asked Miss Mathis not to

1    come, be present with this meeting with me and Mrs.

2    Jutras.

3        Q    We're talking now specifically about the

4    writeup, why you believe this -- is there any other

5    reasons other than what you told me why you believe

6    this was an act of retaliation.

7        A    And the fact that I didn't answer her

8    question to the way she wanted me to answer it.

9        Q    In other words, you didn't tell her who you

10   were bringing to the meeting?

11       A    I didn't answer her the way she wanted me

12   to answer it.

13       Q    What question was she asking you that you

14   didn't answer the way you felt she wanted you to?

15       A    She wanted to know who this person was,

16   when am I going to bring him, what is this person's

17   title, just more questions.

18       Q    How did you feel she wanted you to answer

19   that?

20       A    I don't know.  I just remember I wanted to

21   get home and tell my mom about all this, that this

22   happened, it didn't make any sense.

23       Q    So you didn't tell her at that point in

24   time who you were bringing to the meeting?

25       A    No, no.

1        Q       Do you know a nurse who worked in the

2   fourth floor named Lori Davis?

3        A       Yes.

4        Q       Do you recall Lori Davis coming to you that

5   afternoon between three and four and telling you that

6   Miss Mathis is on the telephone?

7        A       Yes.

8        Q       And do you recall telling Miss Davis or

9   saying to Miss Davis or asking Miss Davis to tell

10  Miss Mathis that you are not here, that you've gone

11  home for the day?

12       A       I remember saying that, Tell her I'm in

13  report, because I already spoke with her.

14       Q       Okay.  So you did not tell her to relate to

15  Miss Mathis that you were no longer there?

16       A       I remember saying, I'm in report, I've

17  already spoken with her.

18       Q       But my question, ma'am, is whether you told

19  her to relate to Miss Mathis that you were no longer

20  at the hospital.

21       A       I don't remember saying it.  I don't

22  remember saying it.  I remember telling her I already

23  spoke to her.  I remember yelling that, going back

24  into a room.

25       Q       Ultimately you did speak with Miss Mathis

148

1    sometime between three and four?

2        A    Yes.

3        Q    Before you left.

4             What do you remember her asking you?  Or

5    excuse me, was that when she said to you, You have to

6    tell me who you are bringing or there is not going to

7    be a meeting?

8        A    Yes.

9        Q    What did you say to her at that time?

10       A    I said, I don't understand what the big

11   issue is over me bringing, bringing a person to the

12   meeting.

13       Q    During that conversation with Miss Mathis,

14   at that point in time did you tell her who you were

15   bringing to the meeting?

16       A    No.

17       Q    So by the end of that day you still had not

18   told her who you were going to bring to the meeting?

19       A    No.

20       Q    Do you know why she was asking you that

21   question?

22       A    Only thing I can assume is she said,

23   because if it's an attorney, I have to cancel the

24   meeting and call another attorney.

25       Q    Why didn't you tell her at the time, I'm

1    not bringing an attorney?

2        A        I did say, I'm not bringing an attorney.

3        Q        But you wouldn't tell her who you were

4    going to bring?

5        A        At that time I was getting upset just like

6    she was getting upset over the constant calls

7    throughout the day, and I said, I don't understand

8    what the big deal is.  I said, You know, it's a

9    meeting that really it's only supposed to be between

10   me and Miss Jutras.

11       Q        But my question, ma'am, is why didn't you

12   at that point, when you said you weren't bringing a

13   lawyer, why didn't you just tell her who you intended

14   to bring to the meeting?

15       A        Because I was getting upset, and like I

16   said before, I wanted to get home, get my kid and

17   talk to my mom and see how foolish to me this was

18   being.

19              (Defendants' Exhibit 15 was marked for

20         identification.)

21       Q        Let me show you what I've marked as Exhibit

22   15, ma'am.  It's a June 30 e-mail from Miss Mathis to

23   Miss Jutras but it reflects a copy being sent to

24   you.

25              And my first question to you is whether you

1    recall having received a copy of this e-mail

2    transmission.

3        A    Yes.

4        Q    You recall receiving it?

5        A    Yes.

6        Q    Did you refuse to sign the written warning

7    when it had been presented to you on that morning of

8    June 30?

9        A    Yes.

10       Q    Why did you refuse to sign it?

11       A    Because it's not factual, it's not

12   accurate.

13       Q    Now, the e-mail goes on to read, quote, I

14   also advised her, referring to you, that I stated to

15   you that I did not need to be present, and reminded

16   her that you preferred it that way.  That if I was

17   not present, either Michael or Lee would be.

18            Do you recall Miss Mathis saying that to

19   you?

20       A    Yes.

21            (Defendants' Exhibit 16 was marked for

22        identification.)

23       Q    Let me show you what I'm going to mark as

24   Exhibit No. 16.  Tell me if you can identify that

25   document, please.

1      A      Yes.

2      Q      Is Marjorie Jackson Carter your mother?

3      A      Yes.

4      Q      Have you seen this before?

5      A      No, I haven't seen it until now.

6      Q      Do you know the circumstances in which your

7   mother might have written this document?

8      A      I believe it probably was when we were

9   having the meeting, meeting when me, Mrs. Jutras and

10  Miss Mathis were having the meeting, because, like I

11  said, my mother was there but she was outside of the

12  office in human resources.

13     Q      What would be the source of your mother's

14  knowledge for the events that took place or the

15  contents of your personnel file?

16     A      I show her every, every accolade, every

17  award that I have so she knows everything about my

18  file, about how proud I am of nursing.

19     Q      She knows those things through you?

20     A      Yes.

21            (Defendants' Exhibit 17 was marked for

22       identification.)

23     Q      All right, now, I take it then you filed a

24  grievance in response to the written warning that you

25  received from Miss Wakat and Mrs. Mathis?

1    A    Yes.

2    Q    Let me show you that, ma'am.  I marked it

3    as Exhibit 17.  I'm going to ask you first if you can

4    identify that as the copy of the brief answer that

5    you filed after receiving a written warning.

6    A    Yes.

7    Q    Is that your signature on the last page?

8    A    Yes.

9    Q    Now that you've had a chance to read this,

10   ma'am, based on your review is everything stated in

11   here true and accurate as far as you recall?

12   A    Yes, as far as I recall.

13   Q    Now, you state in the last page that you

14   want a clarification as to why you were treated

15   differently than other interns.

16        Are you referring specifically to Donna

17   Boccela and Jennifer Stephan?

18   A    Yes.

19   Q    And Michelle Plunkett?  That was the nurse

20   that you were preceptoring.

21   A    Mainly the other two.

22   Q    Donna and Jennifer?

23   A    Because they were PCAs just like I was,

24   working there.

25   Q    You weren't referring then to anyone other

153

1    than those two people?

2        A       Right.  Yes.

3        Q       What happened with respect to the grievance

4    that you filed?

5        A       Mr. -- I had a meeting with Mr. Chaykin.

6    Basically he just read my report, read his report to

7    me.

8        Q       Mr. Chaykin who was the --

9        A       CFO.

10       Q       COO or CFO?

11       A       I think you are right, COO.

12       Q       Did you request a meeting with him?

13       A       Yes.

14               (Defendants' Exhibit 18 was marked for

15           identification.)

16       Q       Let me show you an e-mail dated July 14th

17   that I've marked as Exhibit 18 and ask you if you

18   recall sending that e-mail to Mr. Chaykin.

19       A       Yes.

20       Q       Do you know if Mr. Chaykin did any

21   investigation on his own concerning the grievance

22   that you filed?

23       A       Only what he told me.

24       Q       What did he tell you?

25       A       He told me that he asked that the one unit

154

1   secretary, which was Lori --

2       Q    Lori Davis?

3       A    Uh-hum.  But he also said that he did not

4   ask the two nurses that I listed here in my report,

5   he did not ask them anything, nor did he ask Emma

6   Wimbley anything.

7       Q    Let's go back and look at your report for a

8   minute.

9       A    Uh-hum.

10      Q    The two nurses that you referred to were L.

11  Colloquan and F. Foreman?

12      A    Yes.

13      Q    What knowledge would they have concerning

14  the events that took place that led to your being

15  delivered a written warning?

16      A    Those were the two nurses I was giving

17  report to.  They are the ones that didn't hear any

18  overhead pages.

19      Q    How long do you give a report to a nurse

20  typically?  Could be an hour?

21      A    Yes.

22      Q    Could be five minutes or an hour?

23      A    No, it could never be five minutes.

24      Q    Tell me if you recall how long it was on

25  June 29.

155

1      A      I couldn't tell you a time.  I mean, it

2   depends on how many patients are on a wing.

3      Q      So Mr. Chaykin told you that he did not

4   speak with Nurse Colloquan or Nurse Foreman?

5      A      I asked him, Did you speak to any of my

6   witnesses?  He said, No.

7      Q      Did you have any witnesses other than those

8   two nurses?

9      A      I said Mrs. Wimbley, Emma Wimbley.

10     Q      And what would Miss Wimbley have said?

11     A      This is in regards to me hearing the pages.

12     Q      Was the issue at the time, Miss Diaz,

13  whether you, in fact, were working and reporting off

14  to the nurses or whether you were simply refusing to

15  take a phone call from the director of human

16  resources?

17     A      No.  I already talked to Lynn, Miss

18  Mathis.  I was reporting off in lieu of going back

19  checking on that patient that was getting the blood,

20  so I was back and forth.  Because when you report off

21  you have a team.  You are a team.  You are an RN and

22  LPN.  You let your LPN go first, listen to the report

23  and add what you need to add to her report verbally.

24  Then you give your report on your patients to the

25  rest of their team.

1          So while LPN is giving report I'm back and

2     forth checking on that patient making sure she is not

3     having a reaction.

4     Q     Okay, I understand.  Thank you.  But my

5     question to you, ma'am, is whether anyone I guess

6     ever told you in connection with your written warning

7     that the conduct that they were writing you up for

8     was that you didn't respond to a call by Miss

9     Mathis.

10    A     And that she said I hung up on her.

11    Q     Well, so it's true that someone did tell

12    you that the reason you were being written up was

13    that you didn't respond to a call from her?

14    A     Miss Mathis told me that when she was

15    reading the writeup to me.

16    Q     Let me go back to Mr. Chaykin's

17    investigation.  He told you that he spoke to Lori

18    Davis?

19    A     Yes.

20    Q     And in response to your question he said he

21    did not speak to Nurse Foreman or Nurse Colloquan?

22    A     Yes.

23    Q     Did he tell you what else he might have

24    done, if anything, to investigate your grievance?

25    A     He looked in my personal file and says he

157

1   was -- this is not, that action is not becoming of

2   what's represented in my personal file because my

3   personal file is excellent, and then he proceeded to

4   read his statement.

5       Q    Do you know if he did anything else in

6   connection with an investigation of your grievance?

7       A    He read something about BCC, about BCC

8   interns.   I mean, I don't remember at this time all

9   of it.

10          (Defendants' Exhibit 19 was marked for

11           identification.)

12      Q    Let me show you what I've marked as Exhibit

13  19.   It's an August 6, 1999 response to grievance.

14  I'm going to ask if you could look at that, please,

15  and tell me if you recognize that as a response that

16  Mr. Chaykin delivered to you.

17          Do you recognize that?

18      A    Yes.

19      Q    Now, when you met with Mr. Chaykin did the

20  two of you meet alone?

21      A    Yes.

22      Q    He didn't have his assistant Arisella

23  present?

24      A    No.   She was outside.   I was inside his

25  office with him.

1    Q    The second paragraph of this response reads
2    that employees that participate in the new graduate
3    preceptor program are paid an additional stipend.
4    Individuals that are part of a community college
5    program do not receive any additional remuneration.
6         Do you know if the hospital instituted a
7    graduate preceptor program other than the BCC
8    preceptor program that existed when you took, you
9    participated in that program in 1997?
10   A    If I did, when I asked them to show me
11   proof they said, no, so no, I don't have any
12   information on it because I asked for proof.
13   Q    You don't know either way if there was a
14   new program; What you do know is you never saw any
15   written policies on it?
16   A    They said they had no written policy.
17   Q    Is that a fair statement that I made, that
18   is, that you don't know one way or the other whether
19   there was a new graduate preceptor program that the
20   hospital participated in; what you do know is that
21   you never saw any written policies concerning it?
22   A    They said they never had any written
23   policies concerning it.
24   Q    Let me start again.
25        Do you have any knowledge one way or the

159

1    other, Miss Diaz, as to whether the hospital

2    implemented a new graduate preceptor program after

3    the point in time that you participated in the BCC

4    preceptor program?

5        A    No.

6             (Defendants' Exhibit 20 was marked for

7        identification.)

8        Q    Let me show you a document that I'm going

9    to mark for identification as Exhibit 20, it's a

10   one-page handwritten sheet, and ask you if you can

11   identify that as notes that you prepared.

12       A    Yes.

13       Q    Is this your handwriting?

14       A    Yes.

15       Q    When did you prepare these notes?

16       A    These are out of order but this was after I

17   had my meeting with him, so I wouldn't forget what

18   the context of everything was.

19       Q    Was it immediately after you had the

20   meeting you wrote these notes?

21       A    I believe so.  I believe because -- yeah.

22   Yes, it was.

23       Q    Okay.

24       A    For this one, for this here, pertaining to

25   this, your 14 exhibit.

160

1    Q    Now, because you earlier mentioned

2 Mr. Chaykin as someone who you believe retaliated

3 against you, my question to you, ma'am, is whether

4 you claim that his response to your grievance was

5 another instance of retaliation by the hospital

6 against you.

7    A    Yes.

8    Q    What facts do you have to support your

9 belief that Mr. Chaykin's response to your grievance

10 was an act of retaliation?

11    A    By keeping that writeup in my file, that's

12 a derogatory note on my file that has been

13 exceptional until that time.

14         I felt as if he would have at least looked

15 or listened or talked to any of the people that I

16 asked him to talk to, maybe he would have seen that,

17 you know, I was doing what I was supposed to be doing

18 as a nurse.

19    Q    All right.  Any other basis for your belief

20 that his response to your grievance or his decision

21 on your grievance was an act of retaliation?

22    A    Reading this, I remember him saying we're

23 all team players here, that I need to become a team

24 player.

25    Q    You recall him saying that specifically?

1     A     Yes.

2     Q     So he didn't say you were not a team

3   player.  What he said --

4     A     Go ahead.

5     Q     You tell me, please.  I wasn't there.

6     A     We're all team players.  You need to become

7   a team player.

8     Q     Why did you perceive that as an act of

9   retaliation?

10     A     That's threatening.  That's a -- that's

11   threatening.  I can't -- or not can't, but I feel

12   like I would be watched and every little thing I do

13   be scrutinized so they would have any type of

14   negatives against me.

15     Q     Wasn't that a message that they tried to,

16   that the hospital tried to relate to all of their

17   employees, that we all should act as a team?

18           MR. KARLIN:  I'll object to the form.

19     A     Uh-uh.

20     Q     No?

21     A     No.

22     Q     Had you never heard --

23     A     I heard, but not in that context.

24     Q     Miss Diaz, had you ever heard anyone at the

25   hospital from supervisors to managers previously

1  suggest to you that the employees at Westside should

2  all act as a team prior to the time that Mr. Chaykin

3  at the meeting said, quote, We're all team players

4  and you have to act like a team player, prior to that

5  time?

6      A      I've heard them say be a part of a team at

7  general meetings, not when it's a meeting when it's

8  you and the COO telling me that I'm not being part of

9  a team when other evidence of paperwork shows that

10  I've always been a team player, team member.

11          It's just when I raise questions about

12  something that they say I'm not a team player.

13     Q      Well, he didn't say that to you, did he?

14          MR. KARLIN:  I'm going to object.  You are

15      just arguing at this point.

16     Q      Isn't it true, ma'am, that what he said to

17  you was, quote, We're all team players and you have

18  to be a team player, close quote?

19          MR. KARLIN:  I'll object.

20     A      Yeah.  You interpret I have to be a team

21  player as meaning what repercussions will come if I

22  continue on questioning with this policy.

23     Q      So you took that to mean that if you

24  continued questioning the hospital's policy on why

25  you weren't reimbursed for participating in the

163

1   preceptorship program that there might be

2   reprecussions?

3            And why I was treated differently, there

4   might be repercussions, yes.

5       Q    That's how you interpret the distinction he

6   made to you?

7       A    Yes.

8       Q    Now, paragraph 12 of your complaint states

9   that since you complained both verbally, orally and

10  in writing you have been retaliated against by having

11  your work closely monitored, by having your job

12  threatened, by an unfounded reprimand, by attempting

13  to have an employee provide a false statement against

14  you.

15           Is that all true?

16      A    Yes.

17      Q    What I'd like you to do is, Miss Diaz, is

18  tell me, please, the different instances or events

19  that you believe were acts of retaliation by Westside

20  against you after you started to raise concerns about

21  the preceptor program.

22           Now, we already talked about the written

23  reprimand.

24      A    Uh-hum.

25      Q    Okay?

1     A     Yes.

2     Q     How else -- anything about the written

3    reprimand that we haven't already discussed in terms

4    of why you believe it was a retaliatory act against

5    you?

6           MR. KARLIN:  Do you have anything else to

7       add?

8     A     Regarding this?

9     Q     The reprimand.

10          MR. KARLIN:  Just the written reprimand.

11    A     Let me just make sure.

12          No.

13    Q     All right.  Tell me the next act or event

14   or instance at the hospital which you believe was an

15   act of retaliation against you.

16    A     I watched Mrs. Wakat and Mrs. Jutras go

17   into a room that was assigned to me.  I watched them

18   see who the nurse, the assignment was, saw them go

19   into a room, put on the light and see how long I

20   would take to go get in the room and answer the

21   light.

22    Q     All right, so this was a room of a patient

23   that was assigned to you?

24    A     Yes.

25    Q     And by light you mean when the patient puts

165

1  on the nurse's light to indicate they need help?

2      A      Yes.

3      Q      All right.  And you saw Miss Wakat and Miss

4  Jutras go in and saw them turn on the light to see

5  how long it would take for you to respond?

6      A      Yes.

7      Q      Why do you believe that was an act of

8  retaliation?

9      A      Because that room was empty.

10     Q      And why do you believe that was an act of

11 retaliation other than the fact that the room was

12 empty?

13     A      If you take too long, you could get

14 verbally reprimanded for that.  I mean, they still

15 consider that as a patient that's in need, but they

16 only did that to me.

17     Q      Well, do you know if they ever did that

18 type of test to other nurses at the hospital?

19     A      After, after the fact they have done, they

20 instituted a program called patient representatives

21 that do that now, but back then that program wasn't

22 in existence.

23     Q      Do you know if Miss Wakat or Miss Jutras

24 ever did a similar type of test to other staff nurses

25 to see how long they would respond to a nurse's

1   light?

2        A       No.

3        Q       No, you don't know, or no, they never did?

4        A       Before that time, no, I never saw them do

5   that.

6        Q       That's what you saw.  But do you know, do

7   you know or have any knowledge as to whether they did

8   that to other nurses within the hospital?

9        A       No, not at that time.

10       Q       So you don't have have that knowledge?

11       A       No.

12       Q       Do you know how many nurses there were,

13  staff nurses there were at Westside back in 1999?

14       A       For a whole 24 hours?

15       Q       Yes.  Full-time employees.

16       A       No.

17       Q       Were you ever reprimanded as a result of

18  this instance that you've related to me, ma'am, when

19  Miss Wakat and Miss Jutras went into an empty room

20  and turned on the nurse's light to see how long it

21  would take you to respond?

22       A       No, because I responded appropriately.

23       Q       So you never suffered adversely from that

24  test that they performed of you?

25       A       No.  That was just one of other tests.

167

1     Q     Okay.  Well, I'm just trying to understand

2     what actions were taken that you believe are

3     retaliation.

4            So we talked about the written reprimand

5     and we talked about this instance where Miss Wakat

6     and Miss Jutras turned on the nurse's light to see

7     how long you would respond.

8            What other conduct or acts of the hospital

9     do you believe were acts of retaliation against you?

10    A     Looking, monitoring my charts more closely,

11    signs off charts that I would document on.

12    Q     Who was it that would have monitored your

13    charts more closely?

14    A     It would have been Miss Wakat.

15    Q     Were you ever reprimanded or disciplined in

16    connection with the work that you did on your patient

17    charts?

18    A     No.  Because there was rarely really

19    nothing wrong with them because I stayed there so

20    long trying to make sure everything was okay so I

21    wouldn't get in trouble.

22    Q     So you never suffered any adverse

23    consequences for the fact that you believe Miss Wakat

24    was monitoring your charts more closely?

25           MR. KARLIN:  I'm going to object, form.  Go

168

1          ahead, answer it.

2      A      She was monitoring my charts more closely.

3      Q      I understand, I understand that you believe

4   that.

5          My question is whether you ever suffered

6   any adverse actions as a result of the fact that

7   Miss, you believe Miss Wakat was monitoring your

8   charts more closely.

9          MR. KARLIN:  I'm going to object.  She's

10          answered the question, but I'll allow her to

11          answer it a second time.

12     A      Besides the mental aspect of I better chart

13   that or I'll get in trouble or I better chart or I'll

14   get in trouble, having that to carry on your

15   shoulders too?

16     Q      Yes, ma'am.  How have you suffered?

17     A      That part.

18     Q      You suffered emotional distress because you

19   believe Sue Wakat was monitoring your charts more

20   closely, is that your testimony?

21     A      Yes.

22     Q      Other than this emotional stress you

23   suffered, did you suffer any other consequences to

24   the fact that you believe Miss Wakat was monitoring

25   your charts more closely?

1      A      Who came to me?

2             A PCA came to me asking me what kind of

3    team leader, said that, they were asking me what kind

4    of team leader am I, am I a good team leader.  It's

5    just not making me feel I was doing what I needed to

6    be doing, asking other people questions about me.

7      Q      Is that part of the emotional stress you

8    suffered?

9      A      Yes.

10     Q      What I'm trying to find out now is how else

11   you suffered as a result of the fact you believe Miss

12   Wakat was monitoring your charts more closely.

13            MR. KARLIN:  Just to make it clear, when

14       you say adverse conduct, you mean a tangible

15       like a written counseling or something like

16       that?

17            MR. del RUSSO:  Any way.  Any way that she

18       suffered, either tangible or intangible.

19            MR. KARLIN:  Other than the emotional

20       distress?

21            MR. del RUSSO:  She already told us about

22       that.  Yes.

23     A      No.  That had a lot to do with it.

24     Q      I'm sorry?

25     A      No.  That had a lot to do with it.

1      Q      All right.  How else do you believe the
2    hospital retaliated against you in connection with
3    the claims you've raised in this lawsuit?
4            Excuse me.  Should I add the Mr. Chaykin's
5    denial of your grievance and his comment to you
6    concerning being a team player?  I think we discussed
7    that.  I just want to make sure that we completed the
8    list.
9            Did you perceive that as an act of
10   retaliation?
11           MR. KARLIN:  You have to answer verbally.
12     A     Yes.
13     Q     We've already discussed that so I'm going
14   to add that to our list, and tell me how else you
15   believe the hospital retaliated against you in
16   connection with this lawsuit.
17     A     I remember when I was trying to assist
18   Marlene McKay doing charge during the hurricane
19   season, during a hurricane, and they really didn't
20   want me to set up and charge but no one would tell me
21   why.
22     Q     You volunteered to assist?
23     A     I've helped her before so I'm familiar with
24   the routine on what to do.
25     Q     And what was that area that you were --

171

1       A       Charge nurse, assist the charge nurse.

2       Q       As a charge nurse, and they said to you you

3   didn't have to, it wasn't necessary?

4       A       I was told you don't have to.  Don't do it,

5   don't do it, but then when I get up to the floor,

6   co-workers were, like, you need to help Marlene out,

7   you need to help her out, because she was sick again

8   at that time.

9       Q       Why do you believe that was an act of

10  retaliation?

11      A       They didn't want a troublemaker at the

12  nurses' station.

13      Q       Who is "they"?

14      A       "They" meaning managers, administration.

15      Q       All right.  Who?  You are talking about

16  dates that Marlene McKay would have been ill and

17  physically not present?

18      A       She was present.

19      Q       But she needed someone to help her?

20      A       She needed someone to help her because it

21  was hurricane season.  When they call hurricane,

22  hurricane watch, that means other beach area

23  hospitals close and they come to us.  It means a

24  64-bed wing all of a sudden is an 80- and 70-bed wing

25  with one charge nurse taking care of all those

1 charts.

2     Q     So do they then assign two charge nurses?

3     A     That was what they were supposed to do,

4 yes.

5     Q     When you say "they were supposed to," you

6 mean there is a policy that says in that event there

7 are two charge nurses assigned to the floor?

8     A     Yes, and my name was by that in the

9 original hospital prehurricane sheet list and when I

10 got there they said you don't need to do that.

11     Q     Who said that to you?

12     A     I don't remember.  I know there was a

13 sign-in sheet that you have to sign in, and Miss

14 Mathis was there and Mrs. Wakat was there.

15     Q     Wasn't it Marlene McKay who decided who the

16 other charge nurse was going to be during those

17 assignment dates?

18     A     No, not during a hurricane time.

19     Q     Then who did?

20     A     Like I said, there is also pre, there is a

21 hurricane list and it's a pre and post and I had my

22 name up there already besides charge along with McKay

23 for days and then it goes to evenings and then there

24 is an evening charge nurse and a helper for that.

25     Q     Were there any other people whose name were

173

1    up as alternate charges?

2        A       Marlene, but she wasn't there.

3        Q       Do you know who made the decision on

4    whether to use you or not use you as a charge nurse

5    during the hurricane season, during the hurricane

6    warning or whatever the period was?

7        A       During -- I wasn't supposed to but I went

8    there and helped Marlene anyway.

9        Q       Do you know who made the decision not to --

10       A       No, I do not.

11       Q       How did you suffer adversely as a result of

12   what you just told me, that is, that you had offered

13   to cover as the second charge nurse but they told you

14   you didn't have to?

15       A       I guess that would be emotional.  I mean,

16   feelings were hurt.  I'm a good nurse.  I do my job

17   and I do it very well.  I just interpret it as, like

18   I said, they don't want a troublemaker sitting out

19   there --

20       Q       Other than the fact your feelings were

21   hurt, how else did you --

22       A       Embarrassed.

23       Q       Okay.  How else?

24       A       I got humiliated, degraded feeling.  You

25   feel this big.

174

1    Q    We're all talking about emotional issues.

2  Any other way you suffered other than the emotional

3  stress or distress?

4    A    No, not that I can recall.

5    Q    Did you ever apply for a promotion when you

6  worked at Westside?

7    A    I think I only applied for the tele course

8  and that's it.

9    Q    Didn't you at one point also seek to

10  transfer to the OR?

11    A    That was when I first got there, a long

12  time ago.

13    Q    Other than the tele course, did you ever

14  apply for a promotion at the hospital?

15    A    I don't think so.

16    Q    Did any of your supervisors ever make a

17  racially offensive comment to you?

18    A    No.  Not that I can recall.

19    Q    Did you ever receive an evaluation while

20  you were at the hospital which was not accompanied by

21  a pay raise?

22    A    No.  I received an evaluation that

23  contradicted itself in many places.

24         (Defendants' Exhibit 21 was marked for

25      identification.)

1     Q      Let me show you what I've marked as Exhibit

2     21.   It appears to be an evaluation through September

3     1999.   I'm going to ask you to please leaf through

4     that and tell me if you recognize that as your next

5     annual evaluation.

6             MR. KARLIN:   It's a long document.   Is

7         there a specific question you have for her?

8     Q      Do you recognize that as your next annual

9     evaluation?

10            MR. KARLIN:   You have to answer.

11    A      Yes.

12    Q      Is that your signature, Miss Diaz, at the

13    bottom of page 19?

14    A      Yes.

15    Q      Did you receive a pay raise or a pay

16    increase in connection with this evaluation?

17    A      Yes.

18    Q      Do you know who did this evaluation?

19    A      I had the meeting with Sue Wakat.

20    Q      Do you know if Marlene McKay filled in some

21    of the numbers for this evaluation as she had done in

22    the prior year's evaluation?

23    A      I would assume so.

24            MR. KARLIN:   Don't assume.   If you know,

25        you know.   If you don't know, you don't know.

1        A       I don't know a hundred percent.

2        Q       Do you know if she wrote any of the

3   comments on this evaluation?

4                MR. KARLIN:  Are you asking her if she

5           recognizes her handwriting?

6        Q       Do you know if she wrote any of those

7   comments?

8        A       Some of these are written by both.

9        Q       Did you feel this evaluation was fair?

10       A       This one, no.

11       Q       All right.  I'd like to ask you to turn

12   back to page number 5.  I'm going to skip around a

13   bit on it.

14                Looking at those evaluation numbers on that

15   page, the threes and the fours as an example, did you

16   feel that those specific evaluations were fair?

17                MR. KARLIN:  Just on page 5 you mean?

18                MR. del RUSSO:  Yes.

19                MR. KARLIN:  The question is are the

20          ratings on page 5 fair.  That's what he's

21          asking.

22       A       Yes.

23       Q       Now skip over to page number 15.  Do you

24   see the item number one which reads, quote,

25   Consistently demonstrates as positive attitude, and a

1   number one is circled?

2             Did you feel that rating was fair?

3      A    No.

4      Q    What do you recall -- why don't you feel

5   that was fair?

6      A    This contradicts itself in the writing that

7   says I'm a good preceptor and get along well with

8   others.

9      Q    And where is that?

10     A    In the writing in the summary of

11  strengths.  You can't be both.  You can't have a

12  negative attitude and orient someone new and end up

13  being a good hospital employee, that turns out.

14     Q    You are referring to the comment in summary

15  of strength under B which reads, quote, Serves as a

16  preceptor for new employees, orientees and nursing

17  students.

18            Is that the comment you are referring to?

19     A    Yes.

20     Q    And you feel that that comment was

21  inconsistent with the suggestion that you don't

22  demonstrate a positive attitude?

23     A    Yes.

24     Q    Do you recall anything that Miss Wakat said

25  to you when you met with her and discussed this

1  evaluation?

2      A      She changed one of the answers.

3      Q      Which one?

4      A      That's what this whiteout -- I don't have

5  my paper here.  She whited out one of these.

6      Q      Which one are you referring to, what page?

7      A      Fifteen.  She whited out because it was an

8  eight and she moved it to a nine.  This was a

9  whiteout part.

10          MR. KARLIN:  I think you see it a little

11          bit in the Xerox.

12      Q      I see.  In other words, the sum of those

13  five rating categories she changed from an eight to

14  nine?

15      A      Right.  She changed one of the ones in one

16  through five.  She changed, number four I think she

17  changed.

18      Q      From a one to a two?

19      A      Yes.

20      Q      Was that something that you recall

21  discussing with her?

22      A      Uh-hum.  I remember discussing this page

23  with her.

24      Q      And she changed one of the ratings more

25  favorably for you?

1    A    Favorably but --

2         MR. KARLIN:  Speak up, please.

3    A    More truthful, yes.

4    Q    Would you agree it was a rating change that

5    turned out to be more favorable to you?

6    A    Yes.

7    Q    Do you recall anything else that you

8    discussed with Miss Wakat during your review of this

9    evaluation?

10    A    Yes.  I remember on that same page, I

11    remember discussing that page in further detail with

12    her.

13    Q    Do you recall any comments or criticisms

14    that she made to you during that meeting?

15    A    Yes.  She talked about one, that I wasn't

16    being a patient advocate, which I disagreed with

17    her.  I think that's what some of this writing is on

18    the back.

19         Two was my -- I guess she put down not

20    always maintain a positive attitude, and I said,

21    Well, that can't be if I have more accolades and

22    recommendations from patients and patients' families

23    in my chart than people have on this floor.

24    Q    Okay.  Anything else you recall that was

25    said at that meeting?

```
 1      A      And she told me what the total of my raise

 2  would be later.

 3      Q      All right.  You don't recall anything else

 4  that was discussed at that meeting?

 5      A      I asked her to make -- if I could make a

 6  photocopy and reply.

 7      Q      And did you?

 8      A      Uh-hum.  Yes.

 9      Q      Is that the written reply that's attached

10  to the evaluation?

11      A      Yes.

12      Q      Anything else you recall that was discussed

13  at your meeting with Miss Wakat concerning your

14  evaluation?

15      A      Not that I can recall.

16      Q      I want to go back, Miss Diaz, to the

17  conduct by the hospital that you claim was

18  retaliation and I want to ask you what other

19  instances of conduct you believe were instances of

20  retaliation.

21             We talked about the written reprimand that

22  you received from Miss Mathis.  We talked about how

23  Mr. Chaykin denied the grievance that you filed.  We

24  talked about how you believe Miss Wakat and Miss

25  Jutras were checking on you in connection with the
```

1    nurse's light and how you felt that Miss Wakat was

2    monitoring your charts more closely.

3           And we talked about how they wouldn't allow

4    you or they objected to your volunteering to assist

5    Miss McKay as a charge nurse during the hurricane

6    warning periods.

7           How else do you believe the hospital

8    retaliated against you?

9    A      I'll go to the second writeup.

10   Q      All right.  That was the instance with Miss

11   Fogarty?

12   A      Yes.

13   Q      That was the suspension?

14   A      Yes.

15   Q      We'll talk about that in a minute but I

16   just want to make sure I get an exhaustive list of

17   the instances which you believe are retaliation.

18          Other than the incident which led to your

19   being suspended, how else do you believe the hospital

20   retaliated against you?

21   A      Again, that would be going back, I guess,

22   on emotional when you would see everybody from

23   management come up, walk around the nurses' station

24   and just look at you.

25   Q      Any other way that you believe the hospital

182

1    retaliated against you?

2        A    No, not until we get to the second issue.

3        Q    I just want to run through a few documents

4    with you, Miss Diaz.

5             Now, was there a point in time in

6    connection with the issue of your being reimbursed

7    for participating in the preceptor program, do you

8    recall a point in time when the hospital offered to

9    reimburse you a certain amount of money?

10       A    Yes.

11            (Defendants' Exhibit 22 was marked for

12        identification.)

13       Q    Let me show you what I'm going to mark as

14   Exhibit 22, it's a letter dated November 5, 1999 from

15   Mr. Chaykin to you, ask you if you recall receiving

16   that letter.

17       A    Yes.

18       Q    Was that the first time that you learned

19   that the hospital was offering to reimburse you some

20   amount of money in connection with the preceptor

21   program?

22       A    I believe so, yes.

23       Q    Was that letter mailed to you or was it

24   handed to you by anyone?

25       A    It was handed to my stepfather who had a

183

```
 1   stroke.

 2        Q    At the hospital?

 3        A    No.  At my mailing address.

 4        Q    So someone delivered it to your home?

 5        A    Uh-hum.

 6        Q    That's a yes?

 7        A    Yes.

 8        Q    Was it someone from the hospital or was it

 9   the mailman?

10        A    I wasn't there.  I assume it was the

11   mailman.  I was not there.

12        Q    Well, did you receive that letter?

13        A    Yes.

14        Q    All right.  Now, do you know how the

15   hospital came up with the amount of $350?

16        A    No.

17        Q    Do you know, Miss Diaz, if that was the

18   amount that you initially had paid BCC to participate

19   in the preceptor program?

20        A    I don't remember the amount.

21        Q    Do you recall meeting with Mr. Chaykin in

22   connection with this letter and the hospital's

23   tendering you a check of $350?

24        A    Yes, I remember meeting with him.

25        Q    Was anyone else present at the meeting?
```

184

1     A     No.

2     Q     Did the meeting take place, if you recall,

3  before or after you received this letter which is

4  dated November 5, 1999?

5     A     The meeting happened before, before the

6  letter was mailed to me.

7     Q     Where did the meeting take place?

8     A     Mr. Chaykin's office.

9     Q     Was anyone else present?

10    A     No.

11    Q     Tell me as best you can recall what was

12  discussed by Mr. Chaykin and you at the meeting.

13    A     Through some research that Mrs. Jutras and

14  I don't know who, the manager of accounts payable,

15  they found that someone was reimbursed the fee from

16  BCC and that I was entitled to that, to that effect.

17    Q     Do you know who that someone was who they

18  found was reimbursed?

19    A     They didn't tell me.

20    Q     Was it your understanding, ma'am, that

21  that's why they were offering you a check for $350?

22    A     I didn't know what their motive was.

23    Q     Do you recall anything else that

24  Mr. Chaykin said at that meeting?

25    A     He read the letter to me, if that's what

185

1   you mean.  He read the letter to me.

2        Q      Oh, you hadn't received it at that point?

3        A      No.  He was reading it to me.  We were in

4   his office.  He was reading this to me, this letter

5   with the check attached to it.

6        Q      I thought the check was mailed to your --

7        A      It was mailed eventually because I told him

8   to hold on to the check.

9        Q      Oh, I see, so he had the original letter?

10       A      With the original check.

11       Q      And with the original check?

12       A      Uh-hum.

13       Q      And I take it you didn't accept the check?

14       A      That's correct.

15              (Defendants' Exhibit 23 was marked for

16        identification.)

17       Q      Let me show you what I've marked as Exhibit

18   23.  It appears to be an e-mail from you to

19   Mr. Chaykin dated November 5.  I'm going to ask you

20   if you recall sending that e-mail to him?

21       A      Yes.

22       Q      So he held on to the letter and held on to

23   the check at the conclusion of your meeting?

24       A      Yes.

25       Q      Why didn't you accept the check?

1    A    Because reimbursement wasn't what -- the

2    reimbursement for the course or where they got the

3    $350 from, I don't know where they got that from,

4    number one.

5         Number two, if it was for the course, it

6    wasn't for the whole amount of time that I

7    preceptored.

8    Q    What were you looking for?

9    A    I wasn't looking for -- I didn't expect

10   this.  I wasn't looking for this.

11   Q    I don't understand, ma'am.  Maybe it's my

12   shortcoming.

13        Mr. Chaykin offered you at that time a

14   check for $350 in connection with your participation

15   in the preceptorship program.  Is that a fair

16   statement?

17   A    Yes.  Okay.

18   Q    And you did not accept the check?

19   A    Right.

20   Q    What were you looking for that you were not

21   being offered by the hospital at that point in time?

22   A    It's not that I was looking for.  It's the

23   fact that my main concern was or issue that I brought

24   up with him is that those two nurses were paid for

25   the whole time of internship and I wasn't.

187

1    Q    So does that mean that you expected the

2  hospital to pay you for the time you spent for that

3  eight-week course or the nine-week preceptor course?

4    A    When I met with Mr. Chaykin on that day,

5  no.  I had no idea that this is what he called me

6  down from the nursing floor for to talk to me about.

7    Q    Not so much at that moment in time, Miss

8  Diaz, but I'm trying to determine from you since you

9  were not willing to accept $350 what it was that you

10  were looking to accept.

11        What were you willing to settle for in

12  connection with these issues you've raised concerning

13  your participation in that program?

14    A    At that time -- I don't know.  I don't

15  know.

16        (Defendants' Exhibit 24 was marked for

17      identification.)

18    Q    Let me show you what I marked as Exhibit

19  No. 24, it appears to be an e-mail from you to

20  Mr. Chaykin dated November 12, and ask you if you

21  recall sending that e-mail to him.

22    A    Yes.

23    Q    You recall sending that e-mail?

24    A    Yes.

25        (Defendants' Exhibit 25 was marked for

188

1           identification.)

2      Q     Let me show you what I'm going to mark as

3   Exhibit No. 25, it's two e-mails dated November 12,

4   and ask you if you recognize the bottom as an e-mail

5   you sent to Miss Mathis and the top as an e-mail

6   response which she made to you.

7      A     Yes.

8      Q     How was it that you had possession of

9   documents, accommodations as you've referred to them,

10  instead of them going to the human resources

11  department?

12     A     Because some of the patients, they come

13  back and send it directly to the floor or they, while

14  they are visiting their family member drop off the

15  card at the nurses' station or drop off a letter at

16  the nurses' station.

17     Q     And you kept those documents?

18     A     Yes.

19           (Defendants' Exhibit 26 was marked for

20       identification.)

21     Q     Let me show you what I've marked as Exhibit

22  26.  You may not have seen the top page but my

23  question to you ma'am is whether the subsequent pages

24  reflect that collection of documents that you were

25  asking Miss Mathis to put into your file.

1     A     Yes.  This is not all of them.

2     Q     Okay.  There are more?

3     A     Yes.

4     Q     Do you know where they are?

5     A     I have some with me but that's not all that

6  I gave her.

7     Q     Well, did you keep a copy of the set of

8  documents that you gave to Miss Mathis?

9     A     No.  I had the originals.  She made

10  photocopies of the originals.

11     Q     All right, now, before we talk about the

12  issue or the incident that led to your getting

13  suspended, I want to see if we've exhausted all the

14  acts by Westside which you believe were acts of

15  retaliation.

16          We talked about the written reprimand by

17  Miss Mathis and Miss Wakat.  We talked about how Mr.

18  Chaykin denied your grievance and made a comment

19  concerning whether you were a team player.  We talked

20  about Miss Wakat and Miss Jutras checking on a room

21  assigned to you in connection with how fast you

22  responded to the nurse's light.  We talked about how

23  you believe Miss Wakat was monitoring your charts

24  more closely than before.  We talked about how the

25  hospital did not allow you to assist Miss McKay as an

1    additional charge nurse, and now we're going to talk

2    about the incident which led to your being

3    suspended.

4         Are there any other acts or events of the

5    hospital, conduct by the hospital, which you believe

6    were acts of retaliation other than those?

7    A    No.  Other than those and what we're

8    getting ready to go to now.

9    Q    Other than those that I've just listed,

10   including the suspension, no other acts of

11   retaliation?

12   A    No.

13        THE WITNESS:  Can we take a break?

14        MR. del RUSSO:  Sure.

15        (A recess was taken.)

16   Q    Now, Miss Diaz, I'd like to talk now about

17   the incident which led to your being suspended.

18        You know who Wanda Fogarty is?

19   A    Yes.

20   Q    What was your understanding as to her

21   position at the hospital?

22   A    She's a manager of radiology.

23   Q    She didn't supervise you?

24   A    No.

25   Q    Had you, when you worked at Westside, had a

191

1    chance to observe any problems or incidents which

2    Miss Fogarty had with other employees?

3         A    Yes.

4         Q    Tell me about those.  What types of

5    incidents or problems would you have observed?

6         A    She would berate other employees in the

7    patient's room.

8         Q    Did you ever personally observe that?

9         A    No.

10        Q    You heard about that from others?

11        A    I heard about it from a person she did it

12    to.

13        Q    Who was the person she did it to?

14        A    Persons.

15        Q    Who were the persons that she did it to

16    that you heard that from?

17        A    Lisa.  I can't remember her -- I'm trying

18    to think of her last name.  Lisa is now the,

19    something with chemotherapeutic services, and Susan

20    Gorrell.

21        Q    Gorrell?

22        A    Yes.

23        Q    Lisa African-American?

24        A    No.

25        Q    What about Susan Gorrell?

192

1    A     No.

2    Q     All right.  What other incidents or

3  problems did you have an opportunity to observe or

4  hear of concerning Miss Fogarty's interaction with

5  other employees?

6    A     Not that I know of offhand.

7    Q     Prior to the incident at the end of January

8  of 2000 between you and Miss Fogarty, had you had any

9  problems or run-ins with her during the workday when

10  you were at Westside?

11    A     Not really, no.

12    Q     Can you describe for me as best you recall

13  the incident that took place at the end of January

14  2000 which ultimately led to you being suspended?

15    A     I was on the wing.  I was in a patient's

16  room about to start an IV and Wanda called me, Mrs.

17  Fogarty, called me out of the room and told me that a

18  patient needed to use the bathroom, and I was getting

19  ready to put this needle in another lady and I said,

20  You need to call somebody else, and she came back in

21  and said there isn't anybody else, that I need to go

22  over there and help this lady while I'm in the room

23  trying to start an IV on another patient.

24         So I stop what I'm doing.  I go into the

25  patient's room.  I help the patient, and by that time

193

1   Marlene McKay was coming down and I told her, you

2   know, she pulled me out of a patient's room.

3        I said something to the effect, She pulled

4   me out of the patient's room nastily and she's just

5   going to stand there, or something to that effect, to

6   help the patient, to get her out of the bathroom at

7   that time.  She was in the bathroom.  Get her out of

8   the bathroom, put her back to bed, and then I go and

9   finish doing what I was doing, start another IV on

10  another patient.

11       And the patient asked me was that the other

12  patient's daughter or something.  I said, No.  She

13  asked me why was she so nasty.

14       And then Susan, Susan Wakat, Sue Wakat

15  calls me to come to her office and she asked me what

16  happened, and I told her, I told her what I just said

17  before.  I said, If she's not going to help, all

18  she's going to do is stand there, then what is her

19  use?  What is her function?  What is she going to

20  do?  And then she asked me my side of things and then

21  said okay.

22  Q    Was that it?

23  A    Yes.

24  Q    Now, when you ran into Marlene McKay and

25  you said to her something to the effect, She, being

194

1    Wanda, just pulled me out of a patient's room and now

2    she's just going to stand there, when you said

3    that -- did I quote that approximately correctly

4    based on what you said to Miss McKay?

5        A    For the most part, yes.

6        Q    When you said that to Miss McKay was anyone

7    else in your presence?

8        A    No.  A patient was in the bathroom.  It was

9    me and Marlene in the patient's room, waiting for her

10   to get out the bathroom.

11       Q    When you made the comment later to Sue

12   Wakat what is she there for, was anyone else present?

13       A    Sue was there.  I said that to Sue.

14       Q    Other than Sue?

15       A    I said that to Sue.

16       Q    Was anyone else present?

17       A    No.  The door was open.

18       Q    Did you ever make a comment during that

19   incident to anyone to the effect, you know, what are

20   patient reps good for or what are they here for?

21       A    No.  I said what is she.

22       Q    You never made a comment concerning the

23   patient reps in a general sense, did you?

24       A    No.  I said what is she.

25       Q    All right.  What happened next in terms of

1   this event that ultimately led to your being

2   suspended?

3       A       Apparently Wanda had e-mailed Sue.  That's

4   why Sue called me in the office and Sue wrote up on a

5   disciplinary report along with Lynn Mathis, and then

6   I got called down to Lynn Mathis' office.  This

7   transpired later on that week.

8       Q       You mentioned that apparently Miss Fogarty

9   sent an e-mail to Sue.  Did you ever see that?

10      A       Yes.

11      Q       When would you have seen that?

12      A       Later.  She showed me the computer briefly

13  and then turned the computer back around.

14      Q       Who is "she"?

15      A       Sue.

16              (Defendants' Exhibit 27 was marked for

17       identification.)

18      Q       Let me show you what I marked as Exhibit 27

19  and ask you if you recognize that January 25 e-mail

20  from Wanda Fogarty to Deborah Brindly.

21      A       Yes.

22      Q       Is that the one that you had seen?

23      A       Yes.

24      Q       Who is, or in connection with Westside that

25  is, who was Deborah Brindly?

196

1    A    She, I think, I think she's the one that

2    had set up the patient rep program.

3    Q    All right, and was it later when you met

4    with Sue Wakat and Miss Mathis that you learned that

5    you were being suspended?

6    A    Yes.

7    Q    By the way, at the time that Miss Fogarty

8    sent that e-mail to Deborah Brindly and Sue Wakat, do

9    you know if Wanda Fogarty even knew that you had

10   filed a lawsuit against the hospital?

11   A    I don't know if she knew.

12   Q    Do you know if at that time she knew that

13   you had ever voiced complaints about not being paid

14   for your participation in the preceptor program?

15   A    I don't know if she knew that.

16        (Defendants' Exhibit 28 was marked for

17        identification.)

18   Q    Let me show you what I marked as Exhibit

19   28, which is the written suspension.

20   A    Yes, I remember this.

21   Q    Do you know if this was something that was

22   written up by Sue Wakat?

23   A    Yes.

24   Q    Did you refuse to sign this?

25   A    Yes.

197

1     Q     Now, at the bottom of the page do you see

2  right above and to the right of Sue Wakat's name

3  there appear to be initials MM?  Actually, I don't

4  know what they are.

5     A     Uh-hum.

6     Q     Do you know whose initials they are?

7     A     I think that's Mrs. Mathis' signature.

8     Q     That would be LM.

9           (Defendants' Exhibit 29 was marked for

10     identification.)

11    Q     Let me show you what I'm going to mark as

12 Exhibit 29.  It's a page of handwritten notes.  I'm

13 going to ask you, ma'am, after you've had a chance to

14 review them, whether these are notes that you had

15 written.

16          MR. KARLIN:  Is there a question pending?

17    Q     Do you recognize those as notes which you

18 have written?

19    A     Yes.

20    Q     Do you see in the second paragraph it says,

21 None of my witnesses again questioned, parenthesis M.

22 McKay?  Do you see that?

23    A     Yes.

24    Q     Who were the witnesses at the time that you

25 believe were not questioned?

198

 1    A    That was her.

 2    Q    Marlene McKay?

 3    A    Yes.

 4    Q    Anyone else?

 5    A    No, because it was only me and her in the

 6  room.

 7    Q    Why do you believe your writeup was an act

 8  of retaliation by the hospital?

 9    A    This is something that should have never,

10  shouldn't have gone to this level, didn't warrant

11  going to a writeup level.

12    Q    All right, but why do you believe it was an

13  act of retaliation?

14         MR. KARLIN:  I'll object.  She just

15       answered the question, but I'll allow her to

16       supplement it.

17    Q    Other than the fact that you believe that

18  it should not have gone to this level, as you stated,

19  is there any other reason why you believe that your

20  written suspension was an act of retaliation?

21    A    Yes.  What I said regarding this incident,

22  what I said to Sue was in her office, thinking it was

23  between me and her, what I was saying, not that she

24  was going to write up what I said to her about Wanda.

25    Q    Do you know if Wanda overheard it?

199

1    A    Overheard what?

2    Q    What you said to Sue in Sue's office?

3    A    I don't know.  The door was open.

4    Q    Do you know if anyone else might have

5    overheard your comments to Sue?

6    A    I don't know.

7    Q    Do you know if Dr. Sandler was present in

8    the hallway?

9    A    No.

10    Q    He was not present?

11    A    I did not see Dr. Sandler.

12    Q    All right.  Why else do you believe it was

13    retaliation by the hospital?

14    A    Because it was one more negative action

15    that they can place in my folder to make me look like

16    a bad employee.

17    Q    Any other reasons why you believe that the

18    written suspension was an act of retaliation?

19    A    Besides the humiliation that goes along

20    with it, the embarrassment that goes along with it.

21    Q    That's describing the consequences of it,

22    is it not?  I'm asking why you believe the hospital

23    suspending you was, in fact, an act of retaliation

24    against you.

25    A    One, because I already had a lawsuit

200

1    against them for discrimination, and two to make me

2    look like a bad employee.

3        Q    Do you know if Sue Wakat knew you had filed

4    a lawsuit against the hospital at that point in time?

5        A    At this point in time?

6        Q    At the time you were suspended.

7        A    Yes.

8        Q    How do you know she knew?

9        A    Because one day I was clocking out and she

10   was in her office talking to Debbie Weissman.  She

11   didn't know I was there and I had said something to

12   her and I was getting ready to leave and I came back

13   and I heard her tell Debbie that I'm suing the

14   hospital.  She didn't know I was there but I heard

15   her say it.

16       Q    When did that take place?

17       A    This was maybe in October, November.

18       Q    Of '99?

19       A    Yeah.

20       Q    So you heard her in October or November of

21   '99 make a comment to Debbie Weissman that you were

22   suing the hospital?

23       A    Yup.  Yes.

24       Q    All right.  Is there anything we haven't

25   already discussed in terms of why you believe your

1  suspension was retaliation, an act of retaliation by

2  the hospital?

3      A    Besides the fact that me suing them for

4  discrimination and them trying to make me appear to

5  look like a bad employee through this writeup that

6  didn't, shouldn't have never been a writeup.

7      Q    We already discussed those things, didn't

8  we?

9      A    Yes.

10      Q    Other than those things?

11          MR. KARLIN:  Do you have anything else to

12      add?

13      A    No.

14      Q    You filed a grievance, did you not, in

15  connection with your suspension?

16      A    Yes.

17          (Defendants' Exhibit 30 was marked for

18      identification.)

19      Q    Let me show you what I've marked as Exhibit

20  30 and ask you if you recognize that as a copy of

21  your February 2, 2000 grievance.

22          MR. KARLIN:  That's a yes?

23      A    Yes.

24      Q    Who did you deliver this to?

25      A    I don't remember if it was human resources

1    or Mr. Chaykin.  I don't remember.

2         Q    Do you know if anyone at the hospital did

3    any investigation into this grievance?

4         A    Mr. Chaykin.

5         Q    How do you know he did any investigation?

6         A    Because he replied.

7         Q    To this?

8         A    Yes.

9         Q    What was his reply?

10        A    I don't have the paperwork.  I think I have

11   a reply from him on this.

12        Q    All right, so your recollection is that he

13   filed a written reply to you to this grievance?

14        A    Yes.

15        Q    And what do you recall his reply was?

16        A    That he doesn't perceive any acts, any

17   retaliatory acts, and that my, me suing the hospital

18   is separate in and of itself, to that effect, and

19   that they won't remove the suspension from my file.

20        Q    Do you remember meeting at all with Kim

21   Jutras in connection with your suspension or in

22   connection with the incident itself, the underlying

23   incident involving Wanda Fogarty?

24        A    Yes, before she left, yes.

25        Q    Was that a meeting that you requested?

    1        A       I don't recall.  I know she was in the

    2   process of leaving the facility.

    3        Q       Tell me what you recall took place at that

    4   meeting.

    5        A       I really don't recall.

    6        Q       Do you recall anything that she might have

    7   said to you?

    8        A       I remember her telling me she wasn't going

    9   to be here much longer, that probably Mr. Chaykin

   10   would be handling this.

   11        Q       Other than that, you don't have any

   12   recollection as to what might have been said during

   13   that meeting?

   14        A       No, no.

   15                (Defendants' Exhibit 31 was marked for

   16         identification.)

   17        Q       Let me show you what I marked as Exhibit 31

   18   and ask you if you recognize that as a copy of a

   19   February 7 e-mail that you sent to Miss Jutras.

   20        A       Yes.

   21                (Defendants' Exhibit 32 was marked for

   22         identification.)

   23        Q       I show you what I'm marking as Exhibit 32

   24   to your deposition, ma'am, and ask you if you

   25   recognize this as a copy of a document that you

1    signed and filed with the Florida Commission on Human

2    Relations.

3        A    Yes.

4        Q    Take a moment, please, and read that to

5    yourself.  I'm going to ask you if after reviewing

6    this everything that appears in there as far as you

7    can recall is true and accurate.

8        A    Yes.

9            MR. KARLIN:  You have to answer.

10       A    Yes, it is.

11           (Defendants' Exhibit 33 was marked for

12        identification.)

13       Q    Now, ma'am, I'm going to show you what I

14    marked as Exhibit 33.  It appears to be a February 8

15    e-mail from you to Sue Wakat.  My question is going

16    to be whether you recall sending that e-mail.

17           MR. KARLIN:  Did you send that, that's the

18        only question.

19       A    Yes.

20       Q    Who did you send that to?  I said Sue Wakat

21    but I don't --

22       A    I sent it to four people.

23       Q    To Sue Wakat?

24       A    Myself.

25       Q    Marlene, and who was Alisha Ferguson?

1      A      Witness that was there.

2      Q      She was one of your co-workers?

3      A      Yes.

4      Q      What was the substance of the complaint you

5  were attempting to state in this e-mail?

6      A      This was sent on what we as nurses were

7  doing.  We were doing PCA duties, not doing dressing

8  changes, passing out meds, whatever we need to do,

9  because one of our other PCAs was on a wing sitting

10  with another patient, so there were going to be

11  complaints coming in from families and patients.

12      Q      All right.  Do the complaints that you are

13  raising in this e-mail have anything to do with the

14  issues you've raised in your lawsuit?

15      A      Yes, because I didn't want the complaints

16  to come back on me when I'm informing the nurse

17  manager and the charge nurse what's happening during

18  that time.

19      Q      No complaints did come back to you

20  concerning, from patients or patients' family members

21  concerning the fact that you felt you were being

22  overworked on that day?

23      A      Verbal complaints.  Still, yeah.

24      Q      Are you claiming in this lawsuit that you

25  were given excessive work to retaliate against you

206

1    for the issues you've raised?

2        A      No.  This is just documenting what I did

3    that day because I felt that maybe the complaints

4    would be transpired toward me, transferred to me.

5        Q      But that never happened, did it?

6        A      Not that I know of.

7        Q      Now, you did resign from your employment at

8    Westside.  Isn't that correct?

9        A      Yes.

10       Q      You would agree with me that you weren't

11   fired, were you?

12       A      No.  I resigned.

13       Q      And explain to me why you chose to leave

14   your employment at Westside.

15       A      Going to Westside under the issues that I

16   was going was no longer a happy situation for me.  I

17   felt like every time I punch in all eyes were on me;

18   one little mistake that I might make, would this be

19   it.

20              I never was fired from any position and I

21   didn't want to be fired from something that really is

22   not my fault.

23              There used to be days where I used to wake

24   up at five or four in the morning before I go to

25   Westside to get prepared to go to Westside mentally.

1          (Defendants' Exhibit 34 was marked for

2      identification.)

3      Q    Let me show you what I've marked as Exhibit

4  34, it appears to be a letter dated March 14, 2000,

5  ask you if you recognize that as a copy of your

6  letter of resignation.

7      A    Yes.

8      Q    Is that your signature?

9      A    Yes.

10      Q    How did you deliver that letter to the

11  hospital?

12      A    I went to the administration and handed it

13  to the nursing supervisor.

14      Q    Who was the nursing supervisor that you

15  handed it to?

16      A    His name is Chuck.

17      Q    Chuck?

18      A    I don't remember his last name.

19      Q    On the fourth floor?

20      A    No.  Nursing supervisor's office, the

21  supervisor of the whole hospital.

22      Q    You went to the nursing administration

23  office?

24      A    It's two different supervisors' office.

25  This is on the first floor.

208

1    Q    Did you also post a copy of that letter on

2    the mirror in the nurses' lounge?

3    A    No.

4    Q    So you brought one copy with you when you

5    handed it in?

6    A    I brought two copies, one for Chuck and one

7    for Sue.

8    Q    Did you hand one for Sue?

9    A    No, I did not hand one to Sue.

10    Q    Why not?

11    A    She was not there.

12    Q    What did you do with the copy that you

13    brought for Sue?

14    A    That was sealed shut and put on her door.

15    Q    You sealed it and taped it on her door?

16    A    Yes.

17    Q    Did you give any notice to the hospital

18    concerning your decision to leave?

19    A    No.

20    Q    So were you scheduled to work on the day

21    that you went in and handed this note?

22    A    I think so, yes.

23    Q    All right, so you were scheduled to work on

24    this day and instead you went in in the morning and

25    handed your note of resignation effective

1    immediately?

2       A       No.  I called and spoke to Chuck, told him

3    I won't be coming to work but I will be in later.

4       Q       Well, when did you physically show up at

5    Westside and hand out these notes?

6       A       I came in around 7:30 but I called him like

7    around four in the morning.

8       Q       Four in the morning, to tell him that you

9    weren't going to be there, so the hospital could

10   cover for the fact you weren't going to be there?

11      A       That's right.

12      Q       So you gave a couple hours' notice?

13      A       Yes.

14      Q       Were you dressed in scrubs when you came

15   in?

16      A       No.  I was dressed in dress clothes.

17      Q       When did you start your employment at

18   Hollywood Medical Center?

19      A       I think the class started later on that

20   day, the next day.

21      Q       So you had applied for a job at Hollywood

22   before you decided to resign your employment at

23   Westside?

24      A       Yes, I applied there before.

25      Q       There was no period of time in which you

1    were unemployed, there was no gap between the time

2    you left Westside and the time you began at

3    Hollywood?

4         MR. KARLIN:  I think this was covered on

5         the first depo but go ahead and answer the

6         question.  Do you understand the question?  Did

7         you go from one job to the next job or was there

8         any time in between that you had?

9    A    No.  There was no time.

10   Q    No, there was no time?

11   A    No.

12        (Defendants' Exhibit 35 was marked for

13        identification.)

14   Q    I show you, ma'am, a copy of a document I'm

15   going to mark as Exhibit 35.  It appears to be a

16   March 1, 2000 application for employment at Hollywood

17   Medical Center.  I ask you if you recognize that as

18   the application that you filed.

19   A    Yes.

20        (Defendants' Exhibit 36 was marked for

21        identification.)

22   Q    Let me show you a document that I'm marking

23   Exhibit 36, appears to be a March 3, 2000 letter from

24   Hollywood Medical Center to you, and ask you if you

25   recall receiving that letter from Hollywood Medical

1    Center.

2        A    Yes.

3        Q    Is that your signature at the bottom?

4        A    Yes.

5        Q    Did you sign that the day you began

6    working?

7        A    No.

8        Q    Now, when you began working at Hollywood

9    Medical Center you started by participating in their

10   CCU preceptor program.  Is that a fair statement?

11       A    Yes.

12       Q    And we talked about that a little bit

13   earlier, and you told me that you were paid for your

14   participation in that program, were you not?

15       A    Yes.

16       Q    Isn't it true, Miss Diaz, that you agreed

17   with Hollywood Medical Center that you would, as a

18   condition for participating in that program you would

19   agree to remain an employee at Hollywood Medical

20   Center for at least two years?

21       A    Yes.

22            (Defendants' Exhibit 37 was marked for

23       identification.)

24       Q    I'm going to show you a document I marked

25   as Exhibit No. 37, ask you if you recognize that

212

1   agreement and promissory note.

2       A     Yes.

3       Q     The first page, is that your signature at

4   the bottom?

5       A     Yes.

6       Q     And on the second page, the promissory

7   note, is that your signature as well?

8       A     Yes.

9       Q     Is it your understanding, Miss Diaz, that

10  the arrangement you had made with Hollywood Medical

11  Center is that you would remain an employee for two

12  years?

13      A     Yes.

14      Q     And in the event you did not remain an

15  employee you would be obligated to repay some or all

16  of the charges for attending the CCU course?

17      A     Yes.

18      Q     How have -- in connection with the claims

19  you've raised in this lawsuit, I'd like you to

20  explain for me as best you can how you believe you've

21  been injured or damaged by the actions of Westside

22  Regional Medical Center.

23      A     Well, when I was discriminated against I

24  asked questions.

25          MR. KARLIN:  I think the question is a pain

213

1          and suffering kind of --

2     Q     Tell me about --

3          MR. KARLIN:   -- damages.

4     Q     Let me ask you this way:  You claim in your

5  lawsuit that as a result of the claims you've raised

6  you suffered a substantial amount of stress and

7  emotional harm.  Is that a fair statement?

8     A     Yes.

9     Q     Tell me as best you can how you suffered

10 stress and emotional harm as a result of the conduct

11 of Westside that you are complaining about in this

12 lawsuit.

13    A     My whole demeanor and attitude changed

14 towards nursing.  I used to wake up happy to go to

15 work at Westside.  Instead, like I said before, I

16 would wake up four o'clock thinking, what are they

17 going to do, what do I have to watch, what do I have

18 to be on my extreme Ps and Qs today?

19          The embarrassment of suspension.  What

20 happened to you, Coreen?  Oh, I heard what happened,

21 or the looks that you would get.

22          The stress.  Sometimes the stress carried

23 on to Hollywood Medical Center when I was in class

24 because I wouldn't think about what I was doing.  I

25 was thinking about how am I going to pay

214

1    Christopher's daycare because you still had to wait

2    two weeks before you get a check.  How am I going to

3    pay this?

4              There was a lot.  Knowing that you wouldn't

5    work with a good group of people anymore that really

6    truly cared about the patient.  Not about the money.

7              That's it.

8    Q    Would you agree with me, Miss Diaz, that

9    other than your conversation with Dr. Saez, Roberto

10   Saez, you have not consulted with any doctors or

11   therapists concerning any physical or mental symptoms

12   which you believe are the result of the actions of

13   Westside?

14   A    No, I couldn't.  I didn't have any more

15   insurance after I quit so...

16   Q    So your answer is no?

17   A    Yes.

18   Q    You have insurance now?

19   A    Yes.

20   Q    You've had insurance since June?

21   A    Yes.

22   Q    What about in terms of economic damages, do

23   you claim you suffered financially as a result of the

24   claims you've raised in this lawsuit?

25   A    Yes.

1    Q    How have you suffered financially?

2    A    I had to borrow money from my parents and

3    my aunt to pay certain bills during that time, during

4    the time when I was suspended also.

5    Q    How long were you suspended for?

6    A    Three days.

7         My phone was cut off.

8    Q    Are you saying that the reason your phone

9    was cut off was because you didn't get paid while you

10   were suspended?

11   A    All this, it was all of this happened.

12   Q    Well, would you agree with me that you make

13   more money at Hollywood Medical Center than you were

14   making at Westside?

15   A    In terms of hourly rate, yes, but not in

16   terms of I worked more hours at Westside than I do at

17   Hollywood Medical Center.

18   Q    So you also get a shift differential at

19   Hollywood Medical Center, don't you?

20   A    Yes.

21        MR. KARLIN:  I'll object.  The numbers are

22        going to be the numbers.

23   Q    Do you have an opportunity at Hollywood

24   Medical Center to work overtime?

25   A    Yes, you do, but twelve hours is a lot when

1    you have a little kid, an extra twelve-hour shift.

2        Q    What about the other four days when you are

3    not working, do you have an opportunity to put in for

4    overtime on those days?

5        A    Yes.  That's what I was alluding to.

6        Q    Okay.  Do you keep copies of your federal

7    income tax returns?

8        A    Uh-hum.  Yes.

9        Q    The reason I'm asking, ma'am, is I have

10   requested them in discovery and I didn't receive

11   them.

12           How far back do your copies go?

13       A    I don't know.  I would have to look.  I

14   have a couple copies.

15           MR. del RUSSO:  Perhaps that is something

16       we can discuss between counsel later.

17           All right, ma'am, I have no further

18       questions.

19           CROSS-EXAMINATION

20   BY MR. KARLIN:

21       Q    I have one question, I'm sorry.

22           You had covered the acts of retaliation.

23   In looking at Defendants' Exhibit 21, do you believe

24   that giving you a one on positive attitude is an act

25   of retaliation?

1    A    Yes.

2         MR. KARLIN:  Okay.  I have nothing

3    further.

4         MR. del RUSSO:  Okay.  I'm done.

5         (At 2:30 p.m., the deposition was

6    concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

218

1    STATE OF FLORIDA

2

3    COUNTY OF PALM BEACH

4

5        I, BARBARA DE SIMONE, the undersigned

6    Notary Public, in and for the State of Florida,

7    hereby certify that COREEN DIAZ personally

8    appeared before me and was duly sworn.

9

10       WITNESS my hand and official seal

11   this 2nd day of November, 2000.

12

13

14

15   _Barbara DeSimone_

16   BARBARA DE SIMONE

17   Notary Public, State of Florida

18   My Commission No.: CC735188

19   Expires:  April 19, 2002

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

   STATE OF FLORIDA

3

   COUNTY OF PALM BEACH

4

5        I, BARBARA DE SIMONE, Registered Professional
   Reporter, do hereby certify that I was authorized to
6  and did stenographically report the foregoing
   deposition; and that the transcript is a true and
7  correct transcription of the testimony given by the
   witness.

8

         I further certify that I am not a relative,
9  employee, attorney or counsel of any of the parties,
   nor am I a relative or employee of any of the
10 parties' attorney or counsel connected with the
   action, nor am I financially interested in the
11 action.

12

         Dated this 2nd day of November, 2000.

13

14

15       BARBARA DE SIMONE
         Registered Professional Reporter

16

17

18

19

20

21

22

23

   The foregoing certification of this transcript does
24 not apply to any reproduction of the same by any
   means unless under the direct control and/or
25 direction of the certifying reporter.

# LAWYER'S NOTES

| Page | Line | |
|------|------|---|
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |
|      |      |   |

# APPLICATION FOR EMPLOYMENT

COLUMBIA/HCA HEALTHCARE CORPORATION AND ITS AFFILIATED SUBSIDIARIES ARE EQUAL OPPORTUNITY EMPLOYERS. WE DO NOT DISCRIMINATE ON THE BASIS OF RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY OR VETERAN STATUS.

Select the facility to which you are applying:

- ☐ **COLUMBIA** Northwest Medical Center
  2801 N. State Road 7
  Margate, Florida 33063
  Telephone (954) 978-4050

- ☐ **COLUMBIA** Plantation General Hospital
  401 N.W. 42nd Avenue
  Plantation, Florida 33317
  Telephone (954) 797-6450

- ☑ **COLUMBIA Westside Regional Medical Center**
  8201 West Broward Boulevard
  Plantation, Florida 33324
  Telephone (954) 476-3996

15951

## PERSONAL

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Brown-Diaz | Coreen | M |

PRESENT ADDRESS: 401 NW 116st #IBAC   CITY: Lauderhill   STATE   ZIP 33311

HOME PHONE: 463-1213   CITY   STATE   ZIP

ALTERNATE PHONE: 705-4770

SOCIAL SECURITY NO. 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

ARE YOU LEGALLY ELIGIBLE FOR EMPLOYMENT IN THE UNITED STATES? YES ☑ NO ☐

PERMANENT ADDRESS   STREET: Same

IF NO, WHAT IS YOUR IMMIGRATION STATUS?

DATE VISA EXPIRES

OTHER NAMES UNDER WHICH YOU HAVE BEEN PREVIOUSLY EMPLOYED: Coreen Brown

NAMES OF FRIENDS OR RELATIVES EMPLOYED BY NMC/PGH/WRMC?

HAVE YOU EVER APPLIED HERE BEFORE? YES ☐ NO ☑   IF YES, WHEN?

HAVE YOU EVER BEEN EMPLOYED BY NMC/PGH/WRMC? YES ☐ NO ☑   IF YES, WHEN?

ARE YOU OF THE LEGAL AGE TO WORK? YES ☑ NO ☐

HAVE YOU EVER BEEN CONVICTED OF A FELONY? YES ☐ NO ☑ OR HAD ADJUDICATION WITHHELD? YES ☐ NO ☑

IF YES, LIST DATES, OFFENSES, AND DISPOSITIONS (CONVICTIONS ARE NOT AN IMMEDIATE DISQUALIFICATION FROM EMPLOYMENT).

## EMPLOYMENT INTEREST

POSITION APPLYING FOR: PCA

DATE AVAILABLE: immediately

SALARY EXPECTED: 7.50 - 8.50

CAN YOU WORK WEEKENDS? YES ☑ NO ☐   CAN YOU WORK ROTATING SHIFTS? YES ☐ NO ☐

HOW WERE YOU REFERRED TO NMC/PGH/WRMC? ☐ JOURNAL AD ☐ CLASSIFIED AD ☐ WALK-IN ☐ CAREER FAIR ☐ EMPLOYEE ☑ OTHER, SPECIFY: Job-Hotline

FULL TIME ☑   PART TIME ☐   POOL ☐

DAYS ☐   EVENINGS ☑   NIGHTS ☐ } Weekends

## EDUCATION SKILLS LICENSES

| School | Name and Location of School | Course of Study | No. of Years Completed | Did you Graduate? | Degree / Diploma |
|---|---|---|---|---|---|
| High School | Boyd Anderson, Lauderdale Lakes, Fl | General Studies | 4 | YES ☑ NO ☐ | Diploma |
| Business/Trade/Technical | P.C.A., Oakland Park, Fl | P.C.A | 12 wks | YES ☑ NO ☐ | Diploma + CNA certificate  5/97 |
| College | B.C.C., Davie, Fl | Nursing | 2 yrs | YES ☐ NO ☑ | CNA certificate Graduate |
| Graduate | | | | YES ☐ NO ☐ | |

HAVE YOU EVER SERVED IN U.S. ARMED FORCES? YES ☐ NO ☑   BRANCH OF SERVICE   DATES   ANY SPECIALIZED TRAINING?

DO YOU HOLD ANY PROFESSIONAL LICENSE OR CERTIFICATION? YES ☑ NO ☐   TYPE: CNA certification

NUMBER: D2893-1612846939   STATE: Fl   EXPIRATION DATE: N/A

INDICATE YOUR PREFERENCE:

CLINICAL:
☐ I.C.U.
☐ MED/SURG
☐ ORTHOPEDIC
☑ NURSERY
☐ OB/GYN
☑ EMERGENCY ROOM
☐ OPERATING ROOM
☐ PEDS
☐ POST PARTUM
☐ SUPERVISION
☐ INSERVICE

MAINTENANCE/SECURITY:
☐ BOILER
☐ CARPENTRY
☐ ELECTRONICS
☐ SAFETY
☐ OTHER

CLERICAL:
☐ DATA ENTRY
☐ MEDICAL TRANSCRIPTION
☐ SHORTHAND (WPM)
☐ BOOKKEEPING
☐ SWITCHBOARD
☐ COMPUTER

OTHER SKILLS OR QUALIFICATIONS WHICH WOULD BE OF INTEREST TO NMC/PGH/WRMC: I am a hardworking, very sincere & caring person

DEFENDANT'S EXHIBIT

## EMPLOYMENT HISTORY

LIST CURRENT OR MOST RECENT EMPLOYER FIRST. EXPLAIN ALL PERIODS OF UNEMPLOYMENT. USE ADDITIONAL SHEETS IF NECESSARY TO RECORD ALL PAST EMPLOYMENT.

| | | MAY WE CONTACT YOUR PRESENT EMPLOYER? ☐ Yes ☒ No |
|---|---|---|

**COMPANY NAME (FIRST OR LAST):** Universal Medical Center
**ADDRESS:** 6701 W. Sunrise Blvd
**TELEPHONE:** 954-581-7800
**DATES EMPLOYED FROM:** 87 05/94 **TO:** 8/95
**JOB TITLE:** PCA
**SUPERVISOR'S NAME/TITLE:** Catherine Hendricks
**TYPE OF BUSINESS:** Hospital
**BASE RATE OF PAY START:** 11.50 per hr
**DESCRIPTION OF DUTIES:** Assisting pts c VS, ADLS, baths, feedings, providing safe environment **REASON FOR LEAVING:** Returned to school

**COMPANY NAME:** National Health Care **ADDRESS:** 2000 E. Commercial Blvd **TELEPHONE:** 954-771-3300
**DATES EMPLOYED FROM:** 3/93 **TO:** 11/93
**JOB TITLE:** CNA **SUPERVISOR'S NAME/TITLE:** Ms. Loserenberg **TYPE OF BUSINESS:** Nursing Home
**BASE RATE OF PAY START:** 6.50 **ENDS:** 6.80 per hr
**DESCRIPTION OF DUTIES:** Aided residents in ADLs providing care & safety for residents difficulty c pregnancy **REASON FOR LEAVING:**

**COMPANY NAME:** Bls **ADDRESS:** 1400 N. State Rd 7 **TELEPHONE:** 954-
**DATES EMPLOYED FROM:** **TO:** 10/91
**JOB TITLE:** Sales Associate **SUPERVISOR'S NAME/TITLE:** Perry Fink **TYPE OF BUSINESS:** Sales
**BASE RATE OF PAY START:**
**DESCRIPTION OF DUTIES:** Ringing merchandise on the cash register, aided customers **REASON FOR LEAVING:** Started college (BCC)

## PERSONAL REFERENCE

LIST PEOPLE WHO ARE QUALIFIED TO EVALUATE YOUR CAPABILITIES (DO NOT INCLUDE RELATIVES)

| NAME | TELEPHONE | OCCUPATION | YEARS KNOWN |
|---|---|---|---|
| Bernadette Chapman | 355-5700 (CICU) | Registered Nurse | 4 mos |
| M. Jackson | 485-6550 | Teacher | 2 yrs |

PLEASE READ THE FOLLOWING STATEMENT CAREFULLY BEFORE SIGNING THIS APPLICATION

I understand and agree that:

1. If I misrepresent or omit a fact in my application, I may be refused employment or, if employed, I may be terminated.
2. We will be requesting information from various federal, state and other agencies which maintain records concerning my past activities relating to my driving, credit, criminal, civil, and worker's compensation.
3. My worker's compensation history is for the purpose of making certain I am not assigned a job function which could aggravate a previous injury and will only be checked after conditional offer has been extended to me in compliance with the Americans with Disabilities Act (ADA).
4. I authorize any party or agency contacted by this employer to furnish the above mentioned information. If employed, I may terminate my employment at any time without cause; and either Northwest Medical Center, Plantation General Hospital or Westside Regional Medical Center may terminate or modify the relationship at any time without cause. In consideration of my employment, I agree to conform to the rules and regulations of the Hospital and I understand that no department head or representative of the Hospital, other than the Administrator or the designee has any authority to enter into any agreement for employment for any specified period of time or to make any agreement contrary to this agreement.

4. All qualified employees must be able to perform the essential functions of the position. Any job offer which I may receive from Northwest Medical Center or Plantation General Hospital or Westside Regional Medical Center will be contingent upon successfully completing a required pre-placement physical examination which includes drug screen and/or nicotine/cotinine/nicotinolysis testing and urine drug screen for controlled and illegal substances. All positive results will be verified by an outside laboratory. A positive screening and confirmation drug test shall prohibit consideration of employment.
5. The needs of Northwest Medical Center or Plantation General Hospital or Westside Regional Medical Center make the following conditions mandatory: overtime, shift work, a rotating work schedule, or a work schedule other than Monday through Friday, I accept these conditions of employment.
6. If terminated, I understand that my employment is for no definite period of time and is terminable at will. If terminated, either Northwest Medical Center, Plantation General Hospital or Westside Regional Medical Center is liable only for wages or salary earned as of the date of termination.
7. I have read and understand the above and hereby certify that the acts I have provided in my employment application are true and complete.

**Signature:** Coreen Brown-Olog **Date:** 11-6-97

## FOR PERSONNEL USE ONLY (Applicant is not to complete)

| | | | |
|---|---|---|---|
| **Name** | | **Dept./Cost Center** 614 | **Range** |
| **DOB** | | **Shift** Status PRN Hrs. Wk. | **Salary** 8.00 |
| **Emp. #** | | **Position** PCA | **Location To:** |
| **Date** 8/24/99 | **Transfer/New Hire/Rehire** 8/25/99 | | **From:** |

Can you perform the essential functions of the job for which you are applying, with our without an accommodation?

☑ Yes, With Accommodations

☐ Yes, Without Accommodations

Explain any required accommodations:

_____

_____

_____

Are you a special disabled veteran (30% disability or greater?)

☐ YES        ☑ NO

Are you a veteran of the Vietnam era?

☐ YES        ☑ NO



## Acknowledgment of Receipt of Handbook

The purpose of this Handbook is to provide employees of the Hospital with general information regarding the personnel guidelines the Hospital attempts to follow in most cases, but *no provision of this Handbook or of other personnel policies or procedures is an Employment Contract or any other type of contract.* Due to the nature of hospital operations and variations necessary to accommodate individual situations, the guidelines set out in this Handbook or in other personnel policies or procedures may not apply to every employee or in every situation. The Hospital reserves the right to rescind, modify or deviate from these or other guidelines, policies, practices or procedures relating to employment matters from time to time as it considers necessary in its sole discretion, either in individual or hospital-wide situations, with or without notice.

All employees at Columbia Westside Regional Medical Center are employed for an indefinite term, and employment may be terminated, without cause, at any time, at the will of either the employee or the Hospital. This status can only be altered by a written contract of employment which is specific as to all material terms and is signed by both the employee and the Chief Executive Officer of Columbia Westside Regional Medical Center.

*I have read and understand the above statement and agree to read the Employee Handbook which I hereby acknowledge having received.*

4/1/97 
_____
Date

Colleen Brown (signature)
_____
Employee Signature

iii



## NURSING STAFFING POOL EMPLOYEE

EMPLOYEE NAME: _Covenrinan DIAZ_____    DATE: _2/18/97___

DEPARTMENT: _____    POSITION: _____

**As of this date, I have been classified as a Nursing Staffing Pool Employee. As an employee in this classification, I understand that the following apply to me:**

1. I understand that it is my responsibility to keep in contact with the facility to indicate availability to work. **Failure** to contact the facility by a staffing pool employee will automatically be construed as a resignation of employment, effective the last day worked.

2. I understand that I will be expected to be available, at a minimum, one weekend or its equivalent per month, and holiday scheduling requirements, per the Nursing Policy Manual.

3. In addition, if the facility offers work which is rejected on three (3) different occasions in any six (6) month period, or, if an employee is contacted and is unavailable to work on three (3) occasions, I understand that this may result in my being removed from the staffing pool.

4. I will usually work less than 40 hours per week. **Regardless** of the hours worked, the only time I will be considered to enter the regular base staffing level is if a position is available and the needs of the facility so dictate.

5. I will be asked to work when needed by the facility in any area or on any shift for which I am qualified. While the facility will try to ask me to work when I prefer to, I realize that this cannot always be the case.

6. I realize that I will be asked to work only when needed and that the facility does not guarantee that I will work a certain number of hours.

7. I realize that although the facility will make all efforts to schedule me 24 hours in advance, this is not always possible and that the facility reserves the right to cancel scheduled hours at any time.

8. As a nursing staffing pool employee, I understand that I am being compensated by salary and I am ineligible for any non-qualified employee benefits.

**see over**



# ◆ COLUMBIA Westside Regional Medical Center

### Position Description and Performance Evaluation

| Department Name | Department Number | Position Title | Position Number |
|---|---|---|---|
| Nursing - Med/Surg | 614/615 | Patient Care Assistant | 502 |
| **Supervisor Title** | **Position Grade** | **Approval Signature** | **Approval Date** |
| Nurse Manager | 4 | *Original Signed by:* L. Hardwick, Nurse Mgr. | |

| Indicators of Performance Level: | Age Legend: |
|---|---|
| 5 = Outstanding<br>4 = Excellent<br>3 = Satisfactory Plus<br>2 = Satisfactory<br>1 = Satisfactory Minus | Birth - 12 mos. = Neonate/Infant<br>1 - 11 yrs. = Child/Pediatric<br>12 - 17 yrs. = Adolescent<br>18 - 64 yrs. = Adult<br>65 and over = Geriatric |

| Name of Employee Reviewed: | Name of Reviewer: | Date of Review: |
|---|---|---|
| **Type of Performance Evaluation:**<br>❑ Three-month  ❑ Annual | **Period Covered by Performance Evaluation:** | |

## POSITION GOAL:

The Patient Care Assistant, under the direction of a nurse, assists in providing nursing care to a designated group of patients.

## 1. POSITION REQUIREMENTS

    **A.**    **Education**

        1.    High school graduate preferred.
        2.    Graduation from a formal Patient Care Assistant program, either at a vocational school or hospital.

    **B.**    **Experience**

        Minimum of one year of Patient Care Assistant experience required.

## 2. CAREER PATH

    A.    License Practical Nurse (LPN)
    B.    Registered Nurse (RN)
    C.    Varied position advancements with advanced training.

This position has occupational exposure to blood- and air-borne pathogens and requires the use of personal protective equipment to include gloves, masks, gowns, goggles and ventilation devices. All protective equipment will be specific to the task or procedures to be performed.

VI.    **Standard Vocational Preparation**

This position requires the completion of a formal Patient Care Assistant program, either at a vocational school or hospital.

VII.    **Aptitudes:**

HIGH    **1    2    3    4    5**    LOW

| | |
|---|---|
| **Intelligence:** General learning ability. | 3 |
| **Verbal:** Receive and present information or ideas clearly. | 1 |
| **Numerical:** Performs arithmetic operations quickly and accurately. | 2 |
| **Spatial:** Understands the relationship of forms in space. | 3 |
| **Form Perception:** Is able to perceive discriminations between and among objects. | 1 |
| **Clerical Perception:** Perceives details in verbal or tabular material. | 1 |
| **Motor Coordination:** Hand eye coordination making rapid and/or accurately precise movements. | 1 |
| **Finger dexterity:** Works with fingers placing and turning motions. | 1 |
| **Manual Dexterity:** Works with hands placing and turning motions. | 1 |
| **Eye-Hand-Foot Coordination:** Coordinated movements in response to visual stimuli. | 2 |
| **Color discrimination:** Ability to perceive and respond to similarities or differences in colors, shapes, or other values of the same or different color. | 3 |

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Patient Care Assistant/502 | 4 |

### Geriatric

12. Modifies the interview techniques to adequately assess the geriatric patient by identifying the physical, psychosocial and educational needs common to this age group.   1 2 3 4 5
13. Assesses potential for compromised skin integrity.   1 2 3 4 5
14. Initiates preventive measures for compromised skin integrity.   1 2 3 4 5
15. Monitors intake of prescribed diet and other nutritional supplements each meal.   1 2 3 4 5
16. Notes changes in elimination patterns.   1 2 3 4 5
17. Identifies increased sensitivity to climate changes.   1 2 3 4 5
18. Adjusts temperature of the room.   1 2 3 4 5
19. Provides for safety measures. Identifies patients at risk for falls/injury to self.   1 2 3 4 5

### Age Non-Specific

20. Ensures each patient's hygiene needs are met daily and more frequently as needed.
    - a. Oral Hygiene   1 2 3 4 5
    - b. Complete or partial bath   1 2 3 4 5
    - c. Catheter care   1 2 3 4 5
    - d. Diabetic foot care   1 2 3 4 5
    - e. Shampooing of hair, as instructed by the RN.   1 2 3 4 5
    - f. Shaving of male patients, as directed by the RN.   1 2 3 4 5
21. Provides catheter leg strap to all patients with a foley catheter.   1 2 3 4 5
22. Adheres to standard precaution guidelines at all times.   1 2 3 4 5
23. Performs hand washing before and after contact with each patient.   1 2 3 4 5
24. Assesses patient vital signs and ensures notification of the RN or charge nurse of any significant changes.   1 2 3 4 5
25. Provides skin care to assigned patients:
    - a. Notifies RN of any noted breakdown.   1 2 3 4 5
    - b. Ensures bedridden patients are turned every two hours, or more frequently as instructed.   1 2 3 4 5
    - c. Ensures all bony prominences are well-protected.   1 2 3 4 5
26. Assists in provision of post-mortem care.   1 2 3 4 5
27. Collects and labels specimens for diagnostic lab as instructed by the RN and ensures delivery to appropriate department.   1 2 3 4 5
28. Performs venipuncture utilizing aseptic technique.   1 2 3 4 5
29. Performs Range of Motion exercises as indicated as instructed by the RN.   1 2 3 4 5
30. Explains all procedures and treatments to patients and/or significant other at each occurrence.   1 2 3 4 5 ✓
31. Assists patients with ambulation and activity as instructed by the RN.   1 2 3 4 5 ✓

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Patient Care Assistant/502 | 4 |

## III. UTILIZATION (15%)

| | | |
|---|---|---|
| 1. | Provides for patient safety at all times. | 1 2 3 4 5 |
| 2. | Participates in the hospital's risk management program by reporting all untoward events via the occurrence reporting system to his or her immediate supervisor. | 1 2 3 4 5 |
| 3. | Assesses individual patient rooms and unit environment for safe/sanitary conditions. | 1 2 3 4 5 |
| 4. | Prevents deficiencies in environment that are within the scope of nursing practices: | |
| a. | Maintains locked medication door. | 1 2 3 4 5 |
| b. | No items are stored within 18 inches of the ceiling. | 1 2 3 4 5 |
| c. | No cardboard boxes are on the floor | 1 2 3 4 5 |
| d. | No items are stored under the sink. | 1 2 3 4 5 |
| e. | No eating, drinking or personal items are found at the nurses' station or in the patient care area. | 1 2 3 4 5 |
| f. | Halls are unobstructed/No propped doors. | 1 2 3 4 5 |
| g. | Linen is covered. | 1 2 3 4 5 |
| 5. | Reports hazardous/unsafe conditions to appropriate person/department. | 1 2 3 4 5 |
| 6. | Identifies, sequesters and reports malfunctioning equipment to the appropriate person immediately. | 1 2 3 4 5 |
| 7. | Reports inadequate supplies to the appropriate person. | 1 2 3 4 5 |
| 8. | Utilizes supplies and equipment with efficiency and charges appropriately. | 1 2 3 4 5 |
| 9. | Disposes of and removes equipment, sharps and waste in designated container or area. | 1 2 3 4 5 |
| 10. | Completes refrigerator temperature checks and defrosts and cleans refrigerators and freezers, as assigned. | 1 2 3 4 5 |
| 11. | Reports all abnormal findings to registered nurse immediately. | 1 2 3 4 5 |
| 12. | Utilizes proper lifting techniques. | 1 2 3 4 5 |
| 13. | Documents specific patient valuables on designated form when received and immediately secures. | 1 2 3 4 5 |

**(A)    TOTAL of all Ratings circled above**

**(B)    NUMBER of Ratings circled above**

**(C)    AVERAGE RATING for this category
[equals (A) divided by (B)]**

(Carry forward to Evaluation Ratings Summary section.)

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Patient Care Assistant/502 | 4 |

3.  Follows policy for reporting in sick or absent 100% of the time; avoids excessive unscheduled absences.    1 2 3 4 5

4.  Leaves for meal break on time and returns on time.    1 2 3 4 5

5.  Varies work schedule or shift (working overtime, leaves early when requested, works shifts other than regularly scheduled as required) to meet department staffing needs.    1 2 3 4 5

6.  Works overtime only with appropriate supervisor approval.    1 2 3 4 5

7.  Schedules all holiday and vacation days with supervisory approval.    1 2 3 4 5

8.  Attends all hospital mandatory inservices on a timely basis as scheduled.    1 2 3 4 5

9.  Floats to other areas of the hospital as assigned.    1 2 3 4 5

(A)  **TOTAL of all Ratings circled above**

(B)  **NUMBER of Ratings circled above**

(C)  **AVERAGE RATING for this category**
     **[equals (A) divided by (B)]**

(Carry forward to Evaluation Ratings Summary section.)

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Patient Care Assistant/502 | 4 |

## VI.    INTERPERSONAL (10%)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. | Consistently demonstrates a positive attitude. | 1 | 2 | 3 | 4 | 5 |
| 2. | Fosters team work by offering assistance to others. | 1 | 2 | 3 | 4 | 5 |
| 3. | Provides positive welcome to all clients and family members. | 1 | 2 | 3 | 4 | 5 |
| 4. | Acknowledges and responds tactfully to all requests. | 1 | 2 | 3 | 4 | 5 |
| 5. | Shows consideration in interaction with patient, family and other health care team members by demonstrating therapeutic listening skills and cooperation. | 1 | 2 | 3 | 4 | 5 |

(A)    TOTAL of all Ratings circled above

(B)    NUMBER of Ratings circled above

(C)    AVERAGE RATING for this category
[equals (A) divided by (B)]

(Carry forward to Evaluation Ratings Summary section.)

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Patient Care Assistant/502 | 4 |

## EVALUATION RATINGS SUMMARY
### (Nursing Positions)

| (1) Category of Responsibility | (2) (from prior pages) Average Category Rating | (3) Category Weighting | (4)= (2)x(3) Weighted Average Rating |
|---|---|---|---|
| Patient Care | | 20% | |
| Documentation | | 15% | |
| Utilization | | 15% | |
| General | | 15% | |
| Professional | | 15% | |
| Interpersonal | | 10% | |
| Columbia Westside Standards | | 10% | |
| OVERALL TOTAL RATING | Add Col. 4 to arrive at Overall Total Rating | 100% | |

Filename: sumnurs7.wpd

## ◆ COLUMBIA Westside
## Regional Medical Center     EMPLOYEE ACKNOWLEDGMENT

I have read the following job description:

Department Name/Number:          **Nursing - Med/Surg - 614/615**

Position Title:                  **Patient Care Assistant**

Position Number/Grade:           **502/4**

Job Description Dated:           **June 20, 1996**

and I understand its content.  I understand that it will be used as a basis for my performance appraisal in the manner shown on the job description form, and that I will have the opportunity to comment upon any appraisal of my performance before it is considered final.

I also understand that this job description is not a comprehensive listing of every job responsibility and that other appropriate duties may be required of me while I occupy this position.

Signature: *Coreen Brown-Diaz*

Printed Name: *Coreen Brown Diaz*

**To:**    Coreen Brown-Diaz
**From:**  Ellen Cohen
**Subject:** Full-Time Status
**Date:**  October 17, 1997

# MEMORANDUM

I have been advised of your change in status, from Variable Staff to Full-time, effective 10/5/97 Attached is a FT status form for you to read, sign and date, and return to Human Resources.

Congratulations on your promotion to RN. Attached are two job descriptions for your new position. Please, read, sign and date one, and return it to Human Resources; you may retain the other for your records.

On the first day of the month following two months of FT status...1/1/98...you will be eligible for our flexible benefits program. Among these benefits are health, dental and life insurance. Your Personal Price List, indicating the cost of these plans, is now available to be picked up in Human Resources. Failure to complete your price list will result in Default Coverage (Columbia One Source EPO health insurance for employee coverage only and minimum life insurance of 1x employee's annual salary) which must remain in effect until our next annual enrollment. If you have other health insuance, and wish to decline ours, you must complete a waiver which will be kept on record in your file. If you do not have other health insurance, you must make a selection from one of the plans offered through Columbia. Enclosed is a brochure briefly describing our benefits; complete details for each plan will be provided when you pick up your price list.

You will begin to accrue PTO hours the first day of the month following completion of three months of FT employment...2/1/98.

Attached is a Continuation of Coverage notice regarding your COBRA benefits should you elect to enroll for our health/dental coverage. It applies if you should have a family status change, or, suspension of coverage due to resignation/termination or status change to non-benefited employment. There is nothing for you to do regarding this notice at this time.

Please call me at 476-3996, or ext. 3599, to arrange to meet to discuss your benefits.

Thank you.

/ec

Attachments.



# ◆ COLUMBIA Westside Regional Medical Center

**Position Description and Performance Evaluation**

| Department Name | Department Number | Position Title | Position Number |
|---|---|---|---|
| Nursing - Med/Surg | 614/615 | Registered Nurse | 301 |
| **Supervisor Title** | **Position Grade** | **Approval Signature** | **Approval Date** |
| Nurse Manager | 17 | *Original Signed by:* L. Hardwick, Nurse Mgr. | |

| Indicators of Performance Level: | Age Legend: |
|---|---|
| 5 = Outstanding<br>4 = Excellent<br>3 = Satisfactory Plus<br>2 = Satisfactory<br>1 = Satisfactory Minus | Birth - 12 mos. = Neonate/Infant<br>1 - 11 yrs. = Child/Pediatric<br>12 - 17 yrs. = Adolescent<br>18 - 64 yrs. = Adult<br>65 and over = Geriatric |

| Name of Employee Reviewed: | Name of Reviewer: | Date of Review: |
|---|---|---|
| BROWN DIAZ, COREEN | Marlene McKay | 9/97 |
| **Type of Performance Evaluation:**<br>☐ Three-month   ☑ Annual | **Period Covered by Performance Evaluation:**<br>9/97 - 9/98 | |

**POSITION GOAL:**

To provide safe and effective nursing care to all patients utilizing the nursing process. The Registered Nurse also is responsible for the direction and supervision of assigned personnel delivering said patient care.

1.    **POSITION REQUIREMENTS**

    A.    **Education**

        Graduate from an accredited school of nursing.

    B.    **Experience**

        Minimum of 2 years of clinical experience preferred.

    C.    **Other Qualifications**

        1.    ·  Current Florida Nursing License.
        2.    Current Basic Life Support Certification or agreement to obtain by completion of the ninety day probationary period.

| 5 | College level, 4-5 years |
|---|---|
| 4 | High school, plus some college or technical training |
| 3 | High school education |
| 2 | Eighth to tenth grade education |
| 1 | Below an eighth grade education |

| Reasoning: | 5 |
|---|---|
| Mathematics: | 5 |
| Language: | 5 |

## V.    Personal Protective Equipment

This position has occupational exposure to blood- and air-borne pathogens and requires the use of personal protective equipment to include gloves, masks, gowns, goggles and ventilation devices. Chemotherapy protective equipment will be available for all administration of chemotherapy. All protective equipment will be specific to the task or procedures to be performed. Standard precaution packs will be provided in every patient's room.

## VI.    Standard Vocational Preparation

This is a professional, licensed position requiring two (2) or more years to acquire the requisite knowledge. This knowledge can be obtained through graduation from an accredited nursing school and successfully passing the NCLEX nursing exam.

## VII.    Aptitudes:

**HIGH   1   2   3   4   5   LOW**

| | |
|---|---|
| **Intelligence:** General learning ability. | 1 |
| **Verbal:** Receive and present information or ideas clearly. | 1 |
| **Numerical:** Performs arithmetic operations quickly and accurately. | 2 |
| **Spatial:** Understands the relationship of forms in space. | 3 |
| **Form Perception:** Is able to perceive discriminations between and among objects. | 1 |
| **Clerical Perception:** Perceives details in verbal or tabular material. | 1 |
| **Motor Coordination:** Hand eye coordination making rapid and/or accurately precise movements. | 1 |
| **Finger dexterity:** Works with fingers placing and turning motions. | 1 |
| **Manual dexterity:** Works with hands placing and turning motions.  1 | |
| **Eye-Hand-Foot Coordination:** Coordinated movements in response to visual stimuli. | 2 |
| **Color discrimination:** Ability to perceive and respond to similarities or differences in colors, shapes, or other values of the same or different color. | 3 |

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Registered Nurse/301 | 17 |

2. Recognizes potential for increased stress related to dependency needs of others, i.e., children, elderly parents.  1 2 ③ 4

3. Assesses altered perceptions resulting from change from independence and productive status to dependence and curtailed productivity.  1 2 ③ 4

4. Recognizes anxiety regarding potential changes in life styles (i.e., physical, economic) resulting from illness.  1 2 ③ 4

5. Identifies fear related to potential altered body image.  1 2 ③ 4 :

**Geriatric**

6. Modifies the interview techniques to adequately assess the geriatric patient by identifying the physical, psychosocial and educational needs common to this age group.  1 2 ③ 4 5

7. Identifies increased physical/emotional dependence needs and availability of support networks.  1 2 ③ 4 5

8. Assesses potential for compromised skin integrity.  1 2 ③ 4 5

9. Initiates high risk skin assessment or admission to the unit and prior to transfer out.  1 2 ③ 4 5

10. Initiates preventive measures for compromised skin integrity.  1 2 ③ 4 5

11. Determines increased risks for nutritional deficiencies.  1 2 ③ 4 5

12. Monitors protein and albumin intake.  1 2 ③ 4 5

13. Monitors intake of prescribed diet and other nutritional supplements each meal.  1 2 ③ 4 5

14. Notes changes in elimination patterns.  1 2 ③ 4 5

15. Identifies increased sensitivity to climate changes.  1 2 ③ 4 5

16. Determines presence of disability affecting mobility or sensory acuity.  1 2 ③ 4 5

17. Provides for safety measures.  1 2 ③ 4 5

18. Identifies patients who are at high risk of falls or injury to self.  1 2 ③ 4 5

19. Assesses potential for increased educational needs due to compromised abilities to comply with therapy and interventions.  1 2 ③ 4 5

20. Modifies provision of nursing interventions to reflect the response unique to the geriatric patient.  1 2 ③ 4 5

21. Administers medications with attention to characteristics of the geriatric patient:  complex multi-drug regimens, increased potential for drug interactions and over-medication due to decreased renal and hepatic function and altered absorption.  1 2 ③ 4 5

22. Monitors patient's response to drug therapies and alerts physicians for any untoward reactions.  1 2 ③ 4 5

23. Monitors renal and hepatic laboratory test results; notifies physicians on abnormal results.  1 2 ③ 4 5

24. Analyzes information from initial assessment to identify discharge planning needs and integrates into the plan of care.  1 2 ③ 4 5

**Age Non-Specific**

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Registered Nurse/301 | 17 |

53. Identifies abnormal patient ABG values and reports to physician immediately.   1 ② 3 4 5

54. Demonstrates ability to provide care to the ventilated patient by:
    a. Positioning every 2 hours.   1 ② 3 4 5
    b. Intervening when alarm sounds   1 ② 3 4 5
    c. Performing broncho-tracheal suctioning using aseptic technique   1 ② 3 4 5
    d. Administering ordered sedation judiciously.   1 ② 3 4 5
    e. Intervening with the use of an ambu bag.   1 ② 3 4 5

55. Monitors oxygen saturation continuously or as ordered.   1 ② 3 4 5

56. Auscultates for breath sounds once every shift.   1 ② 3 4 5

57. Observes and documents chest tube drainage; observes for air leak and subcutaneous emphysema.   1 ② 3 4 5

58. Maintains surgical drains by securing and emptying drains every shift and records outputs/ drainage on nursing flow sheet.   1 ② 3 4 5

59. Initiates skin and wound care protocol within two hours of identification.   1 ② 3 4 5

60. Ensures physician is notified of abnormal laboratory, radiology and ABG reports within one hour; panic values within 15 minutes.   1 ② 3 4 5

61. Identifies need for spiritual counseling daily.   1 ② 3 4 5

62. Applies and monitors hypothermia/hyperthermia blanket when ordered.   1 ② 3 4 5

63. Demonstrates ability, following hospital policy and procedure, to care for a patient with either a hard or soft splinting device.   1 ② 3 4 5

64. Demonstrates ability, following hospital policy and procedure, to care for a patient in traction.   1 ② 3 4 5

65. Demonstrates ability, following hospital policy and procedure, to apply splints and bandages.   1 ② 3 4 5

66. Follows ACLS protocol in cardiopulmonary arrest/emergency situations.   1 ② 3 4 5

(A)    **TOTAL of all Ratings circled above**      206

(B)    **NUMBER of Ratings circled above**      79

(C)    **AVERAGE RATING for this category**
      **[equals (A) divided by (B)]**      2.8

(Carry forward to Evaluation Ratings Summary section.)

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Registered Nurse/301 | 17 |

b.  Verifies orders are entered into the computer correctly.  1 2 3 4 5
c.  Updates patient's Kardex.  1 2 3 4 5

**(A)**  **TOTAL of all Ratings circled above**  49   42

**(B)**  **NUMBER of Ratings circled above**   21

**(C)**  **AVERAGE RATING for this category**
**[equals (A) divided by (B)]**   2 3   2


(Carry forward to Evaluation Ratings Summary section.)

---

**III.   UTILIZATION (15%)**

1.   Provides for patient safety at all times.  1 2 ③ 4 5
2.   Adheres to policy for accurate and timely completion of all consents.  1 2 ③ 4 5
     Obtains and completes all consents within shift.
3.   Participates in the hospital's risk management program by reporting all  1 2 ③ 4 5
     untoward events via the occurrence reporting system to his or her
     immediate supervisor.
4.   Assesses individual patient rooms and unit environment for safe/sanitary  1 2 ③ 4 5
     conditions.
5.   Prevents deficiencies in environment that are within the scope of nursing  1 2 ③ 4 5
     practices:
     a.   Maintains locked medication door.
     b.   No items are stored within 18 inches of the ceiling.  1 2 ③ 4 5
     c.   No cardboard boxes are on the floor  1 2 ③ 4 5
     d.   No items are stored under the sink.  1 2 ③ 4 5
     e.   No eating, drinking or personal items are found at the nurses'  1 2 ③ 4 5
          station or in the patient care area.
     f.   Halls are unobstructed/No propped doors.  1 2 ③ 4 5
     g.   Linen is covered  1 2 ③ 4 5
6.   Reports hazardous/unsafe conditions to appropriate person/department.  1 2 ③ 4 5
7.   Identifies, sequesters and reports malfunctioning equipment to the  1 2 ③ 4 5
     appropriate person immediately.
8.   Reports inadequate supplies to the appropriate person.  1 2 ③ 4 5
9.   Utilizes supplies and equipment with efficiency and charges appropriately.  1 2 ③ 4 5
10.  Ensures narcotic discrepancies are resolved before ending shift or leaving  1 2 ③ 4 5
     facility.

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Registered Nurse/301 | 17 |

## IV.    GENERAL (15%)

### Department Responsibilities

1. Greets and orients patient to room.    1 2 ③ 4 5
2. Completes admission data base within 2 hours.    1 2 ③ 4 5
3. Assesses each newly-admitted patient within two hours of arrival.    1 2 ③ 4 5
4. Completes the initial head-to-toe assessment, noting patient's condition/response within the first two hours of shift.    1 2 ③ 4 5
5. Reviews head to toe assessment a minimum of once per shift and updates with any significant adverse change in patient's condition.    1 2 ③ 4 5
6. Transfers patients per hospital policy and procedure; ensures transfer and integrity of patient's belongings.    1 2 ③ 4 5
7. Assesses patient's needs for continued care within the Progressive care unit/hospital and the community.    1 2 ③ 4 5
8. Communicates patient care needs to multi-disciplinary team members throughout the shift and as necessary and solicits feedback as to the patients responses within one hour.    1 2 ③ 4 5
9. Reviews new medical orders promptly, implements STAT orders within 30 minutes and routine orders within 4 hours.    1 2 ③ 4 5
10. Reports pertinent changes in patient's status to physician promptly.    1 2 ③ 4 5
11. Communicates with all staff members at least once per shift and as necessary.    1 2 ③ 4 5
12. Immediately provides follow-up to physician for reports of clinically-pertinent patient data.    1 2 ③ 4 5
13. Responds to cardiopulmonary arrest and other emergency situations where indicated.    1 2 ③ 4 5
14. Initiates appropriate referrals.    1 2 ③ 4 5
15. Provides (with patient education) individualized health education programs for patient/ family.    1 2 ③ 4 5
16. Develops individualized discharge plan for patient in coordination with Utilization Management.    1 2 ③ 4 5
17. Report for scheduled shift on time, prepared to assume duties.
18. Badges in on arrival and out upon leaving and incorporates proper functions.    1 2 ③ 4 5
19. Follows policy for reporting in sick or absent 100% of the time; avoids excessive unscheduled absences.    1 2 ③ 4 5
20. Leaves for meal break on time and returns on time.    1 2 ③ 4 5
21. Varies work schedule or shift (working overtime, leaves early when requested, works shifts other than regularly scheduled as required) to meet department staffing needs.    1 2 ③ 4 5
22. Works overtime only with appropriate supervisor approval.    1 2 ③ 4 5
23. Schedules all holiday and vacation days with supervisory approval.    1 2 ③ 4 5

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Registered Nurse/301 | 17 |

17. Cooperates with other health team members in achieving common goal of quality health care.    1  2  ③  4  5

18. Collaborates with other health members to plan nursing intervention; delegates activities as appropriate.    1  2  ③  4  5

19. Assumes responsibilities for quality care of his/her shift.    1  2  ③  4  5

20. Performs nursing skills using appropriate techniques and equipment.    1  2  ③  4  5

21. Participates in unit management and assumes leadership responsibilities when assigned.    1  ②  3  4  5

22. Participates as a member of at least one hospital and/or nursing committee as directed by the Manager.    ①  2  3  4  5

23. Participates in The Quality Improvement / Performance Improvement Program by data collection, observation and interview.    1  ②  3  4  5

24. Orients new nursing personnel to the unit as delegated by the Manager.    1  ②  3  4  5

25. Documents competency in clinical skills at least annually.    1  ②  3  4  5

26. Ensures education file is up to date; documents attendance at continuing education programs for maintenance of professional licensure per Florida State law.    1  ②  3  4  5

27. Adheres to legal responsibilities as written in the State of Florida Nurse Practice Act.    1  ②  3  4  5

28. Maintains documented competency in Basic Life Support and ACLS per American Heart Association.    1  ②  3  4  5

29. Maintains required certification on preferred specialized area.    1  ②  3  4  5

30. Attends annual mandatory inservices.    1  ②  3  4  5

31. Supports Nursing Services/institutional policies and procedures.    1  ②  3  4  5

32. Interprets Department of Nursing Philosophy and objectives to other health team members.    1  ②  3  4  5

33. Facilitates learning process for affiliated students.    1  ②  3  4  5

34. Ensures confidentiality of information pertaining to patients, staff and hospital business.    1  ②  3  4  5

(A)    TOTAL of all Ratings circled above    80

(B)    NUMBER of Ratings circled above    34

(C)    AVERAGE RATING for this category    2·4
       [equals (A) divided by (B)]

(Carry forward to
Evaluation Ratings
Summary section.)

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/615 | Registered Nurse/301 | 17 |

## VII. COLUMBIA WESTSIDE STANDARDS (10%)

| | | |
|---|---|---|
| 1. | Helps all patients, family members, physicians. | 1  2  ③  4  5 |
| 2. | Smiles, introduces self, and uses caring, thoughtful words either in person or on the telephone. | 1  2  ③  4  5 |
| 3. | Always says "please" and "thank you." | 1  2  ③  4  5 |
| 4. | If unable to help someone, offers to find someone who can.  If transferring a telephone call, announces the caller and briefly explains the situation before ending the transfer. | 1  2  ③  4  5 |
| 5. | Always makes eye contact when speaking with patients, physicians, visitors, employees, etc. | 1  2  ③  4  5 |
| 6. | Consistently acts in a professional manner. | 1  2  ③  4  5 |
| 7. | Wears ID badge in a visible location at all times. | 1  2  ③  4  5 |
| 8. | Adheres to the dress code at all times. | 1  2  ③  4  5 |
| 9. | Knocks before entering a room or office. | 1  2  ③  4  5 |
| 10. | Addresses our customers by name. | 1  2  ③  4  5 |
| 11. | Keeps voice down - does not shout or use improper language. | 1  2  ③  4  5 |
| 12. | Responds to all inquiries promptly and courteously. | 1  2  ③  4  5 |
| 13. | When taking a message, accurately gets all the information -- name of caller, date and time of day, nature of call. | 1  2  ③  4  5 |
| 14. | Works together in the spirit of teamwork. | 1  2  ③  4  5 |
| 15. | Shares information with the people who need it. | 1  2  ③  4  5 |
| 16. | Adheres to the hospital mission and vision statements. | 1  2  ③  4  5 |

(A)    TOTAL of all Ratings circled above

    | 48 |

(B)    NUMBER of Ratings circled above

    | 16 |

(C)    AVERAGE RATING for this category
       [equals (A) divided by (B)]

    | 3 |

(Carry forward to
Evaluation Ratings
Summary section.)

DEVELOPMENT SUMMARY

| Employee Name | Position Title/Number/Grade: |
|---|---|
| *Colleen Brown Diaz* | **Nursing – Med/Surg – 614/615** |
| | **Registered Nurse/301/17** *9 mos* |

| SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENT WEAKNESSES |
|---|---|
| **A.** Colleen has shown great growth in the role of R.N. Has gained self confidence and knowledge. | **A.** Needs to practice more effective time management techniques. eg setting priorities. |
| **B.** Strong Clinical Skills, knowledge, willing to share and teach students. Bright Idea Winner April '98' | **B.** Remain Professional at all times. This includes staff members and other departments. If unable to entire situation, call for assistance. |
| **C.** Overall Works well with all team members. Has shown maturity in dealing with difficult staff and pts. | **C.** Maintain positive attitude, keep in mind that you are a role model to your team and others look to you for leadership. |

**2** Indicate date and general nature of attached Improvement Plan, if applicable:

| No. of In-Service Program Attended. | DID EMPLOYEE ATTEND | SAFETY PROGRAM | CPR | INFECTION CONTROL | No. of Cont. Ed. Progs. Attended | Contact Hrs. |
|---|---|---|---|---|---|---|
| | | ☒ YES ☐ NO | ☒ YES ☐ NO | ☒ YES ☐ NO | | |

| 4 | The position description for this employee has been reviewed and is current. ☐ YES ☐ NO | A revised position description has been attached.. ☐ YES ☐ NO |
|---|---|---|

| 5 | Reviewer Signature: *Written* | Date: *10/11/98* |
|---|---|---|

## EMPLOYEE COMMENTS

Do you have any comments concerning this appraisal?    ☐ YES ☐ NO

Number of additional Comment Pages attached:

| Employee Signature: *Colleen Brown-Diaz* | Date: *10-11-98* |
|---|---|

## COLUMBIA WESTSIDE REGIONAL MEDICAL CENTER

## MANDATORY EDUCATION CHECKLIST

Employee _Brown Rita Coren_

Department _614_

Evaluation Date _9/98_

|  | Date Completed | Manager's Signature |
|---|---|---|
| Employee Annual Update | _9/98_ | _E Crotten_ |

This form must be completed and returned to Human Resources with the appraisal and MSDS documentation for evaluation to be in compliance.

*DEPARTMENTAL TRAINING CHECKLIST*

# COLUMBIA WESTSIDE REGIONAL MEDICAL CENTER

*DEPARTMENT:* · 614 _____

Check One:

Initial Training _____

Annual Training ✓ _____

☑ Review of "Employee's Right to Know" law

☑ Toxic Drug Review:

_____  _____

_____  _____

_____  _____

_____  _____

☐ Address to obtain additional information:

**Toxic Substance Information Center**
**2552 Executive Center**
**Circle West**
**Tallahassee, Florida 32302-5014**

☐ Posting Requirements:

I have received instructions on and understand the implications of the items on this checklist including the availability of the Material Safety Data Sheets.

Employee's Name (PRINT) Coreen Brown-Diaz _____

Employee's Signature Coreen Brown-Di _____

Department Manager's Signature E Cuttoa _____

Date 10/11/98 _____

letter that I sent
to WSMC
when I questioned
Hospital policy
5/99
① Sent to Human Resources
manager + Mrs Mathis
Hospital Chief Nursing
Officer Mrs Jutras

Dear Sirs;

Some events that have transpired recently in this facility need to brought to your attention and addressed.

In 1997 I started working here as a Patient Care Assistant, while completing my degree as a Registered Nurse.  When I received my licensure I was told that I had to participate in an 8 week precetor-ship program at West Side Regional.  Even though I was an employee of this facility I was told by the hospital and by Broward Comunity College that I could not be paid for my internship.  I had to pay West Side Regional and Browrd Community College to intern at this facilty.  Recently it has come to me attention that  2 newly employed Registered Nurses were paid during there internship.  At this present time I am currently a preceptor for a new Registered Nurse who is also being paid while she is in training.

Recently I applied to take a Telemetry course at West Side Regional.  I was told that if my application was approved that I would have to sign a mandatory 18-24month contract to stay with this facility.  It was made known to me that a collegue of mine also applied for the Telemetry course would not have to sign the 18-24month contract.  Now is the contract mandatory for some and optional for others?

Also I'm concerned about the policy governing personnel placement, in addition to other discrepancies.  Can you please enlighten me regarding these issues?



For: BROWN-DIAZ,COREEN M.                    From: LYNN MATHIS
     Tue Jun 1, 1999 11:53 am            Taken by: LYNN MATHIS (476-3996)

to my knowledge, BCC still offers the preceptor program you went through....
I do not know when we started using our own preceptors, but I am checking with Kim Jutras.



For: BROWN-DIAZ, COREEN M.                    From: LYNN MATHIS
      Wed Jun 2, 1999 4:55 pm          Taken by: LYNN MATHIS (476-3996)

**In review:**
The nurses mentioned in our meeting did NOT go through a formal preceptor program, but an extended orientation program. I have no evidence of "commitment to stay" on you or any of the nurses mentioned in our meeting.
It seems you entered into this preceptor program through BCC on your own, finding out about the program through Westside.
The program through BCC called for individual payment from
the student with the commitment of 192 hours at a hosptial / unpaid, (an intership if you will) as part of your clinical curriculum. There is no guarantee on either the part of BCC or the hospital where the student would be placed for employment at the end of the program Westside felt it was in the best interest of the hospital to employee you after the programs end.
I also understand that you have been offered a Tele preceptor program (paid) and turned it down one week prior to starting; that you have been paid for chemo certification/ education as well. There are and have been opportunities provided to you for additional education/training here at Westside.
If in the future Westside decides to use the preceptor program through BCC, the same standards would apply, and they too would not be compensated, as that is the outline of the BCC program.
Here, or at any other hospital in the tri-county area.
If you have any further questions or concerns , please feel free to contact me at x3588.


Lynn

---------------------------------------------------------------------------------

SENT TO: COREEN M. BROWN-DIAZ, KIM JUTRAS



For: BROWN-DIAZ, COREEN M.                    From: LYNN MATHIS
    Thur Jun 3, 1999 4:27 pm            Taken by: LYNN MATHIS (476-3996)

I AM NOT SURE WHAT YOU ARE REQUESTING. WE (AS AN ORGANIZATION) HAVE AN OPPORTUNITY TO STILL USE THE BCC PROGRAM, AS OTHER HOSPITALS DO IN THE AREA. THE DECISION IS MADE ON A CASE BY CASE BASIS.

‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡
Thur Jun 3, 1999 3:07 pm                          From: COREEN M. BROWN-DIAZ


RE OUR CONVERSATION OF 6/1/99. CAN YOU PLEASE FORWARD TO ME THE PAPER WORK THAT I SPOKE OF RE THE INTERNSHIP AND THE CHANMGES THAT MAY OR MAYNOT HAVE OCCURED.
IF POSSIBLE I WOULD LIKE TO HAVE THEM BY THE END OF THE WEEK.


THANKS COREEN DIAZ.

‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡‡

RECD JUL 0 8 1999



For: BROWN-DIAZ,COREEN M.            From: MARY E. MAENZA
      Wed Jun 16, 1999 1:11 pm       Taken by: MARY E. MAENZA (3487)

Coreen,

I checked w/Kim and she would like to meet with you and Lynn together. The meeting can take place the week of 6/28. Would you be available at approximately 11:30 or 2:00 on Wed. 6/30?

Mary
ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt
Mon Jun 14, 1999 12:06 pm                              From: KIM JUTRAS

Coreen--I will have a meeting set up with you, Lynn and I.  Mary Maenza, my administrative assistant, will set it up.

ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt
Fri Jun 11, 1999 4:02 pm                              From: COREEN M. BROWN-DIAZ

 KIM,

 I WOULD LIKE TO HAVE A APPT WITH YOU REGARDING THE LETTER THAT I SENT TO YOU.

I HAVE TALKED TO LYNN MATHIS AND SHE HAS NOT GIVEN ME A SATISFACTORY RESPONSE AND HAS

NOT PROVIDED ME WITH THE PAPER WORK THAT I HAVE ASKED FOR.  IN ADDITION TO, I FEEL THAT

THIS SITUATION IS JUST BEING PUSHED TO THE SIDE AND NOT BEING ADDRESSED.
--------------------------------------------------------------------------------
SENT TO: KIM JUTRAS, LYNN MATHIS

ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt
--------------------------------------------------------------------------------
SENT TO: COREEN M. BROWN-DIAZ, LYNN MATHIS, MARY E. MAENZA

ttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttttt
--------------------------------------------------------------------------------
SENT TO: COREEN M. BROWN-DIAZ, KIM JUTRAS, LYNN MATHIS



```
For: BROWN-DIAZ, COREEN M.              From: KIM JUTRAS
     Mon Jun 14, 1999 12:06 pm          Taken by: KIM JUTRAS (3915)
```

Coreen--I will have a meeting set up with you, Lynn and I.  Mary Maenza, my
administrative assistant, will set it up.

%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%
Fri Jun 11, 1999 4:02 pm                          From: COREEN M. BROWN-DIAZ

 KIM,

 I WOULD LIKE TO HAVE A APPT WITH YOU REGARDING THE LETTER THAT I SENT TO YOU.

I HAVE TALKED TO LYNN MATHIS AND SHE HAS NOT GIVEN ME A SATISFACTORY RESPONSE AND HAS

NOT PROVIDED ME WITH THE PAPER WORK THAT I HAVE ASKED FOR.  IN ADDITION TO, I FEEL THAT

THIS SITUATION IS JUST BEING PUSHED TO THE SIDE AND NOT BEING ADDRESSED.
-------------------------------------------------------------------------------
SENT TO: KIM JUTRAS, LYNN MATHIS

%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%
-------------------------------------------------------------------------------
SENT TO: COREEN M. BROWN-DIAZ, LYNN MATHIS, MARY E. MAENZA

Then Contacted
The Chief Nursing
Officer Mrs Kim Jutras
re: I ~~Could~~ was not
getting a response from
the HR director & I would
like to speak with her
2/14/99

        #4

7/1/99
Had meeting ₵ Kim Jutras
and Lyn Mathis
- Stated there is no
formal hospital policy
re internships
- ~~Stated that~~
-
        #5

For: CHAYKIN,LEE B                          From: KIM JUTRAS
     Mon Jul 12, 1999 9:21 pm        Taken by: KIM JUTRAS (3915)

For your file.
₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺
Tue Jun 29, 1999 1:13 pm                              From: LYNN MATHIS

Coreen,
I understand it is your intention to invite another person to our meeting. Please share
with me who it person is and state the reason for the inclusion.
Thank you.
Lynn
--------------------------------------------------------------------------------
SENT TO: COREEN M. BROWN-DIAZ, KIM JUTRAS

₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺₺



# Westside
# Regional Medical Center

**COUNSELING / CORRECTIVE
DISCIPLINE RECORD**

This form is to be used to record ALL details of a session during which an employee is instructed by a supervisor that a change in behavior is necessary.

| Employee Name | Department | Job Title | Date of Occurrence |
|---|---|---|---|
| Coreen Brown-Diaz | Nursing - 4th | RN | 6.29.99 |

Detailed explanation of reason(s) for discussion. (Include what action was wrong and why it cannot continue.)

At 7:00 Coreen hung up on the HR Director. Between 7:10 pm and 7:50 pm Coreen refused to take the calls of the HR Director. Coreen was paged x7, refused to answer. At 7:40 the HR Div finally spoke to the employee – when asked why she did

Instruction given to employee to correct action

not answer pages she stated she clocked out and was trying to go home to her son. Kronos confirmed Coreen clocked out at 7:56 pm. 2 Employees verbally confirmed Coreen refusing the calls. (see attach.)

Anticipated supervisory action if act continues

Further infractions of hospital (personnel or departmental) policy will result in progressive disciplinary action

| ACTION TAKEN | ☐ VERBAL REPRIMAND | ☒ WRITTEN REPRIMAND | Suspension - Beginning date ☐ YES | Return to work Time / Day | Report To |
|---|---|---|---|---|---|

Failure to change behavior as indicated, or involvement in other situations requiring formal discussion, may result in disciplinary actions, including suspension without pay or discharge, depending on the nature of the situation.

Supervisor's Signature ___ 6/30/99 ___ Date 6/3

A copy of this document will be placed in my personnel file. If I improve on this act within the necessary period, this notice will not be used in further disciplinary sessions with me, unless the violations are related. I understand that I have the right to appeal through formal grievance procedure. My signature indicates I have received a copy of this form.

Employee remarks

| Employee Signature | Date | Witness Signature (employee refused to sign) | Date 6/30/9 |
|---|---|---|---|

For: CHAYKIN,LEE B                          From: KIM JUTRAS
     Mon Jul 12, 1999 9:18 pm          Taken by: KIM JUTRAS (3915)

Lee--This was not originally sent to you but thought you might want it for the file.
↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕
Wed Jun 30, 1999 9:18 am                                    From: LYNN MATHIS

Good morning Kim,
I have presented Ms. Diaz with the written warning regarding her behavior yesterday. She
refused to sign. She stated her intention is to fax it out of the building, not stating who
it was going to. I advised her she needed to have a conversation with you today regarding
her intentions for the meeting scheduled tomorrow. I also advised her that I stated to you
that I did not need to be present, and reminded her that you preferred it that way. That if
I was not present , either Michael or Lee would be. Please let me know when you hear from
her today, thank you.
Lynn
--------------------------------------------------------------------------------
SENT TO: KIM JUTRAS, MARY E. MAENZA, COREEN M. BROWN-DIAZ, SUE WAKAT

↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕↕



To: Mr. M. Joseph
Re: Coreen Diaz R. N. and
an unfortunate situation

Coreen originally asked Human
Resources for clarification on its
policy regarding the interning of
registered nurses. She had noticed
certain discrepancies. The individuals
in Human Resources stated that
there was no policy. She then
inquired about the criteria that was
used to determine that she
would be treated differently
than her peers - during the
interning phase. Again she was not
given an answer regarding the
differentiation of treatment.
In addition several days ago
A negative report was concocted
and placed in Coreen Diaz' personnel
file - which was exemplary. The
Resource personnel (Lyn) called Coreen's
floor 5 - times during the afternoon to
get information from her regarding
her complaint. Twice Coreen responded.
The other times she was attending



performing her duties. The Human Resource worker was interrupting her in the performance of her duties. For not responding to her continuous summons Coreen Diaz was "written up" This is obviously unfair and Coreen Diaz along with her family is requesting

1. A decent response to her original question-- was she given equal treatment while interning?

2. The negative report be purged from her files - because it is so obvious that this is a form of harassment - due to the first issue.

3. No further acts of harassment ensue.

Everyone seeks fair treatment. We are attempting to work inside your system. We do not want to be forced to seek outside assistance

Marjorie Jackson Carter and Family

# EMPLOYEE GRIEVANCE REPORT

GA-435 8/93

| oyee Name | Department | Date Submitted |
|---|---|---|
| reen Brown-Diaz | Nursing 6H | 7/7/99 |

| : previous steps of the grievance procedure been completed? | If yes, give date. |
|---|---|
| ☐ YES   ☑ NO | See below) |

**GRIEVANCE**   State CLEARLY and ACCURATELY all details concerned with your grievance. Be sure to include ALL dates and names of all concerned.

REC'D JUL 0 7 1999

**SOLUTION**   Indicate below what steps you think the company should take in order to satisfy this grievance.

See attached sheets res This situation.

DEFENDANT'S
EXHIBIT
17
PENGAD-Bayonne, N.J.
10/27/00 BDS

| I understand that if a settlement to my satisfaction is not reached. I may proceed to the next step in the grievance procedure. | Employee Signature |
|---|---|
| | X |

*Employee: Retain yellow copy for your records.*

| **This is to certify receipt of your** grievance at this step of the Grievance Procedure. | Grievance is at step No. | Supervision Signature |
|---|---|---|
| | | X |

To: Mr. Chaykin.
From: Coreen Brown-Diaz (R.N.)
Re: Resolution of Solution.

REC'D JUL 0 7 1999

First of all I would lke to state that I enjoy my position here at West Side Regional. Nursing provides me the opportunity in making a positive difference in people lives.

My personal folder reflects my dedication to the profession. And I am pleased to have the numerous accomadations in my file from patients,their families, as well as from staff members.

Originally I asked for clarification re: the internship of newly graduated Registered Nurses. I asked Human Resources for clarification of the policy and they told me that treatment was determined by a case by case basis, and they could not give me a definitive answer. Therefore, I went to the next level in the chain of command and I spoke with Mrs. Jutras. A meeting was set up between myself, Mrs. Jutras, and Mrs. Mathis for 7/1/99.

On 6/29/99 the day in question, Mrs. Mathis questioned me twice regarding the attendance of an attorney at the meeting. I also spoke with Mrs. Jutras' secretary earlier that day regarding the same matter.

Here is a chronological log of the events that occurred from 1510-1600 on 6/29/99

1500- 1514 I was in room 433-1 pt Whitney, Virgina initiating a blood transfusion.
Spoke to Mrs. Mathis briefly regarding our meeting on 7/1/99, ended the conversation and I told her thank you and good-bye.

1511-1514 returned to room 433-1 pt Whitney to asess her during the first 15mins of receiving a blood by product as per protocol states.

1514-1550 At this time I am reporting off to the oncoming shift. No overhead pages were heard by myself or the nurses that I reported off to. L Coloquan(R.N) and M . Foreman (en) were all present during the time I was attempting to report off.

1540- Report was interrupted by Mrs.Mathis , I explained to Mrs. Mathis that I was attempting to finish my work clock out and go home, that we can talk about this in the morning. Mrs. Mathis stated "she needed a response on whether I was going to have legal counsel at the meeting . Mrs. Mathis also stated that she needs to have a repsones by noon of 6/30/99 or there will not be a meeting.

1540-1600 Finished charting on my patients and punchd out at 1556pm. Gathered my belongings re-opened a couple of charts to add a few things to them and then left.

During the time from 1510-1550 Mrs. Mathis in her own statement overhead paged me 3 times and called the nursing floor at least 5 times. In order to question me on whether or not I was going to have legal counsel present at a meeting with her. I had already discussed this matter

.rs. Jutras' secretary, and Mrs. Mathis earlier that same day.     REC'D JUL 0 7 1999

Mid-Morning and change of shift are the most chaotic times of day for nurses. During this time Its not feasible to respond to phone calls while I'm on the floor attempting to perform my daily duties as a Registered Nurse and to fulfill my responsibilities as a team leader.

Furthermore, Mrs. Mathis proceeded to state that my actions were negligent and my conduct detrimental to customer service contrary to the hospitals best interest. This statement is contrived and could not be farther from the truth.

It would have been negligent for me not to have monitored the pt receiving the blood for the first fifteen minutes as hospital protocol requires. It would have been negligent if that pt had a transfusion reaction while I was on the phone with Mrs. Mathis.

Let me re-interate, all I wanted was to have one question answered regarding the hospitals policy on Internships. What criteria is used to decide who receives pay while interning and who does not? In conclusion, I am seeking the following:

1. Clarification of the policy re Internship and why I was differently than other interns whom I have observed.

2. The purging of Mrs. Mathis report from my permanent record , because it was not based on my professional performance. Instead it was a retaliatory measure taken because I questioned the Internship policy.

3. The elimination of any further harassment related to this issue.

Sincerely,

Coreen Brown-Diaz

```
For: CHAYKIN,LEE B                        From: COREEN M. BROWN-DIAZ
      Wed Jul 14, 1999 4:36 pm        Taken by: COREEN M. BROWN-DIAZ ()
```

DEAR SIRS,

  AT YOUR EARLIEST CONVIENCE I WOULD LIKE TO SET UP A MEETING TO TALK TO YOU
ABOUT THE  DISCIPLINARY REPORT THAT WAS PLACED INTO MY FILE.

PLEASE CONTACT ME, I AM EAGERLY AWAITING YOUR REPLY


SINCERELY,

COREEN BROWN-DIAZ.
--------------------------------------------------------------------------------
SENT TO: LEE B CHAYKIN, ARACELIS RIVERA
--------------------------------------------------------------------------------
SENT TO: ARACELIS RIVERA, LEE B CHAYKIN
--------------------------------------------------------------------------------
SENT TO: ARACELIS RIVERA, LEE B CHAYKIN

# Westside Regional
# Medical Center

8201 West Broward Boulevard
Plantation, Florida 33324
Phone (954) 473-6600

To:        Coreen M. Brown – Diaz, R.N.

CC:        Personnel File

From:      Lee Chaykin, COO

Subject:    Response to Grievance Request Dated July 7th, 1999

Date:      August 6, 1999

---

On July 7th, 1999 I received your grievance memo in which you raised three specific concerns. You requested clarification regarding the internship policy regarding how reimbursement can be obtained. A request was made to purge the corrective discipline record from your permanent file that was given to you by the Director of Human Resources. And to discontinue any further perceived harassment regarding these issues.

Regarding the internship policy, employees that participate in the new graduate preceptor program are paid an additional stipend. Individuals that are part of a Community College program do not receive any additional remuneration.

The request to purge the corrective discipline record from your permanent file that was given to you by the Director of Human Resources is denied. My findings corroborate and substantiate that the corrective action was appropriate for the related offence.

As far as the question of perceived harassment in regards to the aforementioned issues I find no evidence or intent to directly or indirectly harass, threaten, or intimidate you as part of this process.





① I asked for clarification of hospital policy on internship in writing
② What criteria is used to determine who recieves pay & who doesn't in writing
③ I need a total to reimbursement
④ that time

8/6/99

There was supposed to be a meeting between myself & Mr Chaykin. Instead he talked & I listened He placed this pre-typed memo infront of me, proceeded to read it to me. Not once asking me my side of the story or even attempting to look at my evidence or talk to my witnesses, only verbally threatening my position @ WLMC. "I'm not being a team player."

At this moment in time I still have not recieved any paper work stating ~~the hospital~~ Hospital policy about internships. ~~only~~



# ◆ COLUMBIA Westside Regional Medical Center

**Position Description and Performance Evaluation**

| Department Name | Department Number | Position Title | Position Number |
|---|---|---|---|
| Nursing - Med/Surg | 614/616 | Registered Nurse | 301 |
| **Supervisor Title** | **Position Grade** | **Approval Signature** | **Approval Date** |
| Nurse Manager | 17 | *Original Signed by:* L. Hardwick, Nurse Mgr. | |

| Indicators of Performance Level: | Age Legend: |
|---|---|
| 5 = Outstanding<br>4 = Excellent<br>3 = Satisfactory Plus<br>2 = Satisfactory<br>1 = Satisfactory Minus | Birth - 12 mos. = Neonate/Infant<br>1 - 11 yrs. = Child/Pediatric<br>12 - 17 yrs. = Adolescent<br>18 - 64 yrs. = Adult<br>65 and over = Geriatric |

| Name of Employee Reviewed: | Name of Reviewer: | Date of Review: |
|---|---|---|
| BROWN-DIAZ, COREEN | Marlene McKay RN | 9/99 |
| **Type of Performance Evaluation:** ☐ Three-month  ☑ Annual | **Period Covered by Performance Evaluation:** 9/98 - 9/99 | |

## POSITION GOAL:

To provide safe and effective nursing care to all patients utilizing the nursing process. The Registered Nurse also is responsible for the direction and supervision of assigned personnel delivering said patient care.

## 1. POSITION REQUIREMENTS

### A. Education

Graduate from an accredited school of nursing.

### B. Experience

Minimum of 2 years of clinical experience preferred.

### C. Other Qualifications

1. Current Florida Nursing License.

    **C.**    **Other Qualifications**

        1.    Current Florida Nursing License.
        2.    Current Basic Life Support Certification or agreement to obtain by completion of the ninety day probationary period.
        3.    ACLS certification preferred.
        4.    Completion of Basic Arrhythmia course with a minimum of 16 hours of didactic instruction preferred.

**2.**    **CAREER PATH**

    1.    Charge Nurse/Assistant Nurse Manager
    2.    Nurse Manager.

**3.**    **AMERICANS WITH DISABILITIES ACT**

    **I.**    **Essential Duties**

        The registered nurse is responsible for the direct and indirect total nursing care of his/her assigned patients.  He/She is also responsible for the supervision of assigned personnel. The position requires intimate knowledge of both department and hospital policies and procedures relevant to the delivery of nursing care. Interpretive skills, frequent interactive and consultative associations, along with management and supervisory skills are inherent in the position.  The ability to retrieve, communicate, or otherwise present information in a written, auditory or visual fashion is essential.  The primary method to express or exchange ideas is through the spoken word.  Written, telephone and manual dexterity skills are required for the position.

    **II.**    **Physical Requirements**

        The position requires a considerable amount of physical work not to exceed 50 pounds. Any work load exceeding 50 pounds will require assistance. The individual will be required to pull-up of reposition patients in bed, lift supplies, place equipment on supports, push beds throughout the hospital, and perform external cardiac compressions. The individual must be able to bend over to perform certain duties such as: check chest tube drainage; check urine output, etc. The individual must also be able to maneuver throughout halls, stairways, and patient rooms in response to hospital emergencies. Interpretation of environmental input requires visual and auditory skills. In the event  there is a need to evacuate the building, heavy lifting will be required to carry patients to safety.  Safety belt will be provided when requested.

    **III.**    **Working Conditions**

        The Registered Nurse spends approximately 100% of his/her time in an air-conditioned environment with varying exposures to excessive humidity or noise.

The position does have heavy exposure to malodorous, infectious, body fluids from patients and some minimal exposure to noxious smells from cleaning agents.

## IV.    General Educational Development

This position requires reasoning, mathematical and English language skills at the levels listed below:

LEVEL
6       Professional school, college masters, or more
5       College level, 4-5 years
4       High school, plus some college or technical training
3       High school education
2       Eighth to tenth grade education
1       Below an eighth grade education

| | |
|---|---|
| **Reasoning:** | **5** |
| **Mathematics:** | **5** |
| **Language:** | **5** |

## V.    Personal Protective Equipment

This position has occupational exposure to blood- and air-borne pathogens and requires the use of personal protective equipment to include gloves, masks, gowns, goggles and ventilation devices.  Chemotherapy protective equipment will be available for all administration of chemotherapy.  All protective equipment will be specific to the task or procedures to be performed.  Standard precaution packs will be provided in every patient's room.

## VI.    Standard Vocational Preparation

This is a professional, licensed position requiring two (2) or more years to acquire the requisite knowledge.  This knowledge can be obtained through graduation from an accredited nursing school and successfully passing the NCLEX nursing exam.

## VII.    Aptitudes:

|   | HIGH | 1 | 2 | 3 | 4 | 5 | LOW |   |
|---|---|---|---|---|---|---|---|---|
| **Intelligence:** General learning ability. | | | | | | | | 1 |
| **Verbal:** Receive and present information or ideas clearly. | | | | | | | | 1 |
| **Numerical:** Performs arithmetic operations quickly and accurately. | | | | | | | | 2 |
| **Spatial:** Understands the relationship of forms in space. | | | | | | | | 3 |
| **Form Perception:** Is able to perceive discriminations between and among objects. | | | | | | | | 1 |
| **Clerical Perception:** Perceives details in verbal or tabular material. | | | | | | | | 1 |

**Motor Coordination:**  Hand eye coordination making rapid
and/or accurately precise movements.                                              1
**Finger dexterity:**  Works with fingers placing and turning motions.            1
**Manual dexterity:**  Works with hands placing and turning motions.  1
**Eye-Hand-Foot Coordination:**  Coordinated movements in
response to visual stimuli.                                                       2
**Color discrimination:**  Ability to perceive and respond to similarities or
differences in colors, shapes, or other values of the same or different color.    3

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

**POSITION RESPONSIBILITIES AND EVALUATION RATINGS**
(See Page 1 for definition of Performance Level Ratings)

RATING
(1=lowest
5=highest)

**CATEGORY OF RESPONSIBILITIES**
**(and weighting percentage):**

I.    **PATIENT CARE (20%)**

**Neonate/Infant**

[This population is not applicable for this unit.]

**Child/Pediatric**

[This population is not applicable for this unit.]

**Adolescent**

1.    Modifies the interview techniques to adequately assess the adolescent patient by identifying the physical, psychological, and educational needs common to this age group.    1  2  ③ 4  5

2.    Recognizes patients' needs to assert independence and reluctance to express dependency needs and anxiety about hospitalization.    1  2  3  ④ 5

3.    Provides for privacy.    1  2  3  ④ 5

4.    Assesses nutritional needs, usually increased in this period of rapid growth.    1  2  ③ 4  5

5.    Provides reassurance and support when there is anxiety regarding potential altered body images.    1  2  3  ④ 5

6.    Recognizes need for peer support.    1  2  ③ 4  5

7.    Modifies nursing interventions to reflect the response unique to adolescence.    1  2  3  ④ 5

8.    Administers medications and therapies safely and accurately utilizing the Five Patient Rights 100% of the time.    1  2  ③ 4  5

9.    Provides teaching specific to educational needs with routine reinforcement because of tendency toward denial and non-compliance.    1  ② 3  4  5

**Adult**

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

1. Modifies the interview technique to adequately assess the adult patient by identifying the physical, psychosocial and educational needs common to this age group.  1  2  3 ④ 5

2. Recognizes potential for increased stress related to dependency needs of others, i.e., children, elderly parents.  1  2  3 ④ 5

3. Assesses altered perceptions resulting from change from independence and productive status to dependence and curtailed productivity.  1  2 ③ 4  5

4. Recognizes anxiety regarding potential changes in life styles (i.e., physical, economic) resulting from illness.  1  2  3 ④ 5

5. Identifies fear related to potential altered body image.  1  2 ③ 4  5

**Geriatric**

6. Modifies the interview techniques to adequately assess the geriatric patient by identifying the physical, psychosocial and educational needs common to this age group.  1  2  3 ④ 5

7. Identifies increased physical/emotional dependence needs and availability of support networks.  1  2  3 ④ 5

8. Assesses potential for compromised skin integrity.  1  2  3 ④ 5

9. Initiates high risk skin assessment or admission to the unit and prior to transfer out.  1  2 ③ 4  5

10. initiates preventive measures for compromised skin integrity.  1  2 ③ 4  5

11. Determines increased risks for nutritional deficiencies.  1  2 ③ 4  5

12. Monitors protein and albumin intake.  1  2 ③ 4  5

13. Monitors intake of prescribed diet and other nutritional supplements each meal.  1  2 ③ 4  5

14. Notes changes in elimination patterns.  1  2 ③ 4  5

15. Identifies increased sensitivity to climate changes.  1  2  3 ④ 5

16. Determines presence of disability affecting mobility or sensory acuity.  1  2  3 ④ 5

17. Provides for safety measures.  1  2  3 ④ 5

18. Identifies patients who are at high risk of falls or injury to self.  1  2  3 ④ 5

19. Assesses potential for increased educational needs due to compromised abilities to comply with therapy and interventions.  1  2 ③ 4  5

20. Modifies provision of nursing interventions to reflect the response unique to the geriatric patient.  1  2 ③ 4  5

21. Administers medications with attention to characteristics of the geriatric patient: complex multi-drug regimens, increased potential for drug interactions and over-medication due to decreased renal and hepatic function and altered absorption.  1  2 ③ 4  5

22. Monitors patient's response to drug therapies and alerts physicians for any untoward reactions.  1  2  3 ④ 5

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

23. Monitors renal and hepatic laboratory test results; notifies physicians on abnormal results.   1 2 ③ 4 5

24. Analyzes information from initial assessment to identify discharge planning needs and integrates into the plan of care.   1 2 ③ 4 5

**Age Non-Specific**

25. Ensures each patient's hygiene needs are met daily and more frequently as needed.   1 2 ③ 4 5

26. Performs pre-operative and post-operative care and instructions for each assigned patient.   1 2 ③ 4 5

27. Adheres to standard precaution guidelines at all times.   1 2 ③ 4 5

28. Performs hand washing before and after contact with each patient.   1 2 ③ 4 5

29. Assesses patient vital signs and ensures notification of the physician and charge nurse of any significant changes.   1 2 3 ④ 5

30. Performs wet and dry dressing changes using aseptic technique per physician order.   1 2 ③ 4 5

31. Provides post mortem care.   1 2 ③ 4 5

32. Collects and labels specimens for diagnostic lab per hospital policy and ensures delivery to appropriate department.   1 2 ③ 4 5

33. Performs venipuncture utilizing aseptic technique.   1 2 ③ 4 5

34. Performs bedside blood glucose monitoring per physician order.   1 2 ③ 4 5

35. Explains all procedures and treatments to patients and/or significant other at each occurrence.   1 ② 3 4 5

36. Administers prescribed medications within 30 minutes of scheduled time.   1 2 ③ 4 5

37. Observes effects of medications within 1 hour, and reports adverse reactions immediately.   1 2 3 ④ 5

38. Administers medication safely and accurately utilizing the Five Patient Rights (Right patient, medication, dose, time, route).   1 2 ③ 4 5

39. Administers medications and therapies in accordance with physician order 100% of the time.   1 2 ③ 4 5

40. Observes and/or recognizes untoward reactions to prescribed therapies or diagnostic procedures   1 2 ③ 4 5

41. Administers, observes and documents intravenous therapy.   1 2 ③ 4 5

42. Adheres to hospital policy and procedure regarding site care, tubing changes, and site rotation of IV's on all central access lines/devices and documents on appropriate form.   1 2 ③ 4 5

43. Follows hospital policy and procedure for administration of blood and blood products.   1 2 ③ 4 5

44. Administers enteral feedings via ng-tube, g-tube, j-tube, and/or enteral feeding tube and documents patient's response.   1 2 ③ 4 5

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

45. Performs gastric lavage per physician order, where indicated.   N/A   1  2  3  4  5
46. Documents on appropriate form the amount and color of gastric output.   1  2  ③  4  5
47. Performs ostomy care to include irrigation, appliance usage, and reinforcement of teaching.   1  2  ③  4  5
48. Inserts intermittent or indwelling urinary catheter using aseptic technique.   1  2  ③  4  5
49. Documents patient's response, color, odor and amount of urine.   1  2  ③  4  5
50. Monitors urine output as ordered and records on appropriate form.   1  2  ③  4  5
51. Notifies physician of inadequate urine output.   1  2  3  ④  5
52. Administers oxygen therapy per physician order.   1  2  ③  4  5
53. Identifies abnormal patient ABG values and reports to physician immediately.   1  2  ③  4  5
54. Demonstrates ability to provide care to the ventilated patient by:
   a.  Positioning every 2 hours.   1  2  3  4  5
   b.  Intervening when alarm sounds   1  2  3  4  5
   c.  Performing broncho-tracheal suctioning using aseptic technique.   1  2  3  4  5
   d.  Administering ordered sedation judiciously.   1  2  3  4  5
   e.  Intervening with the use of an ambu bag.   1  2  3  4  5
55. Monitors oxygen saturation continuously or as ordered.   1  2  3  ④  5
56. Auscultes for breath sounds once every shift.   1  2  3  ④  5
57. Observes and documents chest tube drainage; observes for air leak and subcutaneous emphysema.   1  2  3  ④  5
58. Maintains surgical drains by securing and emptying drains every shift and records outputs/ drainage on nursing flow sheet.   1  ②  3  4  5
59. Initiates skin and wound care protocol within two hours of identification.   1  2  ③  4  5
60. Ensures physician is notified of abnormal laboratory, radiology and ABG reports within one hour; panic values within 15 minutes.   1  2  ③  4  5
61. Identifies need for spiritual counseling daily.   1  ②  3  4  5
62. Applies and monitors hypothermia/hyperthermia blanket when ordered.   1  2  ③  4  5
63. Demonstrates ability, following hospital policy and procedure, to care for a patient with either a hard or soft splinting device.   1  ②  3  4  5
64. Demonstrates ability, following hospital policy and procedure, to care for a patient in traction.   1  ②  3  4  5
65. Demonstrates ability, following hospital policy and procedure, to apply splints and bandages.   1  2  ③  4  5
66. Follows ACLS protocol in cardiopulmonary arrest/emergency situations.   1  2  ③  4  5

(A)    TOTAL of all Ratings circled above

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

**(B)    NUMBER of Ratings circled above**



**(C)    AVERAGE RATING for this category**
**[equals (A) divided by (B)]**

3.2

(Carry forward to Evaluation Ratings Summary section.)

---

## II.    DOCUMENTATION (15%)

1.   Applies the Nursing Process and Gordons Functional Health Patterns appropriately:    1 ②3 4 5

   a.   Completes the initial nursing assessment through interview and examination of patient within two hours of arrival.

   b.   Documents additional data collection and assessments of the patient in the nurse's notes.    1 ②3 4 5

   c.   Documents any change in the patient's condition in the nurse's notes by utilizing the A.P.I.E. format.    1 ②3 4 5

   d.   Based upon the assessment, determines priority nursing diagnoses and indicates each diagnosis' relation-ship to the individual patient within 8 hours of admission.    1 ②3 4 5

   e.   Institutes the plan of care within 8 hours of admission.    1 ②3 4 5

   f.   Documents nursing interventions in the plan of care and documents additional interventions in the nurse's notes utilizing the A.P.I.E. format.    1 2 3 ④ 5

   g.   Reviews and/or revises the nursing diagnosis and plan of care every 8 hours.    1 ②3 4 5

   h.   Evaluates the plan of care every 8 hours in the nurse's notes utilizing the A.P.I.E. format,    1 2 ③4 5

   I.   Appropriately delegates any aspect of the nursing process to staff members based on their scope of practice.    1 ②3 4 5

   j.   Utilizes nursing process documentation forms appropriately to minimize narrative charting.    1 2 3 ④ 5

   k.   Assists the patient, family and significant other in Health Maintenance through education, documenting interventions and verbalization of understanding.    1 ②3 4 5

2.   Documents pertinent patient observations and interventions at time of occurrence.    1 ②3 4 5

3.   Completes nursing flow sheet every shift and graphic neuro check, pre-operative and pre-procedure checklists where indicated.    1 2 3 ④5

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

4. Completes documentation on Transfers, within facility and to another facility, on designated forms when event occurs.   1 2 ③ 4 5

5. Completes documentation on each patient at the completion of each intervention.   1 ② 3 4 5

6. Documents all entries, signature and credentials legibly on all charting.   1 2 3 ④ 5

7. Clarifies physician's orders in absence of adequate, explicit prescribed physician orders.   1 2 3 ④ 5

8. Performs or ensures completion of 24 hour chart check in entirety, utilizing black ink.   1 ② 3 4 5

9. Accurately transcribes physician's orders:   1 2 3 ④ 5

    a. Transcribes medication orders to the MAL.

    b. Verifies orders are entered into the computer correctly.   1 2 3 ④ 5

    c. Updates patient's Kardex.   1 2 ③ 4 5

(A)   **TOTAL of all Ratings circled above**   *59*

(B)   **NUMBER of Ratings circled above**   *21*

(C)   **AVERAGE RATING for this category**
**[equals (A) divided by (B)]**   *2.8*
(Carry forward to Evaluation Ratings Summary section.)

## III.   UTILIZATION (15%)

1. Provides for patient safety at all times.   1 2 3 ④ 5

2. Adheres to policy for accurate and timely completion of all consents. Obtains and completes all consents within shift.   1 2 ③ 4 5

3. Participates in the hospital's risk management program by reporting all untoward events via the occurrence reporting system to his or her immediate supervisor.   1 ② 3 4 5

4. Assesses individual patient rooms and unit environment for safe/sanitary conditions.   1 2 ③ 4 5

   1 2 ③ 4 5

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

5. Prevents deficiencies in environment that are within the scope of nursing practices:
   a.   Maintains locked medication door.
   b.   No items are stored within 18 inches of the ceiling.    1 2 ③ 4 5
   c.   No cardboard boxes are on the floor    1 2 ③ 4 5
   d.   No items are stored under the sink.    1 2 ③ 4 5
   e.   No eating, drinking or personal items are found at the nurses' station or in the patient care area.    1 ② 3 4 5
   f.   Halls are unobstructed/No propped doors.    1 2 ③ 4 5
   g.   Linen is covered    1 2 ③ 4 5
6. Reports hazardous/unsafe conditions to appropriate person/department.    1 2 3 ④ 5
7. Identifies, sequesters and reports malfunctioning equipment to the appropriate person immediately.    1 2 3 ④ 5
8. Reports inadequate supplies to the appropriate person.    1 2 3 ④ 5
9. Utilizes supplies and equipment with efficiency and charges appropriately.    1 2 3 ④ 5
10. Ensures narcotic discrepancies are resolved before ending shift or leaving facility.    ① 2 3 4 5
11. Check crash cart and performs defibrillator check every shift, as assigned, and replaces outdated and missing items as needed.    1 ② 3 4 5
12. Completes quality controls on accuchecks and checks refrigerator temperatures as per policy.    1 ② 3 4 5
13. Disposes of and removes equipment, sharps and waste in designated container or area.    1 2 3 ④ 5
14. Ensures the following tasks are completed on all patients in restraints:    1 ② 3 4 5
   a.   Completes flow sheet in entirety
   b.   Performs needs assessment    1 ② 3 4 5
   c.   Identifies type of restraint.    1 ② 3 4 5
   d.   Obtains and transcribes orders.    1 ② 3 4 5
   e.   Completes assessment and evaluation of responses at appropriate time intervals.    1 ② 3 4 5
15. Reports all abnormal findings to physician immediately.    1 2 3 ④ 5
16. Recognizes signs and symptoms of possible Child/Adult/Elderly abuse and immediately notifies supervisor to alert appropriate agency.    1 2 ③ 4 5
17. Utilizes proper lifting techniques.    1 2 ③ 4 5
18. Documents specific patient valuables on designated form when received and immediately secures.    1 ② 3 4 5

**(A)    TOTAL of all Ratings circled above**       79

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

(B)    NUMBER of Ratings circled above



(C)    AVERAGE RATING for this category
[equals (A) divided by (B)]



(Carry forward to Eval-
uation Ratings Sum-
mary section.)

## IV.    GENERAL (15%)

### Department Responsibilities

1.    Greets and orients patient to room.                                                    1 ② 3 4 5
2.    Completes admission data base within 2 hours.                                  1 ② 3 4 5
3.    Assesses each newly-admitted patient within two hours of arrival.      1 ② 3 4 5
4.    Completes the initial head-to-toe assessment, noting patient's          1 ② 3 4 5
      condition/response within the first two hours of shift.
5.    Reviews head to toe assessment a minimum of once per shift and        1 2 ③ 4 5
      updates with any significant adverse change in patient's condition.
6.    Transfers patients per hospital policy and procedure; ensures transfer   1 ② 3 4 5
      and integrity of patient's belongings.
7.    Assesses patient's needs for continued care within the Progressive care  1 2 ③ 4 5
      unit/hospital and the community.
8.    Communicates patient care needs to multi-disciplinary team members   1 2 ③ 4 5
      throughout the shift and as necessary and solicits feedback as to the
      patients responses within one hour.
9.    Reviews new medical orders promptly, implements STAT orders within   1 ② 3 4 5
      30 minutes and routine orders within 4 hours.
10.   Reports pertinent changes in patient's status to physician promptly.    1 2 ③ 4 5
11.   Communicates with all staff members at least once per shift and as      1 ② 3 4 5
      necessary.
12.   Immediately provides follow-up to physician for reports of clinically-    1 2 ③ 4 5
      pertinent patient data.
13.   Responds to cardiopulmonary arrest and other emergency situations    1 2 ③ 4 5
      where indicated.
14.   Initiates appropriate referrals.                                                          1 2 ③ 4 5
15.   Provides (with patient education) individualized health education         1 ② 3 4 5
      programs for patient/ family.
16.   Develops individualized discharge plan for patient in coordination with  1 2 ③ 4 5
      Utilization Management.

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

17. Report for scheduled shift on time, prepared to assume duties.    1 2 ③ 4 5

18. Badges in on arrival and out upon leaving and incorporates proper functions.    1 2 ③ 4 5

19. Follows policy for reporting in sick or absent 100% of the time; avoids excessive unscheduled absences.    1 2 ③ 4 5

20. Leaves for meal break on time and returns on time.    ① 2 3 4 5

21. Varies work schedule or shift (working overtime, leaves early when requested, works shifts other than regularly scheduled as required) to meet department staffing needs.    ① 2 3 4 5

22. Works overtime only with appropriate supervisor approval.    ① 2 3 4 5

23. Schedules all holiday and vacation days with supervisory approval.    1 2 ③ 4 5

24. Attends all hospital mandatory inservices on a timely basis as scheduled.    1 ② 3 4 5

25. Floats to other areas of the hospital as assigned.    1 ② 3 4 5

**(A)  TOTAL of all Ratings circled above**    `59`

**(B)  NUMBER of Ratings circled above**    `25`

**(C)  AVERAGE RATING for this category
[equals (A) divided by (B)]**    `2.36`
(Carry forward to Evaluation Ratings Summary section.)

---

**V.  PROFESSIONAL ( 15%)**

1. Attends a minimum of nine staff meetings per year and is responsible for all information communicated at meetings.    ① 2 3 4 5

2. Receives assignment from charge nurse at beginning of shift.    1 ② 3 4 5

3. Receives patient status report from off-going nurse, incorporating walking rounds.    1 ② 3 4 5

4. Gives accurate and concise patient care reports.    1 2 ③ 4 5

5. Cooperates in temporary assignments to other units when necessary.    1 2 ③ 4 5

6. Assesses and prioritizes patient care needs according to acuity.    1 ② 3 4 5

7. Delegates patient care responsibilities to assigned care givers based upon patient needs and staff competencies.    1 ② 3 4 5

8. Demonstrates a calm, professional manner during a crisis or emergency situation 100% of the time.    ① 2 3 4 5

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

9.   Correlates theoretical knowledge with clinical practice using Nursing Process.                1 2 ③ 4 5

10.  Prioritizes and organizes assigned responsibilities of patient care on a daily basis as evidenced by timely completion of duties on assigned shift.    1 ② 3 4 5

11.  Determines specific nursing intervention to resolve patient problems.              1 2 ③ 4 5

12.  Revises nursing actions when predicted outcomes do not occur.                1 2 ③ 4 5

13.  Serves as a facilitator of an educational program at least once yearly and as assigned.                1 ② 3 4 5

14.  Contributes to discussion and resolution of department needs and problems.                1 2 ③ 4 5

15.  Integrates new knowledge and skills into own nursing practice; makes an effort to share new ideas with others.              1 2 ③ 4 5

16.  Contributes to identification and resolution of patient care problems.            1 ② 3 4 5

17.  Cooperates with other health team members in achieving common goal of quality health care.              1 2 ③ 4 5

18.  Collaborates with other health members to plan nursing intervention; delegates activities as appropriate.              1 ② 3 4 5

19.  Assumes responsibilities for quality care of his/her shift.              1 ② 3 4 5

20.  Performs nursing skills using appropriate techniques and equipment.        1 2 ③ 4 5

21.  Participates in unit management and assumes leadership responsibilities when assigned.              ① ② 3 4 5

22.  Participates as a member of at least one hospital and/or nursing committee as directed by the Manager.              ① 2 3 4 5

23.  Participates in The Quality Improvement / Performance Improvement Program by data collection, observation and interview.            1 ② 3 4 5

24.  Orients new nursing personnel to the unit as delegated by the Manager.        1 2 ③ 4 5

25.  Documents competency in clinical skills at least annually.              1 2 ③ 4 5

26.  Ensures education file is up to date; documents attendance at continuing education programs for maintenance of professional licensure per Florida State law.              1 2 ③ 4 5

27.  Adheres to legal responsibilities as written in the State of Florida Nurse Practice Act.              1 2 ③ 4 5

28.  Maintains documented competency in Basic Life Support and ACLS per American Heart Association.              1 2 ③ 4 5

29.  Maintains required certification on preferred specialized area.            1 ② 3 4 5

30.  Attends annual mandatory inservices.              1 ② 3 4 5

31.  Supports Nursing Services/institutional policies and procedures.            1 ② 3 4 5

32.  Interprets Department of Nursing Philosophy and objectives to other health team members.              1 ② 3 4 5

33.  Facilitates learning process for affiliated students.              1 2 ③ 4 5

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

34. Ensures confidentiality of information pertaining to patients, staff and hospital business.  1  2  ③  4  5

**(A)    TOTAL of all Ratings circled above**



$80$

**(B)    NUMBER of Ratings circled above**

$34$

**(C)    AVERAGE RATING for this category**
**[equals (A) divided by (B)]**

$2.35$

(Carry forward to
Evaluation Ratings
Summary section.)

## VI.    INTERPERSONAL (10%)

1. Consistently demonstrates as positive attitude.    ①  2  3  4  5
2. Fosters team work by offering assistance to others.    1  ②  3  4  5
3. Provides positive welcome to all clients and family members.    1  ②  3  4  5
4. Acknowledges and responds tactfully to all requests.    1  ②  3  4  5
5. Shows consideration in interaction with patient, family and other health care team members by demonstrating therapeutic listening skills and cooperation.    1  ②  3  4  5

**(A)    TOTAL of all Ratings circled above**



$9$

**(B)    NUMBER of Ratings circled above**



$5$

**(C)    AVERAGE RATING for this category**
**[equals (A) divided by (B)]**



$1.8$

(Carry forward to
Evaluation Ratings
Summary section.)

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

## VII. WESTSIDE WINNING WAYS (10%)
**(Will be rated as 1,2 or 3)**

| | | |
|---|---|---|
| 1. | Adheres to the hospital mission and vision statements. | ①2  3  4  5 |
| 2. | Says hello to everyone. | 1  ②3  4  5 |
| 3. | Wears name badge at eye level. | 1  2  ③4  5 |
| 4. | Maintains positive attitude. | ①2  3  4  5 |
| 5. | When entering a patient's room, greet them by name. | 1  ②3  4  5 |
| 6. | Responds to all inquiries promptly and courteously. | 1  ②3  4  5 |
| 7. | Anticipates the needs of others. | 1  ②3  4  5 |
| 8. | Communicates regularly with customers and explains delays. | 1  ②3  4  5 |
| 9. | Picks up trash. | 1  2  ③4  5 |
| 10. | If receives a complaint, owns the complaint. | ①2  3  4  5 |
| 11. | Identifies self and unit when answering phones. | 1  2  ③4  5 |
| 12. | Answers phone within 3 rings. | 1  2  ③4  5 |
| 13. | Smiles, introduces self, and uses caring, thoughtful words either in person or in the telephone. | 1  ②3  4  5 |
| 14. | If unable to help someone, offers to find someone who can. If transferring a telephone call, announces the caller and briefly explains the situation. | ①2  3  4  5 |
| 15. | Smiles and makes eye contact when interacting with customers. | 1  ②3  4  5 |
| 16. | Knocks before entering a room. | 1  2  ③4  5 |
| 17. | Works together in the spirit of teamwork. | 1  ②3  4  5 |
| 18. | Introduces self and shakes hands when appropriate. | 1  ②3  4  5 |
| 19. | Doesn't interrupt people. | 1  ②3  4  5 |
| 20. | Respects social, economic and cultural differences. | 1  ②3  4  5 |
| 21. | Says "please" and "thank you". | 1  ②3  4  5 |
| 22. | Speaks in a clear voice using appropriate language. | 1  ②3  4  5 |
| 23. | Adheres to dress code at all times. | ①2  3  4  5 |

**(A)  TOTAL of all Ratings circled above**                    | 46 |

**(B)  NUMBER of Ratings circled above**                    | 23 |

**(C)  AVERAGE RATING for this category**
**[equals (A) divided by (B)]**                    | 2 |

(Carry forward to
Evaluation Ratings
Summary section.)

| DEPARTMENT NAME/NUMBER | POSITION TITLE/NUMBER | POSITION GRADE |
|---|---|---|
| Nursing - Med/Surg - 614/616 | Registered Nurse/301 | 17 |

# EVALUATION RATINGS SUMMARY
(Nursing Positions)

| (1)<br>Category of Responsibility | (2)<br>(from prior pages)<br>Average Category Rating | (3)<br>Category Weighting | (4)=<br>(2)x(3)<br>Weighted Average Rating |
|---|---|---|---|
| Patient Care | 3.2 | 20% | .64 |
| Documentation | 2.8 | 15% | .42 |
| Utilization | 2.82 | 15% | .423 |
| General | 2.36 | 15% | .354 |
| Professional | 2.35 | 15% | .352 |
| Interpersonal | 1.8 | 10% | .18 |
| Westside Winning Ways | 2 | 10% | .2 |
| OVERALL TOTAL RATING | Add Col. 4 to arrive at Overall Total Rating | 100% | 2.58 |

Filename: sumnurs7.wpd

Filename: I:\HR\JOB_DESC\614RN.WPD    Date: June 21, 1996

## DEVELOPMENT SUMMARY

| Employee Name: | Position Title/Number/Grade:<br>**Nursing - Med/Surg - 614/616<br>Registered Nurse/301/17** |
|---|---|

| | SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENT WEAKNESSES |
|---|---|---|
| **1** | A. Is now certified (trained) administration of Basic Chemotherapy administration. | A. Needs to review policy for restraints and Documentation of ~~Adults~~ Restraints. |
| | B. Serves as a preceptor for new employes, orientees and nursing students. | B. Needs to effectively handle situations without raising antagonism or hostility. Foster teamwork) |
| | C. Good base knowledge of nursing | C. Chart in rooms) be a proactive pt. advocate) maintain a positive attitude Become an effective team leader. |

| **2** | Indicate date and general nature of attached Improvement Plan, if applicable: |
|---|---|

| **3** | No. of In-Service Program Attended. | DID EMPLOYEE ATTEND | SAFETY PROGRAM ☑YES ☐ NO | CPR ☑YES ☐ NO | INFECTION CONTROL ☑YES ☐ NO | No. of Cont. Ed. Progs. Attended | Contact Hrs. |
|---|---|---|---|---|---|---|---|

| **4** | The position description for this employee has been reviewed and is current. ☐ YES ☐ NO | A revised position description has been attached. ☑ YES ☐ NO |
|---|---|---|

| **5** | Reviewer Signature: *Marlene McKay* RN · CHARGE of nursing | Date: 10/1/99 |
|---|---|---|

## EMPLOYEE COMMENTS

Do you have any comments concerning this appraisal? ☑ YES ☐ NO

My primary focus is being a pt advocate, providing pt care + administering order therapies. Team leadership role needs improvement, however I perform that role in some instances better than nurses that have been here for an extended period of time. Looking up labs + calling doctors + assisting @ the desk, I feel I do an excellent job and have great attitude for the amount of pts + admissions that we have.

Number of additional Comment Pages attached: Over-

| Employee Signature: C. D's | Date: 10/26/99 |
|---|---|

see back of this page for cont of comments

~~Sometimes time~~

my personal file with all the pt accomadations should speak for itself. Re: Fostering teamwork, when you assist at the front desk without being asked. that is team work.

When another nurse asks you to start an IV, or pass a medication for them thats team work.

Making sure all medications are given, all labs are drawn, or called. Or anything else that may arise, thats team work, & making sure anyone on yder team can come to you for anything ~~also~~ being a good team leader. that.

there's Contradiction in weakness to that of professionalism—which states satisfactory. ???

How can you have poor attitude / or an attitude that needs improvement, but have great interpersonal skills & work great with nursing students & peers?

10/26/99  C. Diy RN 1630pm

# WESTSIDE REGIONAL
# MEDICAL CENTER          EMPLOYEE ACKNOWLEDGMENT

I have read the following job description:

     Department Name/Number:     **Nursing - Medical/Oncology - 614**

     Position Title:     **Registered Nurse**

     Position Number/Grade:     **301/17**

     Job Description Dated:     **June 21, 1996**

and I understand its content. I understand that it will be used as a basis for my performance appraisal in the manner shown on the job description form, and that I will have the opportunity to comment upon any appraisal of my performance before it is considered final.

I also understand that this job description is not a comprehensive listing of every job responsibility and that other appropriate duties may be required of me while I occupy this position.

Signature: _____

Printed Name: Coreen Diaz          Date: 10/26/99

# Westside Regional
# Medical Center

8201 West Broward Boulevard
Plantation, Florida 33324
Phone (954) 473-6600

November 5, 1999

Ms. Coreen Brown-Diaz
4041 NW 16ᵗʰ Street, Apt. 102C
Lauderhill, FL 33313

Dear Ms. Brown-Diaz,

After researching the preceptor program at Westside Regional Medical Center, it has been determined that you are
entitled to receive reimbursement for the preceptor program given at Broward Community College. Attached please
find a check in the amount of $350.00. We at Westside Regional Medical Center take pride in our employees and
strive to always do what is fair and equitable for all.

Sincerely,

Lee B. Chaykin
Chief Operating Officer

LBC/ar

cc:    Michael G. Joseph, CEO
       Kim Jutras, CNO
       Rob Carrel, CFO
       Personnel File



P 006 798 711

**Receipt for**
**Certified Mail**
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

| | |
|---|---|
| Sent to Coreen Brown Diaz | |
| Street and No. 4041 nw 16 St. #102C | |
| P.O., State and ZIP Code Lauderhill, FL 33313 | |
| Postage | $ .33 |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, and Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | 11/10/99 |

PS Form 3800, June 1991



For: CHAYKIN,LEE B
    Mon Nov 8, 1999 4:53 pm

From: COREEN M. BROWN-DIAZ
Taken by: COREEN M. BROWN-DIAZ ()

RE CONFERENCE ON FRIDAY 11/5/99

I AM UNABLE TO GIVE YOU A RESPONSE RE THE CONVERSATION THAT WE HAD ON FRIDAY, UNTIL I
DISCUSS MATTERS WITH MY ATTORNEY.

THANK YOU FOR YOUR PATIENCE

COREEN M BROWN-DIAZ.
-----------------------------------------------------------------------------------
SENT TO: COREEN M. BROWN-DIAZ, LEE B CHAYKIN



For: MATHIS,LYNN                              From: LEE B CHAYKIN
     Thur Nov 18, 1999 8:04 am               Taken by: LEE B CHAYKIN ((954)452-2139)

please palce in your file
*******************************************************************************
Fri Nov 12, 1999 3:55 pm                          From: COREEN M. BROWN-DIAZ

RE 11/5/99

I HAVE SPOKEN WITH MY ATTORNEY, AND AT THIS TIME I HAVE BEEN ADVISED NOT TO ACCEPT YOUR
OFFER.   THANK YOU FOR YOU PATIENCE.

COREEN BROWN-DIAZ.

*******************************************************************************

For: BROWN-DIAZ,COREEN M.                    From: LYNN MATHIS
     Fri Nov 12, 1999 4:44 pm          Taken by: LYNN MATHIS (476-3996)

anytime it is convenient for you, any one of us can put the letters in your file
thank you.........
%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%
Fri Nov 12, 1999 3:52 pm                     From: COREEN M. BROWN-DIAZ

 GOOD AFTERNOON,

ON MONDAY,
IF AT ALL POSSIBLE I WOULD LIKE TO BRING TO YOU COPIES OF ACCOMODATIONS THAT I HAVE,
THAT ARE NOT IN MY FILE.  ITS POSSIBLE THAT THEY CAME DIRECTLY TO THE FLOOR WITHOUT
GOING THROUGH THE HR DEPT.

PLEASE LET ME KNOW IF THAT WOULD BE CONVEINENT FOR YOU, PLEASE LET ME KNOW

THANKS

COREEN M BROWN-DIAZ.

%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%



November 16, 1999

The enclosed documentation has been presented to Human Resources at the request of the employee, for inclusion in the personnel file. This documentation has no bearing on evaluation of performance as Administration has no knowledge of these documents.


Respectfully submitted,

Lynn Mathis
Director Human Resources

For Coleen Brown-Diaz

① Missing Bright ID's.
② Missing Green Card / Gift Certificate for a personal man for Her incentive & Fire Ski program
③ Missing Thankyou Letter from B.C.C. Instructor.

Personnel File



Front of the card

Thanks!



EXPRESSIONS
FROM
Hallmark



U.S.A. .99
Canada 1.29
JT 34 E

© HALLMARK CARDS, INC
KANSAS CITY, MO 64141
TORONTO, CANADA M6J 1P8
MADE IN U.S.A.

00345

www.hallmark.com

(Inside the card)

To the wonderful staff of Westside Regional Medical Center.

I am thankful to all of you ! for the kindness you've shown me.

P.S. I love the "Healing Waterfall" tape and thank you so much for taking the time to bring it to me on your day off !!.

Thank you, Karen, for bringing the games and taking the time to play with me.

May God bless you all !!

Rosa Ponte-Simpson
&
Ricardo Simpson

July 8, 1999

Card (+) gift



Thanks for being a great nurse.

We appreciate it.

Best regards,

Jeff & Susan Friedman

**GUEST PASS**

29TH ANNUAL
SOUTH FLORIDA INTERNATIONAL AUTO SHOW
**MIAMI BEACH CONVENTION CENTER**
October 8 through October 17, 1999

**SHOW HOURS**
5 P.M. to Midnight, Friday, October 8
11 A.M. to Midnight - Saturday, October 9 & 16
11 A.M. to 11 P.M. - Sunday, October 10
2 P.M. to 11 P.M. Mon.-Thurs., October 11-14
2 P.M. - Midnight - Friday, October 16
11 A.M. - 8 P.M., Sunday, October 17 • Box Offices Closes 1 Hour prior to show closing

**SOUTH FLORIDA'S OFFICIAL DEALER SPONSORED SHOW**
Foreign and Domestic Cars • Trucks • Million Dollar Alley
Memory Lane • Car Boutique • Prototypes
Holder of the ticket agrees to hold blameless and harmless the South Florida Auto-Truck Dealers Association, Inc.
in the event of personal injury, or loss or damage to property.

---

**GUEST PASS**

29TH ANNUAL
SOUTH FLORIDA INTERNATIONAL AUTO SHOW
**MIAMI BEACH CONVENTION CENTER**
October 8 through October 17, 1999

**SHOW HOURS**
5 P.M. to Midnight, Friday, October 8
11 A.M. to Midnight - Saturday, October 9 & 16
11 A.M. to 11 P.M. - Sunday, October 10
2 P.M. to 11 P.M. Mon.-Thurs., October 11-14
2 P.M. - Midnight - Friday, October 16
11 A.M. - 8 P.M., Sunday, October 17 • Box Offices Closes 1 Hour prior to show closing

**SOUTH FLORIDA'S OFFICIAL DEALER SPONSORED SHOW**
Foreign and Domestic Cars • Trucks • Million Dollar Alley
Memory Lane • Car Boutique • Prototypes
Holder of this ticket agrees to hold blameless and harmless the South Florida Auto-Truck Dealers Association, Inc.
in the event of personal injury, or loss or damage to property.

---

**GUEST PASS**

29TH ANNUAL
SOUTH FLORIDA INTERNATIONAL AUTO SHOW
**MIAMI BEACH CONVENTION CENTER**
October 8 through October 17, 1999

**SHOW HOURS**
5 P.M. to Midnight, Friday, October 8
11 A.M. to Midnight - Saturday, October 9 & 16
11 A.M. to 11 P.M. - Sunday, October 10
2 P.M. to 11 P.M. Mon.-Thurs., October 11-14
2 P.M. - Midnight - Friday, October 16
11 A.M. - 8 P.M., Sunday, October 17 • Box Offices Closes 1 Hour prior to show closing

**SOUTH FLORIDA'S OFFICIAL DEALER SPONSORED SHOW**
Foreign and Domestic Cars • Trucks • Million Dollar Alley
Memory Lane • Car Boutique • Prototypes
Holder of this ticket agrees to hold blameless and harmless the South Florida Auto-Truck Dealers Association, Inc.
in the event of personal injury, or loss or damage to property.

---

**GUEST PASS**

29TH ANNUAL
SOUTH FLORIDA INTERNATIONAL AUTO SHOW
**MIAMI BEACH CONVENTION CENTER**
October 8 through October 17, 1999

**SHOW HOURS**
5 P.M. to Midnight, Friday, October 8
11 A.M. to Midnight - Saturday, October 9 & 16
11 A.M. to 11 P.M. - Sunday, October 10
2 P.M. to 11 P.M. Mon.-Thurs., October 11-14
2 P.M. - Midnight - Friday, October 16
11 A.M. - 8 P.M., Sunday, October 17 • Box Offices Closes 1 Hour prior to show closing

**SOUTH FLORIDA'S OFFICIAL DEALER SPONSORED SHOW**
Foreign and Domestic Cars • Trucks • Million Dollar Alley
Memory Lane • Car Boutique • Prototypes
Holder of this ticket agrees to hold blameless and harmless the South Florida Auto-Truck Dealers Association, Inc.
in the event of personal injury, or loss or damage to property.

---

To: MCKAY, MARLENE M                              From: SUE WAKAT
    Fri Jan 28, 2000 4:23 pm          Taken by: SUE WAKAT (476-3940)

---

`t%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%`
Tue Jan 25, 2000 11:40 am                              From: DEBRA L BRINDLEY

Please read and advise Thanks
`t%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%`
Tue Jan 25, 2000 9:30 am                               From: WANDA S FOGARTY

Debi,  while visiting my pt. in 418 today, little frail lady she was motioning that she
needed to use the restroom, I put on her call light, then proceeded to try to find her
nurse.  Noted on the board it was Coreen's pt. found her, she asked that I locate the PCA,
Emma found her for me, she was busy, the desk, intercommed back to Coreen that she needed
to attend to the pt because PCA was busy, and Coreen walked in the room and in a very loud
voice was verbalizing "What is the point of these pts reps if they are not going to do
anything?"... she said it several times to another RN who walked in, , continuing ...
saying I am serious, what is the point of these Pts. Reps,  I was standing outside of 419
waiting for Dr. Sandler to leave, so of course I overheard the whole exchange.
I wore a new suit today to do WWW and I did not really want to take a pt. to the bathroom,
believing that surely there was staff to take care of this; besides not knowing if she was
even allowed out of bed.. She had green leaves on her door.  Most of the girls on 4 are
very nice, but this nurse is something.
Please clarify what your expectation would be in this circumstance.  Thanks, Wanda
--------------------------------------------------------------------------------
SENT TO: DEBRA L BRINDLEY, SUE WAKAT

`%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%`
--------------------------------------------------------------------------------
SENT TO: SUE WAKAT, KIM JUTRAS

`t%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%%`



**___ial Medical Center**

**COUNSELING / CORRECTIVE DISCIPLINE RECORD**

s form is to be used to record ALL details of a session during which an employee is instructed by a supervisor that a change in behavior is necessary

| Employee Name | Department: | Job Title | Date of Occurrence |
|---|---|---|---|
| Coreen Brown-Diaz | 614 | RN | 1/25/00 |

Detailed explanation of reason(s) for discussion. (Include what action was wrong and why it cannot continue.)

failure to maintain a professional work environment and exhibiting behavior which is contrary to the Hospital's best interests. Specifically, on 1/25 Coreen made a comment about a pt. rep to the effect that - "what is the point of these pt reps, if they are not going to do anything? (continuing) I am serious, what is the point of these pt reps. When I question by myself as to whether she made these statements, Coreen admitted she had. This undermines the mission of the Hospital to promote pt. satisfaction. Conduct that interferes with operations, discredits the Hospital or is

Instruction given to employee to correct action offensive to patients or fellow employees will not be tolerated.

Refrain from unprofessional conduct or any conduct that interferes with operations, discredits the Hospital, is contrary to the Hospital's best interests or is offensive to patients or fellow employees. Conduct self in a manner so as to promote the best interests of the hospital.

Anticipated supervisory action if act continues
Any further infraction of departmental or personnel policy will result in progressive disciplinary process.
K. Walton 1/26/00

| ACTION TAKEN | ☐ VERBAL REPRIMAND | ☐ WRITTEN REPRIMAND | Suspension - Beginning date ☒ YES 1/28/00 | Return to work Time / Day 2/1/00 | Report To 4th Floor |
|---|---|---|---|---|---|

Failure to change behavior as indicated, or involvement in other situations requiring formal discussion, may result in disciplinary actions, including suspension without pay or discharge, depending on the nature of the situation.

Any further infraction of departmental or personnel policy will result in progressive disciplinary process    Supervisor's Signature K. Walton    Date

A copy of this document will be placed in my personnel file. If I improve on this act within the necessary period, this notice will not be used in further disciplinary sessions with me, unless the violations are related. I understand that I have the right to appeal through formal grievance procedure. My signature indicates I have received a copy of this form.

Employee remarks

| Employee Signature | Date | Witness Signature (employee refused to sign) | Date |
|---|---|---|---|
| | | Employee chose not to sign. Sue Walton RN 1/28/00 | 1/28/00 |

1/28/00    1600
meeting with Mrs. Mathis, personnel (Human Resources director) and Sue Viakat 4th floor nurse manager.

re pt rep Wanda Fogarty
- this person a in attendance
- ~~and~~ I could not receive a copy of her e-mail
- none of witness again questioned (M. McKay)
- this is not the first time Mrs Fogarty has been unprofessional, rude, + discourteous. ~~RE~~ To myself + other Nursing staff. And that issue has been brought to the attention of the Nurse Manager S Viakat on numerous occasions. other staff members that have been witness to her behavior are Lisa Doyle (RN) + Susan Garrell (LPN) + Heather Ferguson (LPN).

Re: the comment that was made.
Asking McKay what is there purpose/function?
I stated well if they are stopping me from performing my job what is the point?

- When talking to Sue Viakat (Nurse Manager I asked her the question ~~that~~ in her office after confronting me about this. What is the point of having pt reps if they are stopping me from starting an iv (124-1) which happened to be a MD's mother. After assisting (418-2) to the ~~Ba~~ Bathroom + back to Bed. ~~#~~ Even that Docters mother made a comment about Mrs Fogardy's behavior.



EMPLOYEE GRIEVANCE REPORT
DATED 4/93

| Name | Department | Date Submitted |
|---|---|---|
| reen Brown-DIAX | 1614 Medical/Oncology | 2-2-2000 |

Previous steps of the grievance procedure been completed?    If yes, give date.
☐ YES  ☐ NO

**GRIEVANCE**  State CLEARLY and ACCURATELY all details concerned with your grievance. Be sure to include ALL dates and names of all concerned.

The disciplinary action of suspension that I received is done solely in retaliation to the lawsuit that I have filed against West Side Regional for discrimination. That was said to S. Wachat (acting 4th Floor Nurse Manager) is spoken in confidence in her office.

It's puzzling to me that on more than one occasion S. Fogarty has been rude & discourteous to other staff members in the presence of patients & thier families. Yet no disciplinary action has been brought against Ms. Fogarty.

**SOLUTION**  Indicate below what steps you think the company should take in order to satisfy this grievance.

I demand that this suspension be removed from my record & I receive the 3 days (1/28/00 - 1/31/00) back pay that I am entitled to. If the suspension is not removed I will file a suit with the EEOC. Because this suspension is purely a retaliary act which is contrary to my civil rights.

closures 12:00  Oreen Brown-Dix

I understand that if a settlement to my satisfaction is not reached. I may proceed to the next step in the grievance procedure.

Employee Signature
X

*Employee: Retain yellow copy for your records*

| This is to certify receipt of your grievance at this step of the Grievance Procedure. | Grievance is at step No. | Supervision Signature X |
|---|---|---|

For. BROWN-DIAZ,COREEN M.                     From: COREEN M. BROWN-DIAZ
        Mon Feb 7, 2000 4:24 pm        Taken by: COREEN M. BROWN-DIAZ ()

ADDENDUM TO GREIVANCE.

GOOD AFTERNOON MRS JUTRAS;

I FELT THAT IT WAS NECESSARY FOR ME TO PUT IN WRITING SOME OF THE EVENTS THAT I TALKED
TO YOU ABOUT IN YOUR OFC ON 2/2/00.

RE; MRS.FOGARTY

AGAIN LIKE I STATED TO YOU EARLIER, SHE STOPPED ME FROM PERFORMING MY DUTIES AS A RN.
I WAS IN 424-1 MRS KHAN, (A CARDIOLOGIST'S MOTHER). I WAS ATTEMPTING TO D/C A SALINE
LOCK AND RESITE HER IF POSSIBLE. JUST AS I WAS ABOUT TO D/C THE IV CATHETER MRS. FOGARTY
CAME AND IN A RUDE AND ABRUPT MANNER SAID " THAT PT OVER THERE NEEDS TO GO TO THE
BATHROOM". I STATED BACK TO MRS. FOGARTY WELL RIGHT NOW I'M IN THE MIDDLE OF SOMETHING
AND I CAN'T CAN YOU CALL HELEN (THE PCA) ON THE FLOOR.  AT THAT TIME MRS. FOGARTY LEFT
THE ROOM FOR ABOUT 30SECONDS AND THEN CAME BACK IN AND STATED SHE IS REFERRING TO THE
PCA IS BUSY AND THAT I NEED TO GO BECAUSE THAT PT IN 418-2 NEEDED TO USE THE
RESTROOM.  MRS. FOGARTY OBVIOUSLY SAW ME ATTEMPTING TO DO A PROCEDURE ON THIS OTHER PT
AND SHE CONT TO BE RUDE AND UNPROFESSIONAL.  MRS KHAN (THE PT IN 424-1) STATED "WHAT'S
WRONG WITH HER".  I MADE NO COMMENT, STOPPED WHAT I WAS DOING AND ASSISTED THE PT IN
418-2 TO THE BATHROOM.

MRS JUTRAS, ASSISTING THE PT TO THE BATHROOM WAS AND IS NOT THE ISSUE, I HAVE NO
PROBLEM WITH THAT WHAT SO EVER, THAT IS PART OF THE JOB.  HOWEVER I WAS NOT THE ONLY
PERSON ON THAT WING THAT MRS. FOGARTY COULD HAVE GONE TO.  MRS. FOGARTY WAS RUDE AND
UNPROFESSIONAL AND DISCOURTEOUS.  ALSO NOTING THAT THIS WAS AND HAS NOT BEEN THE FIRST
TIME THAT MRS. FOGARTY HAS DISPLAYED LESS THAN APPROPRIATE BEHAVIOR TOWARDS STAFF
MEMBERS. AND IF YOU WOULD LIKE TO QUESTION THOSE STAFF MEMBERS THEY ARE S.GORRELL(LPN)
L. DOYLE (RN) AND A. FERGUSON (LPN) AND MYSELF.  THIS ISSUE HAS BEEN BROUGHT TO THE
ATTENTION TO S. WAKAT (4TH FLOOR MANAGER) ON NUMEROUS OCCAISONS.

PLEASE FEEL FREE TO CONTACT ME IF YOU HAVE ANY QUESTIONS.

THANK YOU FOR YOUR TIME


COREEN BROWN-DIAZ.
-----------------------------------------------------------------------------------------
SENT TO: KIM JUTRAS, COREEN M. BROWN-DIAZ



## FLORIDA HUMAN RELATIONS COMMISSION

CCREEN DIAZ,

        Complainant,

-against-

                                          **VERIFIED COMPLAINT**

CCLUMEIA HCSPITAL CORPORATICN
CF SCUTH BRCWARD, AND COLUMBIA
HCSPITAL CORPORATION OF SOUTH
FLCRIDA,

        Respondent.

_____/

    1.    I am the complainant in the above referenced matter. I was born February 5. 1971. I reside at 4041 NW 16ᵗʰ Street, Unit 102C Lauderhill FL 33313 Tel: (954) 746-5335 and SS# 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. I am an employee as defined by the Florida Civil Rights Act of 1992 (FCRA) and the Civil Rights Act of 1964 in that I complained about protected activity and was retaliated against by respondents.

    2.    The respondents are employers as defined by the FRCA and Title VII. It's principal address is 8201 West Broward Blvd., Plantation FL 33324 Tel : 473-6600

    3.    Complainant commenced her employment as a patient care assistant while completing her degree as a registered nurse. Even though she was a current employee of the facility, she was advised by the hospital that she could not complete her internship with the hospital but needed to go through Broward Community College Internship which was an unpaid position and in fact required her to pay for the internship. However, at least two caucasian nurses were treated more favorably by allowing them to train directly at the hospital and to receive compensation. When Ms. Diaz inquired as to the basis for the difference in treatment, and other



matters, her inquiry was met with deaf ears.

4.    Since her complaints (both oral and in writing), she has been retaliated against by having her work closely monitored, having her job threatened for not being a "team player", receiving an unfounded reprimand and attempting to have an employee prepare a false statement concerning her. This has resulted in Ms. Diaz suffering a substantial amount of stress and emotional harm.

5    Subsequently, complainant repeated her complaints of discrimination and retaliation and has filed a lawsuit.

6    On or about January 28, 2000, complainant was again suspended for a pretexual reason in retaliation for her protected activity.

7.    In addition, complainant was also retaliated against by having her work closely scrutinized and otherwise being subjected to different terms and conditions of employment.

8.    As a result, I charge respondents with denying me with equal terms, conditions and privileges of employment by reason of retaliation in violation of Title VII and FCRA.

9.    I herein authorize the Florida Human Relations Commission to dually file this complaint with the EEOC.

_COREEN DIAZ_

STATE OF FLORIDA      )
                            ) ss.

COUNTY OF BROWARD    )

        On this 14TH day of February, 2000. before me. the undersigned Notary Public of the State of Florida, personally appeared COREEN DIAZ and produced a Florida's Drivers License as identification and being by me first duly sworn, deposes and says that he executed the foregoing Affidavit and that the facts are true and correct to the best of his knowledge and belief.

NOTARY PUBLIC, STATE OF
FLORIDA AT LARGE

Stewart L Kanin
My Commission CC838297
Expires May 18, 2003

```
For: MATHIS,LYNN                        From: SUE WAKAT
     Tue Feb 8, 2000 5:31 pm       Taken by: SUE WAKAT (476-3940)
```

This is what I received from Coreen
₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮
Tue Feb 8, 2000 2:57 pm                      From: COREEN M. BROWN-DIAZ

2-8-2000
I WAS UNABLE TO GO TO LUNCH TODAY, DUE TO THE FACT THAT I WAS EXTREMELY BUSY TODAY.
THIS MORNING I TOOK AND RECORDED ALL THE VITAL SIGNS ON 17PT'S THIS AM.  AND STARTED
AM CARE ON 7 OF THE 17 PT'S THIS AM DIE TO THE FACT THAT MY PCA WAS SITTING ON ANOTHER
WING, WHILE MY WING WAS UNATTENDED. THAT LEFT NO TIME FOR ME AND MY COLLEGUES TO START
OUR OTHER NURSING RESPONSIBITIES FOR THE DAY. THIS WAS DONE IN ORDER TO APPEASE SOME
FAMILY MEMBERS THAT WERE THREATENING TO GO TO ADMINISTRATION THIS AM.  I BROUGHT THIS
INFO TO YOUR ATTENTION AND INFORMED YOU OF EXACTLY WHAT ME AND MY COLLEGUES WERE DOING
AND YOU MADE NO INFERENCE ABOUT RELAYING THIS INFO TO THE CHARGE NURSE. AS A MATTER OF
FACT SHE WAS NOT AVAILABLE AT THE TIME. THE ONLY 2 PERSON'S AT THE DESK WERE MYSELF AND
THE UNIT SECRETARY.  WHEN I WAS ABLE TO ASK  THE CHARGE NURSE ABOUT "HOW COME MY PCA
CAN SIT AND NO ONE OFFERS OR TELLS THE OTHER PCA'S TO SPLIT UNTIL THE SITTER COMES IN?"

ANOTHER POINT WHEN THE SITTER CAME TO THE FLOOR, IT WAS ME WHO SET UP THE VIDEO, IT WAS
ME WHO SHOWED HER WHERE SHE HAS TO SIT. AND THIS WASN'T EVEN ON MY ASSIGNED SIDE.

IN REVIEW I CAN'T INFORM THE CHARGE NURSE IF SHE IS NOT THERE AND YOU ARE ON THE PHONE
WITH ME. IF I HAD WAITED AND NOT TOLD ANYONE WHAT THE COMPLAINTS WERE. THEN I WOULD'VE
ASKED "HOW COME YOU DIDN'T TELL ANYONE WHAT WAS GOING ON" OR "WHY ARE THESE FAMILIES
GOING TO ADMINISTRATION".

PS. PLEASE PAY ME FOR MY LUNCH TODAY, SINCE I WAS UNABLE TO TAKE IT.
------------------------------------------------------------------------------------
SENT TO: SUE WAKAT, COREEN M. BROWN-DIAZ, MARLENE M MCKAY, ALISHA M. FERGUSON
```



₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮₮



March 14,2000

To Whom It May Concern:

For the past three and a half years I've been employed at Westside Regional Medical Center. The staff on the Medical/Oncology floor are the greatest, they are like a second family to me.

I enjoy every aspect of nursing. There have been so many times that I have gone above and beyond the call of duty, because I have a genuine interest in the total well being of my patients and their families.

However, the emotional stress, due to what I perceive as retaliatory acts because of my pending lawsuit involving discrimination. I find it necessary to resign from my position effective immediately.

Respectfully Yours,

Coreen Brown-Diaz R.N.

cc

Nurse Manager
Human Resources
Nursing supervisor
Personnel file.



# TENET.

## APPLICATION FOR EMPLOYMENT

TENET HEALTHCARE CORPORATION OFFERS EQUAL EMPLOYMENT
OPPORTUNITY TO ALL APPLICANTS FOR EMPLOYMENT AND TO ALL EMPLOYEES
REGARDLESS OF SEX, AGE, RACE COLOR, RELIGIOUS CREED, NATIONAL
ORIGIN, ANCESTRY, MARITAL STATUS, SEXUAL ORIENTATION, OR DISABILITY.

**PLEASE PRINT PLAINLY**

### PERSONAL DATA

Date 3/1/00

Name **Brown-Diaz Coreen**
Last Name / First Name / Initial

Social Security No. 167586939

Present Address **2650 NW 60 Way**
Street Number and Name

Telephone (954) 746-5335

**Sunrise** **Fl** **33313**
City / State / Zip Code

Message Telephone (954) 485-6550

Other names under which you have worked N/A

Are you a U.S. citizen or authorized to work in the U.S. on an unrestricted basis? ☑ Yes ☐ No

Can you, after employment, submit:
Proof of your legal right to work in the U.S.? ☑ Yes ☐ No

Have you ever been convicted of a felony? ☐ Yes ☑ No

If yes, please give the date, location, and disposition of your case.

RECEIVED
MAR - 2 2000
HOLLYWOOD MEDICAL CENTER
HUMAN RESOURCES

### IN CASE OF EMERGENCY PLEASE CALL:

Name: **Marjorie Carter** Relationship: **Mother** Business Phone: 797-4800

Address: **4045 NW 16 st** Home Phone: 485-6550

### POSITION DESIRED

Position(s) applied for **RN; Critical Care Internship** Salary requirement $17-18 per hour

I understand that applicants who do not meet the minimum qualifications of the position will not be considered for the position. Only those final candidates will be contacted.

Specify: ☑ Full - time ☐ Part - time ☐ Per diem
Days and hours preferred **7A - 7p or 7A - 3pm**

Were you previously employed by Tenet Healthcare Corporation, National Medical Enterprises, Inc., American Medical International, Inc. or one of its subsidiaries? ☐ Yes ☑ No

If yes, when and where? _____

Names of relatives employed by Tenet Healthcare Corporation **N/A**

If an offer is extended, when would you be available for work? **Within 2 weeks**

How did you become aware of the position for which you are applying? Please give individual or source **Gary Calderon**

Do you have a reliable method of transportation to use if you are hired to work in this facility? ☑ Yes ☐ No

### EMPLOYMENT HISTORY (Must be completed in full.)

Are you presently employed? ☑ Yes ☐ No

May we contact your present employer? ☑ Yes ☐ No

List on page 2 your work experience beginning with most recent job.

| From | To | NAME AND ADDRESS OF EMPLOYER | | JOB TITLE & DUTIES |
|---|---|---|---|---|
| | | Name All About Staffing Agency | | RN, assessing pt, performing therapies as ordered by the doctor. |
| | Present | Address 12701 W Sunrise Blvd | | |
| | | City Sunrise  State Fl  Zip 33311 | | |
| Starting Salary $25 per hour | Final Salary | Supervisor J. McNiff  Ph. 858-1833 | | Reason for Leaving Still employed. |

| From | To | NAME AND ADDRESS OF EMPLOYER | | JOB TITLE & DUTIES |
|---|---|---|---|---|
| Mo./Yr. | Mo./Yr. | Name West Side Regional | | Team Leader Nursing assign pt to AiDe, LPN, + myself, assist the Charge Nurse provide pt care |
| 8/97 | present | Address 8201 W. Broward Blvd | | |
| | | City Plantation  State Fl  Zip 33324 | | |
| Starting Salary 16 per hr | Final Salary 17.05 | Supervisor Marlene McKay  Ph. 476-3940 | | Reason for Leaving Still employed |

| From | To | NAME AND ADDRESS OF EMPLOYER | | JOB TITLE & DUTIES |
|---|---|---|---|---|
| Mo./Yr. | Mo./Yr. | Name | | |
| | | Address | | |
| Starting Salary | Final Salary | City  State  Zip | | |
| | | Supervisor  Ph. | | Reason for Leaving |

| From | To | NAME AND ADDRESS OF EMPLOYER | | JOB TITLE & DUTIES |
|---|---|---|---|---|
| Mo./Yr. | Mo./Yr. | Name | | |
| | | Address | | |
| Starting Salary | Final Salary | City  State  Zip | | |
| | | Supervisor  Ph. | | Reason for Leaving |

| From | To | NAME AND ADDRESS OF EMPLOYER | | JOB TITLE & DUTIES |
|---|---|---|---|---|
| Mo./Yr. | Mo./Yr. | Name | | |
| | | Address | | |
| Starting Salary | Final Salary | City  State  Zip | | |
| | | Supervisor  Ph. | | Reason for Leaving |

## EDUCATION AND TRAINING

| Name of school and address | No. of years | Course or major | Diploma/Degree |
|---|---|---|---|
| Broward Community College | 2 | Nursing | A.S. Degree |
| Nova Southeastern | 6 months | Undecided. | Not yet |

Professionals and technical applicants only

| Professional License No. | Type of License | Place of issue | Expiration date |
|---|---|---|---|
| 3191912 | RN | Florida | 7-31-00 |

Membership in professional organizations

If you are licensed, has your license ever been suspended or revoked or are you currently involved in any proceeding that could affect your license or certification? ☐ Yes ☑ No  If yes, please give the date, location, and disposition of your case. _____

## REFERENCES (PLEASE DO NOT LIST RELATIVES)

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Barbara Johnston RN | 7725 Biltmore Blvd | 963-0697 |
| Alisha Ferguson LPN | 1925 NW 19st #Q106 | 466-2995 |
| Maria Gonzalez RN | 2201 NW 60 way | 721-8745 |

e space below for any additional information necessary to describe your full qualifications (i.e., specialty areas such as ICU, special equipment, typing speed, computer software programs).

*Basic Chemotherapy Administration Certified.*
*IV technical skills Level II Certified.*

Do you speak, read or write in any language other than English?

☑ Yes    ☐ No    If yes, please describe *Spanish*

## PLEASE READ CAREFULLY

PLEASE DO NOT RESPOND TO THE FOLLOWING QUESTIONS UNTIL AFTER YOU HAVE READ AND / OR DISCUSSED THE JOB DESCRIPTION OF THE POSITION FOR WHICH YOU ARE APPLYING.

Do you believe you would be able to perform the essential functions of the job for which you are applying?
Answer yes or no.    ☐ Yes    ☐ No

Is there any accomodation that you believe can reasonably be made which would permit you to perform the essential functions of the job for which you are applying? Answer yes or no.    ☐ Yes    ☐ No

Please explain your answer. _____

I hereby certify that the answers to the foregoing questions are true to the best of my knowledge and agree to have any of the statements checked by Tenet Healthcare Corporation unless I have indicated to the contrary.

I am aware that a more detailed investigation concerning background and credit may also be conducted, if applicable to the job for which I am applying, and I hereby authorize such an investigation.

I understand that employment is contingent upon satisfactory completion of reference checks and that, upon my written request, information on the nature and scope of an inquiry, if one is made, will be provided to me.

Should a job offer be made, I consent to taking a pre-placement physical examination and such future examinations as may be required by Tenet Healthcare Corporation. I understand that any job offer or my continuing employment, if hired, is contingent upon my being physically, mentally and medically able, with or without reasonable accommodation, to successfully perform the essential functions of my job. I agree that the results of my medical / health screen may be released to appropriate agencies in the event of a worker's compensation injury and / or dispute on payment of a medical claim. I understand that as part of my pre-placement physical examination, upon which any offer of employment is contingent, I will be required to successfully pass a drug screening test. The test will be administered at Tenet Healthcare Corporation's expense, and will require me to provide a urine specimen for analysis. The urine specimen will be analyzed for the presence of marijuana, cocaine, phencyclidine (PCP), opiates and amphetamines. Results of the drug test are confidential, and will not be disclosed to others without my specific written consent. My signature below specifically signifies my consent to this pre-placement drug screening test.

I agree to wear or use all protective clothing or devices required by the facility and to comply with all safety policies and procedures.

I understand that nothing contained in this employment application is intended to lead to or create an employment contract between Tenet Healthcare Corporation or any subsidiary or affiliate and myself which would in any way restrict the right of the company to terminate my employment at will.

I further understand and agree that the employment relationship that may result from my application will be employment-at-will, and either I or Tenet Healthcare Corporation or any subsidiary or affiliate may terminate the relationship at any time.

I understand that any omission, misrepresentation or falsification can be grounds for refusal of employment. I further understand that, if employed, any false statements or misrepresentations herein or in conjunction with the application process may be cause for dismissal.

I understand that any and all disputes regarding my employment with Tenet, including any disputes relating to the termination of my employment, are subject to the Tenet Fair Treatment Process, which includes final and binding arbitration, and I also understand and agree, as a condition of employment and continued employment, to submit any such disputes for resolution under that process, and I further agree to abide by and accept the decision of the Arbitration panel as the final and binding decision and resolution of any such disputes I may have

3-1-2002

# HOLLYWOOD
## Medical Center

Tenet South Florida HealthSystem

3600 Washington Street
Hollywood, Florida 33021
Tel 954.966.4500

March 3, 2000

Coreen Brown-Diaz
2650 NW 60 Way
Sunrise, FL 33313

Dear Coreen:

Hollywood Medical Center (HMC) is pleased to offer you the Full Time position of Registered Nurse in our Critical Care Department. Your hourly salary will be $14.00 during the preceptor program. Upon successful completion of the program, your hourly salary will be 16.99, plus shift differential.

In accordance with HMC's policy to provide a safe, healthy, and efficient drug/alcohol free work environment, you must consent to a post-offer of employment drug test which will be administered at Smith Kline Laboratories at your earliest convenience. You must also consent to a post-offer of employment health screening examination which will be administered at HMC.

This offer of employment is contingent upon successful completion of the above post-offer of employment tests and presentation of original documentation demonstrating your identity and authorization to work in the United States and attestation under penalty of perjury as to your right to work in the United States. **Your initial start date will be confirmed, via telephone, by a Human Resources Department representative. Pending clearance from Human Resources and employee health, orientation will be held on Monday, April 3, 2000, from 8:00am - 4:30pm in the hospital auditorium.**

The terms and conditions of employment contained in this letter and in the contents that will be discussed with you at orientation is not a contract or employment guarantee, but will be acknowledged, understood, accepted and agreed to by your signature below.

If you have any questions, please feel free to give me a call at 954-985-6254.

Sincerely,

Gerry S. Falchick
Human Resources Director

Acknowledge: Coreen M Brown-Di

Date: 3-13-00



# HOLLYWOOD
Medical Center

Tenet South Florida HealthSystem

3600 Washington Street
Hollywood, Florida 33021
Tel 954.966.4500

## HOLLYWOOD MEDICAL CENTER
## PROMISSORY NOTE - Preceptor Program

**THIS AGREEMENT**, made and executed on this ___3___ day of ___13___, 2000 between Hollywood Medical Center and <u>Coreen Brown-Diaz</u> a Registered Nurse here in after referred to as "Nurse".

**WHEREAS**, the Nurse is qualified to practice as a Nurse in the State of Florida; and
**WHEREAS**, the Nurse desires to become eligible to work in a Critical Care area, and Hollywood Medical Center desires to provide the necessary training to the Nurse, per the following terms and conditions hereinafter set forth.

**NOW, THEREFORE**, it is agreed as follows:

**EDUCATION**: Hollywood Medical Center agrees to provide education related to Critical Care Nursing, the Nurse agrees to attend the required classroom instruction and preceptorship. In return for the institution bearing the expense of this training, the Nurse promises to be employed at Hollywood Medical Center as a Nurse for a minimum of two (2) years, hours including authorized non-productive hours, i.e., holidays and vacation. The working paid hours commences upon completion of the course and will be completed in twenty-four months by a full time staff nurse, or in the case of a per diem nurse, unless these time frames are extended by the Director of Human Resources and the Assistant Administrator, Patient Care Services.

**TERMS**: The charge for nurses taking the Critical Care course is five thousand dollars ($5,000.00). This amount is being advanced to the Nurse and this debt will be forgiven after the successful completion of two (2) years of satisfactory or above average performance of a nurse. This agreement does not preclude termination of the Registered Nurse for poor performance or cause should this action become necessary. Should the Nurse leave employment, the debt of five Thousand dollars ($5,000.00) will become due and payable upon termination of employment, pro rated when applicable and a payment schedule arranged.

_Brenda Garcia_
**Education Dept./HR Dept.**

_Coleen M Brown-De_
**Registered Nurse**

_3-13-00_
**Date**

_3-13-00_
**Date**







# HOLLYWOOD
## Medical Center
Tenet South Florida HealthSystem

3600 Washington Street
Hollywood, Florida 33021
Tel 954.966.4500

**PROMISSORY NOTE**

**$5,000**                                                          **Hollywood, FL.**

**FOR VALUE RECEIVED, I** Coreen Brown-Diaz hereby promise to pay to the order of
**HOLLYWOOD MEDICAL CENTER,** located at **3600 Washington Street,** in lawful money
of the United States of America, the principal sum of Five thousand dollars ($5,000.00*) if I
resign my position within two years of employment succeeding the completion of this training.

I hereby waive demand, presentment for payment, dishonor.  Notice of dishonor, protest and
notice of protest, and agree to pay all expenses incurred in collecting the same, including
reasonable attorneys' fees, in the event this note shall not be paid on demand as herein provided.

This note is non-transferable.

DATE: 3 – 13-00

_____                    _____
Employee Signature                                  Witness

*Amount will be prorated from date of hire.

